No. 16-4687

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

HAMZA KOLSUZ
*Defendant/Appellant.*

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. T. S. Ellis, III)

JOINT APPENDIX

VOLUME I of I

**DANA J. BOENTE**
**United States Attorney**

**Heather Alpino**
**Special U.S. Assistant Attorney**
**Counsel for Appellee**
**2100 Jamieson Avenue**
**Alexandria, VA 22314**
**(703) 299-3700**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Todd M. Richman**
**Assistant Federal Public Defender**
**Counsel for Appellant**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**

This page intentionally left blank for double-sided pagination and printing

# TABLE OF CONTENTS

District Court docket sheet (as of February 27, 2017). . . . . . . . . . . . . . . . . . . . . . 1

Indictment (March 2, 2016, Doc. 9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Motion to Suppress Evidence (March 30, 2016, Doc. 19). . . . . . . . . . . . . . . . . 27

Government's Response in Opposition to Defendant's Motion to
    Suppress Evidence Seized from Defendant's Cellular Phone
    (April 6, 2016, Doc. 20). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    Exhibit 1 (email) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Defendant's Reply in Support of Motion to Suppress
    (April 14, 2016, Doc. 22). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Joint Stipulation of Facts for Suppression Hearing
    (April 19, 2016, Doc. 25). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    Exhibit 1 (email). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    Exhibit 2 (CBP report re: 2013 stop at JFK). . . . . . . . . . . . . . . . . . . . . . . 101

    Exhibit 3 (CBP report re: 2012 stop and 2013 seizure). . . . . . . . . . . . . . . 106

    Exhibit 4 (Dep't of State memorandum). . . . . . . . . . . . . . . . . . . . . . . . . . 113

    Exhibit 5 (CBP report re: outbound inspection on jetway) . . . . . . . . . . . . 117

    Exhibit 6 (second CBP report re: outbound inspection on jetway). . . . . . . 120

    Exhibit 7 (Coppolo report of investigation re: search of iPhone). . . . . . . . 130

Transcript, Suppression Hearing (April 29, 2016, Doc. 27). . . . . . . . . . . . . . . 131

    Government's evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

Adam Coppolo               Direct examination. . . . . . . . . . . . . . .  141
                           Cross examination. . . . . . . . . . . . . . . .  145
                           Redirect examination.. . . . . . . . . . . . . .  150

Defendant's argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  152

Government's argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  160

Defendant's rebuttal argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  168

Ruling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  177

Order (denying motion) (April 29, 2016, Doc. 29).. . . . . . . . . . . . . . . . . . .  189

Memorandum Opinion (denying motion) (May 5, 2016, Doc. 30). . . . . . . . . .  190

Findings of Fact and Conclusions of Law (June 23, 2016, Doc. 52). . . . . . . . .  215

Transcript (bench verdict) (July 1, 2016, Doc. 79).. . . . . . . . . . . . . . . . . . . .  245

Order (bench verdict) (July 1, 2016, Doc. 55). . . . . . . . . . . . . . . . . . . . . . . .  260

Judgment (October 7, 2016, Doc. 71). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  262

Notice of Appeal (October 21, 2016, Doc. 73). . . . . . . . . . . . . . . . . . . . . . . .  268

APPEAL,CLOSED,INTERPRETER

# U.S. District Court
# Eastern District of Virginia - (Alexandria)
## CRIMINAL DOCKET FOR CASE #: 1:16-cr-00053-TSE All Defendants

Case title: USA v. Kolsuz

Magistrate judge case number: 1:16-mj-00059-MSN

Date Filed: 03/02/2016

Date Terminated: 10/07/2016

---

Assigned to: District Judge T. S. Ellis, III

Appeals court case number: 16-4687

### Defendant (1)

**Hamza Kolsuz**
*TERMINATED: 10/07/2016*

represented by **Todd M. Richman**
Office of the Federal Public Defender (Alexandria)
1650 King St
Suite 500
Alexandria, VA 22314
(703) 600-0800
Email: todd_richman@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender*

**Erica Lynn Marshall**
Cause of Action
1875 Eye Street,NW
Suite800
Washington, DC 20006
202-803-6068
Fax: 202-330-5842
Email: erica.marshall@causeofaction.org
*ATTORNEY TO BE NOTICED*

### Pending Counts

18:371 Conspiracy to Commit an Offense Against the United States (FORFEITURE)
(1)

22:2778(b)(2) and 2778(c) and 22 CFR

### Disposition

30 months (on each of counts 1 & 2) to run concurrent, 3 years SR (on each of counts 1 & 2) to run concurrent and w/ special conditions, Order of Forfeiture, $200.00 SA ($100.00 as to each count)

30 months (on each of counts 1 & 2) to

**J.A. 1**

121.1, 123.1, and 127.1 Attempt to
Export Defense Articles Without
License (FORFEITURE)
(2)

run concurrent, 3 years SR (on each of
counts 1 & 2) to run concurrent and w/
special conditions, Order of Forfeiture,
$200.00 SA ($100.00 as to each count)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

18:554(a) Smuggling Goods from the
United States (FORFEITURE)
(3)

**Disposition**

DISMISSED ON GOVERNMENT'S
MOTION 10/7/2016

**Highest Offense Level (Terminated)**

Felony

**Complaints**

22:2778(b) and (c) and
22 CFR Parts 121 and 127 Attempt to
export defense articles without a license

**Disposition**

---

**Plaintiff**

**USA**                                   represented by   **Heather Alpino**
                                                          US Attorney's Office (Alexandria-NA)
                                                          2100 Jamieson Avenue
                                                          Alexandria, VA 22314
                                                          **NA**
                                                          703-299-3700
                                                          Email: heather.alpino2@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: US Attorney*

                                                          **Dennis Fitzpatrick**
                                                          United States Attorney's Office
                                                          2100 Jamieson Ave
                                                          Alexandria, VA 22314
                                                          (703) 299-3954
                                                          Email: dennis.fitzpatrick@usdoj.gov
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Karen Ledbetter Taylor**
                                                          United States Attorney's Office

**J.A. 2**

2100 Jamieson Ave
Alexandria, VA 22314
NA
703 299-3700
Email: Karen.Taylor2@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/04/2016 | 1 | COMPLAINT as to Hamza Kolsuz (1). (lbru, ) [1:16-mj-00059-MSN] (Entered: 02/04/2016) |
| 02/04/2016 | 2 | AFFIDAVIT by USA as to Hamza Kolsuz (lbru, ) [1:16-mj-00059-MSN] (Entered: 02/04/2016) |
| 02/04/2016 | | **Turkish Interpreter requested** in case as to Hamza Kolsuz (lbru, ) [1:16-mj-00059-MSN] (Entered: 02/04/2016) |
| 02/04/2016 | | **Interpreter Information: Betal Agcayazi** (Court Interpreting Services) is the Interpreter. Turkish is the type of language required. Appointment is set for 2/4/16 @ 2:30 pm for a Initial Appearance. (krob, ) Modified on 2/4/2016 (lbru, ). [1:16-mj-00059-MSN] (Entered: 02/04/2016) |
| 02/04/2016 | 4 | Redacted Criminal Case Cover Sheet (lbru, ) [1:16-mj-00059-MSN] (Entered: 02/04/2016) |
| 02/04/2016 | | Arrest of Hamza Kolsuz (wgar, ) [1:16-mj-00059-MSN] (Entered: 02/04/2016) |
| 02/04/2016 | 5 | Minute Entry for proceedings held before Magistrate Judge John F. Anderson:Initial Appearance as to Hamza Kolsuz held on 2/4/2016. US appeared through: Heather Alpino. Deft appeared without counsel and with Turkish interpreter: Betal Agcayazi. Deft informed of rights, charges, and penalties. Court to appoint counsel. Gov't is seeking detention: GRANTED pending PH/DH. Detention and Preliminary Hearing set for 2/8/2016 at 02:00 PM in Alexandria Courtroom 400 Magistrate Judge Michael S. Nachmanoff. Deft remanded to the custody of the USMS. (Tape #FTR.)(wgar, ) [1:16-mj-00059-MSN] (Entered: 02/04/2016) |
| 02/04/2016 | | ORAL ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Hamza Kolsuz - Todd M. Richman for Hamza Kolsuz appointed. Entered by Magistrate Judge John F. Anderson on 02/04/2016. (wgar, ) [1:16-mj-00059-MSN] (Entered: 02/04/2016) |
| 02/04/2016 | 6 | Temporary Detention Order as to Hamza Kolsuz. Signed by Magistrate Judge John F. Anderson on 02/04/2016. (wgar, ) [1:16-mj-00059-MSN] (Entered: 02/04/2016) |
| 02/05/2016 | | **Interpreter Information: Betal Agcayazi** (Court Interpreting Services) is the Interpreter. Turkish is the type of language required. Appointment is set for 2/08/2016 @ 2:00 for a Detention and Preliminary Hearing (lbru, ) [1:16-mj-00059-MSN] (Entered: 02/05/2016) |

| 02/08/2016 | 7 | Minute Entry for proceedings held before Magistrate Judge Michael S. Nachmanoff:Preliminary Hearing as to Hamza Kolsuz held on 2/8/2016. US appeared through: Heather Alpino and Karen Taylor. Deft appeared w/counsel: Todd Richman and w/Turkish interpreter Betal Agcayazi. Govt adduced evidence - Rests. Affidavit entered into evidence as Govt's Exhibit #1. Court finds PC. Matter continued for further proceedings before the Grand Jury. Detention Hearing as to Hamza Kolsuz held on 2/8/2016. Deft does not seek release at this time. Deft remanded. (Tape #FTR.)(cmar, ) [1:16-mj-00059-MSN] (Entered: 02/08/2016) |
| --- | --- | --- |
| 02/08/2016 | 8 | ORDER OF DETENTION as to Hamza Kolsuz. Signed by Magistrate Judge Michael S. Nachmanoff on 02/08/16. (cmar, ) [1:16-mj-00059-MSN] (Entered: 02/09/2016) |
| 03/02/2016 | 9 | INDICTMENT as to Hamza Kolsuz (1) count(s) 1, 2, 3. (lbru, ) (Entered: 03/02/2016) |
| 03/02/2016 | 12 | Redacted Criminal Case Cover Sheet (lbru, ) (Entered: 03/02/2016) |
| 03/02/2016 | 13 | NOTICE OF ATTORNEY APPEARANCE: Erica Lynn Marshall appearing for Hamza Kolsuz (Marshall, Erica) (Entered: 03/02/2016) |
| 03/03/2016 |  | Set Hearing as to Hamza Kolsuz: Arraignment set for 3/11/2016 at 11:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (rban, ) (Entered: 03/03/2016) |
| 03/04/2016 |  | **Interpreter Information: Mesut Fikret Polat** (Court Interpreting Services_ is the Interpreter. Turkish is the type of language required. Appointment is set for 3/11/16 @ 11:00 am for a Arraignment. (krob, ) (Entered: 03/04/2016) |
| 03/11/2016 | 14 | Minute Entry for proceedings held before District Judge Gerald Bruce Lee:Arraignment as to Hamza Kolsuz (1) Count 1,2,3 held on 3/11/2016 Deft WFA, PNG and demanded a jury trial. Jury Trial set for 5/16/2016 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. 2 days. Motion Hearing set for 4/15/2016 at 09:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. Motions are due 3/30/16. Responses due 4/6/16. Parties to call the trial judge's chambers to set a non-Friday date for any evidentiary hearing that may be necessary, and notice it later for the non-Fri. date T.B.D. Discovery Order entered and filed. Case to be REASSIGNED to another judge. Appearances: Heather Alpino, Dennis Fitzpatrick for gov't; Deft w/ counsel, Todd Richman and Erica Marshall; Turkish interpreter Mesut Polat. Deft remanded. (Court Reporter R. Wilson.)(tbul, ) Modified on 3/14/2016 (tbul, ). (Entered: 03/14/2016) |
| 03/11/2016 | 15 | WAIVER of Speedy Trial filed in open court by Hamza Kolsuz (/s/ by Judge Lee) (tbul, ) (Entered: 03/14/2016) |
| 03/11/2016 | 16 | Agreed Discovery Order entered and filed in open court as to Hamza Kolsuz. /s/ by District Judge Gerald Bruce Lee on 3/11/16. (tbul, ) (Entered: 03/14/2016) |
| 03/14/2016 | 17 | ORDERED that Defense motions shall be due by 3/30/2016, the Government's |

J.A. 4

| | | response shall be due by 4/6/2016, and the motions hearing date shall be set for 4/15/2016; that a two day jury trial shall be set for 5/16/2016- 5/17/2016; that as a result of scheduling conflicts with other matter before the Court the Clerk's Office is directed to reassign the case to another judge. Signed by District Judge Gerald Bruce Lee on 3/11/2016. (tbul, ) (Entered: 03/14/2016) |
|---|---|---|
| 03/14/2016 | | Case as to Hamza Kolsuz Reassigned to District Judge T. S. Ellis, III. District Judge Gerald Bruce Lee no longer assigned to the case. (tbul, ) (Entered: 03/14/2016) |
| 03/14/2016 | | Set/Reset Deadlines re Motion or Report and Recommendation in case as to Hamza Kolsuz, Set/Reset Hearings as to Hamza Kolsuz: Motion Hearing set for 4/15/2016 at 09:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Jury Trial set for 5/16/2016 at 10:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (tbul, ) (Entered: 03/14/2016) |
| 03/17/2016 | 18 | Subpoena issued (lbru, ) (Entered: 03/17/2016) |
| 03/30/2016 | 19 | MOTION to Suppress *Evidence* by Hamza Kolsuz. (Marshall, Erica) (Entered: 03/30/2016) |
| 04/06/2016 | 20 | RESPONSE in Opposition by USA as to Hamza Kolsuz re 19 MOTION to Suppress *Evidence* (Attachments: # 1 Exhibit 1)(Alpino, Heather) (Attachment 1 replaced on 4/7/2016) (krob, ). (Entered: 04/06/2016) |
| 04/12/2016 | 21 | ORDER re 19 MOTION to Suppress *Evidence* filed by Hamza Kolsuz. ORDERED that the oral argument currently scheduled for 9:00 a.m., Friday, April 15,2016, is CANCELLED. ORDERED that oral argument on defendant's motion to suppress is SCHEDULED for 2:00 p.m., Friday, April 29, 2016. It is further ORDERED that the parties are each DIRECTED to advise the Court by 5:00 p.m., Monday, April 18, 2016, whether either party intends to present any witnesses at the April 29, 2016 hearing, and if so, the names of the witnesses and an estimate of the time required for each witness' testimony as to Hamza Kolsuz. Signed by District Judge T. S. Ellis, III on 4/12/2016. (lbru, ) (Entered: 04/12/2016) |
| 04/12/2016 | | Reset Deadlines re Motion in case as to Hamza Kolsuz 19 MOTION to Suppress *Evidence*. Motion Hearing set for 4/29/2016 at 02:00 PM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (lbru, ) (Entered: 04/12/2016) |
| 04/12/2016 | | Terminate Motion Hearing for proceedings held before District Judge T. S. Ellis, III: (lbru, ) (Entered: 04/12/2016) |
| 04/13/2016 | | **Interpreter Information: Kenan Top and Hayri Berberoglu** (Court Interpreting Services) is the Interpreter. Turkish is the type of language required. Appointment is set for 4/29/2016 @ 2:00 pm for a Motions (lbru, ) Modified on 4/19/2016 (lbru, ). (Entered: 04/13/2016) |
| 04/14/2016 | 22 | REPLY TO RESPONSE to by Hamza Kolsuz re 20 Response in Opposition, 19 MOTION to Suppress *Evidence* (Richman, Todd) (Entered: 04/14/2016) |

**J.A. 5**

| 04/18/2016 | 23 | STATUS REPORT *in Response to April 12, 2016 Order* by Hamza Kolsuz (Richman, Todd) (Entered: 04/18/2016) |
| 04/18/2016 | 24 | STATUS REPORT *Regarding Suppression Hearing* by USA as to Hamza Kolsuz (Alpino, Heather) (Entered: 04/18/2016) |
| 04/19/2016 | 25 | STIPULATION by USA and Hamza Kolsuz *as to Facts for Suppression Hearing* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Alpino, Heather) (Entered: 04/19/2016) |
| 04/20/2016 | 26 | NOTICE *Regarding Defendant's "Motion to Suppress Evidence"* by USA as to Hamza Kolsuz (Attachments: # 1 Exhibit 1)(Alpino, Heather) (Entered: 04/20/2016) |
| 04/28/2016 | | Motion Hearing 19 reset for 4/29/2016 at 11:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Counsel notified. (mpha) (Entered: 04/28/2016) |
| 04/29/2016 | 28 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Motion Hearing as to Hamza Kolsuz held on 4/29/2016 re: Defendant's Motion 19 to Suppress Evidence. Todd M. Richman and Erica L. Marshall present on behalf of defendant. Heather Alpino and Dennis Fitzpatrick present on behalf of USA. Government calls Special Agent Adam Coppolo (ICE) as witness. Exhibit binder w/ stipulations (7 exhibits) entered into evidence. Defendant's Motion 19 to Suppress, denied. Government to order transcript. Order & Memorandum Opinion to follow. (Court Reporter Michael A. Rodriquez)(mpha) (Entered: 05/02/2016) |
| 04/29/2016 | 29 | ORDER denying Motion 19 to Suppress as to Hamza Kolsuz (1): For good cause, and for the reasons stated from the bench, which will be elucidated in a forthcoming Memorandum Opinion, It is hereby ORDERED that defendant's motion to suppress is DENIED. Signed by District Judge T. S. Ellis, III on 04/29/2016. (mpha) (Entered: 05/02/2016) |
| 05/01/2016 | 27 | TRANSCRIPT of Proceedings held on 4-29-2016, before Judge Ellis. Court reporter/transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/31/2016. Redacted Transcript Deadline set for 7/1/2016. Release of Transcript Restriction set for 8/1/2016.**(rodriquez, michael) (Main Document 27 replaced on 5/2/2016) (jlan, ). (Entered: 05/01/2016) |
| 05/05/2016 | 30 | MEMORANDUM OPINION as to Hamza Kolsuz. Signed by District Judge T. |

**J.A. 6**

| | | |
|---|---|---|
| | | S. Ellis, III on 5/5/2016. (rban, ) (Entered: 05/06/2016) |
| 05/06/2016 | 31 | NOTICE *of Filing of Defendant's Waiver of Right to Trial by Jury* by Hamza Kolsuz (Attachments: # 1 Exhibit Defendant's Waiver of Right to Trial by Jury) (Richman, Todd) (Entered: 05/06/2016) |
| 05/09/2016 | 32 | ORDERED that the jury trial currently set for 10:00 a.m., Monday, May 16,2016, is CONTINUED to 11:00 a.m., Wednesday, May 18,2016 as to Hamza Kolsuz. Signed by District Judge T. S. Ellis, III on 5/09/2016. (lbru, ) (Entered: 05/09/2016) |
| 05/09/2016 | | Terminate Deadlines and Hearings as to Hamza Kolsuz:, Set/Reset Deadlines/Hearings as to Hamza Kolsuz: Bench Trial set for 5/18/2016 at 11:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (lbru, ) (Entered: 05/09/2016) |
| 05/09/2016 | 33 | NOTICE OF ATTORNEY APPEARANCE Dennis Fitzpatrick appearing for USA. (Fitzpatrick, Dennis) (Entered: 05/09/2016) |
| 05/09/2016 | 34 | NOTICE *of Consent to Non-Jury Bench Trial* by USA as to Hamza Kolsuz re 31 Notice (Other), 32 Order (Fitzpatrick, Dennis) (Entered: 05/09/2016) |
| 05/12/2016 | 35 | EXHIBIT LIST by USA as to Hamza Kolsuz (Alpino, Heather) (Entered: 05/12/2016) |
| 05/13/2016 | 36 | Subpoena issued (krob, ) (Entered: 05/13/2016) |
| 05/16/2016 | 37 | ORDERED that the bench trial currently set for 11:00 a.m., Wednesday, May 18, 2016, is CONTINUED to 1:00 p.m., Wednesday, May 18, 2016. It is further ORDERED that the government is DIRECTED to file its proposed findings of fact and conclusions of law by 5:00 p.m., Tuesday, May 17,2016, Defendant may, if he wishes, file proposed findings of fact and conclusions of law, but is not required to do so as to Hamza Kolsuz. Signed by District Judge T. S. Ellis, III on 5/16/2016. (lbru, ) (Entered: 05/16/2016) |
| 05/16/2016 | | Reset Hearings as to Hamza Kolsuz: Bench Trial set for 5/18/2016at 01:00 PM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (lbru, ) (Entered: 05/16/2016) |
| 05/16/2016 | | **Interpreter Information: Olcay Rached and Cagri Tanyol** are the Interpreters. Turkish is the type of language required. Appointment is set for 5/18/16 @ 1:00 pm for a Bench Trial. (krob) (Entered: 05/16/2016) |
| 05/16/2016 | 38 | NOTICE *Regarding Trial Schedule* by Hamza Kolsuz (Richman, Todd) (Entered: 05/16/2016) |
| 05/17/2016 | 39 | Memorandum by USA as to Hamza Kolsuz (Alpino, Heather) (Entered: 05/17/2016) |
| 05/17/2016 | 40 | *Amended* EXHIBIT LIST by USA as to Hamza Kolsuz (Alpino, Heather) (Entered: 05/17/2016) |
| 05/17/2016 | 41 | Proposed Finding of Facts by USA as to Hamza Kolsuz (Alpino, Heather) |

| | | |
|---|---|---|
| | | (Entered: 05/17/2016) |
| 05/18/2016 | 42 | *Second Amended* EXHIBIT LIST by USA as to Hamza Kolsuz (Alpino, Heather) (Entered: 05/18/2016) |
| 05/18/2016 | 43 | TRIAL EXHIBIT CUSTODY FORM. Exhibits 1-40 returned to USA. (krob, ) (Entered: 05/18/2016) |
| 05/18/2016 | 44 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Bench Trial Day 1 begun on 5/18/2016 as to Hamza Kolsuz (1) Counts 1, 2, and 3. Defendant present w/ counsel Todd M. Richman, Erica L. Marshall, and Turkish interpreters Olcay Rached and Cagri Tanyol. Dennis Fitzpatrick and Heather Alpino present on behalf of USA w/ HSI Special Agent Adam Coppolo present at counsel table. Rule on witnesses made. Government Exhibits 20, 21, 22 (jointly stipulated to), admitted. Opening statements waived by both parties. Government adduced evidence and rests. Defendant adduced evidence. Bench Trial Day 2 set for 5/19/2016 at 09:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Defendant remanded to the custody of the USMS. (Attachments: # 1 Trial Exhibit Custody Form)(Court Reporter Michael A. Rodriquez)(mpha) (Entered: 05/18/2016) |
| 05/19/2016 | 45 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Bench Trial Day 2 as to Hamza Kolsuz (1) held on 5/19/2016. Defendant present w/ counsel Todd M. Richman, Erica L. Marshall, and Turkish interpreters Olcay Rached and Cagri Tanyol. Dennis Fitzpatrick and Heather Alpino present on behalf of USA w/ HSI Special Agent Adam Coppolo present at counsel table. Defendant continued to adduce evidence and rests. Government calls rebuttal witness. Matter taken under advisement. Parties to file briefs re: defendant's mental state/credibility promptly. Transcript to be prepared w/i 10 days. Government's findings of fact and conclusions of law to be submitted by 6/10/2016; defendant's brief to be filed by 6/17/2016; government's response to be filed by 6/22/2016. Defendant remanded to the custody of the USMS. (Attachments: # 1 Witness List, # 2 Exhibit, # 3 Trial Exhibit Custody Form) (Court Reporter Michael A. Rodriquez)(mpha) (Entered: 05/19/2016) |
| 05/19/2016 | 46 | ORDER For the reasons stated from the bench, and for good cause, the parties are DIRECTED to submit memoranda on the subjects described from the bench in accordance with the following schedule: 1. the government is DIRECTED to submit proposed findings of fact and conclusions of law, based on the testimony elicited at trial, by 5:00 p.m., Friday, June 10, 2016. 2. Defendant is DIRECTED to submit a memorandum in opposition to the government's proposed findings of fact and conclusions of law by 5:00 p.m., Friday, June 17, 2016. 3. The government is DIRECTED to submit a reply brief by 5:00 p.m., Wednesday, June 22, 2016. Signed by District Judge T. S. Ellis, III on 05/19/2016. (mpha) (Entered: 05/19/2016) |
| 05/27/2016 | 47 | TRANSCRIPT of Proceedings held on 5/18/16, before Judge Ellis. Court reporter/transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request** |

| | | |
|---|---|---|
| | | Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/27/2016. Redacted Transcript Deadline set for 7/27/2016. Release of Transcript Restriction set for 8/25/2016.(rodriquez, michael) (Entered: 05/27/2016) |
| 05/27/2016 | 48 | TRANSCRIPT of Proceedings held on 5/19/16, before Judge Ellis. Court reporter/transcriber Michael Rodriquez, Telephone number 301-213-4913. NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/27/2016. Redacted Transcript Deadline set for 7/27/2016. Release of Transcript Restriction set for 8/25/2016.(rodriquez, michael) (Entered: 05/27/2016) |
| 06/10/2016 | 49 | Proposed Finding of Facts by USA as to Hamza Kolsuz (Alpino, Heather) (Entered: 06/10/2016) |
| 06/17/2016 | 50 | Proposed Finding of Facts by Hamza Kolsuz (Richman, Todd) (Entered: 06/17/2016) |
| 06/22/2016 | 51 | Reply by USA as to Hamza Kolsuz re 50 Proposed Finding of Facts *and Conclusions of Law* (Alpino, Heather) (Entered: 06/22/2016) |
| 06/23/2016 | 52 | FINDINGS OF FACT and CONCLUSIONS OF LAW as to Hamza Kolsuz. Signed by District Judge T. S. Ellis, III on 6/23/2016. (rban, ) (Entered: 06/24/2016) |
| 06/23/2016 | 53 | ORDERED that defense counsel is DIRECTED to ensure that the Findings of Fact and Conclusions of Law are interpreted into Turkish for defendant; that the parties are DIRECTED to appear at 11:00 a.m., 7/1/2016, to receive the Court's verdict and to schedule a sentencing date. Signed by District Judge T. S. Ellis, III on 6/23/2016. (rban, ) (Entered: 06/24/2016) |
| 06/30/2016 | | **Interpreter Information: Hayri Berberoglu** (Court Interpreting Services) is the Interpreter. Turkish is the type of language required. Appointment is set for 7/1/16 @ 11:00 am for a Dooket Call. (krob) (Entered: 06/30/2016) |
| 07/01/2016 | 54 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Docket Call as to Hamza Kolsuz held on 7/1/2016. Defendant present w/ counsel Erica L. Marshall and Turkish interpreter Hayri Berberoglu. Heather Alpino and Dennis Fitzpatrick present on behalf of USA. Per Order dated 6/23/2016 doc. |

J.A. 9

| | | |
|---|---|---|
| | | 53 , the parties directed to appear today to receive the Court's verdict and schedule a sentencing. Sentencing set for 10/7/2016 at 09:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Defendant remanded to the custody of the USMS. Order to follow. (Court Reporter Michael A. Rodriquez) (mpha) (Entered: 07/01/2016) |
| 07/01/2016 | 55 | ORDER Accordingly, based on the findings of fact and conclusions of law, Defendant is FOUND GUILTY of (i) one count of conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, (ii) one count of attempting to export firearm parts without the requisite license, in violation of 22 U.S.C. § 2778, and (iii) one count of smuggling goods from the United States, in violation of 18 U.S.C § 554. It is hereby ORDERED that sentencing is SCHEDULED for 9:00 a.m., Friday, October 7, 2016. Signed by District Judge T. S. Ellis, III on 07/01/2016. (mpha) (Entered: 07/05/2016) |
| 09/02/2016 | 56 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED - government and defense counsel) as to Hamza Kolsuz. Objections to PSI due 09/19/2016. (forsyth, carolyn) (Entered: 09/02/2016) |
| 09/19/2016 | 57 | MOTION to Seal *Notice of Informatin Disclosure* by USA as to Hamza Kolsuz. (Attachments: # 1 Proposed Order)(Fitzpatrick, Dennis) (Entered: 09/19/2016) |
| 09/19/2016 | 58 | NOTICE *of Filing of Sealed Documents* by Hamza Kolsuz re 57 MOTION to Seal *Notice of Informatin Disclosure* (Attachments: # 1 Supplement Non-Confidential Memo)(Fitzpatrick, Dennis) (Entered: 09/19/2016) |
| 09/19/2016 | 59 | ORDER granting 57 Motion to Seal as to Hamza Kolsuz (1). Signed by District Judge T. S. Ellis, III on 9/19/16. (krob, ) (Entered: 09/20/2016) |
| 09/19/2016 | 60 | Sealed Notice filed by USA. (krob, ) (Entered: 09/20/2016) |
| 09/19/2016 | 61 | Sealed Confidential Memorandum filed by USA.(krob) (Entered: 09/20/2016) |
| 09/28/2016 | | **Interpreter Information: Olcay Rached** is the Interpreter. Turkish is the type of language required. Appointment is set for 10/7/16 @ 9:00 am for a Sentencing. (krob, ) (Entered: 09/28/2016) |
| 09/30/2016 | 62 | Memorandum by USA as to Hamza Kolsuz *'s Sentencing* (Alpino, Heather) (Entered: 09/30/2016) |
| 10/03/2016 | 63 | NOTICE OF ATTORNEY APPEARANCE Karen Ledbetter Taylor appearing for USA. (Taylor, Karen) (Entered: 10/03/2016) |
| 10/03/2016 | 64 | MOTION for Forfeiture of Property by USA as to Hamza Kolsuz. (Attachments: # 1 Proposed Order)(Taylor, Karen) (Entered: 10/03/2016) |
| 10/04/2016 | 65 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) as to Hamza Kolsuz. (forsyth, carolyn) (Entered: 10/04/2016) |
| 10/04/2016 | 67 | SENTENCING MEMORANDUM by Hamza Kolsuz (Richman, Todd) (Entered: 10/04/2016) |

**J.A. 10**

| 10/07/2016 | 68 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Sentencing held on 10/7/2016 for Hamza Kolsuz (1). Defendant present w/ counsel Todd M. Richman and Turkish interpreter Olcay Rached. Heather Alpino and Dennis Fitzpatrick present on behalf of USA. Defense requests time served in addition to the 8+ months already served and objects to imposition of SR. Government argues time served does not represent the seriousness of the evidence presented and that a substantial sentence is warranted as conduct in case was extremely egregious; moves to dismiss count 3 of the Indictment. The Court adopts PSIR w/o exceptions and defendant sentenced to 30 months on each count (Count 1 & Count 2) to run concurrent and w/ CFTS, 3 years SR as to each count (Count 1 & Count 2) to run concurrent and w/ special conditions, Order of Forfeiture, $200.00 SA ($100.00 as to each count), no fine. Order Dismissing Count 3 of the Indictment, filed and entered in open court. Defendant advised of right to appeal w/i 10 days (defense notes intention to file a written notice of appeal). Defendant remanded to the custody of the USMS. (Court Reporter Renecia Wilson)(mpha) (Entered: 10/11/2016) |
| 10/07/2016 | 69 | ORDER OF DISMISSAL OF COUNT THREE Upon the imposition of sentence on Counts One and Two in this matter, the motion of the United States dismissing Count Three is hereby Granted. It is therefore, ORDERED that Count Three of the Indictment in this matter is DISMISSED. Signed by District Judge T. S. Ellis, III on 10/07/2016. (mpha) (Entered: 10/11/2016) |
| 10/07/2016 | 70 | PRELIMINARY ORDER OF FORFEITURE as to Hamza Kolsuz (1). Signed by District Judge T. S. Ellis, III on 10/07/2016. (mpha) (Entered: 10/11/2016) |
| 10/07/2016 | 71 | JUDGMENT as to Hamza Kolsuz (1), Counts 1 & 2: 30 months (on each Counts 1 and 2) to run concurrent, 3 years (on each of Counts 1 and 2) to run concurrent, Order of Forfeiture, $200.00 SA ($100.00 as to each count); Count 3: Dismissed on government's motion 10/7/2016. Signed by District Judge T. S. Ellis, III on 10/07/2016. (mpha) (Entered: 10/18/2016) |
| 10/07/2016 | 72 | Confidential Information Page re: Judgment as to Hamza Kolsuz (1). (mpha) (Entered: 10/18/2016) |
| 10/21/2016 | 73 | NOTICE OF APPEAL by Hamza Kolsuz (Richman, Todd) (Entered: 10/21/2016) |
| 10/24/2016 | 74 | Transmission of Notice of Appeal to 4CCA as to Hamza Kolsuz to US Court of Appeals re 73 Notice of Appeal - Final Judgment (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (krob, ) (Entered: 10/24/2016) |
| 10/24/2016 | 75 | ORDER of USCA: The court appoints the Federal Defender for the Eastern District of Virginia to represent appellant in this case as to Hamza Kolsuz re 73 Notice of Appeal - Final Judgment (krob, ) (Entered: 10/25/2016) |
| 10/25/2016 | 76 | USCA Case Number 16-4687. Case Manager: T. Fischer for 73 Notice of Appeal - Final Judgment filed by Hamza Kolsuz. (krob, ) (Entered: 10/25/2016) |
| 11/07/2016 | 77 | TRANSCRIPT REQUEST by Hamza Kolsuz for proceedings held on July 1, |

| | | |
|---|---|---|
| | | 2016 (verdict) before Judge Ellis, (Pratt, Frances) (Entered: 11/07/2016) |
| 11/07/2016 | 78 | TRANSCRIPT REQUEST by Hamza Kolsuz for proceedings held on Oct. 7, 2016 (sentencing) before Judge Ellis, (Pratt, Frances) (Entered: 11/07/2016) |
| 12/12/2016 | 79 | TRANSCRIPT of proceedings as to Hamza Kolsuz for dates of 7/1/2016 before Judge Ellis, re 73 Notice of Appeal - Final Judgment Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/11/2017. Redacted Transcript Deadline set for 2/13/2017. Release of Transcript Restriction set for 3/13/2017.**(rodriquez, michael) (Entered: 12/12/2016) |
| 12/30/2016 | 80 | ORDER of USCA as to Hamza Kolsuz re 73 Notice of Appeal - Final Judgment. The deadline for filing of transcript by Renecia Wilson is extended to 01/17/2017 without sanctions. (jlan) (Entered: 12/30/2016) |
| 01/04/2017 | 81 | TRANSCRIPT of proceedings as to Hamza Kolsuz for dates of October 7, 2016 before Judge T.S. Ellis, III, re 73 Notice of Appeal - Final Judgment Court Reporter/Transcriber Renecia Wilson, Telephone number,703-501-1580. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/3/2017. Redacted Transcript Deadline set for 3/6/2017. Release of Transcript Restriction set for 4/4/2017.**(wilson, renecia) (Entered: 01/04/2017) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/27/2017 11:31:45 | | |
| **PACER Login:** | fp0311:2550870:0 | **Client Code:** |
| **Description:** | Docket Report | **Search** | 1:16-cr-00053- |

| | | Criteria: | TSE |
|---|---|---|---|
| Billable Pages: | 9 | Cost: | 0.90 |



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:16-CR-53 |
| | ) | |
| v. | ) | COUNT 1: |
| | ) | 18 U.S.C. § 371 |
| HAMZA KOLSUZ, | ) | Conspiracy to Commit an Offense Against |
| | ) | the United States |
| Defendant. | ) | |
| | ) | COUNT 2: |
| | ) | 22 U.S.C. §§ 2778(b) and (c), and 22 C.F.R. |
| | ) | §§ 121.1, 123.1, and 127.1 |
| | ) | Arms Export Control Act |
| | ) | |
| | ) | COUNT 3: |
| | ) | 18 U.S.C. § 554(a) |
| | ) | Smuggling Goods from the United States |
| | ) | |
| | ) | Criminal Forfeiture |
| | ) | 18 U.S.C. § 981(a)(1)(C) |
| | ) | 19 U.S.C. § 1595a(d) |
| | ) | 28 U.S.C. § 2461(c) |
| | ) | 22 U.S.C. § 401 |

## INDICTMENT

March 2016 Term – at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### COUNT ONE

(Conspiracy to Commit an Offense Against the United States)

#### Background

At all times material to this Indictment:

1.  The Arms Export Control Act, Title 22, United States Code, Section 2778 ("AECA"

1

or the "Act") authorized the President to control the export of defense articles and defense services

from the United States. Unless a specific exception applies, the Act provided that no defense articles

or defense services may be exported without a license for such export. 22 U.S.C. § 2778(b). The

regulations promulgated pursuant to the Act were the International Traffic in Arms Regulations

("ITAR"), Title 22, Code of Federal Regulations, Sections 120 through 130. The United States

Department of State, Directorate of Defense Trade Controls (the "DDTC") administered the ITAR

and regulated the export of defense articles. Section 2778(c) of the AECA established criminal

penalties for any willful violation of Section 2778 or any rule or regulation thereunder. Under

Section 123.1 of the ITAR, any person who intended to export a defense article had to obtain the

approval of the DDTC before such export occurred. Pursuant to the ITAR, exporting, or attempting

to export, a defense article from the United States without a license or written approval from the

DDTC was unlawful. 22 C.F.R. § 127.1(a)(1). The ITAR defined exporting to include, among other

things: "[s]ending or taking a defense article out of the United States in any manner . . . ." 22 C.F.R.

§ 120.17.

2.    The ITAR defined a defense article to be any item on the United States Munitions List

("USML") contained in the regulations. The USML set forth twenty-one categories of defense

articles that are subject to export licensing controls by the United States Department of State's

Directorate of Defense Trade Controls ("DDTC"). 22 C.F.R. § 121.1.

3.    The following items possessed by and seized from the defendant, HAMZA KOLSUZ, were

defense articles designated on the USML in Category I(g), which could not and cannot be exported from

the United States without a license or written approval from the DDTC:

a.    9mm handgun barrels (unknown manufacturer),

2

   b.   9mm Sig Sauer handgun barrels,

   c.   9mm threaded Sig Sauer handgun barrels,

   d.   9mm threaded Glock 26 barrels,

   e.   .45 caliber threaded Glock 21 barrels,

   f.   9mm threaded Glock 19 barrels, and

   g.   9mm threaded Glock 17 barrels.

4.   The following items possessed by and seized from the defendant, HAMZA KOLSUZ, were

defense articles designated on the USML in Category I(h), which could not and cannot be exported from

the United States without a license or written approval from the DDTC:

   a.   9mm Glock 31 round magazines,

   b.   9mm Glock 17 round magazines,

   c.   9mm Glock 15 round magazines,

   d.   9mm Smith & Wesson M&P 17 round magazines,

   e.   9mm Glock 10 round magazines,

   f.   .45 caliber Glock 13 round magazines,

   g.   9mm Smith & Wesson 32 round magazines,

   h.   .357 caliber Glock 15 round magazines, and

   i.   .22 caliber Glock caliber conversion kits.

5.   It was also unlawful for a person to violate United States smuggling laws.  Title 18, United

States Code, Section 554(a) made it a federal crime to fraudulently or knowingly export or send from the

United States, or attempt to export or send from the United States, any merchandise, article, or object

3

contrary to any law or regulation of the United States, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States.

6.     Neither KOLSUZ nor any co-conspirator identified herein ever applied for, received, or possessed a license from the DDTC to export defense articles.

### The Conspiracy

7.     Beginning on or before December 2, 2012 and continuing through on or about February 2, 2016, the exact dates being unknown to the Grand Jury, in Loudon County, Virginia, in the Eastern District of Virginia, and elsewhere, the defendant, HAMZA KOLSUZ, did knowingly and willfully conspire with other individuals, both known and unknown to the Grand Jury, to knowingly and willfully export defense articles from the United States to the Republic of Turkey, without having first obtained a license or written approval from the United States Department of State's DDTC, in violation of Title 22, United States Code, Section 2778(b)(2) and (c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1, and to fraudulently or knowingly export merchandise, articles, or objects contrary to a law of the United States, in violation of Title 18, United States Code, Section 554(a).

8.     It was the object of the conspiracy to obtain firearms and/or firearms parts in the United States and export them to the Republic of Turkey without the required license or written approval from the DDTC.

9.     It was further the object of the conspiracy to smuggle firearms and/or firearms parts from the United States to the Republic of Turkey.

4

Manner and Means

10.     The manner and means by which the co-conspirators sought to accomplish the object of the conspiracy included, among others:

a.     It was part of the conspiracy that co-conspirators would and did purchase and attempt to purchase firearms and/or firearms parts online and in person in the United States with the intent to send firearms and/or firearms parts to the Republic of Turkey.

b.     It was further part of the conspiracy that co-conspirators would and did travel from overseas countries, including the Republic of Turkey, to the United States for the purpose of acquiring firearms.

c.     It was further part of the conspiracy that one or more co-conspirators would and did check luggage containing firearms and/or firearms parts on flights leaving from the United States—including flights leaving from Dulles International Airport, in the Eastern District of Virginia—that had an end destination in overseas countries, including the Republic of Turkey.

d.     It was further part of the conspiracy that firearms would be exported to the Republic of Turkey in parts in an effort to avoid detection by the United States Department of Homeland Security.

e.     It was further part of the conspiracy that, upon arrival in the Republic of Turkey, firearms parts would be sold to individuals who would assemble the parts into complete firearms which were then sold.

f.     It was further part of the conspiracy that co-conspirators, including KOLSUZ, would and did agree to transport firearms parts from locations outside the Eastern District of Virginia

5

into the Eastern District of Virginia, for purposes of departing from Dulles International Airport to transport the firearms parts to overseas countries, including the Republic of Turkey.

      g.    It was further part of the conspiracy that co-conspirators misrepresented, concealed, hid, and caused to be misrepresented, concealed, and hidden, the purposes and acts done in furtherance of the conspiracy to avoid detection and apprehension by the United States Government.

Overt Acts in Furtherance of the Conspiracy

11.    On or about December 2, 2012, KOLSUZ checked into a flight at John F. Kennedy International Airport ("JFK") International Airport destined for Amsterdam, Netherlands—with a final destination in the Republic of Turkey—with luggage containing defense articles that were and are designated on the USML, including, but not limited to: forty (40) upper receivers, twenty (20) unfinished lower receivers, sixteen (16) firearm barrels, and twenty-six (26) firearms magazines. These items were detained and subsequently seized by the Department of Homeland Security, Customs and Border Protection ("CBP") and were not returned to KOLSUZ, who remained in the United States.

12.    On or about December 14, 2012, KOLSUZ and two other individuals—Unindicted Co-Conspirator 1 ("UCC-1") and Unindicted Co-Conspirator 2 ("UCC-2")—entered a gun store and attempted to buy forty (40) M-16 rifles to replace certain firearms and/or firearms parts that had been confiscated by CBP officers at JFK International Airport.

13.    On or about January 8, 2013, KOLSUZ checked in for a flight at JFK International Airport destined for Istanbul, Republic of Turkey via Paris, France with luggage containing items controlled on the USML in Categories I(g) and I(h), specifically, one (1) Beretta .380 caliber slide,

6

one (1) barrel, one (1) spring, and one (1) guide rod. These items were detained and subsequently seized and were not returned to KOLSUZ.

14.    On or about March 15, 2014, UCC-1 checked into a flight at Newark Liberty International Airport destined for the Republic of Turkey via Frankfurt, Germany with luggage containing firearms parts, including twenty (20) magazine springs, one (1) Streamlight TLR-4, twenty-five (25) trigger assemblies, one (1) 92F part, three (3) Sig recoil springs, and three (3) Glock recoil springs. These items UCC-1 sought to export were detained and subsequently seized and were not returned to UCC-1.

15.    Between on or about October 4, 2015, and on or about January 4, 2016, KOLSUZ and UCC-2 communicated regarding: the purchase and pricing of firearms and/or firearms parts, firearms and/or firearms parts that had been purchased, sending money to pay for the purchase of firearms and/or firearms parts, the co-conspirators' current inventory of firearms and/or firearms parts, avoiding detection from law enforcement and customs officials, making plans to meet in person to conduct business, and their direction of an individual who would be traveling to New Jersey and Ohio to purchase firearms and/or firearms parts.

16.    On or about January 14, 2016, an online order from Lone Wolf Distributers for five (5) 9mm Glock 17 threaded barrels and five (5) 9mm Glock 19 barrels was placed and billed to UCC-2 on or about January 15, 2016.

17.    On or about January 25, 2016, KOLSUZ entered the United States at Miami International Airport on a B2 visitor's visa.

18.    On or about February 2, 2016, KOLSUZ began his return trip to Istanbul, Republic of Turkey by checking in at Miami International Airport for a flight that was to take KOLSUZ and his

7

checked luggage through Cleveland Hopkins International Airport and Dulles International Airport before embarking for Istanbul, Republic of Turkey.

19.    On or about February 2, 2016—while KOLSUZ was waiting to board his flights, KOLSUZ and UCC-2 communicated regarding how to avoid detection and get firearms parts to the Republic of Turkey without the parts being detained by law enforcement.

20.    After flying from Miami to Cleveland and Cleveland to Dulles, KOLSUZ arrived at Dulles International Airport for a flight destined for Istanbul, Republic of Turkey and later entered the jetway to board that flight. A customs inspection by CBP officers revealed that eighteen (18) handgun barrels; twenty-two (22) 9mm handgun magazines; four (4) .45 caliber handgun magazines; one (1) .357 caliber handgun magazine; and one (1) .22 caliber Glock caliber conversion kit were in KOLSUZ's checked luggage.

(In violation of Title 18, United States Code, Section 371.)

8

THE GRAND JURY FURTHER CHARGES THAT:

COUNT TWO

(Arms Export Control Act)

21.    Paragraphs one (1) through twenty (20) of this Indictment are restated and

realleged as if fully set forth herein.

22.    On or about February 2, 2016, in or near Loudon County, Virginia, within the

Eastern District of Virginia, the defendant, HAMZA KOLSUZ, did knowingly and willfully

attempt to export from the United States to the Republic of Turkey handgun barrels; 9mm, .45

caliber, and .357 caliber handgun magazines; and a .22 caliber Glock caliber conversion kit, all

of which were and are designated as defense articles on the United States Munitions List, the

export of which was and is controlled under the Arms Export Control Act, without first having

obtained from the United States Department of State a license or written approval for such

export.

(In violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c), and

Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1.)

9

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT THREE

### Smuggling Goods from the United States

23.    Paragraphs one (1) through twenty (20) of this Indictment are restated and realleged as if fully set forth herein.

24.    On or about February 2, 2016, in or near Loudon County, Virginia, within the Eastern District of Virginia, the defendant, HAMZA KOLSUZ, did fraudulently and knowingly attempt to export and send from the United States handgun barrels; 9mm, .45 caliber, and .357 caliber handgun magazines; and a .22 caliber Glock caliber conversion kit, contrary to the Arms Export Control Act, Title 22, United States Code, Section 2778(b)(2), and the International Traffic in Arms Regulations, Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1, a law and regulation of the United States.

(In violation of Title 18, United States Code, Section 554(a).)

J.A. 23

## FORFEITURE

a.    The allegations contained in Counts One through Three of this Indictment are realleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 19, United States Code, Section 1595a(d); Title 28 United States Code, Section 2461(c); and Title 22, United States Code, Section 401.

b.    Upon conviction of the defendant of the violations alleged in this Indictment, the defendant shall forfeit to the United States any property constituting or derived from any proceeds which the defendant obtained, directly or indirectly, as a result of the violation alleged in this Indictment, and any property which the defendant used or intended to be used in any manner or part to commit or to facilitate the commission of such violation.

c.    The property subject to forfeiture includes, but is not limited to:

     i.    Four 9mm Glock 31 round magazines,

     ii.    Four 9mm Glock 17 round magazines,

     iii.    Four 9mm Glock 15 round magazines,

     iv.    One 9mm Smith & Wesson 17 round magazine,

     v.    Eight 9mm Glock 10 round magazines,

     vi.    Four .45 caliber Glock 13 round magazines,

     vii.    One 9mm Smith & Wesson 32 round magazine,

     viii.    One .357 Glock 15 round magazine,

     ix.    One 9mm handgun barrel (unknown manufacturer),

     x.    Four 9mm Sig Sauer handgun barrels,

J.A. 24

      xi.    One 9mm threaded Sig Sauer handgun barrel,

      xii.    One 9mm threaded Glock 26 barrel,

     xiii.    One .45 caliber threaded Clock 21 barrel,

     xiv.    Five 9mm threaded Glock 19 barrels,

      xv.    Five 9mm threaded Glock 17 barrels, and

     xvi.    One .22 caliber Glock caliber conversion kit.

d.    If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

      i.    Cannot be located upon the exercise of due diligence;

      ii.    Has been transferred, sold, or deposited with a third person;

     iii.    Has been placed beyond the jurisdiction of the Court;

     iv.    Has been substantially diminished in value; or

      v.    Has been commingled with other property without cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

J.A. 25

(All pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 19, United States Code, Section 1595a(d); Title 28, United States Code, Section 2461(c); and Title 22, United States Code, Section 401.)

A TRUE BILL

Pursuant to the E-Government Act,
The original of this page has been filed
under seal in the Clerk's Office

_____          _____
DATE                             FOREPERSON

Dana J. Boente
United States Attorney

By: _____
    Heather Alpino
    Special Assistant United States Attorney
    Dennis Fitzpatrick
    Assistant United States Attorney

13

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:16-CR-00053** |
| | ) | |
| **HAMZA KOLSUZ,** | ) | |
| | ) | **Trial: May 16, 2016** |
| **Defendant.** | ) | |

### DEFENDANT HAMZA KOLSUZ'S MOTION TO SUPPRESS EVIDENCE

Comes now, Defendant HAMZA KOLSUZ, by counsel, and respectfully submits this Motion to Suppress Evidence.

### INTRODUCTION

Mr. Kolsuz is a citizen of Turkey and visited the United States pursuant to a tourist visa between January 25, 2016, and February 3, 2016. On February 3, 2016, Customs and Border Patrol agents allegedly found various handgun parts in Mr. Kolsuz's checked luggage for an outbound return flight to Istanbul, Turkey. Mr. Kolsuz was arrested. After Mr. Kolsuz's arrest, without a warrant and without Mr. Kolsuz's consent, law enforcement officers conducted a seizure and forensic search of his cell phone that lasted from the arrest through March 3, 2016.

None of the exceptions to the Fourth Amendment's warrant requirement apply in this case. Specifically, the Fourth Amendment does not permit warrantless searches of cell phones incident to arrest. *Riley v. California*, 134 S.Ct. 2473 (2014). Moreover, the border search exception for warrantless searches is inapplicable because the governmental interests that justify border searches were not at stake here. Agents seized Mr. Kolsuz's phone and commenced its forensic search after it was already determined that the phone would not cross the border. To find that this search was justified here "would mean that the border search doctrine has no

1

borders." *See United States v. Kim*, 103 F. Supp. 3d 32, 35 (D.D.C. 2015). Accordingly, Mr. Kolsuz moves to suppress any evidence contained within or otherwise obtained from, or as the fruit of, the unconstitutional search of his cell phone.

## BACKGROUND

Mr. Kolsuz is charged in a three-count indictment with attempting to violate the Arms Export Control Act, 22 U.S.C. 2778, attempting to smuggle goods from the United States in violation of 18 U.S.C. § 554, and conspiracy to commit those offenses in violation of 18 U.S.C. § 371.

On the evening of February 2, 2016, Mr. Kolsuz boarded a plane in Cleveland, Ohio, and his ultimate destination was Istanbul, Turkey, with a stop at Dulles International Airport. According to the allegations in the indictment, on the morning of February 3, 2016, a customs inspection performed by Customs and Border Patrol officers at Dulles International Airport revealed an assortment of handgun parts contained in Mr. Kolsuz's checked luggage. Mr. Kolsuz was arrested on February 3, 2016, and has remained in federal custody since this time. While none of the handgun parts constituted an actual firearm, or required a person to have a license to possess them, or were illegal to transport in one's luggage, the Arms Export Control Act ("AECA") (22 U.S.C. § 2778) prohibits the exportation without a license of "military aircraft, helicopters, artillery, shells, missiles, rockets, bombs, vessels of war, explosives, military and space electronics, and certain firearms." USSG § 2M5.2, Application Note 1. The AECA also prohibits the unlicensed export of handgun parts.

According to discovery provided thus far by the government, following the arrest of Mr. Kolsuz, Homeland Security Special Agent ("SA") Adam Coppolo transported, among other things, Mr. Kolsuz's mobile phone to the Homeland Security office located in Sterling, Virginia.

SA Coppolo then requested the assistance of Computer Forensic Agent ("CFA") Michael Del Vacchio in extracting information from Mr. Kolsuz's phone (which was an iPhone, and thus could more aptly be described as a computer than a phone because such devices collect and store vast quantities of digital information unrelated to telephonic communication). This report was used by SA Coppolo to conduct a "border search" of the iPhone. According to the law enforcement report of the search, the purpose of the search of the phone was to find evidence relating to the charge on which Mr. Kolsuz had been arrested. This purported border search, which occurred at an office building in Sterling, Virginia, commenced after Mr. Kolsuz had been arrested and lasted for a full month, concluding on or about March 3, 2016. At no time during this search was the phone in the process of crossing the border, about to cross the border, or in danger of crossing the border.

The forensic report that resulted from the iPhone search is 896 pages in length. It details Mr. Kolsuz's internet browsing history, text messages, emails, previous GPS locations down to exact addresses, and calendar appointments dating years into the future.

## ARGUMENT

Warrantless searches of cell phones seized from arrested persons are no longer justified by the "search incident to arrest" exception to the Fourth Amendment's warrant requirement. *Riley v. California*, 134 S.Ct. 2473 (2014). The government, however, attempts to justify the search in this case under the "border search" exception, which generally allows for "exhaustive forensic searches" of electronic devices at the border upon reasonable suspicion. *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013). The issue is whether, after *Riley*, the "border search" exception may be extended to the search of an arrestee's cell phone seized incident to an arrest at the border, when the arrestee is no longer in the process of crossing the border or attempting to

cross the border. In other words, while law enforcement may delay a person crossing the border to perform an exhaustive forensic search of his electronic devices before he leaves the country, may law enforcement arrest a person and seize his electronic device, thus removing any possibility of it crossing the border, and still rely on the border-search exception to conduct a subsequent search of the device for evidence of the crime for which the person has been arrested?

### A. After *Riley*, the Border Search Exception Does Not Extend to the Search of Mr. Kolsuz's Cell Phone Pursuant to His Arrest.

#### 1. The Exceptions to the Warrant Requirement are Narrowly Construed

The ultimate touchstone of the Fourth Amendment is reasonableness. *Riley*, 134 S.Ct. at 2482. "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing … reasonableness generally requires the obtaining of a judicial warrant." *Id.* In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. *Id.* Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). Exceptions to the Fourth Amendment's warrant requirement must be "jealously and carefully drawn," accompanied by "a showing by those who seek exemption that the exigencies of the situation made that course imperative." *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) (internal quotations and citations omitted). Indeed, the Supreme Court has recently emphasized that warrant exceptions are narrowly construed in light of their original justification. *See Arizona v. Gant*, 556 U.S. 332 (2009). Specifically, the Court held that a warrantless search violated the Fourth Amendment where an exception to the warrant requirement was asserted in a manner unjustified by the original basis for the exception.

4

*Id.* at 343 (warrant exception cannot apply in circumstances where its application would "untether the rule from the justifications underlying" the exception).

In *Riley*, the Supreme Court held that "the search incident to arrest exception does not apply to cell phones," and thus, that "a warrant is generally required . . . even when a cell phone is seized incident to arrest." 134 S.Ct. at 2493-94. Generally, the "search incident" doctrine allows police to "discover and seize the fruits or evidences of crime" for reasons of evidence preservation or officer safety. *Id.* at 2482-84. However, in balancing the competing interests of privacy and law enforcement needs in the context of cell phone searches incident to arrest, the Court concluded that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse," *id.* at 2488-89, and that "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house." *Id.* at 2491 (emphasis in original). *Riley* noted that "other case-specific exceptions may still justify a warrantless search of a particular phone," and it discussed the exigency exception, but it made no mention of the "border search" exception. *Id.* at 2494.

## 2. The Border Search Exception Does Not Apply When the Search is Conducted to Find Evidence Not Contraband At the Border

Under the "border search" exception, the government may conduct "routine" searches of persons and effects at the border or its functional equivalent upon no suspicion, *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), and "nonroutine" searches—i.e., highly intrusive searches—upon reasonable suspicion. *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985). However, the scope and reach of the "border search" exception is determined by reference to its historical scope and rationale. *United States v. Ramsey*, 431 U.S. 606, 620-622 (1977) (examining "the rationale behind the border-search exception" and "historically recognized scope of the border-search doctrine" to uphold a suspicionless search of mail at the

border).  In this regard, "searches made at the border, pursuant to the longstanding right of the

sovereign to protect itself by stopping and examining persons and property crossing into this

country, are reasonable simply by virtue of the fact that they occur at the border.  *United States v.*

*Ramsey*, 431 U.S. 606, 616, (1977).

Congress, since the beginning of our Government, "has granted the Executive plenary

authority to conduct routine searches and seizures at the border, without probable cause or a

warrant, in order to regulate the collection of duties and to prevent the introduction of contraband

into this country."  *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004) (discussing

plenary authority to protect territorial integrity to prevent "the entry of unwanted persons and

effects") (citing *United States v. Montoya de Hernandez*, 473 U.S. at 537).

While the border search exception has been held to apply to searches both upon entry and

exit, the underlying rationale rests on "fundamental principles of national sovereignty" and the

"long-standing right of the sovereign to protect itself."  *United States v. Oriakhi*, 57 F.3d 1290,

1296-97 (4th Cir. 1995) (holding that the sovereign has interest in regulating foreign commerce

and controlling its currency).  Importantly, the Supreme Court has justified warrantless border

searches precisely because they are based on purposes *other than* furnishing evidence against a

person.  *Ramsey*, 431 U.S. at 616 (differentiating the "long-standing right of the sovereign to

protect itself" and the "plenary customs power" from "the more limited power to enter and

search" places or objects, which generally requires a warrant).

The "border search" exception is a narrow one and may not be extended beyond its

historical purposes to a post-arrest, investigatory search of a cell phone seized incident to an

arrest at the border.  Here, Mr. Kolsuz was already arrested when the agents searched his phone.

Additionally, both the phone and the allegedly illegal contraband—the gun parts detected by

border patrol agents—had already been seized when the Homeland Security agents began to search his phone.  At the time of the search of Mr. Kolsuz's phone, which lasted over a month, the government was not exercising its sovereign authority to monitor items entering or exiting the country, regulating commerce, controlling currency, or collecting any duties.  Rather, the government's own report of the search concedes that it began to search the phone, after determining that it would not cross the border, for the purpose of gathering evidence relating to the charge upon which Mr. Kolsuz had been arrested.

In *United States v. Cotterman*, decided before the Supreme Court's opinion in *Riley*, the Ninth Circuit held that the government could take a laptop seized during a border search with reasonable suspicion and take it to another location to be forensically examined.  However, there, the suspected contraband was the digital data itself (child pornography on the laptop).  709 F.3d 952, 958-59 (9th Cir. 2013).  Moreover, the government seized the laptop upon the defendant's entry into the United States (while allowing the defendant and his wife to enter), and did not discover evidence of crime until later conducting the forensic search.  *Id.* at 957-59.  In other words, the search in *Cotterman* was conducted in furtherance of determining whether the laptop could be permitted to legally enter the United States.

Here, in contrast, at the time of the forensic search, the gun parts had already been seized, Mr. Kolsuz had already been arrested, and his cell phone had already been held as potential evidence.  The cell phone itself was not contraband or a dutiable article.  Nor was it, like the laptop in *Cotterman*, still in the process of crossing the border conditioned upon a search for contraband.  As noted, the phone was not being searched to determine whether it could legally cross the border, but for evidence to be used in a criminal prosecution.  Upon Mr. Kolsuz's arrest the agents were entitled to continue searching his personal effects because other exceptions

7

applied to those items (i.e., search incident to arrest, inventory search, and inevitable discovery). A search of his cell phone for evidence of the crime for which he had been arrested, however, required a warrant. *See United States v. Camou*, 773 F.3d 932, 937-45 (9th Cir. 2014) (rejecting the government's attempt to justify a cell phone search at an interior border patrol checkpoint under the exigency, vehicle, good faith, search incident, and inevitable discovery exceptions).

Moreover, other courts considering the intersection of technology, the Fourth Amendment, and the border search exception, have held that the border search exception does not allow for warrantless searches of computer devices. In *United States v. Kim*, Judge Amy Berman Jackson concluded that the warrantless search of a traveler's laptop as he was departing the United States was unreasonable. In that case, DHS border patrol agents seized Mr. Kim's computer, cloned the hard drive, and sent it to a forensic lab roughly 150 miles from the airport. The Court stated that "there was little about this search—neither its location nor its scope and duration—that resembled a routine search at the border." *United States v. Kim*, 103 F. Supp. 3d 32, 35 (D.D.C. 2015). The Court accordingly held that the search was unreasonable and violated the Fourth Amendment. *Id.*

The search of Mr. Kolsuz's phone simply was not made during a border search. It was, instead, a search incident to his arrest and a warrant was therefore required. *See Riley v. California*, 134 S.Ct. 2473 (2014). In addition to the fact that the government had no sovereign border protection interests at stake here, a border search is one that occurs, by definition, at the border (or its functional equivalent, such as an airport). *See Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973) (border searches "take place not only at the border itself, but at its functional equivalents as well"). Mr. Kolsuz's phone was not searched at the functional equivalent of the border. It does not appear that any customs agents even tried to gain access to

the phone at the airport. Rather, the phone was not searched until it entered a secure Homeland Security facility located in an office building in Sterling, Virginia, roughly five miles away from the airport. Moreover, the search was not reasonably close in time to any attempted border crossing, as the search lasted for an entire month after Mr. Kolsuz's attempt to leave.

Furthermore, the search cannot be analyzed under the extended border search doctrine, as this doctrine justifies border searches done away from the physical border only where agents have reasonable suspicion "not only with respect to the nature of the material seized *but to the fact that it has indeed illegally crossed a border within a reasonably recent time*." *United States v. Bilir*, 592 F.2d 735, 739-740 (4th Cir. Md. 1979). This doctrine is inapposite to the search done here. Mr. Kolsuz's cell phone had not illegally crossed a border recently. In fact, it remains detained within the United States where it had been for the days preceding Mr. Kolsuz's arrest.

The government has acknowledged that the search was conducted to gather evidence to be used against Mr. Kolsuz in this proceeding—not in furtherance of any sovereign interest relating to securing the border, because it had already arrested Mr. Kolsuz and determined that neither he nor his phone would cross the border, at least until the conclusion of this criminal prosecution (at which time, of course, they would be subject to a border search before leaving).

### B. The Government Could Have Easily Obtained a Warrant But Chose Not To Do So Here.

In the modern era of electronic communication, search warrants are easy to obtain, and do not even require an in-person application. *Missouri v. McNeely*, 133 S.Ct. 1552, 1561-62 (2013). The government is still in possession of Mr. Kolsuz's phone. If the government had a legal basis to search Mr. Kolsuz's cell phone, SA Copollo could easily have applied for and obtained a warrant for its search. The government chose, however, to forgo judicial

authorization of its exhaustive forensic analysis of Mr. Kolsuz's smart phone.  Instead, it conducted an intrusive, month-long forensic search for evidence to be used in this criminal prosecution, the reasons for which were entirely unrelated to the justifications supporting the border-search exception to the warrant requirement.  In other words, it was not a border search, but a search incident to arrest.  And it was conducted without a warrant in contravention of clear Supreme Court precedent on cell phone searches incident to arrest.

## **CONCLUSION**

For the foregoing reasons, the Court should order the exclusion of all evidence derived from the warrantless search of Mr. Kolsuz's cell phone, and all evidence that was a fruit of that warrantless search.

Respectfully submitted,

HAMZA KOLSUZ

By Counsel,

Geremy Kamens,

Federal Public Defender

By:      _____/s/_____
           Todd Richman
           Assistant Federal Public Defender
           VA Bar Number 41834
           Erica L. Marshall
           Volunteer Attorney
           VA Bar Number 78781
           *Attorneys for Hamza Kolsuz*
           Office of the Federal Public Defender
           1650 King Street, Suite 500
           Alexandria, Virginia 22314
           703-600-0825
           703-600-0880 (fax)
           todd_richman@fd.org
           erica_marshall@fd.org

**J.A. 36**

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2016, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Heather Alpino
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Heather.alpino2@usdoj.gov

By:            /s/
Erica L. Marshall
Volunteer Attorney
VA Bar Number 78781
*Attorney for Hamza Kolsuz*
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
703-600-0859
703-600-0880 (fax)
Erica_Marshall@fd.org

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:16-CR-53 |
| HAMZA KOLSUZ, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM DEFENDANT'S CELLULAR PHONE**

The United States of America, by and through its attorneys Dana J. Boente, United States Attorney; Heather Alpino, Special Assistant United States Attorney; and Dennis Fitzpatrick, Assistant United States Attorney, hereby files this response to the Defendant's "Motion to Suppress Evidence." Because the Defendant's cellular phone was lawfully searched pursuant to the government's broad authority to conduct warrantless border searches—an exception to the warrant requirement that is completely distinct from the search incident to arrest exception—the United States respectfully requests that the Court deny the motion.

**I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

On January 25, 2016, the Defendant entered the United States at Miami International Airport on a B2 visitor's visa. On February 1, 2016, Charles Reich, a Special Agent assigned to the New York Homeland Security Investigations ("HSI") Field Office—which is part of U.S. Immigration and Customs Enforcement ("ICE")—called United States Customs and Border Protection ("CBP") Supervisory Officer Mike Augustino, who was on duty at Washington Dulles International Airport ("Dulles"). Reich informed Augustino that: (1) the Defendant had

previously been stopped at John F. Kennedy International Airport ("JFK") attempting to export items on the United States Munitions List ("USML") from the United States to the Republic of Turkey without a license, in violation of the Arms Export Control Act; (2) the Defendant was scheduled to take a flight from Dulles to the Republic of Turkey the next day, February 2, 2016; and (3) he wanted to make sure that the Defendant's checked bags were searched to determine whether they contained any firearms parts. Reich thereafter called the HSI agent on duty at Dulles, Special Agent Jay Culley, and had a similar conversation with him.

Reich followed up on the phone calls by sending an email to Augustino and Culley, which is attached as Exhibit 1. The email included the Defendant's name and date of birth, and noted his Turkish citizenship. The email also contained: (1) the summary that had been written by the CBP officer who interviewed the Defendant at secondary inspection when he entered the United States on January 25, 2016; and (2) the Defendant's flight itinerary for his Cleveland to Dulles flight and his Dulles to Istanbul flight. Furthermore, the email stated: "Not sure how his English is, on 01/08/2013 (2013SZ003360701) he was stopped by CBP exodus team at jfk with gun parts. Had a Turkish speaking [CBP officer] on site." Moreover, in the email, Reich asked Augustino and Culley to examine the Defendant's checked bags to see if they contained any firearms parts. Reich also requested that they ask the Defendant certain questions, specifically: (1) "who he met in Florida;" (2) "did he get money from anyone (believe he met guy from NY on probation for gun related offenses who traveled there last week);" (3) "what 'tourism did he do;'" (4) "did he attend gun show in Ohio (there was one this past weekend);" (5) "did he purchase anything firearms related;" (6) "[d]id he ship any parts out;" and (7) "did he go with anyone to Ohio." Approximately three hours later, Augustino forwarded Reich's email to CBP's Tactical Terrorist Response and Counterterrorism Response Teams at Dulles, writing: "Please

note the below request from HSI New York.  Please also note the questions provided.  If the exam yields negative results, please ensure all questions are addressed in the closeout.  Also will need to coordinate with [Turkish Airlines] for checked bags after he clears the ticket counter."

CBP Supervisory Officer Lauren Colgan on the Tactical Terrorist Response Team thereafter assigned CBP Officer Jonathan Budd to the matter.  Both Colgan and Budd reviewed Reich's email.  In addition, Colgan queried the "2013SZ003360701" reference in Reich's email, which was a CBP report summarizing the circumstances involved in the January 8, 2013 stop of the Defendant at JFK.  Colgan reviewed this report, which explained that a search of the Defendant's checked luggage on January 8, 2013 revealed firearms parts that cannot be lawfully exported from the United States without a license because they are on the USML.  Because the Defendant did not appear to have an export license, those items were seized by CBP.  The report also referenced an even earlier seizure of firearms parts in the Defendant's luggage that he had attempted to transport from the United States, through JFK Airport, to the Republic of Turkey on December 2, 2012 without an export license.  Colgan also reviewed TECS records memorializing the December 2, 2012 and January 8, 2013 stops of the Defendant at JFK.[1] Accordingly, Colgan was well-aware that the Defendant had previously attempted to export firearms parts from the United States to Turkey without a DDTC license on both of these dates.

On February 2, 2016, the Defendant began his return trip to Istanbul, Republic of Turkey by checking in at Miami International Airport for a flight that was to take him and his checked luggage through Cleveland Hopkins International Airport and Dulles before embarking for Istanbul, Republic of Turkey on Turkish Airlines.  After the Defendant and his checked luggage arrived at Dulles, Colgan and Budd coordinated with Turkish Airlines and United Airlines to get

---

[1] TECS is an internal database that serves as a data repository to support law enforcement "lookouts," border screening, and reporting for the United States Department of Homeland Security's primary and secondary border inspection processes.

3

the Defendant's checked bags pulled from the airplane prior to their transport to his connecting flight to the Republic of Turkey.  After Colgan and Budd obtained the Defendant's two pieces of checked luggage, they initiated an outbound customs examination on the luggage.  This examination resulted in the discovery of various firearms parts that cannot lawfully be exported from the United States without a license from the United States Department of State's Directorate of Defense Trade Controls ("DDTC").  Specifically, the inspection revealed eighteen handgun barrels, twenty-two 9mm handgun magazines, four .45 caliber handgun magazines, and one .22 caliber Glock caliber conversion kit.[2]  Based on their training and experience, Colgan and Budd immediately knew that the barrels and the caliber conversion kit are listed on the USML and could not lawfully be exported from the United States without a DDTC license.[3]

Culley arrived at Dulles as Colgan and Budd were reviewing the contents of the Defendant's checked bags.  He had previously reviewed Reich's email, was aware of two previous stops of the Defendant as a result of his conversation with Reich, and had reviewed TECS records documenting the two earlier stops.  After the firearms parts were found in the Defendant's checked luggage, Colgan, Budd, Augustino, and Culley conducted an outbound customs inspection of the Defendant on the jetway as he attempted to board his flight to Istanbul.  On the jetway, after he was asked whether he had anything to declare, the Defendant admitted

---

[2] The Defendant's luggage also contained one .357 caliber handgun magazine, but it is unclear whether the CBP officers were aware of that fact at that time.  CBP later seized the handgun barrels and handgun caliber conversion kit pursuant to 19 U.S.C. § 1595a(d) and 22 U.S.C. § 401 because:  (1) the attempted exportation of the firearms parts violates 22 C.F.R. §§ 127.1, 127.2, 123.17, and 123.22(b); and (2) the attempted exportation of those firearms parts violates 22 C.F.R. § 120.30 and 15 C.F.R. §§ 30.4 and 30.17 because the Defendant failed to file electronically in the Automated Export System, which is a requirement for the legal exportation of any article listed on the USML.  CBP also seized the magazines, laser aiming modules, and the two pieces of luggage.

[3] Although Colgan believed that the magazines were also on the USML, the magazines were not officially seized until after Colgan reviewed a DDTC blanket memorandum explaining that magazines are controlled on the USML.

that there were barrels and/or magazines in his checked luggage.  The Defendant stated that he initially flew from the Republic of Turkey to Miami, Florida and then travelled to Ohio.  While in Ohio, he stated that he attended a gun show where he made cash purchases for the items found in his checked luggage.  The Defendant was asked whether he had any licenses to export any of the items found in his checked luggage from the United States.  The Defendant responded that he neither had nor needed a license to lawfully export the items from the United States.  The Defendant further claimed that the items in his luggage were solely for personal use, and that he had no intention of selling them in Turkey or any other country.

On the jetway, CBP officers took the Defendant's iPhone from him and placed it in his carry-on luggage.  The Defendant was then transported to the CBP secondary inspection area, along with his carry-on luggage and the iPhone.  At that time, Colgan manually reviewed the Defendant's most recent text messages on his phone—which was not password-protected—as well as his phone's call log listing his most recent calls.  The phone remained in the secondary inspection area after this initial cursory inspection.  Colgan also queried the Automated Export System ("AES") to ascertain:  (1) whether the Defendant had ever filed an export license with CBP at the time of any export, and (2) whether the Defendant was listed as a License Registrant with DDTC.  The query revealed no records associated with the Defendant.

HSI Special Agent Adam Coppolo read the Defendant his *Miranda* rights.  In an ensuing interview conducted by Coppolo, Culley, and HSI Special Agent James Donovan, the Defendant stated, among other things, that:  (1) he entered the United States with the intention of sightseeing in Florida with Bayram Bulut, an individual the Defendant said he had known since 2006 or 2007; (2) he was in possession of $9,000.00 when he entered the United States; and (3) he had visited numerous gun shops, pawn shops, and a gun show while he was in Florida.  The

Defendant stated that he had purchased the firearms parts in his luggage at the gun show, and that Bayram had not purchased any of the firearms parts.  The Defendant denied that anyone else had ordered the firearms parts located in his checked luggage.  The Defendant stated that Bayram had told him not to purchase the gun parts because it would lead to problems for the Defendant, but that the Defendant decided not to heed his warning.  After the conclusion of the interview early in the morning on February 3, 2016, Coppolo took custody of the iPhone, and the agents arrested the Defendant.

Coppolo then transported the Defendant's iPhone to HSI's office in Sterling, Virginia.  Coppolo turned over the phone to HSI Computer Forensic Agent Michael Del Vacchio, who conducted a logical file system extraction of the Defendant's iPhone.  The phone was already in airplane mode when he received it, and he did not change this setting.  Del Vacchio hooked the phone up to a Cellebrite UFED Physical Analyzer and conducted a logical file system extraction of the phone, which extracts only the device's file system.  During this type of extraction, the Cellebrite software only accesses the phone's allocated space—space to which the phone's operating system has already written files, for example, photographs and messages—and does not access the phone's unallocated space.  This is in contrast to a physical extraction, which makes a bitstream copy of the phone's hard drive and obtains everything on the phone—including data in the phone's allocated and unallocated space.

Once the logical file system extraction was complete, the UFED Physical Analyzer generated a report that Del Vacchio subsequently provided to Coppolo for review.  Coppolo thereafter reviewed the report to search for evidence of merchandise being exported contrary to law.  The report includes the Defendant's contact lists, emails, messenger conversations (including Kik, iChat, and WhatsApp conversations), photographs, and videos.  The United

States seeks to use some of this evidence at trial.

On March 3, 2016, after the Defendant had previously been charged in a Criminal Complaint, the grand jury returned a three-count indictment against the Defendant charging him with: (1) conspiring with other individuals, in violation of 18 U.S.C. § 371, to violate 22 U.S.C. §§ 2778(b)(2) and (c); 22 C.F.R. §§ 121.1, 123.1, and 127.1; and 18 U.S.C. § 554(a); (2) knowingly and willfully attempting to export from the United States to the Republic of Turkey handgun barrels; 9mm, .45 caliber, and .357 caliber handgun magazines; and a .22 caliber Glock caliber conversion kit, all of which were and are designated as defense articles on the USML, without first having obtained a license or written approval from the DDTC, in violation of 22 U.S.C. §§ 2778(b)(2) and (c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1; and (3) smuggling goods from the United States, in violation of 18 U.S.C. § 554(a).[4]  The Defendant entered a not guilty plea at his arraignment on March 11, 2016, and a jury trial is scheduled before this Court on May 16, 2016.

---

[4] The Arms Export Control Act, Title 22, United States Code, Section 2778 ("AECA" or the "Act") authorizes the President to control the export of defense articles and defense services from the United States. Unless a specific exception applies, the Act provides that no defense articles or defense services may be exported without a license for such export. 22 U.S.C. § 2778(b). The regulations promulgated pursuant to the Act are the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Sections 120 through 130. The United States Department of State, Directorate of Defense Trade Controls (the "DDTC") administers the ITAR and regulates the export of defense articles. Section 2778(c) of the AECA establishes criminal penalties for any willful violation of Section 2778 or any rule or regulation thereunder. Under Section 123.1 of the ITAR, any person who intends to export a defense article has to obtain the approval of the DDTC before such export occurred. Pursuant to the ITAR, exporting, or attempting to export, a defense article from the United States without a license or written approval from the DDTC is unlawful. 22 C.F.R. § 127.1(a)(1). The ITAR defines exporting to include, among other things: "[s]ending or taking a defense article out of the United States in any manner . . . ." 22 C.F.R. § 120.17. The ITAR defines a defense article to be any item on the USML contained in the regulations. The USML sets forth twenty-one categories of defense articles that are subject to export licensing controls by the DDTC. 22 C.F.R. § 121.1.

## II.    ANALYSIS

Contrary to the Defendant's argument, the search of his cellular phone was a lawful exercise of the government's broad border search authority.   Moreover, even if the Court concludes that the search violated the Fourth Amendment, suppression is not warranted because the agents acted in good faith reliance on binding appellate authority.

### A.    A Border Search of a Cellular Phone Does Not Require a Warrant, Probable Cause, or Any Heightened Level of Suspicion.

Searches of persons and their effects at the border constitute a long-recognized exception to the Fourth Amendment's warrant requirement.  *United States v. Ramsey*, 431 U.S. 606, 616–19 (1977).  The authority to conduct warrantless border searches advances the United States' "inherent authority" and "paramount interest" in protecting its "territorial integrity," which "is at its zenith" at the border.  *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *see also United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005) (characterizing the government's interest as "overriding").  This substantially elevated governmental interest renders "the Fourth Amendment's balance of reasonableness . . . qualitatively different at the international border than in the interior," specifically, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is . . . struck much more favorably to the Government."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 538–40 (1985) (internal citation omitted); *see also Ramsey*, 431 U.S. at 623 n.17 (recognizing lack of "statutorily created expectation of privacy" at the border and the "constitutionally authorized right of customs officials" to search persons and goods at the border).

The border search authority granted to customs officers is broad and is codified in numerous statutes and regulations.  Congress has defined customs officers to include "any officer of the United States Customs Service of the Treasury Department . . . or . . . of the Coast Guard,

or any agent or other person, including foreign law enforcement officers, authorized by law or designated by the Secretary of the Treasury to perform any duties of an officer of the Customs Service." 19 U.S.C. § 1401(i). Accordingly, customs officers working for CBP and ICE—which includes HSI—have border search authority. Customs officers' border authority includes the right to: inspect and search any vehicle or vessel and all persons, packages and cargo therein, *see* 19 U.S.C. §§ 482, 1467, 1581; inspect and search all persons, baggage, and merchandise entering the United States, *see* 19 U.S.C. §§ 1496, 1582, and 19 C.F.R. § 162.6; detain and search all persons entering from foreign countries, *see* 19 U.S.C. § 1582; and detain property until inspected, examined, found to comply with the law, and cleared for release, *see* 19 U.S.C. §§ 1461, 1499. Similar broad authority "to conduct routine searches and seizures at the border, without probable cause or a warrant" has existed "[s]ince the founding of our Republic." *Montoya de Hernandez*, 473 U.S. at 537 (citing *Ramsey*, 431 U.S. at 616–17).

The Defendant now seeks to have this Court limit the Government's statutory and constitutional authority to conduct warrantless searches at the border by applying the holding in *Riley v. California*, 134 S. Ct. 2473 (2014)—which applies solely to searches incident to arrest—to searches of electronic devices detained at the border pursuant to the government's plenary border search authority. In *Riley*, the Supreme Court held that a search warrant is generally required to conduct a digital search of a cellular phone seized incident to a lawful arrest, in part because officer safety concerns are not implicated. *Id.* at 2484–85. Critically, however, the Court recognized that, "even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 2494. "The border search exception is one such case-specific exception." *United States v. Saboonchi*, 48 F. Supp. 3d 815, 817 (D. Md. 2014).

*Riley* does not suggest, let alone require, the presence of a warrant to conduct a border search of a cellular phone or other electronic device. Indeed, the Supreme Court has never imposed the requirement of a warrant for a border search. Neither has any other court. Indeed, the "longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself," *Ramsey*, 431 U.S. at 619, and *Riley* does not alter this longstanding law.

Allowing warrantless searches of cellular phones at the border is not only consistent with *Riley*, it also reflects that which "[b]oth Congress and the Supreme Court have made clear": "extensive searches at the border are permitted, even if the same search elsewhere would not be." *Ickes*, 393 F.3d at 502; *cf. United States v. Hernandez*, Crim. A. No. 15-2613, 2016 WL 471943, at *3 n.2 (S.D. Cal. Feb. 8, 2016) (stating that, in *Riley*, the Supreme Court "gave no indication that [its] holding applied to the border search exception"); *Saboonchi*, 48 F. Supp. 3d at 819 (recognizing that "*Riley* did not diminish the Government's interests in protecting the border or the scope of the border search exception" and denying defendant's motion to reconsider, in light of *Riley*, ruling that warrantless border search of phone was constitutional). Indeed, contrary to the Defendant's assertion that the border search exception to the Fourth Amendment's warrant requirement is construed narrowly, the Fourth Circuit has recognized that "[t]he realization that important national security interests are at stake 'has resulted in courts giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officials.'" *Ickes*, 393 F.3d at 505 (quoting *United States v. Stanley*, 545 F.2d 661, 666 (9th Cir. 1976)).

In *United States v. Ickes*, the Fourth Circuit held that the border search of a computer passed constitutional muster because border searches conducted without a warrant or a showing

of probable cause constitute a "well-recognized exception to the safeguards of the Fourth Amendment" that derives from the sovereign's right to police its borders and to protect its citizens. *Id.* at 505–06; *see also id.* at 505 ("'The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. Time and again, we have stated that searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border.'" (quoting *Flores-Montano*, 124 S. Ct. at 1585)). The court explained that the competing interests of the government and of the individual arrestee are weighed differently at the border, and that, because a port of entry is not analogous to a residence, an individual's expectation of privacy is "substantially lessened" at the border. *Id.* at 506 (citing *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971) (plurality opinion)). Accordingly, travelers approaching the border should not be surprised to have their baggage searched by customs officers. *Id.*

*Ickes* demonstrates that border searches of electronic devices, like all border searches, do not require a warrant. Indeed, *Ickes* confirms the sovereign's right, as part of a routine border search, to open, inspect, and review files or other items contained in a traveler's electronic media just as it would with other physical items in the traveler's possession. *See id.* at 505–07; *see also United States v. Linarez-Delgado*, 259 F. App'x 506, 508 (3d Cir. 2007) (citing *Ickes* and holding that viewing of video footage on camcorder detained at border was a reasonable border search not requiring a warrant, consent, or reasonable suspicion); *United States v. Bunty*, 617 F. Supp. 2d 359, 364–65 (E.D. Pa. 2008) (holding that search of computer equipment at border was a routine search not requiring reasonable suspicion); *United States v. McAuley*, 563 F. Supp. 2d 672, 679 (W.D. Tex. 2008) (concluding that border search of computer is a routine search and does not require reasonable suspicion to search computer

disks, hard drive, or other related devices).[5]

Contrary to the Defendant's assertion, the border search exception applies just as robustly to searches of people and property that are exiting—not just entering—the United States. *See, e.g.*, *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 63 (1974) (stating, in dicta, that "those entering and leaving the country may be examined as to their belongings and effects . . . without violating the Fourth Amendment"); *Julian v. United States*, 463 U.S. 1308, 1310 (1983) (Rehnquist, J., in chambers) (applying border search exception to exit search); *United States v. Oriakhi*, 57 F.3d 1290, 1295–97 (4th Cir. 1995) ("[W]e join the several other circuit courts which have held that the *Ramsey* border search exception extends to all routine searches at the nation's borders, irrespective of whether persons or effects are entering or exiting from the country."). It would be odd to find that travelers exiting the country have a greater reasonable expectation of privacy than those entering, as "the departure from the United States is almost invariably followed by an entry into another country which will likely conduct its own border search." *United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003) (internal quotation marks omitted). Moreover, the governmental interest in departing passengers and property is similar to its interest in entering passengers and property, as demonstrated by the crime at issue here—the attempted unlawful export of controlled defense articles to a foreign nation.

Balanced against this compelling governmental interest is a traveler's diminished expectation of privacy at the border. International travelers know that, by virtue of their voluntary decision to present themselves for entry into or exit out of the United States, they are subject to the government's plenary search authority. *See, e.g.*, *Ramsey*, 431 U.S. at 623 n.17. Knowing this, travelers have several options, including avoiding traveling to and from

---

[5] *But see United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en banc) (discussed in more detail below, holding that reasonable suspicion is required in order to conduct a forensic examination of electronic devices seized at the border).

the United States, leaving their personal technology devices behind, and removing from their personal technology devices any information that they would not want accessed by customs officers. *See Abidor v. Napolitano*, 990 F. Supp. 2d 260, 280 (E.D.N.Y. 2013) (stating that, because "the individual crossing a border is on notice that certain types of searches are likely to be made, . . . he thus has ample opportunity to diminish the impact of that search by limiting the nature and character of the effects which he brings with him" (internal quotation omitted)). This is in stark contrast to the search incident to arrest context, which typically involves situations in which the search is triggered by unanticipated and non-voluntary contact with law enforcement on the part of the arrestee.

Only once has the Supreme Court ever required any heightened suspicion to justify a border search or seizure, and that case involved the extreme factual situation of a prolonged detention of a defendant—suspected of smuggling drugs in her alimentary canal—for a monitored bowel movement. *Montoya de Hernandez*, 473 U.S. at 534–36, 541–42. The Court specifically refrained from defining further "what level of suspicion, if any, [would be] required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches," *id.* at 541 n.4, and, in cases involving border searches of property, the Court has rejected lower court decisions cabining the government's plenary border search authority. *See, e.g.*, *Flores-Montano*, 541 U.S. at 150 (overturning Ninth Circuit decision requiring reasonable suspicion to conduct a border search of an automobile gas tank); *Ramsey*, 431 U.S. at 607–08, 620–24 (overturning D.C. Circuit decision requiring probable cause and a warrant before opening international mail). In *Flores-Montano*, a decision issued nine years after *Montoya de Hernandez*, the Court cautioned against "[c]omplex balancing tests" to categorize items crossing the border that might require individualized suspicion. 541 U.S. at 152. *Montoya de Hernandez* and *Flores-Montana*

each reflect the Supreme Court's hesitance to unduly constrain the sovereign's border authority by arbitrarily assigning higher levels of privacy at the border to particular categories or items, or to particular types of searches.[6]   Accordingly, the border search of the Defendant's cellular phone did not require a warrant, probable cause, or any heightened level of suspicion.

> B.    The Search of the Defendant's Cellular Phone was a Border Search, Not a Search Incident to Arrest.

The Defendant argues that the evidence from his cellular phone should be suppressed because the warrantless search of his phone was more akin to a search incident to arrest than a border search.  Specifically, the Defendant appears to argue that, given the facts surrounding the stop and his subsequent arrest, *Riley* abrogates the United States' broad authority to conduct a warrantless border search of his phone.

As a preliminary matter, the search incident to arrest exception to the Fourth Amendment's warrant requirement at issue in *Riley* is markedly different in scope and purpose from the border search exception.  The search incident to arrest exception allows for a search of the person and the immediate vicinity of the arrestee.  This is fully consistent with the limited

---

[6] In *Flores-Montano*, while the Supreme Court suggested that, like "highly intrusive searches of the person" requiring some level of suspicion, there may be border searches of property that are sufficiently "destructive" or that are conducted in a "particularly offensive manner" so as to require reasonable suspicion, searches of electronic devices fall outside the scope of these exceptions.  *See* 541 U.S. at 152, 155–56 & n.2.  However, the search of the Defendant's cellular phone:  (1) did not involve the destruction of property; (2) was not a search of a "person;" and (3) was not conducted in a sufficiently "particularly offensive manner" as to warrant departing from the centuries-old principle that the Government can conduct suspicionless searches at the border.  *See id.* at 152, 155–56 & n.2; *cf. United States v. Feiten*, Crim. No. 15-20631, 2016 WL 894452, at *7 (E.D. Mich. Mar. 9, 2016) (stating that, even if search of defendant's electronic media was a highly intrusive search that infringed on the Defendant's "dignity and privacy interests," the defendant "ha[d] failed to point to any authority suggesting that such a conclusion would necessitate a warrant.").  Indeed, when the Supreme Court discussed "highly intrusive searches" in *Flores-Montano*, it expressly referred to "highly intrusive searches of the person" which raised concern based on the "dignity and privacy interests of the person being searched," and made the point that this concern was not triggered by a search of an individual's vehicle.  *Id.* at 152.

Appeal: 16-4687   Doc: 21   Filed: 03/13/2017   Pg: 56 of 273

purposes of the exception, which are to locate any weapons that might endanger the arresting officer and/or to prevent the destruction of evidence by the arrestee. *See Riley*, 134 S. Ct. at 2483 (quoting *Chimel v. California*, 395 U.S. 752, 762–63 (1969)). As the Court noted in *Riley*, "there are no comparable risks [of harm to the officer or destruction of evidence] when the search is of digital data." *Id*. at 2485.

While *Riley* was based in part on the Supreme Court's determination that the search of a cellular phone *is not* closely tied to the historical justifications for searches incident to arrest, *see id.* at 2484–88, the ability to conduct suspicionless searches of electronic devices at the border *is* closely tied to the historical justifications for border searches. Specifically, such searches are central to the governmental interest in preventing the movement of certain materials—for example, export-controlled items—and persons across the border. Indeed, the border search exception serves different and broader purposes than the search incident to arrest exception, specifically, protecting the nation's core sovereign interest in controlling the entry and exit of persons and property to and from the United States in order to safeguard against threats to the citizenry from contraband, smuggling, and illegal activity. *See*, *e.g.*, *Almeida-Sanchez v. United States*, 413 U.S. 266, 291 (1973) (stating that border search authority is "an incident of every independent nation" and "is part of its independence").

Unlike the case with searches incident to arrest, the purposes underlying the border search doctrine apply in full force to searches of electronic media, which can contain contraband (such as child pornography or weapons) or material (such as classified information or malware) that, if illicitly transferred beyond our borders, could pose a direct threat to our national security. Electronic media can also contain information that helps the government to identify individuals who illegally transport contraband—including weapons parts—from the United States to other

J.A. 52

countries. "Allowing customs officials without a warrant to forensically search an electronic device presented at an international border or its equivalent is utterly consistent with its historical mooring of protecting the country by preventing unwanted goods" from crossing the international border. *United States v. Feiten*, Crim. No. 15-20631, 2016 WL 894452, at *6 (E.D. Mich. Mar. 9, 2016).

In the instant case, Colgan and others were well within their authority as customs officers to initiate a border search of the Defendant and his belongings since he voluntarily presented himself at the border, with his iPhone, for inspection; it is therefore irrelevant that he never actually crossed the border. *See United States v. Abbouchi*, 502 F.3d 850, 855 (9th Cir. 2007) (explaining that a border search is valid once the suspect "check[s] his luggage, obtain[s] his boarding pass, pass[es] through security, and embark[s] on the ramp to his flight because these acts 'manifest a definite commitment to leave the United States,' and the search occurred 'in reasonable temporal and spatial proximity to the departure'"); *see also United States v. Humphries*, 308 F. App'x 892, 896 (6th Cir. 2009) (explaining that, because defendant's vehicle was close enough to the border or its functional equivalent to fall within the border search exception, "it was of no consequence that defendant had not actually crossed the border").

The CBP and HSI customs officers' broad authority to conduct a border search of the Defendant and his belongings was not abrogated upon the Defendant's arrest, and, instead, the government retained its authority to complete the border search of the Defendant's phone. *See, e.g.*, *United States v. Calderon-Quinonez*, 382 F. App'x 540, 541 (9th Cir. 2010) ("[T]he seizure of the cocaine in Calderon's vehicle following the arrest was proper either as a border search or because it was supported by probable cause."); *United States v. Bates*, 526 F.2d 966, 967–68 (5th Cir. 1976) (concluding that search of defendant's vehicle after his arrest was a valid border

search, and rejecting defendant's argument that, "because he was arrested for a bond violation, and because the customs officers conducted a preliminary search, the search in which the contraband was discovered should be tested by 'search incident to an arrest' standards rather than by border search standards"); *Gonzalez-Alonso v. United States*, 379 F.2d 347, 349 (9th Cir. 1967) (concluding that second, more thorough search of defendant's vehicle at location away from the border and after his arrest was a permissible border search); *Rivas v. United States*, 368 F.2d 703, 706 (9th Cir. 1966) ("The arrest for impeding a federal officer was a legal arrest which produced a further right to search as well as the continued right of a border search."); *United States v. Young*, Crim. A. No. 12-210, 2013 WL 885288, at **1–2 (W.D.N.Y. Jan. 16, 2013), *adopted by* 2013 WL 885170 (W.D.N.Y. Mar. 8, 2013) (concluding, based on government's broad border search authority, that "review of the contents of defendant's cellular telephones was a permissible border search" where: (1) defendant was placed under arrest after border search of his vehicle revealed drugs; and (2) three cellular phones seized during search were subjected to warrantless search after defendant's arrest).

The fact of the arrest does not abrogate the government's broad border search authority because the officers always had full plenary authority to conduct a complete search of the Defendant's phone under the border search doctrine. Indeed, the Defendant does not dispute that CBP and ICE customs officers would have had the authority to complete the entire border search, including the search of his phone, had he not been arrested. Were this Court to conclude that the government's border search authority ends upon arrest, this would undermine the very authority that Congress has deemed essential to protecting our nation's security and economy and would severely impede the United States' ability to, for example, defend against terrorism and weapons being illegally exported overseas and used against Americans and others.

Furthermore, numerous courts have upheld the government's plenary border search authority where evidence of criminal wrongdoing rather than contraband was uncovered. *See, e.g.*, *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) (upholding warrantless search and seizure of financial documents during border search and stating: "Gurr thus misstates the law in arguing that no case suggests that Customs officials may seize something that they do not know to be contraband. The distinction that Gurr would draw between contraband and documentary evidence of a crime is without legal basis." (citation omitted)); *United States v. Fortna*, 796 F.2d 724, 739 (5th Cir. 1986), *cert. denied*, 479 U.S. 950 (1986) (upholding photocopying of documents and map found in carry-on bag during border search because the documents aroused agents' suspicion of illegal conduct involving material or persons entering or leaving the United States); *United States v. Schoor*, 597 F.2d 1303, 1306 (9th Cir. 1979) (Kennedy, J.) ("[W]here customs officers are authorized to search for material subject to duty or otherwise introduced illegally into the United States and they discover the instrumentalities or evidence of crimes, they may seize the same." (citation omitted)); *see also United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015) (holding that examination and photocopy of a document was part of a lawful border search because "the CBP officer in this case was entitled to inspect and copy the notebook as evidence of" a financial crime, and, "like other federal law enforcement officers," "CBP officers are neither expected nor required to ignore tangible or documentary evidence of a federal crime"). Indeed, "[t]he important factor for a court to consider is whether the search was conducted under the proper authority, not the 'underlying intent or motivation of the officers involved.'" *Gurr*, 471 F.3d at 149 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)); *see also United States v. Smasal*, Crim. A. No. 15-85, 2015 WL 4622246, at **2–4, *10 (D. Minn. June 19, 2015) (rejecting—in case where forensic analysis of defendant's electronic

18

devices detained at border revealed evidence of crimes—defendant's claim that border search was conducted for general law enforcement rather than customs enforcement, citing Supreme Court's admonitions against subjective inquiries into improper motives or pretext in order to determine Fourth Amendment issues, and noting that the validity of a border search "does not depend on whether it is prompted by a criminal investigative motive" (quoting *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006))).

The United States has a strong interest in preventing weapons parts from being illicitly transported beyond its borders, particularly when the destination of those parts is an area of the world that is on the edge of an active war zone. Indeed, in part because "[t]he United States's interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself," *Boumelhem*, 339 F.3d at 423, it is essential that the United States know when weapons parts have been or will be exported beyond its borders. When individuals attempt to illegally export weapons parts overseas, their cellular phones frequently contain email receipts for the purchase of weapons parts, as well as images of weapons and weapons parts, which can contain serial numbers. This information helps the government to uncover what weapons are illegally crossing its borders, and it is the responsibility of CBP and HSI customs officers to investigate these matters. *See Ickes*, 393 F.3d at 507 (stating that "[t]he essence of border search doctrine is a reliance upon the trained observations and judgments of customs officials," and that, "searches [of electronic devices] are most likely to occur where . . . the traveler's conduct or the presence of other items in his possession suggest the need to search further"). This is at the heart of what the border search exception to the warrant requirement is about.

Typically, when individuals illegally export weapons parts from the United States, they

J.A. 56

only take some of the parts with them when they exit the country, and frequently ship additional weapons parts out of the United States. Furthermore, it is common for individuals to work together to illegally export weapons parts from the United States. Accordingly, even though one person may be caught attempting to export weapons parts, additional people are often involved in the illegal enterprise and may themselves be unlawfully exporting items. Export violations, by their very nature, are customs-related offenses affecting the national security and economy of the United States. Such violations are part and parcel of what customs officers investigate, and the fact that the search in this case ended up revealing evidence that could be used in a prosecution of the Defendant for crimes stemming from his February 2, 2016 attempted export of firearms parts does not transform the search from a border search into a search incident to arrest.

In addition, the fact that the Defendant's phone was taken to a secondary location for analysis did not alter the character of the search; it still was a border search requiring neither probable cause nor a warrant for its execution. Indeed, the Ninth Circuit has concluded that a search of a defendant's laptop that was seized at the border and examined 170 miles away was still a border search because the laptop had never been "cleared" for entry by customs. *United States v. Cotterman*, 709 F.3d 952, 961–62 (9th Cir. 2013) (en banc). The Sixth Circuit employed similar reasoning in *United States v. Stewart*, 729 F.3d 517 (6th Cir. 2013), where it found that an offsite examination of the defendant's computers fell within the border search exception.[7]  *Id.* at 526. Similarly, in the instant case, the Defendant's cellular phone was never "cleared" for exit by customs, and the search of his phone in Sterling, Virginia was therefore still a border search requiring neither probable cause nor a warrant for its execution. *Cf. United*

---

[7] As *Stewart* and *Cotterman* explain, an offsite examination does not transform a search into an extended border search. Even if it did, however, it would make no difference to the outcome of this case, because extended border searches may be justified by reasonable suspicion, which, as described below, was clearly present here.

*States v. Saboonchi*, 990 F. Supp. 2d 536, 546, 548 (D. Md. 2014) (stating that "[a] border search need not take place *at* the border" and concluding that search in Baltimore of defendant's devices seized in New York was undertaken "pursuant to the general border search doctrine").

Moreover, while the Defendant argues that the length of the search of his cellular phone helps show it was a search incident to arrest rather than a border search, in *Saboonchi*, the district court suggested that a search conducted "over the course of several days, weeks, or months" would still constitute a border search. *See* 990 F. Supp. 2d at 561, 565, 569; *see also Feiten*, 2016 WL 894452, at *2, *7 (holding that warrantless search of cellular phone during a month-long period was still a border search). Indeed, any suggestion that the search of the Defendant's cellular phone was "particularly offensive" due to the duration of the search runs counter to the Supreme Court's admonitions in *Montoya de Hernandez*. *See* 473 U.S. at 542, 544.

In light of the foregoing, the Government had broad authority under the border search doctrine to conduct a warrantless search of the Defendant's cellular phone.[8] Indeed, as explained above, the Fourth Circuit has stated that "[t]he realization that important national security interests are at stake 'has resulted in courts giving the *broadest interpretation* compatible with our constitutional principles in construing the statutory powers of customs officials.'" *Ickes*, 393 F.3d at 505 (quoting *Stanley*, 545 F.2d at 666) (emphasis added). "Time and again," the Fourth Circuit has "stated that searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border,'" *id.* at 505 (quoting *Flores-Montano*, 124 S. Ct. at 1585), and that "extensive searches at the border are permitted, even if the same search elsewhere would not

---

[8] While the Defendant's motion focuses on Coppolo's review of the Cellebrite report, the United States notes that Colgan's manual review at secondary inspection of the Defendant's most recent text messages on his cellular phone as well as his most recent calls constitutes a routine search requiring neither reasonable suspicion nor a warrant. *See Hernandez*, 2016 WL 471943, at *3 (concluding that no reasonable suspicion was required for "non-forensic scan of the cell phone's text messages of the kind conducted in the initial border search in *Cotterman*").

21

be." *Id.* at 502.  This broad authority was not abrogated by *Riley* and applies even when the search:  (1) occurs after an arrest; (2) uncovers evidence of criminal wrongdoing rather than contraband; (3) takes place at a location away from the border; and (4) is temporally attenuated from the time the individual was present at the border.  Accordingly, because the search of the Defendant's cellular phone was a border search, the Court should reject the Defendant's argument that the evidence obtained from the search should be suppressed.

C.     Because the Instant Search was a Border Search and Because Reasonable Suspicion of Criminal Activity Was Present in This Case, This Court Need Not Determine Whether It Was Required.

In *United States v. Cotterman*, the Ninth Circuit became the first and only federal appellate court to hold that a forensic examination of electronic media detained at the border for inspection requires the presence of reasonable suspicion of criminal wrongdoing because such an examination is not a routine search.  709 F.3d at 968.  The court's decision was accompanied by a powerful dissent criticizing the majority for flouting border search jurisprudence in its effort to elevate electronic devices to a special category carrying with it heightened Fourth Amendment protections at the border.  *Id.* at 971–81 (Callahan, J., dissenting in part).  The *Cotterman* Court determined that, because forensic analysis could enable greater access to the large quantity of information capable of being stored on electronic devices, such analysis was analogous in invasiveness and intrusiveness to a strip search and thus required greater Fourth Amendment protections at the border.  *Id.* at 964–66.  However, as the dissent noted, this holding does not square with Supreme Court precedent that makes clear the Court's disinclination to assess the intrusiveness of a border search based upon the categories of objects involved, or the quantity of items searched.  *Id.* at 975–76 (Callahan, J., dissenting).

As explained above, in *Ickes*, the Fourth Circuit held that searches of electronic devices

22

constitute routine border searches with no requirement of reasonable suspicion. 393 F.3d at 506–07. While the *Ickes* search appears to have been a conventional search as opposed to a forensic search, the Fourth Circuit did not distinguish between the two and has never required reasonable suspicion in order to conduct a forensic border search of an electronic device. Furthermore, in *Cotterman*, while the Ninth Circuit appeared to be troubled by the Government's ability to make copies of the hard drives of electronic devices and "perform[] forensic evaluations" on them "that took days to turn up contraband," it failed to adequately define what constitutes a "forensic" search, and how such a search differs from a conventional search. *See* 709 F.3d at 966; *cf. Saboonchi*, 990 F. Supp. 2d at 554 ("[I]t is difficult to figure out the precise basis on which the Ninth Circuit distinguished forensic searches from conventional ones."). Moreover, in *Saboonchi*, the United States District Court for the District of Maryland applied *Cotterman* to a forensic search of an electronic device, but, recognizing the Fourth Circuit's controlling precedent in *Ickes* regarding the broad scope of the sovereign's border search authority, limited its requirement of reasonable suspicion to a forensic search that involves the creation of "a bitstream copy" of the hard drive of a computer or digital device that is then analyzed "by means of specialized software."[9] 990 F. Supp. 2d at 569.

    In the instant case, Del Vacchio conducted a logical file system extraction of the phone, which only extracts the phone's file system. During this type of extraction, the Cellebrite

---

[9] Other district courts have disagreed with the notion that electronic devices should be afforded heightened protection from search at the border. *See*, *e.g.*, *House v. Napolitano*, Civ. A. No. 11-10852, 2012 WL 1038816, at **7–8 (D. Mass. Mar. 28, 2012) (stating that requiring a higher level of suspicion for forensic searches of electronic media would arbitrarily "provide travelers carrying such devices with greater privacy protection than others who chose to carry the same type of personal information in hard copy form"); *United States v. Verma*, Crim. A. No. 08-699, 2010 WL 1427261, at *4 (S.D. Tex. Apr. 8, 2010) (stating that forensic border search of traveler's computer and external drives, regardless of how exhaustive, constitutes routine search, does not threaten traveler's dignity or inflict damage to his property, and is far less intrusive than dismantling of traveler's gas tank upheld as routine border search in *Flores-Montano*).

software only accesses the phone's allocated space—space to which the phone's operating system has already written files, for example, photographs and messages—and does not access the phone's unallocated space. This is in contrast to a physical extraction like that described in *Cotterman* and *Saboonchi*, which makes a bitstream copy of the phone's hard drive and obtains everything on the phone—including allocated and unallocated space and all deleted files. The extraction of the Defendant's phone resulted in the creation of a report, which was not analyzed by or searched with specialized software. Accordingly, the search of the Defendant's iPhone lacks two key features that the *Saboonchi* and *Cotterman* Courts describe as constituting a forensic search: (1) the creation of a bitstream copy, which includes access to the hard drive's unallocated space, and (2) the subsequent analysis of that bitstream copy by means of specialized software, including software that allows agents to search for key terms.[10]  *See Cotterman*, 709

---

[10] In the instant case, the extraction method relied in part on device backup files, which included some messages that had been previously deleted by the Defendant. Device backup files are files that are copied and saved based on selections made by the phone's user regarding which files to back up. The purpose of backup files is to have a copy of certain data in the event of a data loss event. While some deleted messages appear in the report, this does not mean that a customs official can access or search "any files that ever may have been on" the Defendant's iPhone, because these device backup files were located in the phone's allocated space, as opposed to the phone's unallocated space, and no keyword search was ever conducted on the data contained in the Defendant's iPhone. *See Saboonchi*, 990 F. Supp. 2d at 568. Indeed, in concluding that there must be reasonable suspicion to conduct a warrantless border search of an electronic device, the *Cotterman* Court relied in part on the fact that agents had accessed files in the unallocated space of Cotterman's laptop—"the space where the computer stores files that the user ostensibly deleted and maintains other 'deleted' files retrieved from websites the user has visited." 709 F.3d at 965.

Furthermore, in conducting the search of the Defendant's iPhone, Del Vacchio only accessed data stored locally on the Defendant's phone. He did not access any information in the "cloud"—that is, data stored on remote servers as opposed to on the phone itself—nor could he have, as the phone was in airplane mode, which, among other things: (1) prevents the phone from communicating with cell towers, meaning that the phone cannot send or receive mobile data, and (2) disconnects the phone from any Wi-Fi networks to which it had previously been connected. Moreover, Del Vacchio did not connect the phone to any new Wi-Fi networks. The fact that the search did not involve any data in the "cloud": (1) negates the Ninth Circuit's concern in *Cotterman* that phone searches involving access to the "cloud" involves a more serious intrusion into a person's privacy than a search of data stored locally on the phone; and (2)

F.3d at 965–66; *Saboonchi*, 990 F. Supp. 2d at 569. The United States therefore submits that, for this additional reason, the *Saboonchi* and *Cotterman* Courts' requirement of reasonable suspicion does not apply to the search of the Defendant's iPhone.

However, this Court need not reach the constitutional question of whether border searches of electronic media require reasonable suspicion because it is clear that the search in this case was based on reasonable suspicion that the Defendant was engaged in criminal activity. *See, e.g.*, *United States v. Molina-Gomez*, 781 F.3d 13, 19–20 (1st Cir. 2015) (declining to determine whether border search of defendant's laptop, gaming system, and cellular phones required reasonable suspicion where such suspicion was present, and noting Supreme Court's caution against "complex balancing tests"); *United States v. Hassanshahi*, 75 F. Supp. 3d 101, 119 n.11 (D.D.C. 2014) (holding that the doctrine of constitutional avoidance counseled against reaching question of whether reasonable suspicion was required for forensic computer search because reasonable suspicion was present).[11]

Reasonable suspicion means a "minimal level of objective justification." *INS v. Delgado*, 466 U.S. 210, 217 (1984). It "is 'considerably less than proof of wrongdoing by a preponderance

---

addresses the Supreme Court's concern in *Riley* that, in conducting a search of a phone, it may be difficult for officers to differentiate between information stored locally on a phone and information stored remotely in the "cloud," which could be accessed seamlessly using the phone and that could not on any rationale be viewed as subject to a search incident to arrest. *See Riley*, 134 S. Ct. at 2491; *Cotterman*, 709 F.3d at 965 ("With the ubiquity of cloud computing the government's reach into private data becomes even more problematic.").

[11] Judicial restraint is a long-standing principle oft-repeated by the Supreme Court and enshrined in our jurisprudence. *See Ashwander v. TVA*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring); *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988). That principle counsels that courts should refrain from "'anticipat[ing] a question of constitutional law in advance of the necessity of deciding it,' or 'formulat[ing] a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *United States v. Chappell*, 691 F.3d 388, 392 (4th Cir. 2012) (quoting, in part, *Ashwander*, 297 U.S. at 346–47). Before addressing a constitutional issue, a court must therefore determine whether a decision on that issue would affect the ultimate outcome of the case. If not, a constitutional decision would be "unnecessary" and thus "inappropriate." *Lyng*, 485 U.S. at 446.

J.A. 62

of the evidence,' and 'obviously less demanding than that for probable cause.'" *United States v. Jones*, 584 F.3d 1083, 1086 (D.C. Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Here, Reich called Augustino and Culley and informed them that:  (1) the Defendant had previously been stopped at JFK attempting to export items on the USML from the United States to the Republic of Turkey without a license, in violation of the Arms Export Control Act; and (2) the Defendant was scheduled to take a flight from Dulles to the Republic of Turkey the following evening.  Reich followed up his phone call with an email to Augustino and Culley, which included:  (1) the Defendant's name, date of birth, and citizenship; (2) the summary that had been written by the CBP officer who interviewed the Defendant at secondary inspection when he entered the United States on January 25, 2016; (3) the Defendant's flight itinerary for his Cleveland to Dulles flight and his Dulles to Istanbul flight; and (4) information that the Defendant had previously been stopped at JFK Airport on January 8, 2013 with firearms parts, along with a reference to a seizure report for that date.  Colgan, Budd, and Culley reviewed Reich's email and were therefore aware of its contents.

Colgan also queried the seizure report referenced in Reich's email, which summarized the circumstances involved in the January 8, 2013 stop of the Defendant at JFK Airport.  Colgan reviewed this report, which explained that a search of the Defendant's checked luggage on January 8, 2013 revealed the presence of firearms parts that cannot lawfully be exported from the United States without a DDTC license.  Because the Defendant did not appear to have an export license, those items were seized by CBP.  The report also referenced an even earlier seizure of firearms parts in the Defendant's luggage that he had attempted to transport from the United States to the Republic of Turkey on December 2, 2012, without a DDTC license.  Moreover, Colgan and Culley reviewed TECS records memorializing the December 2, 2012 and January 8,

2013 stops of the Defendant at JFK.  Accordingly, Colgan and Culley were well-aware of the
fact that the Defendant had previously attempted to export firearms parts from the United States
to Turkey without a DDTC license on December 2, 2012 and January 8, 2013.

Furthermore, the outbound customs exam of the Defendant's two pieces of checked
luggage resulted in the discovery of various firearms parts that cannot be exported from the
United States without a license from the DDTC.  Based on their training and experience, Colgan
and Budd immediately knew that the barrels and the caliber conversion kit are listed on the
USML and cannot be exported from the United States without a DDTC license.  Furthermore,
the Defendant admitted on the jetway that there were barrels and/or magazines in his checked
luggage, and that he did not have any licenses to export them.  Moreover, when Colgan queried
AES before the Defendant was interviewed by the HSI agents, the query confirmed that:  (1) the
Defendant had never filed an export license with CBP at the time of any export; and (2) the
Defendant was not listed as a License Registrant with DDTC.

Accordingly, the instant case is easily distinguishable from *United States v. Kim*, 103 F.
Supp. 2d (D.D.C. 2015), a case cited by the Defendant.[12]  In *Kim*, the district court found that,
while it was "a close case," the government lacked reasonable suspicion for the border search in
that case because:  (1) it was clear that the search of the defendant's computer was not based on
the belief that he was engaged in criminal activity because the agent testified that he decided to
obtain and search the laptop "based upon his understanding that such a search required no level
of suspicion at all," and that he decided before the stop that he would search the defendant's
laptop the next time the defendant entered the United States; (2) it was not obvious to an agent

---

[12] The Government's particularized and objective bases for suspecting that the Defendant
was engaged in criminal activity are also much stronger than those found to be sufficient in both
*Cotterman* and *Saboonchi* to justify a warrantless forensic border search of electronic media.
*See Cotterman*, 709 F.3d at 968–69; *Saboonchi*, 990 F. Supp. 2d at 571.

who was well-trained in the contents of the USML that the items found in the defendant's checked luggage were on the USML; and (3) the fact that there was a TECS alert about a previous alleged export violation did not provide reasonable suspicion because the facts of the stop at issue in *Kim* were distinguishable from those in the previous stop, specifically, "nothing about the one completed prior incident even involved a trip to the United States."[13]  *Id.* at 44–49.

In the instant case, however:  (1) while Reich requested that CBP officers search the Defendant's checked luggage, there was no request for any search of the Defendant's electronic devices; (2) it was obvious to agents who were well-trained in the contents of the USML that firearms parts controlled on the USML were in the Defendant's checked luggage and were supposed to arrive with the Defendant in the Republic of Turkey; and (3) the December 2, 2012 and January 8, 2013 stops at JFK involving the Defendant attempting to export firearms parts to Turkey without a license were nearly identical to the February 2, 2016 stop in terms of the general location of departure (the United States), the destination of the flights (Turkey), and the nature of the items found in the Defendant's checked luggage (firearms parts listed on the USML).  Indeed, while "evidence of prior criminal conduct alone is not sufficient to give rise to reasonable suspicion," here, it was obvious to the officers that the Defendant was yet again

---

[13] In *Kim*, the district court ruled that *Riley* obviated the need to address the constitutional question of what level of suspicion might be required for a forensic border search of electronic media, reading *Riley* to provide a framework for determining the reasonableness of such a search based on "the totality of the unique circumstances" of the case before it.  103 F. Supp. 2d at 53–55.  This free-form "reasonableness" balancing test ignores border search precedent and conflicts with the general Fourth Amendment requirement that courts set forth "'workable rules'" established on "'a categorical basis – not in an ad hoc, case-by-case fashion.'"  *See Riley*, 134 S. Ct. at 2491–92 (noting the Court's "general preference to provide clear guidance to law enforcement through categorical rules," and quoting *Michigan v. Summers*, 452 U.S. 692, 705 n.19 (1981)).  Moreover, the *Kim* Court's analysis ignores the fact that *Riley*, by its own terms, was limited to an analysis of Fourth Amendment reasonableness in the context of an exception—search incident to arrest—that is treated differently under the law than border searches.  *See United States v. Blue*, Crim. A. No. 14-244, 2015 WL 1519159, at *2 (N.D. Ga. Apr. 1, 2015) (stating that *Riley* "has no direct application" to the warrantless extraction of data during border search of cell phone).

attempting to export USML-controlled firearms parts to Turkey without a DDTC license. *See id.* at 45 (citations omitted).

Given the existence of reasonable suspicion in this case, and the question of whether the examination of the Defendant's iPhone even constitutes a forensic search, this Court need not—and should not—decide the constitutional question of whether the search required reasonable suspicion, because that inquiry would be broader than what is necessary to resolve this case.

D.    Suppression of the Evidence from the Defendant's Cellular Phone is Not Warranted Because the Agents Acted in Good Faith Reliance on Binding Appellate Authority.

If this Court were to determine that a warrant was required for the search of the Defendant's cellular phone (which it should not), this ruling would not require the exclusion of the evidence resulting from the search. *See Davis v. United States*, 131 S. Ct. 2419, 2427 (2011) (holding that the deterrence of exclusion varies with the culpability of the relevant law enforcement conduct; when actions are taken with "an objectively 'reasonable good-faith belief'" that the conduct is lawful, exclusion is unwarranted (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984))).  Here, agents plainly acted in an objectively reasonable good faith belief on the Supreme Court's long-established border search precedents (discussed above), as well as this Court's precedent (including *Ickes*), in concluding that they did not need a warrant in order to search a cellular phone seized at the border pursuant to a lawful border search.

## III.    CONCLUSION

Because the Defendant's cellular phone was lawfully searched pursuant to the government's broad authority to conduct warrantless border searches—an exception to the warrant requirement that is completely distinct from the search incident to arrest exception—the United States respectfully requests that the Court deny the Defendant's motion to suppress the

evidence obtained from the search.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:    /s/_____

Heather Alpino
Special Assistant United States Attorney
Eastern District of Virginia
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3936
Heather.Alpino2@usdoj.gov

Dennis Fitzpatrick
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3954
Dennis.Fitzpatrick@usdoj.gov

J.A. 67

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2016, I filed the foregoing with the Clerk of Court using the CM/ECF system.

By:    /s/ _____
       Heather Alpino
       Special Assistant United States Attorney
       Eastern District of Virginia
       United States Attorney's Office
       2100 Jamieson Avenue
       Alexandria, Virginia 22314
       Phone: (703) 299-3936
       Heather.Alpino2@usdoj.gov

       Dennis Fitzpatrick
       Assistant United States Attorney
       United States Attorney's Office
       Eastern District of Virginia
       2100 Jamieson Avenue
       Alexandria, Virginia 22314
       Phone: (703) 299-3954
       Dennis.Fitzpatrick@usdoj.gov

J.A. 68

# EXHIBIT 1



**From:** AUGUSTINO, MICHAEL
**Sent:** Monday, February 01, 2016 21:23
**To:** CBP IAD TTRT; CBP IAD CTRT
**Subject:** FW: TK8 on 2/2

Teams,

Please note the below request from HSI New York.  Please also note the questions provided.  If the exam yields negative results, please ensure all questions are addressed in the closeout.  Also will need to coordinate with TK for checked bags after he clears the ticket counter.

Thanks

Respectfully,

*Michael E. Augustino*

Supervisory CBP Officer
Office of Field Operations
Port of Washington-Dulles
Tactical Terrorism Response Team
Office: 703-661-7102

████████████████

michael.augustino@cbp.dhs.gov



**WARNING:** The information contained herein remains under the control of the Department of Homeland Security (DHS), through the Bureau of Customs and Border Protection (CBP).  It is being disseminated for authorized LAW ENFORCEMENT purposes only.  This information shall not be

953

J.A. 70

distributed beyond the original addressees without prior authorization of the originator as it may contain proprietary or other sensitive trade information subject to dissemination restrictions under the Trade Secrecy Act and Bank Secrecy Act. It is not to be released to the public and only those personnel with a valid "need-to-know" should be allowed access.

**From:** Reich, Charles [mailto:Charles.Reich@ice.dhs.gov]
**Sent:** Monday, February 01, 2016 8:07 PM
**To:** AUGUSTINO, MICHAEL <MICHAEL.AUGUSTINO@cbp.dhs.gov>
**Cc:** Culley, Jay D <Jay.D.Culley@ice.dhs.gov>
**Subject:** TK8 on 2/2

SCBPO Augustino & SA Culley,

Below is what we spoke about on the phone.

My lookout is
P7T51948400CNY
Kolsuz, Hmaza
██████████Turkey

From inbound inspection:
"PAX WILL BE IN US TIL FEB 2,2016 IN MIAMI AND CLEVELAND. PAX IS HERE FOR TOURISM. PAX OWNS PLASTIC MOLD COMPANY CALLED PLASTIK KALIP FOR 7 YEARS NOW WITH HIS BROTHER. PAX HAS NO COLLEGE EDUCATION. PAX NOR FAMILY HAS ANY MILITARY TRAINING. PAX HAS NEVER BEEN TO ANY OTHER TERROR SOURCE COUNTRY. HAS NEVER BEEN TO SYRIA NOR PAKISTAN. IN POSS OF $9,000 USD. NO OTHER DEROG INFO AT THIS TIME. PAX ADMITTED B2."

| UA (UA) | 3725 | 2/2/2016 | 1935 | 2053 | 2/2/2016 7:35:00 PM | 3 | CLEVELAND HOPKINS INTL (CLE) USA | WASHINGTON DULLES INTL (IAD) USA |
|---|---|---|---|---|---|---|---|---|
| TK (TK) | 8 | 2/2/2016 | 2310 | 1615 | 2/2/2016 11:10:00 PM | 4 | WASHINGTON DULLES INTL (IAD) USA | ATATURK INTL (IST) TURKEY |

Not sure how his English is, on 01/08/2013 (2013SZ003360701 ) he was stopped by CBP exodus team at jfk with gun parts. Had a Turkish speaking cbpo on site.

Please check bags for parts. Please ask
-who he met in Florida
-did he get money from anyone (believe he met guy from NY on probation for gun related offenses who traveled there last week)
-what "tourism did he do"
-did he attend gun show in Ohio (there was one this past weekend)

-did he purchase anything firearm related
-Did he ship any parts out
-did he go with anyone to Ohio


Please feel free to call if anything else is needed or comes up.
Thanks for the help,
-Charles

955

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:16-CR-00053** |
| | ) | |
| **HAMZA KOLSUZ,** | ) | |
| | ) | **Motion Hearing: April 29, 2016, 2:00 p.m.** |
| **Defendant.** | ) | |

## DEFENDANT'S REPLY IN SUPPORT OF  MOTION TO SUPPRESS

The government's response to defendant's Motion to Suppress fails to address the principal argument raised in the Motion—that the search in this case was not a border search because the government interests which allow warrantless border searches were eliminated before the search began.  Simply put, the phone was not in the process of clearing customs at the time of its search.  It had been seized in relation to its owner's arrest and intended prosecution, precluding any possibility of it crossing a border.  At the time of the search, therefore, the government cannot claim that it was vindicating the interests that allow border searches—for example, protecting the nation's territorial integrity by preventing contraband from crossing a border.  Accordingly, the proper mode of analysis for the search of Mr. Kolsuz's cell phone is not the border-search exception, but traditional Fourth Amendment jurisprudence.  Under that analysis, there is no dispute that a warrant would have been required to search Mr. Kolsuz's phone incident to his arrest.  And as the government concedes, it did not obtain a warrant.

Indeed, the Supreme Court has in recent years repeatedly emphasized that lower courts err when they interpret exceptions to the warrant requirement to permit searches unjustified by the rationale for the claimed exception.  *See Arizona v. Gant*, 556 U.S. 332, 343 (U.S. 2009) (rejecting a reading of the vehicle "search incident to arrest" exception that would untether the

exception from the justification for exempting such searches from the warrant requirement);
*Riley v. California*, 134 S. Ct. 2473, 2484 (2014) (requiring a warrant to search a cell phone
incident to arrest because, while a "mechanical application" of the search-incident-to-arrest
exception "might well support" a warrantless search of a cell phone following an arrest, the
interests that justify searches incident to arrest—officer safety and destruction of evidence—do
not).  *See also Knowles v. Iowa*, 525 U. S. 113, 119, (1998) (declining to extend the search-
incident-to-arrest exception to the issuance of citations, "a situation where the concern for officer
safety is not present to the same extent and the concern for destruction or loss of evidence is not
present at all").

Moreover, even were the search of Mr. Kolsuz's cellphone analyzed as a border search, it
was plainly a non-routine, extended border search.  It occurred over the course of a month and
resulted in a nearly 900-page report generated by a Computer Forensic Agent using specialized
software.  Non-routine, extended border searches are permitted only upon a showing of
reasonable suspicion.  *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985).  Here, the
reasonable suspicion alleged by the government goes solely to the possible existence on the
phone of evidence relating to the crime for which Mr. Kolsuz had been arrested.  The
government does not allege that it had reasonable suspicion that the phone contained contraband
or some other item relevant to whether it could legally cross the border.  Accordingly, the
suspicion the government alleges might justify a search under the Fourth Amendment—if
conducted pursuant to a warrant or an exception to the warrant requirement—but it does not
justify a non-routine, month-long border search by a Computer Forensic Agent.

J.A. 74

# ARGUMENT

The government's opposition is replete with responses to arguments that Mr. Kolsuz did not raise in his Motion to Suppress.  Over the course of its lengthy opposition, the government spends much time defeating straw-man arguments.[1]  It barely mentions, however, Mr. Kolsuz's primary argument—that the search of his cellphone was not a border search at all.  Nor can it, since the facts indicate that the phone was searched incident to Mr. Kolsuz's arrest, for evidentiary purposes, and not in furtherance of any governmental interests which underlie the border search exception to the Fourth Amendment's warrant requirement.[2]  By mischaracterizing the defendant's argument as a claim that the Supreme Court in *Riley* "imposed the requirement of a warrant for a border search," Opp. At 10, the government obscures the actual argument—that the search should not be evaluated as a border search in the first place because there was no imminent border crossing when it occurred.

## A. The Month-Long Search of Mr. Kolsuz's Cellphone Following His Arrest Was Not a Border Search As it Did Not Implicate Any of the Rationales Underlying the Border Search Exception.

Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, the Fourth Amendment generally requires a judicial warrant.  *Riley v.*

---

[1]    *See, e.g.,* Government's Response in Opposition (dkt # 20) ("Opp.") at 12 ("[c]ontrary to the defendant's assertion, the border search exception applies just as robustly to searches of people and property that are exiting—not just entering—the United States.")  But defendant made no such argument.  See Motion to Suppress (dkt. # 19) at 6 ("the border search exception has been held to apply to searches both upon entry and exit").

[2]    The government is correct, of course, that the subjective intent of the officers conducting a search is not determinative.  *See* Opp. at 18.  The officer's acknowledgement that he searched the phone "to search for violations of the law" is therefore not legally controlling.  But the objective government interests at stake at the time of the search in this case are entirely consistent with that admission—that this was a search in support of a criminal prosecution and not undertaken to vindicate the government's interests in securing the border.  Accordingly, while the officer's subjective intent is not determinative, it is relevant here because it corroborates what the facts objectively demonstrate.

J.A. 75

*California*, 134 S. Ct. 2473, 2482 (2014).  In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.  *Id.* (citing *Kentucky v. King*, 563 U.S. 452, 460 (2011)).  Any exception to the Fourth Amendment's warrant requirement, including the border search exception, must be narrowly construed consistent with its original justification.  *See Arizona v. Gant*, 556 U.S. 332 (2009).

As detailed in Mr. Kolsuz's Motion to Suppress, the border search exception is grounded in the sovereign's longstanding right to protect itself.  *See United States v. Ramsey*, 431 U.S. 606, 616 (1977).  This sovereign power of protection can justify warrantless inbound searches to "exclude harmful influences, including undesirable aliens, from the sovereign's territory," *United States v. Oriakhi*, 57 F.3d 1290, 1296-1297 (4th Cir. Md. 1995) (citations omitted), as well as warrantless outbound searches to regulate foreign commerce and prevent the "export of its currency, national treasures, and other assets."  *Id.* (citations omitted).

The border search exception, however, has never been justified by the government's interest in gathering evidence against a person already arrested for a crime.  While the government is of course correct that evidence of a crime may be found in the course of a legally instituted border search, and that such evidence may be used at trial, *see* Opp. at 18, the gathering of evidence for a criminal prosecution has never been recognized as a basis for conducting a border search.  *See United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) ("We recognize that the primary purpose of a border search is to seize contraband property unlawfully imported or brought into the United States. However, where customs officers are authorized to search for material subject to duty or otherwise introduced illegally into the United States and they discover the instrumentalities or evidence of crimes, they may seize the same.") (citing *United States v. Schoor*, 597 F.2d 1303, 1306 (9th Cir. 1979)).  *See also United States v. Djibo*,

2015 U.S. Dist. LEXIS 168440, *23 (E.D.N.Y. Dec. 16, 2015) (granting motion to suppress and holding that after defendant was arrested at border, customs agent could not conduct "quick look" into cellphone); *United States v. Rivera*, 2014 U.S. Dist. LEXIS 151950, *11 (D.V.I. 2014) (refusing to justify a warrantless airport checkpoint search under the administrative search rationale where it was conducted for criminal investigatory purposes).

The myriad of cases cited by the government to justify its position are largely inapposite, as they pertain to pre-arrest searches at the border conducted when people and/or items were in the process of crossing a border. *See United States v. Saboonchi*, 48 F.Supp. 3d 815, 817 (D. Md. 2014) (finding reasonable suspicion to conduct forensic search of a computer seized at the border and suspected of having contraband where defendant was allowed to proceed into the United States); *United States v. Humphries*, 306 Fed. Appx. 892 (6th Cir. 2009) (pre-arrest car search at Canadian border where the discovery of drugs and a gun during the search prompted arrest).

The government failed to cite a single case decided post-*Riley* to support the proposition that the search of the cellphone was a valid border search even *after Mr. Kolsuz's arrest*.[3]  In fact, most of the cases cited by the government for this proposition are more than forty years old and even cut against the government's position. *See United States v. Bates*, 526 F.2d 966, 967 (5th Cir. 1976) (finding that the search of car after defendant's arrest was a border search but only where it appeared "the car was never released from the immediate border area, that a thorough search was planned from the outset, and that the contraband was discovered within 75

---

[3]    Pre-*Riley* cases on this issue are of limited relevance because the issue can only have squarely arisen since *Riley* was decided.  Before *Riley*, when a person was arrested at the border and his cellphone seized, the warrantless search of the phone would generally have been permissible as a search incident to arrest, so there was no need to squarely address the scope of border-search authority with respect to the cell phone of an arrestee.

minutes of Bates' arrival at the border"); *Gonzales-Alonso v. United States*, 379 F.2d 347, 349 (9th Cir. 1967) (arresting defendant after search under what would later become the extended border search doctrine); *United States v. Calderon-Quinonez*, 382 Fed. Appx. 540 (9th Cir. 2010) (arresting driver after a routine car search at the border revealed cocaine).

Moreover, many cases cited by the government actually highlight the fact that the government often obtains a warrant to search cellphones seized at the border. *See, e.g.*, *United States v. Young*, 2013 WL 885288 (W.D.N.Y. Jan. 16, 2013) (decided pre-*Riley* and pre-*Cotterman*, finding a border agent's review of a single text message from a phone seized from a driver attempting to enter the United States from Canada after his arrest for drug possession constituted a border search and discussing that the agents thereafter applied for a search warrant to further analyze the contents of the cellphone); *United States v. Hernandez*, Crim. No. 15-2613, 2016 WL 471943, 2016 Dist. LEXIS 15884, at *2-3  (S.D. Cal. Feb. 8, 2016) (noting that the government obtained a warrant to search the defendant's cell phone which it seized at the border).

The policy of seeking a warrant for a cellphone search post-arrest is consistent with the observation in *United States v. Abbouchi*, 502 F.3d 850 (9th Cir. 2007), a case cited by the government, that a border search "occur[s] at the last practicable opportunity before [an item's] passage over the international border." *Id*. at 855.  Here, the search of the phone was conducted after Mr. Kolsuz's arrest, and after it had been seized to remain in the United States as potential evidence in a criminal investigation—not at the last practical opportunity before its passage over an international border.  Once it had been determined that neither Mr. Kolsuz nor the phone would cross the border because of his arrest, there is no reason to analyze the search of the phone under anything other than traditional Fourth Amendment jurisprudence.  *See United States v.*

*Soto-Soto*, 598 F.2d 545, 549-550 (9th Cir. 1979) (suppressing evidence where a supposed "border search" was not conducted in furtherance of customs laws but in furtherance of traditional law enforcement interests). In *Soto-Soto*, the court relied on the commonsense principle that, "[i]n conferring upon customs officers such broad authority, circumscribed only by Constitutional limitations of the Fourth Amendment, the Congress has in effect declared that a search which would be 'unreasonable' within the meaning of the Fourth Amendment, if conducted by police officers in the ordinary case, would be a reasonable search if conducted by Customs officials in the lawful pursuit of unlawful imports. Judicial recognition of this distinction has given rise to the term 'border search,' *in order to distinguish official searches which are reasonable because made solely in the enforcement of Customs laws from other official searches made in connection with general law enforcement*." *Id.* (emphasis added) (citing *Alexander v. United States*, 362 F.2d 379, 381 (9th Cir. 1966)).

Further, the government's reliance on the Fourth Circuit's reasoning in *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005), is misplaced. In *Ickes*, the court held that that the defendant's computer constituted ordinary cargo under the border search exception and that the agents could therefore open it and look at it on his way into the country. *Id.* at 505. The Supreme Court has now rejected, however, the *Ickes* court's central premise: that the search of a modern cellphone, such as Mr. Kolsuz's iPhone, is the same as a search of a container. *Riley*, 134 S.Ct. at 2491 ("Treating a cell phone as a container whose contents may be searched incident to an arrest is a bit strained as an initial matter . . . but the analogy crumbles entirely when a cell phone is used to access data located elsewhere, at the tap of a screen."). Moreover, the search in *Ickes* involved only a cursory search of the defendant's laptop, often referred to as a "quick look" and not the type of in-depth forensic search at issue here. *See United States v. Cotterman*, 709

F.3d 952, 957 (9th Cir. 2013).  In the instant case, prior to Mr. Kolsuz's arrest, Agent Coppolo conducted a "quick look" at the phone while Mr. Kolsuz was being interviewed by customs agents, and Mr. Kolsuz does not challenge the legality of that search.  The challenge here is to the exhaustive search of Mr. Kolsuz's phone following his arrest.  Under *Riley*, the Homeland Security agents were required to obtain a warrant to conduct that search.

**B. Even if the Search in this Case Were Analyzed as a Border Search, it Could Not be Justified.**

While courts have long held that border searches constitute a "historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained," *United States v. Ramsey*, 431 U.S. 606, 621 (1977), reasonableness remains the touchstone for all exceptions to the warrant requirement.  *United States v. Riley*, 134 S. Ct. 2473, 2480 (2014). Where a search is "undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant."  *Id.* at 2480 (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 (1995)).

Even if the Court analyzes this search as a border search, which it should not, the Supreme Court has noted that the "border search" exception is similar to the "search incident to arrest" exception.  *United States v. Ramsey*, 431 U.S. 606, 621 (1977) ("[The border search exception] is a longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained, and in this respect is like the similar 'search incident to lawful arrest' exception treated in *United States v. Robinson*, 414 U.S. 218, 224 (1973).").  Accordingly, the Court should treat the warrantless search of a cell phone under the border search doctrine the same way the Supreme Court has treated the warrantless search of a cellphone under the "incident to arrest" exception—as unlawful.  *See Riley*, 134 S. Ct. at 2485. This is particularly true given the facts of this case, where the search occurred only after Mr.

Kolsuz's arrest, at which point the government's sovereign interests with respect to the border had dissipated, and its general law-enforcement interests were paramount.

In *United States v. Cotterman*, the Ninth Circuit held that a forensic examination of a laptop at the border required a showing of reasonable suspicion under the Fourth Amendment. 709 F.3d 952, 957 (9th Cir. 2013). This is consistent with the Supreme Court's holding that "non-routine" border searches must be based on reasonable suspicion. *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985). Courts around the country have followed, holding that the government must have at least reasonable suspicion to conduct a forensic search of an electronic device such as a cellphone or laptop at the border because of the serious privacy interests involved with modern electronics. *See, e.g.*, *United States v. Saboonchi*, 990 F. Supp. 2d 536, 539 (D. Md. 2014) ; *see also United States v. Hassanshahi*, 75 F. Supp. 3d 101, 2014 U.S. Dist. LEXIS 166156, 2014 WL 6735479, *12 (D.D.C. 2014) (not reaching constitutional question of whether reasonable suspicion was required because the court found reasonable suspicion); *United States v. Blue*, No. 1:14 CR 244, 2015 U.S. Dist. LEXIS 43281 (N.D. Ga. March 12, 2015) (same); *United States v. Oriakhi*, 57 F.3d 1290, 1296-1297 (4th Cir. 1995) (a border search that goes beyond the routine is justified by reasonable suspicion, a lesser standard than required for analogous non-border searches, citing *Montoya de Hernandez*, 473 U.S. at 541).

While the government focuses on the existence of reasonable suspicion that Mr. Kolsuz committed a crime, that standard has little meaning on the instant facts. The *Terry* and "reasonable suspicion" standards adopted for non-routine border searches have been used to justify minor transgressions to privacy in order to allow the government to root out and stop imminent criminal activity. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Cortez*, 449 U.S. 411, 417 ("An investigatory stop must be justified by some objective manifestation that the

person stopped is, or is about to be, engaged in criminal activity.")   Along this line, a customs agent must have reasonable suspicion that criminal activity is afoot in order to justify a non-routine search at the border.  *United States v. Montoya de Hernandez*, 473 U.S. 531, 541-42 (1985) (holding that, before an arrest, "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified…if the customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband").

But where the reasonable suspicion goes to the existence of evidence of a crime that has been completed (or, on these facts, interrupted), rather than to imminent criminal activity, it does not justify a border search.  *See United States v. Jae Shik Shim*, 103 F.Supp. 3d 32 (D.D.C. 2015).  Rather, a warrant is required to gather evidence to be used against a defendant at trial. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014).   Accordingly, to defend this search as a reasonable-suspicion-based border search, the government would need reasonable suspicion not that the phone's owner had committed a crime, but that crime was afoot—*i.e.*, that the phone was about to cross the border with contraband, or with some other content that would relate to whether it could legally leave the country.[4]

---

[4]        It is true, of course, that the government can seize evidence of a crime (and thereby prevent it from crossing a border), but that has nothing to do with its border-integrity interests. Rather, that is an exercise of its traditional law-enforcement interests (the same interests that could allow evidence to be seized domestically to prevent it from being destroyed or moved to an unknown location).  Indeed, there is nothing inherent about evidence of a crime that precludes it from crossing a border.  For example, after trial in this case, there would appear to be no reason that Mr. Kolsuz could not take the phone and all its present contents with him whenever he returns to Turkey.

**C. If This Search Were Analyzed as a Border Search, The Government Could Not Defend it as a "Routine" Border Search.**

Finally, the government argues that even though the case agent brought in a Computer Forensic Agent to assist in searching Mr. Kolsuz's cellphone, the search was nonetheless routine rather than forensic. This argument, which rests on the assertion that the agents did not search the "unallocated" space during the month-long computer-aided search, fails. As the court noted in *Saboonchi*:

> [a] conventional search at the border of a computer or device may include a Customs officer booting it up and operating it to review its contents, and seemingly, also would allow (but is not necessarily limited to) reviewing a computer's directory tree or using its search functions to seek out and view the contents of specific files or file types. . . . And, just as a luggage lock does not render the contents of a suitcase immune from search, a password protected file is not unsearchable on that basis alone…

> [i]n a forensic search of electronic storage, a bitstream copy is created and then is searched by an expert using highly specialized analytical software — often over the course of several days, weeks, or months — to locate specific files or file types, recover hidden, deleted, or encrypted data, and analyze the structure of files and of a drive."

*United States v. Saboonchi*, 990 F.Supp. 2d at 560-61. Here, it is undisputed that Agent Michael Del Vacchio, a Computer Forensic Agent with the Department of Homeland Security Investigations, conducted an advanced logical extraction of Mr. Kolsuz's iPhone using a Cellebrite Physical Analyzer. Agent Del Vacchio photographed the device and generated a report detailing the results of the logical extraction. This 896-page report contains all the information generated from Mr. Kolsuz's cellphone, including messages between him and family and friends, his GPS location to precise map coordinates dating back to December 2015, his emails, instant messages, call log, calendar, contacts, and internet browsing history. The government makes much of the fact that the search was not the very most thorough type of

forensic search possible, but that is a red herring.  It was plainly an exhaustive, non-routine search, and that is all that matters to trigger a reasonable-suspicion standard.

## **CONCLUSION**

For the foregoing reasons, the Court should order the exclusion of all evidence derived from the warrantless search of Mr. Kolsuz's cell phone, and all evidence that was a fruit of that warrantless search.


Respectfully submitted,

HAMZA KOLSUZ

By Counsel,

Geremy Kamens,

Federal Public Defender


By:      _____/s/_____
         Todd Richman
         Assistant Federal Public Defender
         VA Bar Number 41834
         Erica L. Marshall
         Volunteer Attorney
         VA Bar Number 78781
         *Attorneys for Hamza Kolsuz*
         Office of the Federal Public Defender
         1650 King Street, Suite 500
         Alexandria, Virginia 22314
         703-600-0845
         703-600-0880 (fax)
         todd_richman@fd.org
         erica_marshall@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2016, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Heather Alpino
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Heather.alpino2@usdoj.gov

By: _____/s/_____
Erica L. Marshall
Volunteer Attorney
*VA Bar Number 78781*
*Attorney for Hamza Kolsuz*
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
703-600-0859
703-600-0880 (fax)
Erica_Marshall@fd.org

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:16-CR-53 |
| HAMZA KOLSUZ, | ) | |
| | ) | |
| Defendant. | ) | |

**JOINT STIPULATION OF FACTS FOR SUPPRESSION HEARING**

The United States of America, by and through its attorneys Dana J. Boente, United States Attorney; Heather N. Alpino, Special Assistant United States Attorney; and Dennis Fitzpatrick, Assistant United States Attorney, and the defendant, by and through his counsel, Todd Richman and Erica Marshall, jointly stipulate to the following facts for the purposes of the suppression hearing scheduled for April 29, 2016, and request that the Court rely on these stipulated facts and the exhibits attached thereto as evidence for the purposes of the suppression hearing:

1. On January 25, 2016, the Defendant entered the United States at Miami International Airport on a B2 visitor's visa.

2. On February 1, 2016, Charles Reich, a Special Agent assigned to the New York Homeland Security Investigations ("HSI") Field Office—which is part of U.S. Immigration and Customs Enforcement ("ICE")—called United States Customs and Border Protection ("CBP") Supervisory Officer Mike Augustino, who was on duty at Washington Dulles International Airport ("Dulles").

3. Reich informed Augustino that: (1) the Defendant had previously been stopped at John F. Kennedy International Airport ("JFK") attempting to export firearms parts CBP agents

**J.A. 86**

believed to be on the United States Munitions List ("USML") from the United States to the Republic of Turkey without an export license; (2) the Defendant was scheduled to take a flight from Dulles to the Republic of Turkey the next day, February 2, 2016; and (3) he wanted to make sure that the Defendant's checked bags were searched to determine whether they contained any firearms parts.

4.    Reich thereafter called the HSI agent on duty at Dulles, Special Agent Jay Culley, and had a similar conversation with him.

5.    Reich followed up on the phone calls by sending an email to Augustino and Culley, which is attached as Exhibit 1.

6.    The email included the Defendant's name and date of birth, and noted his Turkish citizenship.

7.    The email also contained:  (1) the summary that had been written by the CBP officer who interviewed the Defendant at secondary inspection when he entered the United States on January 25, 2016; and (2) the Defendant's flight itinerary for his Cleveland to Dulles flight and his Dulles to Istanbul flight.

8.    Furthermore, the email stated:  "Not sure how his English is, on 01/08/2013 (2013SZ003360701) he was stopped by CBP exodus team at jfk with gun parts.  Had a Turkish speaking [CBP officer] on site."

9.    Moreover, in the email, Reich asked Augustino and Culley to examine the Defendant's checked bags to see if they contained any firearms parts.

10.    Reich also requested that they ask the Defendant certain questions, specifically: (1) "who he met in Florida;" (2) "did he get money from anyone (believe he met guy from NY on probation for gun related offenses who traveled there last week);" (3) "what 'tourism did he

do;'" (4) "did he attend gun show in Ohio (there was one this past weekend);" (5) "did he purchase anything firearms related;" (6) "[d]id he ship any parts out;" and (7) "did he go with anyone to Ohio."

11.     Approximately one hour later, Augustino forwarded Reich's email to CBP's Tactical Terrorist Response and Counterterrorism Response Teams at Dulles, writing: "Please note the below request from HSI New York.  Please also note the questions provided.  If the exam yields negative results, please ensure all questions are addressed in the closeout.  Also will need to coordinate with [Turkish Airlines] for checked bags after he clears the ticket counter."

12.     CBP Supervisory Officer Lauren Colgan and CBP Officer Jonathan Budd, both of whom are on the Tactical Terrorist Response Team, received and reviewed Reich's email.

13.     Colgan assigned Budd to work on the matter with her.

14.     In addition, Colgan queried the "2013SZ003360701" reference in Reich's email, which was a CBP report summarizing the circumstances involved in the January 8, 2013 stop of the Defendant at JFK.

15.     Colgan reviewed this report, which is attached as Exhibit 2, which stated that a search of the Defendant's checked luggage on January 8, 2013 revealed a Beretta .380 automatic pistol slide, a barrel, a guide rod, and a recoil spring.  The report states that CBP then detained the parts and referred the matter to the United States Department of State for a determination as to whether the parts were on the USML.  The report states that the parts were seized one week later after CBP was advised by the Department of State that the parts were controlled on the USML and could not legally be exported from the United States without a license from the United States Department of State Directorate of Defense Trade Controls ("DDTC").  The report also referenced an earlier incident in which firearms parts determined to be on the USML

were found in the Defendant's luggage that he had attempted to transport from the United States,

through JFK Airport, to the Republic of Turkey on December 2, 2012 without an export license

from the United States Department of State.  The report relating to that incident states that those

parts were detained on December 2, 2012, and seized on January 15, 2013, the same date that the

items from the January 8, 2013 incident were seized.  (*See* Exhibit 3.)

16.     Colgan also reviewed TECS records memorializing the December 2, 2012 and

January 8, 2013 stops of the Defendant at JFK.[1]

17.     On February 2, 2016, the Defendant checked in at Miami International Airport for

a flight that took him to Cleveland Hopkins International Airport.  He then checked in for a flight

that was to take him and his checked luggage from Cleveland Hopkins International Airport

through Dulles before embarking for Istanbul, Republic of Turkey on Turkish Airlines.  His

checked luggage was checked through to arrive with him in Istanbul.

18.     After the Defendant and his checked luggage arrived at Dulles, Colgan and Budd

coordinated with Turkish Airlines and United Airlines to get the Defendant's checked bags

pulled from the airplane prior to their transport to his connecting flight to the Republic of

Turkey.

19.     After Colgan and Budd obtained the Defendant's two pieces of checked luggage,

they initiated an outbound customs examination on the luggage.

20.     This examination resulted in the discovery of various firearms parts.

---

[1] TECS is an internal database that serves as a data repository to support law enforcement "lookouts," border screening, and reporting for the United States Department of Homeland Security's primary and secondary border inspection processes.

21.    Specifically, the inspection revealed eighteen handgun barrels, twenty-two 9mm handgun magazines, four .45 caliber handgun magazines, and one .22 caliber Glock caliber conversion kit.[2]

22.    Based on their training and experience, Colgan and Budd immediately knew that the barrels and the caliber conversion kit are listed on the USML and that, based on their understanding, these items could not lawfully be exported from the United States without an export license from the DDTC.[3]

23.    Culley arrived at Dulles as Colgan and Budd were reviewing the contents of the Defendant's checked bags.

24.    Culley had previously reviewed Reich's email, was aware of two previous stops of the Defendant as a result of his conversation with Reich, and had reviewed TECS records documenting the two earlier stops.

25.    After the firearms parts were found in the Defendant's checked luggage, Colgan, Budd, Augustino, and Culley conducted an outbound customs inspection of the Defendant on the jetway as he attempted to board his flight to Istanbul.  There was no Customs and Border Protection Turkish translator present during the outbound customs inspection.

26.    The Defendant's native language is Turkish, and he speaks very little English.

27.    A CBP report summarizing the outbound customs inspection of the Defendant on the jetway, attached as Exhibit 5, states that the Defendant "admitted to CBP that he was in possession of the firearms parts."

---

[2] The Defendant's luggage also contained one .357 caliber handgun magazine, but it is unclear whether the CBP officers were aware of that fact at that time.

[3] Although Colgan believed that the magazines were also on the USML, the magazines were not officially seized until after Colgan reviewed a DDTC blanket memorandum explaining that magazines are controlled on the USML.  (Exhibit 4 at 1–3.)

28.     A second CBP report summarizing the outbound customs inspection of the

Defendant on the jetway, attached as Exhibit 6, states that the Defendant "was stopped on the jet

way for Turkish Airline[s] flight number 8 by members of the [Tactical Terrorism Response]

team, CTR supervisor and an HSI special agent."   It further states that "[a] binding declaration

was obtained by members of the [Tactical Terrorist Response] team from the [Defendant] in his

native language via a translator," specifically, a Turkish Airlines representative.  The Turkish

Airlines representative, whose name does not appear in the report, was working for Turkish

Airlines at the time and is not affiliated with CBP in any official manner.    It is unknown as of

April 19, 2016 whether this person has any formal training or experience as a translator.  The

report also states that the Defendant "admitted being in possession of the" firearms parts found in

his checked luggage, and that he stated that he "initially flew into Miami and then traveled to

Ohio.  While in Ohio, [he] attended a gun show where he made cash purchases of the items."

The report states that the Defendant "was asked if he had any licensure for the items for

exportation from the United States," to which the Defendant "responded that he did not have nor

need an FFL (federal firearms license)."  Finally, the report states that the Defendant:

> claims no knowledge of any licenses required for exportation other
> than an FFL.  The [Defendant] stated that he did not bring very
> much cash into the US, that he used his ATM cards to get the cash
> needed to purchase the items in question (on the subject's entry
> into the US, CBP systems showed the subject in possession of
> $9,000usd).  The [Defendant] has approximately $2,600usd in his
> possession at the time of the encounter.  The [Defendant] claims
> that the items are all for personal use and that he has no intention
> of selling them in Turkey or any other country."

29.     The Defendant never visited a gun show in Ohio.  He was briefly in Ohio on

February 2, 2016, after flying from Miami, Florida to Cleveland Hopkins International Airport.

He spent the entirety of his duration in Ohio in the Cleveland Hopkins International Airport awaiting the departure of his flight to Dulles.

30.     On the jetway leading to his flight from Dulles to Istanbul, CBP officers took the Defendant's iPhone 6 Plus Model #A1524 ("iPhone") from him and placed it in his carry-on luggage.

31.     The Defendant was then transported to the CBP secondary inspection area, along with his carry-on luggage and the iPhone.

32.     At that time, Colgan manually reviewed the Defendant's most recent text messages on his phone—which was not password-protected—as well as his phone's call log listing his most recent calls.

33.     The phone remained in the secondary inspection area after this initial cursory inspection.

34.     Colgan also queried the Automated Export System ("AES") to ascertain: (1) whether the Defendant had ever filed an export license with CBP at the time of any export, and (2) whether the Defendant was listed as a License Registrant with the DDTC.  The query revealed no records associated with the Defendant.

35.     HSI Special Agent Adam Coppolo read the Defendant his *Miranda* rights in the secondary inspection area.

36.     According to a report created by Coppolo, in an ensuing interview conducted by Coppolo, Culley, and HSI Special Agent James Donovan, the Defendant stated, among other things, that:  (1) he entered the United States with the intention of sightseeing in Florida with Bayram Bulut, an individual the Defendant said he had known since 2006 or 2007; (2) he was in possession of $9,000.00 when he entered the United States; and (3) he had visited numerous gun

7

shops, pawn shops, and a gun show while he was in Florida.  According to the report, the Defendant stated that he had purchased the firearms parts in his luggage at the gun show, and that Bayram had not purchased any of the firearms parts.  According to the same report, the Defendant denied that anyone else had ordered the firearms parts located in his checked luggage. The report further states that the Defendant informed the agents that Bayram had told him not to purchase the gun parts because it would lead to problems for the Defendant, but that the Defendant decided not to heed his warning.

37.     After the conclusion of the interview early in the morning on February 3, 2016, Coppolo took custody of the iPhone, and the agents arrested the Defendant.

38.     Coppolo then transported the Defendant's iPhone to HSI's office in Sterling, Virginia.  HSI's office in Sterling, Virginia is approximately four miles from Dulles.

39.     Coppolo turned over the phone to HSI Computer Forensic Agent Michael Del Vacchio and asked for his assistance in extracting information from the Defendant's iPhone.

40.     The phone was already in airplane mode when Del Vacchio received it, and he did not change this setting.

41.     Del Vacchio hooked the phone up to a Cellebrite Physical Analyzer and conducted an advanced logical file system extraction of the phone.  The Cellebrite Physical Analyzer is a technology tool utilized by law enforcement to extract data from electronic devices.

42.     The Cellebrite software accessed the iPhone's allocated space—space to which the phone's operating system has already written files, for example, photographs and messages.

43.     The Cellebrite software did not access any data stored remotely (i.e., in the "cloud") and instead only accessed data stored on the iPhone itself.

J.A. 93

44.     No bitstream copy was made of the Defendant's iPhone.

45.     Once the logical file system extraction was complete, the Cellebrite Physical Analyzer generated a report that Del Vacchio subsequently provided to Coppolo for review.

46.     The 896-page report includes the Defendant's personal contact lists, emails, messenger conversations (including Kik and iChat conversations), photographs, and videos.  It also includes the Defendant's calendar, web browsing history, call logs, and a history of his physical location down to precise GPS coordinates.

47.     A Report of Investigation ("ROI") written by Coppolo regarding the search of the Defendant's iPhone, attached as Exhibit 7, states that "[f]rom on or after February 2, 2016, to on or about March 3, 2016, a customs border search was conducted on [the Defendant's] cell phone."  The ROI further states that Coppolo reviewed the Cellebrite report "to conduct a border search of the iPhone in order to search for violations of law, including but not limited to, violations of Title 22 United States Code Section 2778 and Title 18 United States Code Section 554."

48.     The ROI further states that "[f]rom on or about February 3, 2016 to on or about March 3, 2016, SA Coppollo accessed this [Cellebrite] report pursuant to customs border search authority.  Among other things, SA Coppolo reviewed contacts lists, emails, messenger conversations (including but not limited to Kik and iChat conversations), photos and videos."

49.     The ROI states that, on March 3, 2016, Coppolo confirmed with Del Vacchio that no other information could be obtained from the iPhone.  At that time, Coppolo concluded his search.

50.     The Defendant's iPhone has remained in the custody of HSI since it was taken to HSI's office in Sterling, Virginia on February 3, 2016.

51.     Early in the morning on February 3, 2016, CBP seized the handgun barrels and handgun caliber conversion kit pursuant to 19 U.S.C. § 1595a(d) and 22 U.S.C. § 401.  CBP also seized the iPhone, the magazines, laser aiming modules, and the two pieces of luggage.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:     /s/_____
        Heather Alpino
        Special Assistant United States Attorney
        Eastern District of Virginia
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Phone: (703) 299-3936
        Heather.Alpino2@usdoj.gov

        Dennis Fitzpatrick
        Assistant United States Attorney
        United States Attorney's Office
        Eastern District of Virginia
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Phone: (703) 299-3954
        Dennis.Fitzpatrick@usdoj.gov

Todd Richman
Assistant Federal Public Defender
Officer of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Phone: (703) 600-0845
Todd_Richman@fd.org

Erica Marshall
Volunteer Attorney
Officer of the Federal Public Defender
1650 King Street, Suite 500

Alexandria, Virginia 22314
Phone: (703) 600-0825
Erica_Marshall@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that, on April 19, 2016, I filed the foregoing with the Clerk of Court using the CM/ECF system.


By:    /s/_____
        Heather Alpino
        Special Assistant United States Attorney
        Eastern District of Virginia
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Phone: (703) 299-3936
        Heather.Alpino2@usdoj.gov

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 102 of 273



**From:** AUGUSTINO, MICHAEL
**Sent:** Monday, February 01, 2016 21:23
**To:** CBP IAD TTRT; CBP IAD CTRT
**Subject:** FW: TK8 on 2/2

Teams,
Please note the below request from HSI New York.  Please also note the questions provided.  If the exam yields negative results, please ensure all questions are addressed in the closeout.  Also will need to coordinate with TK for checked bags after he clears the ticket counter.

Thanks

Respectfully,

*Michael E. Augustino*

Supervisory CBP Officer
Office of Field Operations
Port of Washington-Dulles
Tactical Terrorism Response Team



**WARNING:** The information contained herein remains under the control of the Department of Homeland Security (DHS), through the Bureau of Customs and Border Protection (CBP).  It is being disseminated for authorized LAW ENFORCEMENT purposes only.  This information shall not be

**J.A. 98**

distributed beyond the original addressees without prior authorization of the originator as it may contain proprietary or other sensitive trade information subject to dissemination restrictions under the Trade Secrecy Act and Bank Secrecy Act.  It is not to be released to the public and only those personnel with a valid "need-to-know" should be allowed access.

**From:** Reich, Charles [mailto: ████████████████]
**Sent:** Monday, February 01, 2016 8:07 PM
**To:** AUGUSTINO, MICHAEL <██████████████████████>
**Cc:** Culley, Jay D ████████████████████>
**Subject:** TK8 on 2/2

SCBPO Augustino & SA Culley,

Below is what we spoke about on the phone.

My lookout is
████████████████████
Kolsuz, Hmaza
████████████ Turkey

From inbound inspection:
"PAX WILL  BE IN US TIL FEB 2,2016 IN MIAMI AND CLEVELAND. PAX IS HERE FOR TOURISM. PAX OWNS PLASTIC MOLD COMPANY CALLED PLASTIK KALIP FOR 7 YEARS NOW WITH HIS BROTHER. PAX HAS NO COLLEGE EDUCATION. PAX NOR FAMILY HAS ANY MILITARY TRAINING. PAX HAS NEVER BEEN TO ANY OTHER TERROR SOURCE COUNTRY. HAS NEVER BEEN TO SYRIA NOR PAKISTAN. IN POSS OF $9,000 USD. NO OTHER DEROG INFO AT THIS TIME. PAX ADMITTED B2."

| UA (UA) | 3725 | 2/2/2016 | 1935 | 2053 | 2/2/2016 7:35:00 PM | 3 | CLEVELAND HOPKINS INTL (CLE)  USA | WASHINGTON DULLES INTL (IAD)  USA |
|---------|------|----------|------|------|---------------------|---|-----------------------------------|-----------------------------------|
| TK (TK) | 8 | 2/2/2016 | 2310 | 1615 | 2/2/2016 11:10:00 PM | 4 | WASHINGTON DULLES INTL (IAD)  USA | ATATURK INTL (IST)  TURKEY |

Not sure how his English is, on 01/08/2013  (2013SZ003360701 ) he was stopped by CBP exodus team at jfk with gun parts. Had a Turkish speaking cbpo on site.

Please check bags for parts. Please ask
-who he met in Florida
-did he get money from anyone (believe he met guy from NY on probation for gun related offenses who traveled there last week)
-what "tourism did he do"
-did he attend gun show in Ohio (there was one this past weekend)

-did he purchase anything firearm related
-Did he ship any parts out
-did he go with anyone to Ohio


Please feel free to call if anything else is needed or comes up.
Thanks for the help,
-Charles

REQUESTED BY:  COPPOLO, ADAM J

         OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

         <APPROVED>   SEACATS - INCIDENT REPORT <APPROVED>       PAGE   1

INCIDENT  NBR: 2013SZ003360701          FP&F CASE NBR: █████████
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET EXODUS FAILURE TO OBTAIN DOS LICENSE FOR EXPORT.

          DATE    TIME              DATE    TIME                DATE    TIME
SEARCH:      /              ARREST:      /           SEIZURE: 01152013/1615
================================================================================
VIOLATOR DATA

LAST NAME: KOLSUZ
FIRST NAME: HAMZA               MIDDLE NAME:
CITIZENSHIP: TK   DOB: █████████
STREET ADDRESS: █████████████████████       APT/SUITE:
CITY: ████  ISTANBUL             STATE:       CNTRY: TK   ZIP:
VIOLATOR TRAVEL CATEGORY:          VIOLATOR STATUS AT ARREST:
LOCAL USE:

TECS RECORD ID: ███████████
OTHER NAMES:
RACE: U  SEX: M   HT: 0'00"  WT: 000  HAIR:      EYES:
SSN:         CITIZENSHIP: TR  OCCUPATION:
BIRTHPLACE - COUNTRY:       STATE:       CITY:
PPN: ██████        COUNTRY: TR  TYPE:    ISSUED:      EXPIRES:
DRIVERS LICENSE - NUMBER:            STATE:       COUNTRY:
SCARS/MARKS/TATTOOS/ETC:

MISCELLANEOUS NUMBERS-NUMBER:            TYPE:
================================================================================
SUMMARY DATA

OI OFFICE CODE:    CASE #:
PROJECT CODES: █████ ARCHIVED - * ARMS EXPORT CONTROL ACT VIOLATIONS
PRIOR INFO:  NONE X ████  CUSTOMS  TECS ████    ████

                    NAME-TITLE-AGENCY
DECLARATION TAKEN BY:
ARRESTING OFFICER:
SEIZING OFFICER:     A-TCET EXODUS
SUPERVISOR:          HOFFMAN/K-SUPVY CBP OFFCR-C
PORT DIRECTOR:       SUSAN MITCHELL

TYPE OF INCIDENT: C  COMMERCIAL/NON-NARCOTIC      DISCOVERY DATE: 01082013
================================================================================

         OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>        PAGE    2

INCIDENT  NBR: 2013SZ003360701              FP&F CASE NBR: ▮
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET EXODUS FAILURE TO OBTAIN DOS LICENSE FOR EXPORT.

| LAW CHARGED | LAW CHARGED | LAW CHARGED |
|-------------|-------------|-------------|
| 19USC1595A(D) | 22USC401 | 22USC2778 |
| 22CFR123.22 | | |

=============================================================================
AGENCY PARTICIPATION

DISCOVERING:                CSX
SEIZING:                    CSX
PARTICIPATED IN SEIZURE:    CSA
=============================================================================
CONVEYANCE DATA

CONVEYANCE TYPE: C COMMERCIAL AIRCRAFT
ITINERARY:  DATE  01082013  TIME 1900  FROM US UNITED STATES
                              VIA
INBOUND/OUTBOUND: O  CONVEYANCE SEARCHED: N  CONVEYANCE SEIZED: N
FLIGHT #: 184            AIRLINE CODE: DL   BILL OF LADING:

REGISTRATION NUMBER:
 MAKE:                  MODEL:
SERIAL #:               YEAR:    COL:

TECS RECORD ID:
=============================================================================
SEIZURE DATA

REASON FOR EXAM: ▮          TYPE OF EXAM:
SEIZURE REFERRED TO OI:  N   FILER CODE:
MANUFACTURER NAME/NBR:
SHIPPER NAME/NBR:
ABANDONED:    BLITZ:   DOG ALERT:   XRAY:
ENFORCEMENT AID USED:
ENTRY NUMBER:              ENTRY TYPE:
APPRAISING OFFICER:
MITIGATING OFFICER:
ON SITE MITIGATION:
 CITATION ASSOCIATED WITH PENALTY:
PENALTY: PENALTY ASSESSED        .00    MITIGATED AMT          .00
 AMT CLCTD         .00 DATE         RECEIPT#         PRMSRY AMT
PLACE OF DISCOVERY: P (WITHIN P.O.E.) LOC: DELTA /JFK
PLACE OF SEIZURE:  P (WITHIN P.O.E.) LOC: DELTA/JFK

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

**J.A. 102**

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>   SEACATS - INCIDENT REPORT <APPROVED>      PAGE   3

INCIDENT  NBR: 2013SZ003360701          FP&F CASE NBR: █████████████
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET EXODUS FAILURE TO OBTAIN DOS LICENSE FOR EXPORT.


1 DESC OF SEIZED ITEM: BARETTA SLIDE
   COMM/CD: ████████   QTY:        1.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:     COUNTRY OF DESTINATION:
   DEC VAL:      0     FOR VAL:              DOM VAL:      150
   DUTY:       0.00    LEGAL STAT: AF PHYS STAT: TW CUST: █████
   CONCEAL: E SEC:        ENTERED TARIFF #: ████████████
   T.E.S. CODE: █████  INV LIST: N  CONCEAL COMM/CDE:

2 DESC OF SEIZED ITEM: BARREL
   COMM/CD: ████████   QTY:        1.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:     COUNTRY OF DESTINATION:
   DEC VAL:      0     FOR VAL:              DOM VAL:      125
   DUTY:       0.00    LEGAL STAT: AF PHYS STAT: TW CUST: █████
   CONCEAL: E SEC:        ENTERED TARIFF #: ████████████
   T.E.S. CODE: █████  INV LIST: N  CONCEAL COMM/CDE:

3 DESC OF SEIZED ITEM: BERETTA RECOIL SPRING
   COMM/CD: ████████   QTY:        1.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:     COUNTRY OF DESTINATION:
   DEC VAL:      0     FOR VAL:              DOM VAL:      15
   DUTY:       0.00    LEGAL STAT: AF PHYS STAT: TW CUST: █████
   CONCEAL: E SEC:        ENTERED TARIFF #: ████████████
   T.E.S. CODE: █████  INV LIST: N  CONCEAL COMM/CDE:

4 DESC OF SEIZED ITEM: BERETTA GUIDE ROD
   COMM/CD: ████████   QTY:        1.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:     COUNTRY OF DESTINATION:
   DEC VAL:      0     FOR VAL:              DOM VAL:      25
   DUTY:       0.00    LEGAL STAT: AF PHYS STAT: TW CUST: █████
   CONCEAL: E SEC:        ENTERED TARIFF #: ████████████
   T.E.S. CODE: █████  INV LIST: N  CONCEAL COMM/CDE:

TOTALS:          DECLARED VALUE:     0    FOREIGN VALUE:        0
                 DOMESTIC VALUE:   315         DUTY:        0.00
================================================================================
CIRCUMSTANCES/REMARKS:
On 01/08/2013 The JFK Exodus Team responded to Delta airlines to perform an
outbound enforcement exam on Kolsuz, Hamza DOB-███████████. KOLSUZ was subject
of prior seizure (see seizure #2013SZ003356301) for the unauthorized
exportation of weapon parts. KOLSUZ is a Turkish national traveling to the U.S.
on a B1/B2 visa. KOLSUZ was traveling on Delta flight 184, prior to KOLSUZ was
met at gate his checked in baggage was examined KOLSUZ had 1 bag tag# 235457.
Upon an intensive bag exam CBPO's Melle, Zizzo, Brennan & Faltas discovered 4
weapon component parts,(1) Beretta .380 automatic pistol slide, (1) barrel, (1)
guide rod and (1) recoil spring. CBPO Zizzo contacted HSI Fede with our
        OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:   COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>   SEACATS - INCIDENT REPORT <APPROVED>        PAGE    4

INCIDENT  NBR: 2013SZ003360701             FP&F CASE NBR: ██████████
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET EXODUS FAILURE TO OBTAIN DOS LICENSE FOR EXPORT.

findings.
KOLSUZ was stopped in the jet way prior to boarding his flight, on site was
CBPA Aydin, Saadet who is fluent in the Turkish language and interpreted during
the outbound exam.  During questioning HSI M.Fede instructed CBP to detain
KOLSUZ per AUSA Du Charme EDNY for an HSI probable cause arrest.   KOLSUZ was
escorted to the Delta Immigration Primary for further questioning, during

questioning KOLSUZ insisted that these 4 weapon parts did not require a license
to export he checked it on various websites. CBPO Melle asked KOLSUZ if he had
a license to legally export these 4 weapon parts out of the U.S. his response
was "NO".
KOLSUZ was advised that the 4 weapon component parts were going to be detained
and an Exodus Command Center Referral would be made. These items were detained
on 6051D No.337802 and a copy was given to KOLSUZ as receipt.
An Exodus Command Center referral was made to DDTC (Department of State),
referral number ██████████████ was generated. The EARS referral came back
from DDTC with a determination that the 4 weapon component parts were (1)
Beretta .380 automatic pistol slide, (1) barrel, (1) guide rod, (1) recoil
spring are controlled on the U.S. Munitions List. These 4 weapon parts fall
under U.S. Munitions list categories (1) (3) (4) I (h); (2) I (g) and therefore
require a U.S. Department of State license to legally be exported from the
United States. Failure to meet this requirement is a violation of the

International Traffic and Arms Regulations (ITAR).  Because this State
Department requirement was not, the 4 weapon component parts were seized under
19USC1595 (a) (d) and 22usc401 for violation of 22CFR127.1, 22CFR127.2 and
22CFR123.22 (b). In addition, the attempted exportation of these weapon parts
is a violation of 22CFR120.30, 15CFR30.2 and 15CFR30.18, due to the exporter
KOLSUZ having failed to file electronically in the Automated Export System
(AES), which is a requirement of for the legal exportation of ITAR controlled
items.
Upon arrival HSI K. Chan & G. Coats contacted AUSA DuCharme EDNY were
prosecution was declined.
██████████████████████
Seizing Officer: Melle _Participating Officers Zizzo, Brennan, Faltas,
Lewandowski, Gonzalez, Louard & Wong.

================================================================================

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

020816                    TECS II - LIST OF RELATED RECORDS              PAGE    1

4 RECORDS ARE RELATED TO BASE RECORD
2013SZ003360701          ████████  HOFFMAN        K 011513

████████████          KOLSUZ        HAMZA        U M  ████████
█████                 ██████████████████████████              PRIMARY VI
████████████          KOLSUZ        HAMZA        W M  ██████
█████                                                         PRIMARY VI
████████████          ████████  JFK INTL ARPT
A-TCET EXODUS FAILURE TO OBTAIN DOS LICENSE FOR EXPORT.

████████████          FPCS  ████  MELLE  JR       J

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  MAIDEN, KEELIE B

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>      PAGE   1

INCIDENT  NBR: 2013SZ003356301           FP&F CASE NBR:
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET/EXODUS  FAILURE TO OBTAIN DOS/DOC LICENSES - FAILURE TO FILE AES

         DATE    TIME              DATE    TIME                  DATE    TIME
SEARCH: 12022012/1625      ARREST:        /         SEIZURE: 01152013/1500
=================================================================================
VIOLATOR DATA

LAST NAME: KOLSUZ
FIRST NAME: HAMZA                 MIDDLE NAME:
CITIZENSHIP: TR   DOB:
STREET ADDRESS:                          SOK. NO.              APT/SUITE:
CITY:        ISTANBUL                     STATE:        CNTRY: TR  ZIP:
VIOLATOR TRAVEL CATEGORY:          VIOLATOR STATUS AT ARREST:
LOCAL USE:

TECS RECORD ID:
OTHER NAMES:
RACE: U  SEX: M  HT: 0'00"  WT: 000  HAIR:        EYES:
SSN:           CITIZENSHIP: TR  OCCUPATION:
BIRTHPLACE - COUNTRY:         STATE:        CITY:
PI                      COUNTRY: TR  TYPE:     ISSUED:      EXPIRES:
DRIVERS LICENSE - NUMBER:                  STATE:        COUNTRY:
SCARS/MARKS/TATTOOS/ETC:

MISCELLANEOUS NUMBERS-NUMBER:                     TYPE:
=================================================================================
SUMMARY DATA

OI OFFICE CODE:      CASE #:
PROJECT CODES:     ARCHIVED - *  ARMS EXPORT CONTROL ACT VIOLATIONS
PRIOR INFO:  NONE X      CUSTOMS   TECS

                    NAME-TITLE-AGENCY
DECLARATION TAKEN BY:
ARRESTING OFFICER:
SEIZING OFFICER:      A-TCET/EXODUS TEAM
SUPERVISOR:          HOFFMAN/K-SUPVY CBP OFFCR-C
PORT DIRECTOR:       SUSAN MITCHELL

TYPE OF INCIDENT: C  COMMERCIAL/NON-NARCOTIC      DISCOVERY DATE: 12022012
=================================================================================

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

` REQUESTED BY:  MAIDEN, KEELIE B

          OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

               <APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>      PAGE   2

INCIDENT  NBR: 2013SZ003356301              FP&F CASE NBR:
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET/EXODUS  FAILURE TO OBTAIN DOS/DOC LICENSES - FAILURE TO FILE AES

LAW CHARGED             LAW CHARGED              LAW CHARGED
19USC1595A(D)           22USC401                 22USC2778
22CFR123.22
===============================================================================
AGENCY PARTICIPATION

DISCOVERING:                CSX
SEIZING:                    CSX
PARTICIPATED IN SEIZURE:    CSA
===============================================================================
CONVEYANCE DATA

CONVEYANCE TYPE: C COMMERCIAL AIRCRAFT
ITINERARY:  DATE  12022012  TIME      FROM US UNITED STATES
                                 VIA
INBOUND/OUTBOUND: O  CONVEYANCE SEARCHED: N  CONVEYANCE SEIZED: N
FLIGHT #: 70            AIRLINE CODE: DL   BILL OF LADING:

REGISTRATION NUMBER:
 MAKE:                   MODEL:
SERIAL #:                YEAR:    COL:

TECS RECORD ID:
===============================================================================
SEARCH DATA

SEARCH TYPE: P PATDOWN   RESULTS: N NEGATIVE
TIME COMPLETED:  1626    FUNDS:      .00

SEARCHING OFFICER:   LEWANDOWSKI/J-CBP OFFCR-C
AUTHORIZING OFFICER: ADORNO/P-SUPVY CBP OFFCR-C
WITNESS:           FEDE, MATTHEW / HSI SPECIAL AGENT
REASON FOR SEARCH:
===============================================================================
SEIZURE DATA

REASON FOR EXAM:            TYPE OF EXAM:
SEIZURE REFERRED TO OI:  N   FILER CODE:
MANUFACTURER NAME/NBR:
SHIPPER NAME/NBR:
ABANDONED:   BLITZ:  DOG ALERT:   XRAY:
ENFORCEMENT AID USED:
ENTRY NUMBER:            ENTRY TYPE:
APPRAISING OFFICER:
MITIGATING OFFICER:
ON SITE MITIGATION:
          OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  MAIDEN, KEELIE B

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>       PAGE   3

INCIDENT  NBR: 2013SZ003356301            FP&F CASE NBR: ▆▆▆▆▆▆▆
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET/EXODUS  FAILURE TO OBTAIN DOS/DOC LICENSES - FAILURE TO FILE AES

CITATION ASSOCIATED WITH PENALTY:
PENALTY: PENALTY ASSESSED        .00    MITIGATED AMT         .00
  AMT CLCTD        .00 DATE        RECEIPT#          PRMSRY AMT
PLACE OF DISCOVERY: P (WITHIN P.O.E.) LOC: TERMINAL FOUR / JFKIA
PLACE OF SEIZURE:  P (WITHIN P.O.E.) LOC: TERMINAL FOUR / JFKIA

   1 DESC OF SEIZED ITEM: UPPER RECEIVERS FOR SEMI-AUTO PISTOLS
     COMM/CD: ▆▆▆▆▆       QTY:        40.00 UM: EA  WT DET:    FDIN:
     COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
     DEC VAL:      0       FOR VAL:             DOM VAL:     14000
     DUTY:       0.00      LEGAL STAT: AF PHYS STAT: TW CUST: ▆▆▆▆
     CONCEAL: E SEC:       ENTERED TARIFF #: ▆▆▆▆▆
     T.E.S. CODE: ▆▆▆  INV LIST: N  CONCEAL COMM/CDE:

   2 DESC OF SEIZED ITEM: GRIP MODULE FOR SIG SAUER P-250 PISTOLS
     COMM/CD: ▆▆▆▆▆       QTY:        20.00 UM: EA  WT DET:    FDIN:
     COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
     DEC VAL:      0       FOR VAL:             DOM VAL:       880
     DUTY:       0.00      LEGAL STAT: AF PHYS STAT: TW CUST: ▆▆▆
     CONCEAL: E SEC:       ENTERED TARIFF #: ▆▆▆▆▆
     T.E.S. CODE: ▆▆▆  INV LIST: N  CONCEAL COMM/CDE:

   3 DESC OF SEIZED ITEM: BARRELS FOR SEMI-AUTO PISTOLS
     COMM/CD: ▆▆▆▆▆       QTY:        16.00 UM: EA  WT DET:    FDIN:
     COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
     DEC VAL:      0       FOR VAL:             DOM VAL:      2960
     DUTY:       0.00      LEGAL STAT: AF PHYS STAT: TW CUST: ▆▆▆▆
     CONCEAL: E SEC:       ENTERED TARIFF #: ▆▆▆▆▆
     T.E.S. CODE: ▆▆▆  INV LIST: N  CONCEAL COMM/CDE:

   4 DESC OF SEIZED ITEM: MAGAZINES FOR FIREARMS
     COMM/CD: ▆▆▆▆▆       QTY:        26.00 UM: EA  WT DET:    FDIN:
     COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
     DEC VAL:      0       FOR VAL:             DOM VAL:       910
     DUTY:       0.00      LEGAL STAT: AF PHYS STAT: TW CUST: ▆▆▆▆
     CONCEAL: E SEC:       ENTERED TARIFF #: ▆▆▆▆▆
     T.E.S. CODE: ▆▆▆  INV LIST: N  CONCEAL COMM/CDE:

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY: MAIDEN, KEELIE B

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>        PAGE    4

INCIDENT  NBR: 2013SZ003356301              FP&F CASE NBR:
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET/EXODUS  FAILURE TO OBTAIN DOS/DOC LICENSES - FAILURE TO FILE AES

  5 DESC OF SEIZED ITEM: SPRINGS / INTERNAL PARTS FOR PISTOLS
   COMM/CD:               QTY:      60.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:    COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
   DEC VAL:       0      FOR VAL:                DOM VAL:       300
   DUTY:      0.00      LEGAL STAT: AF PHYS STAT: TW CUST:
   CONCEAL: E SEC:       ENTERED TARIFF #:
   T.E.S. CODE:      INV LIST: N  CONCEAL COMM/CDE:

  6 DESC OF SEIZED ITEM: SMITH & WESSON 6900 SERIES PISTOL GRIP
   COMM/CD:               QTY:       1.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:    COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
   DEC VAL:       0      FOR VAL:                DOM VAL:       35
   DUTY:      0.00      LEGAL STAT: AF PHYS STAT: TW CUST:
   CONCEAL: E SEC:       ENTERED TARIFF #:
   T.E.S. CODE:      INV LIST: N  CONCEAL COMM/CDE:

  7 DESC OF SEIZED ITEM: GUIDE ROD LASER SIGHT FOR GLOCK PISTOL
   COMM/CD:               QTY:       1.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:    COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
   DEC VAL:       0      FOR VAL:                DOM VAL:       350
   DUTY:      0.00      LEGAL STAT: AF PHYS STAT: TW CUST:
   CONCEAL: E SEC:       ENTERED TARIFF #:
   T.E.S. CODE:      INV LIST: N  CONCEAL COMM/CDE:

  8 DESC OF SEIZED ITEM: HARD PLASTIC STORAGE CASES
   COMM/CD: EVD           QTY:       3.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:    COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
   DEC VAL:       0      FOR VAL:                DOM VAL:       0
   DUTY:      0.00      LEGAL STAT: EV PHYS STAT: DO CUST:
   CONCEAL: Z SEC:       ENTERED TARIFF #: EVD
   T.E.S. CODE:      INV LIST: N  CONCEAL COMM/CDE:

TOTALS:          DECLARED VALUE:       0    FOREIGN VALUE:          0
                 DOMESTIC VALUE:   19435         DUTY:          0.00
================================================================================
CIRCUMSTANCES/REMARKS:
On 12/02/2012, The JFK EXODUS Team responded to the Delta Airlines ticket
counter at terminal four, JFK airport, where subject HAMZA KOLSUZ had presented
his checked baggage (Delta tag #s DL863056 & DL863057) for carriage aboard
flight DL70, to Amsterdam, The Netherlands. Subject had booked a connecting
flight (KL1613) for the following day to Istanbul, Turkey. During an
examination of subject's baggage, various parts, components, and accessories
for firearms were discovered. These items were subsequently detained under CBP
form              (with one continuation sheet) and Subject KOLSUZ was given a
copy as a receipt for the detained items. Due to concerns regarding possible
OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  MAIDEN, KEELIE B

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>      PAGE   5

INCIDENT  NBR: 2013SZ003356301           FP&F CASE NBR: ▇▇▇▇▇▇
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET/EXODUS  FAILURE TO OBTAIN DOS/DOC LICENSES - FAILURE TO FILE AES

Department of State (DOS) license requirements, referrals were prepared and
submitted to the Exodus Command Center (ECC). Official license determinations
were subsequently received from the U.S. Department of State via the ECC
(referral ID #s ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and
▇▇▇▇▇▇▇▇▇). A total of (40ea) upper receiver assemblies for pistols,
along with (16ea) barrels for pistols, were determined to be items which are

controlled by the United States Munitions List (USML) under category I(g), and
therefore require a U.S. Department of State license to be legally exported
from the United States. A total of (20ea) grip modules for Sig Sauer P-250
pistols, (26ea) magazines for firearms, (1ea) factory hand grip for Smith &
Wesson 6900 series pistol, and (60ea) assorted small parts, springs, and
internal components of Smith & Wesson / Sig Sauer pistols, were determined to
be USML items under category I(h), and also require a U.S. Department of State
license to be legally exported from the United States. Failure to obtain and
present a valid DOS license to CBP is a violation of the International Traffic
in Arms Regulations (ITAR). Because this requirement was not met, these items
are seized under 19USC1595(a)(d) and 22USC401 for violation of 22CFR127.1,
2▇▇R127.2 and 22CFR123.22(b). In addition, the attempted exportation of these
commodities is a violation of 22CFR120.30, 15CFR30.4, and 15CFR30.18, due to
the exporter having failed to file electronically in the Automated Export
System (AES), which is a requirement for the legal exportation of any USML

article.

Another item discovered within subject's baggage was (1ea) "Laser Max" guide
rod laser sight for a Glock semi-automatic handgun. Due to a possible U.S.
Department of Commerce (DOC) license requirement, an ECC referral
(▇▇▇▇▇▇▇▇▇▇▇▇ was prepared and submitted to the DOC for an official
license determination. The official license determination concluded that in
order to legally export this commodity from the United States to Turkey, a DOC
license (or exception) would be required. Subject KOLSUZ did not possess a DOC
license, and any claim for an exception to license requirements would mandate
an electronic filing be made in the Automated Export System (AES). Because
neither of these requirements were met, the aforementioned laser sight is
seized under 22USC401 and 19USC1595a(d) for violation of 50USC2401-2413,
15CFR736, 15CFR764.2 and 15CFR774.  In addition, the attempted exportation of
this commodity is a violation of 15CFR30.4, 15CFR30.16, and 15CFR758.1, due to

the exporter having failed to file electronically in AES. Seized items, packed
within three (3) hard plastic cases TOT SPC under CBP form 6051S ▇▇▇▇▇▇ (with
one continuation sheet). See ▇▇▇▇▇▇▇▇▇▇ for more information
regarding this incident.

Seizing Officer: J. Lewandowski

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  MAIDEN, KEELIE B

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

                              <APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>        PAGE   6

INCIDENT  NBR: 2013SZ003356301                FP&F CASE NBR:
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: A-TCET/EXODUS  FAILURE TO OBTAIN DOS/DOC LICENSES - FAILURE TO FILE AES

Participating Officers: R. Gonzalez, J. Melle, K. Louard, W. Wong, R. Zizzo

HSI S/A on site: M. Fede

=================================================================================

J.A. 111

REQUESTED BY:  MAIDEN, KEELIE B

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

0▓▓316                    TECS II - LIST OF RELATED RECORDS                    PAGE    1

                    4 RECORDS ARE RELATED TO BASE RECORD
2013SZ003356301     INCD C47 HOFFMAN          K 011513


████████████        KOLSUZ        HAMZA        U M  ██████      
        ████████████                                           PRIMARY VI

████████████        KOLSUZ        HAMZA        U M  ██████
        ████                                                   PRIMARY VI

████████████        SEAR 4701 JFK INTL ARPT
        A-TCET/EXODUS   FAILURE TO OBTAIN DOS/DOC LICENSES - FAILURE

████████████        FPCS 02  LEWANDOWSKI      J


OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY



**United States Department of State**

*Bureau of Political-Military Affairs*
*Office of Defense Trade Controls Compliance*
*Washington, D.C. 20522-0112*

<u>MEMORANDUM</u>                                                   FEB 2 1 2014

TO:        Cory Dunne, HSI Liaison
           Counter-Proliferation Investigations Unit
           U.S. Department of Homeland Security
           Washington, D.C.

FROM:      Glenn E. Smith
           Chief, Enforcement Division

SUBJECT:   Pre-Trial Certification

The Office of Defense Trade Controls Compliance (DTCC) is in receipt of your memorandum dated December 4, 1013, regarding a request for a Pre-Trial Certification. The Directorate of Defense Trade Controls (DDTC) is responsible for the administration of Section 38 of the Arms Export Control Act (AECA) (22 U.S.C. 2778) and the International Traffic in Arms Regulations (ITAR) (22 C.F.R. Parts 120-130) issued pursuant thereto, as they relate to the manufacture, brokering, temporary import, export and transfer of defense articles and defense services.

Please see DDTC's confirmations, below, regarding whether the items in your request are defined by the ITAR as defense articles of a nature described on the United States Munitions List (USML) (22 C.F.R. Part 121) and, therefore, are subject to the jurisdiction of the Department of State.

- .17 caliber magazine is covered by Category I(h) on the USML;

- .22 caliber magazine is covered by Category I(h) on the USML;

- .24 caliber magazine is covered by Category I(h) on the USML;

- .222 caliber magazine is covered by Category I(h) on the USML;

- .223 caliber magazine is covered by Category I(h) on the USML;

- .243 caliber magazine is covered by Category I(h) on the USML;

- .25 caliber magazine is covered by Category I(h) on the USML;

- .257 caliber magazine is covered by Category I(h) on the USML;

- .260 caliber magazine is covered by Category I(h) on the USML;

- .264 caliber magazine is covered by Category I(h) on the USML;

- .270 caliber magazine is covered by Category I(h) on the USML;

- .284 caliber magazine is covered by Category I(h) on the USML;

- .30 caliber magazine is covered by Category I(h) on the USML;

- .303 caliber magazine is covered by Category I(h) on the USML;

- .308 caliber magazine is covered by Category I(h) on the USML;

- .32 caliber magazine is covered by Category I(h) on the USML;

- .338 caliber magazine is covered by Category I(h) on the USML;

- .357 caliber magazine is covered by Category I(h) on the USML;

- .370 caliber magazine is covered by Category I(h) on the USML;

- .375 caliber magazine is covered by Category I(h) on the USML;

- .38 caliber magazine is covered by Category I(h) on the USML;

- .40 caliber magazine is covered by Category I(h) on the USML;

- .41 caliber magazine is covered by Category I(h) on the USML;

- .44 caliber magazine is covered by Category I(h) on the USML;

- .45 caliber magazine is covered by Category I(h) on the USML;

- .454 caliber magazine is covered by Category I(h) on the USML;

- .458 caliber magazine is covered by Category I(h) on the USML;

- .50 caliber magazine is covered by Category I(h) on the USML;

- 5 mm magazine is covered by Category I(h) on the USML;

- 5.45 mm magazine is covered by Category I(h) on the USML;

- 5.56 mm magazine is covered by Category I(h) on the USML;

- 5.7 mm magazine is covered by Category I(h) on the USML;

- 6 mm magazine is covered by Category I(h) on the USML;

- 6.5 mm magazine is covered by Category I(h) on the USML;

- 6.8 mm magazine is covered by Category I(h) on the USML;

- 7 mm magazine is covered by Category I(h) on the USML;

- 7.62 mm magazine is covered by Category I(h) on the USML;

- 8 mm magazine is covered by Category I(h) on the USML;

- 9 mm magazine is covered by Category I(h) on the USML; and

- 10 mm magazine is covered by Category I(h) on the USML.

This document is provided for use by the HSI case agent and the AUSA for pre-trial activities such as subpoenas, search warrants, and indictments.  For cases going to trial, please contact this office to request a formal Trial Certification.

REQUESTED BY:   COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>   SEACATS - INCIDENT REPORT <APPROVED>      PAGE   1

```
INCIDENT  NBR: ██████████████          FP&F CASE NBR:
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: ARREST IF HAMZA KOLSUZ / 22USC2778

          DATE    TIME              DATE    TIME            DATE    TIME
SEARCH:      /           ARREST: 02032016/0500   SEIZURE:       /
===============================================================================
VIOLATOR DATA

LAST NAME: KOLSUZ
FIRST NAME: HAMZA              MIDDLE NAME:
CITIZENSHIP: TR   DOB: ████████
STREET ADDRESS: ██████████████████            APT/SUITE: ████████
CITY: ISTANBUL              STATE:      CNTRY: TR   ZIP:
███████████████████         VIOLATOR STATUS AT ARREST:
LOCAL USE:

TECS RECORD ID: ██████████████
OTHER NAMES:
RACE: W  SEX: M   HT:  '  "  WT:     HAIR:      EYES:
SSN:            CITIZENSHIP: TR  OCCUPATION:
BIRTHPLACE - COUNTRY:      STATE:       CITY:
PPN:           COUNTRY:    TYPE:   ISSUED:      EXPIRES:
DRIVERS LICENSE - NUMBER:              STATE:       COUNTRY:
SCARS/MARKS/TATTOOS/ETC:

MISCELLANEOUS NUMBERS-NUMBER:              TYPE:
===============================================================================
SUMMARY DATA

OI OFFICE CODE: DC CASE #: ██████████████
PROJECT CODES: YE0 ILLEGAL EXPORTS
PRIOR INFO:  NONE  ████████   CUSTOMS 3 TECS  ████████  ████████
                    NAME-TITLE-AGENCY
DECLARATION TAKEN BY:
ARRESTING OFFICER:    COPPOLO/A-CRIM IN
SEIZING OFFICER:
SUPERVISOR:           OSBORN/R-SUPVY CRIM INVSTGR-C
PORT DIRECTOR:

TYPE OF INCIDENT: O  OTHER              DISCOVERY DATE: 02022016
===============================================================================
```

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>        PAGE   2

INCIDENT  NBR: █████████████          FP&F CASE NBR:
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: ARREST IF HAMZA KOLSUZ / 22USC2778

LAW CHARGED                LAW CHARGED                LAW CHARGED
22USC2778
================================================================================
AGENCY PARTICIPATION

DISCOVERING:                   CSI
ARRESTING:                     CSA
PARTICIPATED IN ARREST:        CSI
================================================================================
CONVEYANCE DATA

CONVEYANCE TYPE: N NONE
ITINERARY:  DATE          TIME      FROM
                                    VIA
================================================================================
ARREST DATA

PLACE OF ARREST:   P (WITHIN P.O.E.)  LOC: WASHINGTON DULLES INT'L AIRPORT
AGENCY ARRESTEE RELEASED TO:      REFUSED BY:
               TIME NOTIFIED:      TIME ARRIVED:    TIME RELEASED:
================================================================================
CIRCUMSTANCES/REMARKS:
On February 3, 2016, Hamza KOLSUZ, a Turkish National, present in the United
States on a B2 visitor's visa, was arrested by agents with Homeland Security
Investigations, Washington, D.C. (HSI/DC).  This arrest was initiated based
on a U.S. Customs and Border Protection (CBP) outbound customs inspection of
KOLSUZ.  On February 2, 2016, KOLSUZ checked in for Turkish Airline flight
number 8.  During check-in, KOLSUZ checked two (2) pieces of luggage which
were subsequently subject to a customs border search.  At the time of the
inspection, CBP identified what appeared to be items (firearm parts and
components) that were subject to the International Traffic in Arms
Regulations (ITAR).  Based on this discovery, CBP officers and Special Agent
Jay Culley with HSI/DC, conducted an outbound inspection of KOLSUZ on the jet
way.  KOLSUZ admitted to CBP that he was in possession of the firearm parts.
At that time, KOLSUZ was transported to the CBP inspection area for further
processing.  Additional HSI agents arrived on
scene and conducted an investigation and interview of KOLSUZ utilizing a

Turkish translator.  The case was presented to the Eastern District of
Virginia and accepted for prosecution.  See CBP seizure █████████████  for
further information regarding the items seized.  Also see HSI/DC case
█████████████     for information related to the investigation.

================================================================================

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:   COPPOLO, ADAM J

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

020516                    TECS II - LIST OF RELATED RECORDS                 PAGE   1



3 RECORDS ARE RELATED TO BASE RECORD
OSBORN          R 020416

KOLSUZ          HAMZA          W M          PRIMARY VI

KOLSUZ          HAMZA          W M          PRIMARY VI

COPPOLO          A 020316
HAMZA KOLSUZ

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:   COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>   SEACATS - INCIDENT REPORT <APPROVED>       PAGE   1

INCIDENT   NBR: ████████████        FP&F CASE NBR: ██████████████
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: OUTBOUND WEAPON COMPONENTS

```
          DATE    TIME              DATE    TIME              DATE    TIME
SEARCH: 02022016/2320    ARREST:        /        SEIZURE: 02022016/2330
```
================================================================================
VIOLATOR DATA

LAST NAME: KOLSUZ
FIRST NAME: HAMZA                 MIDDLE NAME:
CITIZENSHIP: TR   DOB: ████████
STREET ADDRESS: ██████████████████████        APT/SUITE: ████████
CITY: ISTANBUL                    STATE:        CNTRY: TR   ZIP:
VIOLATOR TRAVEL CATEGORY:              VIOLATOR STATUS AT ARREST:
LOCAL USE:

TECS RECORD ID: ██████████████
OTHER NAMES:
RACE: U   SEX: M   HT: '   "   WT:      HAIR:      EYES:
SSN:          CITIZENSHIP: TR   OCCUPATION:
BIRTHPLACE - COUNTRY:        STATE:        CITY:
PPN:              COUNTRY:    TYPE:    ISSUED:        EXPIRES:
DRIVERS LICENSE - NUMBER:              STATE:          COUNTRY:
SCARS/MARKS/TATTOOS/ETC:

MISCELLANEOUS NUMBERS-NUMBER:              TYPE:
================================================================================
SUMMARY DATA

OI OFFICE CODE:   CASE #: ██████████████
PROJECT CODES:
PRIOR INFO:  NONE   ████   CUSTOMS   TECS   ██████   ██████████

                    NAME-TITLE-AGENCY
DECLARATION TAKEN BY: BUDD/J-CBP OFFCR-C
ARRESTING OFFICER:
SEIZING OFFICER:       BUDD/J-CBP OFFCR-C
SUPERVISOR:            COLGAN/L-SUPVY CBP OFFCR-C
PORT DIRECTOR:        WAYNE BIONDI

TYPE OF INCIDENT: O  OTHER                 DISCOVERY DATE: 02022016
================================================================================

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>      PAGE   2

INCIDENT  NBR: ▉▉▉▉▉▉▉▉        FP&F CASE NBR: ▉▉▉▉▉▉▉▉
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: OUTBOUND WEAPON COMPONENTS

| LAW CHARGED | LAW CHARGED | LAW CHARGED |
|---|---|---|
| 19USC1595A(D) | 22USC401 | 22USC2778 |
| 22CFR123.22 | 22CFR123.1 | |

================================================================================
AGENCY PARTICIPATION

DISCOVERING:               CSI
SEIZING:                   CSI
PARTICIPATED IN SEIZURE:   ICE CSA
================================================================================
CONVEYANCE DATA

CONVEYANCE TYPE: C COMMERCIAL AIRCRAFT
ITINERARY:  DATE  02022016  TIME           FROM US UNITED STATES
                                VIA
INBOUND/OUTBOUND: O  CONVEYANCE SEARCHED: N  CONVEYANCE SEIZED: N
FLIGHT #: 8                 AIRLINE CODE: TK   BILL OF LADING:

REGISTRATION NUMBER:
 MAKE:                 MODEL:
SERIAL #:              YEAR:    COL:

TECS RECORD ID:
================================================================================
SEARCH DATA

SEARCH TYPE: P PATDOWN   RESULTS: N NEGATIVE
TIME COMPLETED:  2325    FUNDS:   2600.00

SEARCHING OFFICER:   BUDD/J-CBP OFFCR-C
AUTHORIZING OFFICER: COLGAN/L-SUPVY CBP OFFCR-C
WITNESS:             AUGUSTINO/M-SUPVY CBP OFFCR-C
REASON FOR SEARCH:
================================================================================
SEIZURE DATA

REASON FOR EXAM:           TYPE OF EXAM:
SEIZURE REFERRED TO OI:    FILER CODE:
MANUFACTURER NAME/NBR:
SHIPPER NAME/NBR:
ABANDONED:   BLITZ:   DOG ALERT:   XRAY:
ENFORCEMENT AID USED:
ENTRY NUMBER:             ENTRY TYPE:
APPRAISING OFFICER:
MITIGATING OFFICER:
ON SITE MITIGATION:
        OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>   SEACATS - INCIDENT REPORT <APPROVED>      PAGE   3

INCIDENT  NBR: ███████████         FP&F CASE NBR: ████████████
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: OUTBOUND WEAPON COMPONENTS

 CITATION ASSOCIATED WITH PENALTY:
PENALTY: PENALTY ASSESSED        .00    MITIGATED AMT        .00
  AMT CLCTD       .00 DATE        RECEIPT#        PRMSRY AMT
PLACE OF DISCOVERY: P (WITHIN P.O.E.) LOC: DULLES INT'L AIRPORT
PLACE OF SEIZURE:   P (WITHIN P.O.E.) LOC: DULLES INT'L AIRPORT

  1 DESC OF SEIZED ITEM: GLOCK 31ROUND MAGAZINE, 9MM
    COMM/CD: EVD          QTY:        4.00 UM: EA  WT DET:    FDIN:
    COUNTRY OF ORIGIN:       COUNTRY OF EXPORT:      COUNTRY OF DESTINATION:
    DEC VAL:      0       FOR VAL:             DOM VAL:        1
    DUTY:       0.00      LEGAL STAT: SZ PHYS STAT: HE CUST: ████
    CONCEAL: E SEC:       ENTERED TARIFF #: ████
    T.E.S. CODE: ████  INV LIST: N  CONCEAL COMM/CDE:

  2 DESC OF SEIZED ITEM: GLOCK 17ROUND MAGAZINE, 9MM
    COMM/CD: EVD          QTY:        4.00 UM: EA  WT DET:    FDIN:
    COUNTRY OF ORIGIN:       COUNTRY OF EXPORT:      COUNTRY OF DESTINATION:
    DEC VAL:      0       FOR VAL:             DOM VAL:        1
    DUTY:        0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ████
    CONCEAL: E SEC:       ENTERED TARIFF #: ████
    T.E.S. CODE: ████  INV LIST: N  CONCEAL COMM/CDE:

  3 DESC OF SEIZED ITEM: GLOCK 15ROUND MAGAZINE, 9MM
    COMM/CD: EVD          QTY:        4.00 UM: EA  WT DET:    FDIN:
    COUNTRY OF ORIGIN:       COUNTRY OF EXPORT:      COUNTRY OF DESTINATION:
    DEC VAL:      0       FOR VAL:             DOM VAL:        1
    DUTY:        0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ████
    CONCEAL: E SEC:       ENTERED TARIFF #: ████
    T.E.S. CODE: ████  INV LIST: N  CONCEAL COMM/CDE:

  4 DESC OF SEIZED ITEM: S&W 17ROUND MAGAZINE, 9MM
    COMM/CD: EVD          QTY:        1.00 UM: EA  WT DET:    FDIN:
    COUNTRY OF ORIGIN:       COUNTRY OF EXPORT:      COUNTRY OF DESTINATION:
    DEC VAL:      0       FOR VAL:             DOM VAL:        1
    DUTY:        0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ████
    CONCEAL: E SEC:       ENTERED TARIFF #: ████
    T.E.S. CODE: ████  INV LIST: N  CONCEAL COMM/CDE:

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>   SEACATS - INCIDENT REPORT  <APPROVED>      PAGE   4

INCIDENT  NBR: 2016SZ003972001            FP&F CASE NBR: 2016540100011701
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: OUTBOUND WEAPON COMPONENTS


5 DESC OF SEIZED ITEM: GLOCK 10ROUND MAGAZINE, 9 MM
   COMM/CD: EVD            QTY:          8.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:      COUNTRY OF DESTINATION:
   DEC VAL:        0       FOR VAL:                DOM VAL:           1
   DUTY:        0.00       LEGAL STAT: SZ PHYS STAT: HE CUST:
   CONCEAL: E SEC:         ENTERED TARIFF #:
   T.E.S. CODE:        INV LIST: N  CONCEAL COMM/CDE:

6 DESC OF SEIZED ITEM: GLOCK 13ROUND MAGAZINE, .45 CAL
   COMM/CD: EVD            QTY:          4.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:      COUNTRY OF DESTINATION:
   DEC VAL:        0       FOR VAL:                DOM VAL:           1
   DUTY:        0.00       LEGAL STAT: SZ PHYS STAT: HE CUST:
   CONCEAL: E SEC:         ENTERED TARIFF #:
   T.E.S. CODE:        INV LIST: N  CONCEAL COMM/CDE:

7 DESC OF SEIZED ITEM: SMITH & WESSON 32ROUND MAGAZINE, 9MM
   COMM/CD: EVD            QTY:          1.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:      COUNTRY OF DESTINATION:
   DEC VAL:        0       FOR VAL:                DOM VAL:           1
   DUTY:        0.00       LEGAL STAT: SZ PHYS STAT: HE CUST:
   CONCEAL: E SEC:         ENTERED TARIFF #:
   T.E.S. CODE:        INV LIST: N  CONCEAL COMM/CDE:

8 DESC OF SEIZED ITEM: HANDGUN BARREL 9MM (UNKNOWN)
   COMM/CD: EVD            QTY:          1.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:      COUNTRY OF DESTINATION:
   DEC VAL:        0       FOR VAL:                DOM VAL:           1
   DUTY:        0.00       LEGAL STAT: SZ PHYS STAT: HE CUST:
   CONCEAL: E SEC:         ENTERED TARIFF #:
   T.E.S. CODE:        INV LIST:    CONCEAL COMM/CDE:

9 DESC OF SEIZED ITEM: HANDGUN BARREL 9MM/SIG SAUER
   COMM/CD: EVD            QTY:          4.00 UM: EA  WT DET:     FDIN:
   COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:      COUNTRY OF DESTINATION:
   DEC VAL:        0       FOR VAL:                DOM VAL:           1
   DUTY:        0.00       LEGAL STAT: SZ PHYS STAT: HE CUST:
   CONCEAL: E SEC:         ENTERED TARIFF #:
   T.E.S. CODE:        INV LIST:    CONCEAL COMM/CDE:


OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY: COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED> SEACATS - INCIDENT REPORT <APPROVED>      PAGE   5

INCIDENT  NBR: ▮▮▮▮▮▮▮▮           FP&F CASE NBR: ▮▮▮▮▮▮▮▮
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: OUTBOUND WEAPON COMPONENTS


10 DESC OF SEIZED ITEM: THREADED HANDGUN BARREL 9MM/SIG SAUER
     COMM/CD: EVD          QTY:          1.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
     DEC VAL:       0      FOR VAL:                DOM VAL: ▮▮▮▮     1
     DUTY:        0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ▮▮▮▮
     CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮
     T.E.S. CODE: ▮▮▮  INV LIST:    CONCEAL COMM/CDE:

11 DESC OF SEIZED ITEM: THREADED GLOCK 26 BARREL 9MM
     COMM/CD: EVD          QTY:          1.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
     DEC VAL:       0      FOR VAL:                DOM VAL: ▮▮▮▮     1
     DUTY:        0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ▮▮▮▮
     CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮
     T.E.S. CODE: ▮▮▮  INV LIST:    CONCEAL COMM/CDE:

12 DESC OF SEIZED ITEM: THREADED GLOCK 21 BARREL/ .45 CAL
     COMM/CD: EVD          QTY:          1.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
     DEC VAL:       0      FOR VAL:                DOM VAL: ▮▮▮▮     1
     DUTY:        0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ▮▮▮▮
     CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮
     T.E.S. CODE: ▮▮▮  INV LIST:    CONCEAL COMM/CDE:

13 DESC OF SEIZED ITEM: THREADED GLOCK 19 BARREL 9MM
     COMM/CD: EVD          QTY:          5.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
     DEC VAL:       0      FOR VAL:                DOM VAL: ▮▮▮▮     1
     DUTY:        0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ▮▮▮▮
     CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮
     T.E.S. CODE: ▮▮▮  INV LIST:    CONCEAL COMM/CDE:

14 DESC OF SEIZED ITEM: THREADED GLOCK 17 BARREL 9MM
     COMM/CD: EVD          QTY:          5.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:      COUNTRY OF EXPORT:    COUNTRY OF DESTINATION:
     DEC VAL:       0      FOR VAL:                DOM VAL: ▮▮▮▮     1
     DUTY:        0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ▮▮▮▮
     CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮
     T.E.S. CODE: ▮▮▮  INV LIST:    CONCEAL COMM/CDE:


OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>        PAGE   6

INCIDENT  NBR: ▮▮▮▮▮▮▮▮▮▮▮▮▮          FP&F CASE NBR: ▮▮▮▮▮▮▮▮▮▮▮▮
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: OUTBOUND WEAPON COMPONENTS


15 DESC OF SEIZED ITEM: LASER AIMING MODULE
   COMM/CD: EVD           QTY:        5.00 UM: EA  WT DET:    FDIN:
   COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:   COUNTRY OF DESTINATION:
   DEC VAL:       0     FOR VAL:              DOM VAL: ▮▮▮▮▮      1
   DUTY:       0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ▮▮▮▮▮
   CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮▮▮
   T.E.S. CODE: ▮▮▮▮  INV LIST:   CONCEAL COMM/CDE:

16 DESC OF SEIZED ITEM: GLOCK PISTOL CASE
   COMM/CD: EVD           QTY:        1.00 UM: EA  WT DET:    FDIN:
   COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:   COUNTRY OF DESTINATION:
   DEC VAL:       0     FOR VAL:              DOM VAL: ▮▮▮▮▮      1
   DUTY:       0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ▮▮▮▮▮
   CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮▮▮
   T.E.S. CODE: ▮▮▮▮  INV LIST: N  CONCEAL COMM/CDE:

17 DESC OF SEIZED ITEM: GLOCK CALIBER CONVERSION KIT .22 CAL
   COMM/CD: EVD           QTY:        1.00 UM: EA  WT DET:    FDIN:
   COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:   COUNTRY OF DESTINATION:
   DEC VAL:       0     FOR VAL:              DOM VAL: ▮▮▮▮▮      1
   DUTY:       0.00     LEGAL STAT: SZ PHYS STAT: HE CUST: ▮▮▮▮▮
   CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮▮▮
   T.E.S. CODE: ▮▮▮▮  INV LIST:   CONCEAL COMM/CDE:

18 DESC OF SEIZED ITEM: SAMSONITE BAG, GREY
   COMM/CD: EVD           QTY:        1.00 UM: EA  WT DET:    FDIN:
   COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:   COUNTRY OF DESTINATION:
   DEC VAL:       0     FOR VAL:              DOM VAL: ▮▮▮▮▮      0
   DUTY:       0.00     LEGAL STAT: EV PHYS STAT: HE CUST: ▮▮▮▮▮
   CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮▮▮
   T.E.S. CODE: ▮▮▮▮  INV LIST: N  CONCEAL COMM/CDE:

19 DESC OF SEIZED ITEM: NAUTICA BAG, GREY
   COMM/CD: EVD           QTY:        1.00 UM: EA  WT DET:    FDIN:
   COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:   COUNTRY OF DESTINATION:
   DEC VAL:       0     FOR VAL:              DOM VAL: ▮▮▮▮▮      0
   DUTY:       0.00     LEGAL STAT: EV PHYS STAT: HE CUST: ▮▮▮▮▮
   CONCEAL: E SEC:       ENTERED TARIFF #: ▮▮▮▮▮
   T.E.S. CODE: ▮▮▮▮▮  INV LIST: N  CONCEAL COMM/CDE:


OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>   SEACATS - INCIDENT REPORT <APPROVED>        PAGE   7

INCIDENT  NBR: �&blacksquare;            FP&F CASE NBR: ▮
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: OUTBOUND WEAPON COMPONENTS


20 DESC OF SEIZED ITEM: GUN BRUSHES
     COMM/CD: EVD           QTY:        6.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:     COUNTRY OF DESTINATION:
     DEC VAL:       0       FOR VAL:              DOM VAL: ▮      0
     DUTY:        0.00      LEGAL STAT: EV PHYS STAT: HE CUST: ▮
     CONCEAL: Z SEC:        ENTERED TARIFF #: ▮
     T.E.S. CODE: ▮   INV LIST: N  CONCEAL COMM/CDE:

21 DESC OF SEIZED ITEM: GUN CLEANING KIT
     COMM/CD: EVD           QTY:        2.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:     COUNTRY OF DESTINATION:
     DEC VAL:       0       FOR VAL:              DOM VAL: ▮      0
     DUTY:        0.00      LEGAL STAT: EV PHYS STAT: HE CUST: ▮
     CONCEAL: Z SEC:        ENTERED TARIFF #: ▮
     T.E.S. CODE: ▮   INV LIST: N  CONCEAL COMM/CDE:

22 DESC OF SEIZED ITEM: MISCELLANEOUS DOCUMENTS
     COMM/CD: EVD           QTY:        1.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:     COUNTRY OF DESTINATION:
     DEC VAL:       0       FOR VAL:              DOM VAL:       0
     DUTY:        0.00      LEGAL STAT: EV PHYS STAT: HE CUST: ▮
     CONCEAL: Z SEC:        ENTERED TARIFF #: ▮
     T.E.S. CODE: ▮   INV LIST: N  CONCEAL COMM/CDE:

23 DESC OF SEIZED ITEM: IPHONE 6
     COMM/CD: EVD           QTY:        1.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:     COUNTRY OF DESTINATION:
     DEC VAL:       0       FOR VAL:              DOM VAL:       0
     DUTY:        0.00      LEGAL STAT: EV PHYS STAT: HE CUST: ▮
     CONCEAL: Z SEC:        ENTERED TARIFF #: ▮
     T.E.S. CODE: ▮   INV LIST: N  CONCEAL COMM/CDE:

24 DESC OF SEIZED ITEM: GLOCK 15 RD, MAGAZINE .357
     COMM/CD: EVD           QTY:        1.00 UM: EA  WT DET:     FDIN:
     COUNTRY OF ORIGIN:     COUNTRY OF EXPORT:     COUNTRY OF DESTINATION:
     DEC VAL:       0       FOR VAL:              DOM VAL:       1
     DUTY:        0.00      LEGAL STAT: SZ PHYS STAT: HE CUST: ▮
     CONCEAL: Z SEC:        ENTERED TARIFF #: ▮
     T.E.S. CODE: ▮   INV LIST:    CONCEAL COMM/CDE:

TOTALS:        DECLARED VALUE:       0    FOREIGN VALUE:            0
               DOMESTIC VALUE:      18        DUTY:           0.00
=================================================================================


OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY: COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>     PAGE  8

INCIDENT  NBR: ███████████           FP&F CASE NBR: ████████████
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: OUTBOUND WEAPON COMPONENTS

CIRCUMSTANCES/REMARKS:
Subject: Hamza KOLSUZ
DOB: ██████
COC: Turkey
POB: Turkey
Turkish PP#: ███████████
Visa Foil: ████████████

On Tuesday, February 02, 2016 the subject's two checked bags were examined by
Supervisory Tactical Terrorism Response officer (TTRO) Colgan and TTRO Budd
prior to the subject's departure from the United States. The subject's baggage
contained numerous items that appeared in violation of International Traffic in
Arms Regulations (ITAR). Upon the discovery of these items, HSI agents
responded to assist in the interview. The subject was attempting to export,
without license or permission, the ITAR controlled items into his native
Turkey. The subject was intercepted one two separate occasions for the same

violation (see reports ████████████ and ███████████ for full details).
The subject was stopped on the jet way for Turkish Airline flight number 8 by
members of the TTR team, CTR supervisor and an HSI special agent. A binding
declaration was obtained by members of the TTR team from the subject in his
native language via a translator. The subject admitted being in possession of
the ITAR items. The items in question are as follows:
1.      18 handgun barrels
2.      26 handgun magazines
3.      Five under barrel laser aiming modules
4.      One .22 handgun conversion kit
On the jet way and through translation provided by a Turkish Airlines
representative, the subject stated that following:
The subject had in his checked baggage the aforementioned items. Subject
initially flew into Miami and then traveled to Ohio. While in Ohio, the subject
attended a gun show where he made cash purchases of the items. Subject was

asked if he had any licensure for the items for exportation from the United
States and the subject responded that he did not have nor need an FFL (federal
firearms license). Subject stated that he did not need any other licenses
because he did not have possession of firearms and as such no FFL was needed.
Subject claims no knowledge of any licenses required for exportation other than
an FFL. The subject stated that he did not bring very much cash into the US,
that he used his ATM cards to get the cash needed to purchase the items in
question (on the subject's entry into the US, CBP systems showed the subject in
possession of $9,000usd). The subject has approximately $2,600usd in his
possession at the time of the encounter. The subject claims that the items are
all for personal use and that he has no intention of selling them in Turkey or
any other country.
Failure to obtain and present a valid DOS license to CBP is a violation of the
            OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>          PAGE   9

INCIDENT  NBR: ███████████████          FP&F CASE NBR: ████████████
VIOLATOR NAME: KOLSUZ, HAMZA
TOPIC: OUTBOUND WEAPON COMPONENTS

International Traffic in Arms Regulations (ITAR). Because this requirement was
not met, the barrels and caliber conversion kit were seized under

19USC1595(a)(d) and 22USC401 for violation of 22CFR127.1, 22CFR127.2,
22CFR123.17 and 22CFR123.22(b). In addition, the attempted exportation of these
commodities is a violation of 22CFR120.30, 15CFR30.4, and 15CFR30.18, due to
the exporter having failed to file electronically in the Automated Export
System (AES), which is a requirement for the legal exportation of any United
States Munitions List (USML) article.
The magazines, laser aiming modules and the two bags associated with the
carriage of said items were seized as evidence for the case pending against the
subject on behalf of HSI.
The subject was turned over to special agents with Homeland Security
Investigations for possible prosecution.

================================================================================

Appeal: 16-4687 Doc: 31 Filed: 03/13/2017 Pg: 133 of 273

REQUESTED BY:  COPPOLO, ADAM J

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

020916                    TECS II - LIST OF RELATED RECORDS                    PAGE   1

4 RECORDS ARE RELATED TO BASE RECORD



COLGAN

KOLSUZ        HAMZA        U M                    PRIMARY VI

KOLSUZ        HAMZA        U M                    PRIMARY VI

BUDD          J

COPPOLO       A 020316

HAMZA KOLSUZ

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE     1 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N  C O N T I N U A T I O N | CASE NUMBER ▮▮▮▮▮▮▮▮▮▮▮ |
| | REPORT NUMBER: ▮▮▮▮ |

DETAILS OF INVESTIGATION

From on or after February 2, 2016, to on or about March 3, 2016, a customs border search was conducted on Hamza KOLSUZ's cell phone.  This report serves to document this border search.

Following the arrest of Hamza KOLSUZ on February 3, 2016, Special Agent (SA) Adam Coppolo transported, among other things, KOLSUZ's cell phone to the HSI/DC Sterling, VA office.  This phone had previously been detained by CBP officers at the time of KOLSUZ's outbound inspection along with his other personal items.

Pursuant to Title 19 United States Code 1595(a), SA Coppolo requested the assistance of Computer Forensic Agent (CFA) Michael Del Vacchio in creating a report based on a logical extraction of KOLSUZ's iPhone. This report was used by SA Coppolo to conduct a border search of the iPhone in order to search for violations of law, including but not limited to, violations of Title 22 United States Code Section 2778 and Title 18 United States Code Section 554.

On or about February 3, 2016, CFA Del Vacchio prepared a report which he subsequently provided to SA Coppolo for review.  From on or about February 3, 2016 to on or about March 3, 2016, SA Coppolo accessed this report pursuant to customs border search authority.  Among other things, SA Coppolo reviewed contact lists, emails, messenger conversations (including but not limited to Kik and iChat conversations), photos and videos.

On March 3, 2016, SA Coppolo confirmed with CFA Del Vacchio that no other information could be obtained from the iPhone.  At that time, SA Coppolo concluded his border search of the iPhone.  SA Coppolo will no longer search the report for new evidence.  SA Coppolo will only access the report in an attempt to review the evidence that has already been reviewed.

Pertinent information discovered during the border search of the iPhone may be documented in subsequent Reports of Investigation (ROI's).

Additional Information:
IMEI: ▮▮▮▮▮▮▮▮▮▮▮
DHS Form 6051S # ▮▮▮▮▮▮▮▮
Line Item # ▮▮▮▮

Investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                     EASTERN DISTRICT OF VIRGINIA
 2                        Alexandria Division

 3   UNITED STATES OF AMERICA,          )
                                        )
 4                       Plaintiff,     )
                                        )
 5   v.                                 ) CRIMINAL ACTION
                                        )
 6   HAMZA KOLSUZ,                      ) 1:16-cr-53
                                        )
 7                                      )
                         Defendants.    )
 8   _____)

 9                      REPORTER'S TRANSCRIPT

10                      SUPPRESSION HEARING

11                   Friday, April 29, 2016

12                             ---

13   BEFORE:      THE HONORABLE T.S. ELLIS, III
                  Presiding
14
     APPEARANCES:  HEATHER ALPINO, SAUSA
15                 DENNIS FITZPATRICK, AUSA
                   United States Attorney's Office
16                 2100 Jamieson Ave.
                   Alexandria, VA 22314
17
                       For the Government
18
                   TODD M. RICHMAN, ESQ.
19                 Federal Public Defender's Office
                   1650 King Street, Suite 500
20                 Alexandria, VA 22314

21                     For Defendant Stewart

22                             ---

23          MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                   Official Court Reporter
24          USDC, Eastern District of Virginia
                   Alexandria, Virginia
25
```

1                    APPEARANCES CONTINUED:

2          ERICA LYNN MARSHALL, ESQ.
           Cause of Action
3          1919 Pennsylvania Ave NW
           Suite 650
4          Washington, DC 20006

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 137 of 273

```
 1                            INDEX

 2    RECAPITULATION BY THE COURT:                    4

 3    WITNESSES:          DIRECT CROSS REDIRECT RECROSS

 4    Adam Coppolo         11      15      20

 5    ARGUMENT BY THE DEFENDANT:                      22

 6    ARGUMENT BY THE GOVERNMENT:                     30

 7    REBUTTAL ARGUMENT BY THE DEFENDANT:             44

 8    RULING BY THE COURT:                            47

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  United States versus Hamza

2     Kolsuz.  Criminal case 1:16-cr-53.

3          THE COURT:  Is the interpreter here?  Not

4     yet?

5          ATTORNEY RICHMAN:  None of us have seen the

6     interpreter here.

7          THE COURT:  Oh, I thought he was here.  I

8     was told he was -- by 1:00.  It is 1:00.  All right.  I

9     will recess until he arrives.

10          Ms. Horvath, I know you are awfully good,

11     but I don't know you are good in Turkish.

12          MS. HORVATH:  I'm sorry, your Honor.  I

13     can't help you there.  I wouldn't even try.

14          THE COURT:  Well, thank you, anyway.

15          I'll recess until we can locate an

16     interpreter.  I think the matter has been fully briefed

17     and the stipulation of facts is quite helpful, and I

18     think I can make some remarks at the beginning that may

19     focus the argument or, at least, give you enough

20     information so that you can tell me that I haven't

21     correctly focused on the pertinent issue or issues.

22          Court stands in recess.  I'll reconvene as

23     soon as -- as soon as interpreters arrive.

24          Court stands in recess.

25          (Court recessed at 1:03 p.m.)

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
 1                    (Court called to order at 1:14 p.m.)

 2           THE COURT:  All right.

 3           Good afternoon.

 4           You may call the next case, and after that I

 5    will have the interpreter come to the podium.

 6           THE CLERK:  United States versus Hamza

 7    Kolsuz.  Criminal Case Number 1:16-cr-53.  Counsel,

 8    please note your appearance for the record.

 9           ATTORNEY ALPINO:  Good afternoon, your

10    Honor, Heather Alpino and Dennis Fitzpatrick for the

11    United States.

12           ATTORNEY FITZPATRICK:  Good afternoon.

13           THE COURT:  All right.

14           Ms. Alpino and Mr. Fitzpatrick, good

15    afternoon.  Mr. Richman, good afternoon.

16           ATTORNEY RICHMAN:  And Ms. Erica Marshall is

17    with me, and she will be appearing today.

18           THE COURT:  And Mr. Bergeroglu.

19           THE INTERPRETER:  Yes, your Honor.

20           THE COURT:  Come to the podium, please, sir.

21           Would you give us your name and your

22    qualifications as an interpreter in English and Turkish.

23           THE INTERPRETER:  My name is Hayri

24    Bergeroglu.  I have full college degree in engineering

25    in the United States, and I have been interpreting like
```

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 140 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 6 of 58 PageID# 251

6

1    23 years for the courts in Maryland, Virginia, District

2    area for different agencies.

3              THE COURT:  Have you served as an

4    interpreter in English and Turkish in this court before?

5              THE INTERPRETER:  No, sir.  This court,

6    first time.

7              THE COURT:  All right.

8              Are you able to translate from English to

9    Turkish and Turkish to English simultaneously, that is,

10    as it's spoken?

11              THE INTERPRETER:  Yes.  I am.

12              THE COURT:  All right.

13              Given you're the lengthy experience, I think

14    the Court is satisfied that you are fully competent and

15    capable of serving as an Turkish-English interpreter.

16    I'll have the deputy clerk administer the interpreter's

17    oath to you now.

18              (Interpreter sworn by clerk).

19              THE COURT:  All right.

20              If at any time you need to have people slow

21    down or to repeat something, just raise your hand.  I

22    will stop the proceedings and ensure that you have an

23    opportunity to translate everything.

24              THE INTERPRETER:  It is understood.

25              THE COURT:  Thank you.

1            And good afternoon to you, Mr. Kolsuz.

2            All right.  You may be seated.

3            THE DEFENDANT:  (Complied).

4            THE COURT:  All right.

5            The matter is before the Court on a motion

6    to suppress evidence discovered as a result of a

7    warrantless search of defendant's cellphone that was

8    taken when he was leaving the United States.

9            The defendant has been charged in a

10   three-count indictment with violating the Arms Export

11   Control Act with attempting to smuggle goods from the

12   United States and conspiracy to commit those offenses.

13           Now, there is a lengthy stipulation of

14   facts, which I think serve to frame the issues quite

15   clearly.  This appears to be an exit search, which in

16   Fourth Circuit authority means it is same as coming in

17   or going out.  The question is whether it's a routine or

18   non-routine search.

19           The defendant also argues that under Riley

20   it requires -- it's a search incident to arrest that

21   requires a warrant and probable cause.  The government

22   takes the position that Riley doesn't apply to border

23   searches.  Those are the principal arguments that are

24   involved.

25           Do we need anymore facts or testimony?

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 142 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 8 of 58 PageID# 253

8

1           ATTORNEY ALPINO:  Your Honor, a little bit

2    of just limited testimony we'd like to get out of

3    Special Agent Adam Coppolo.

4           Specifically, one, the fact that during his

5    interview with the defendant at the airport the

6    defendant acknowledged his two previous encounters with

7    law enforcement in 2012, 2013; two, the fact that

8    Special Agent Coppolo --

9           THE COURT:  Now, that would go to the issue

10   of --

11          ATTORNEY ALPINO:  Reasonable suspicion, your

12   Honor.

13          THE COURT:  Reasonable suspicion or probable

14   cause, whichever the Court determines is needed in this

15   case.

16          ATTORNEY ALPINO:  That is correct, your

17   Honor.

18          THE COURT:  What is the second bit of

19   evidence?

20          ATTORNEY ALPINO:  The fact that Special

21   Agent Coppolo didn't use any searching software or

22   analytical software to review or the Cellebrite report

23   that was given to him.

24          THE COURT:  All right.  And that goes to

25   whether it's a routine or non-routine search.

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 143 of 273

```
 1                ATTORNEY ALPINO:  Correct, your Honor.

 2                THE COURT:  All right.  Now, same -- one

 3      witness, right?

 4                ATTORNEY ALPINO:  Correct, your Honor.

 5                THE COURT:  Can do both?

 6                ATTORNEY ALPINO:  Yes.

 7                THE COURT:  All right.

 8                And anything else.

 9                ATTORNEY ALPINO:  There are two other

10      issues.  One, I wanted to elicit some testimony about

11      him -- about a second iPhone that was found in the

12      defendant's -- in the defendant's luggage on the day of

13      the stop and the fact that that cellphone, which is

14      brand new, is actually on its way back to Turkey if it

15      hasn't actually arrived there yet.

16                THE COURT:  What is the relevance of that to

17      what --

18                ATTORNEY ALPINO:  Defense --

19                THE COURT:  Wait until I finish.

20                What is the relevance to that to what we

21      have before the Court today?

22                ATTORNEY ALPINO:  Defense counsel argues

23      that part of the reason that this was a search incident

24      to arrest as opposed to a border search is that there

25      was no chance, no risk the cellphone, the cellphone at
```

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 144 of 273
Case 1:16-cr-00053-TSE    Document 27    Filed 05/01/16    Page 10 of 58 PageID# 255

10

1    issue here would have actually crossed border.  And

2    here -- that the testimony from Special Agent Coppolo

3    shows that the items are routinely sent back to the

4    defendant or his family when there's deemed to be no

5    evidence -- no information of any relevance on the item.

6              So there could have been a risk here that

7    this cellphone would have been sent back also had it not

8    had anything on it, had it been brand new, for example.

9              THE COURT:  Any other evidence you intend to

10   elicit?

11             ATTORNEY ALPINO:  Just some testimony about

12   why Homeland Security Investigations agents, when they

13   do their searches of electronic information, what type

14   of information relating to customs enforcement is

15   commonly found in those devices.

16             THE COURT:  How many witnesses do you intend

17   to call?

18             ATTORNEY ALPINO:  Just one, Special Agent

19   Adam Coppolo.

20             THE COURT:  All right.  Let's do it.  Call

21   him.

22             ATTORNEY ALPINO:  The government calls

23   Special Agent Adam Coppolo.

24             THE COURT:  Come forward, take the oath

25   please, sir.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Mr. Richman, do you-all intend to call any

2    evidence?

3          ATTORNEY RICHMAN:  We do not, your Honor.

4          THE COURT:  Thank you.

5          (Witness sworn).

6          THE COURT:  All right.  You may proceed.

7          DIRECT EXAMINATION:

8    BY ATTORNEY ALPINO:

9    Q.    Good afternoon.  Could you please state and spell

10   your full name for the record?

11   A.    Adam Coppolo, C-o-p-p-o-l-o.

12   Q.    Who is your employer?

13   A.    Ice Homeland Security Investigations.

14   Q.    How long have you worked there?

15   A.    About ten years.

16   Q.    What is your job title?

17   A.    Special Agent.

18   Q.    Are you the case agent for United States versus

19   Hamza Kolsuz?

20   A.    Yes, I am.

21   Q.    Do you see him in the courtroom?

22   A.    Yes I do.

23   Q.    Could you identify him by where he is sitting and

24   what he is wearing?

25   A.    He is sitting at the defense table next to his

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 146 of 273
Case 1:16-cr-00053-TSE    Document 27    Filed 05/01/16    Page 12 of 58 PageID# 257

12

1    counsel wearing a green jumpsuit.

2                ATTORNEY ALPINO:  Your Honor, may the record

3    reflect that he has identified the defendant?

4                THE COURT:  So ordered.

5    BY ATTORNEY ALPINO:

6    Q.    Did there a time when you interviewed Mr. Kolsuz

7    at Dulles Airport on February 2nd and 3rd, 2013?

8    A.    Yes.

9    Q.    During this interview, did he acknowledge any

10   previously encounters with law enforcement?

11   A.    Yes, he did.

12   Q.    How many?

13   A.    Two.

14   Q.    On what dates?

15   A.    December of 2012 and January of 2013.

16   Q.    While you were at the airport, at some point, did

17   his iPhone come into your possession?

18   A.    Yes, it did.

19   Q.    Did you later give that iPhone to computer

20   forensic agent Michael Del Vacchio?

21   A.    Yes, I did.

22   Q.    Did he later produce a report containing data

23   extracted from that cellphone?

24   A.    Yes, he did.

25   Q.    How did you review that report?

1    **A.**    I reviewed it on my computer.

2                    THE COURT:  Speak up, if you would please,

3    Agent.

4                    THE WITNESS:  Yes, your Honor.

5    BY ATTORNEY ALPINO:

6    **Q.**    Did you use any searching software or analytical

7    software to review the report?

8    **A.**    No, no software.

9    **Q.**    Was a second phone found in the defendant's

10   belongings when he was -- when he was at border at the

11   airport on February 2nd, 2016?

12   **A.**    Yes.

13   **Q.**    Could you describe that phone?

14   **A.**    It was an iPhone.

15   **Q.**    Could you describe the condition that phone was

16   in?

17   **A.**    It was told that it was a new iPhone still in its

18   original packaging.

19   **Q.**    Was that phone ever searched?

20   **A.**    No, it was not.

21   **Q.**    Why not?

22   **A.**    There was no reason to search it.  We didn't

23   believe that there was any customs violation present on

24   the phone.

25   **Q.**    What happened to that phone?

1    A.    It's in the process of being sent back to his

2    family in Turkey.

3    Q.    When electronic devices are detained at the border

4    and searched, what type of information relating to

5    customs enforcement is commonly found those devices?

6    A.    It could be any customs violation or evidence of

7    customs violation, so it could be anything from evidence

8    of ITAR or USML violations, narcotics violations,

9    relating --

10           THE REPORTER:  Excuse me?  Would you please

11    repeat?

12           THE WITNESS:  United States Munitions List

13    violations relating to --

14           THE COURT:  You're saying munitions, right?

15           THE WITNESS:  Munitions, yes, your Honor.

16           -- related to ITAR, which is the

17    International Trafficking in Arms Regulations, narcotics

18    trafficking, child pornography, bulk cash smuggling,

19    anything related to customs violations.

20           ATTORNEY ALPINO:  No further questions, your

21    Honor.

22           ATTORNEY FITZPATRICK:  Court's indulgence?

23           THE COURT:  Yes.

24           ATTORNEY FITZPATRICK:  Thank you, your

25    Honor.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

Appeal: 16-4687   Doc: 21   Filed: 03/13/2017   Pg: 149 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 15 of 58 PageID# 260

15

1          THE COURT:  I might -- I might say what you

2    have just elicited doesn't cover the waterfront that you

3    said you were going to cover, but I am not sure it

4    matters.  It's up to you.

5          ATTORNEY ALPINO:  Nothing further, your

6    Honor.

7          THE COURT:  All right.

8          Cross-examination?

9

10   BY ATTORNEY MARSHALL:

11   Q.    Good afternoon, Agent Coppolo.

12   A.    Good afternoon.

13   Q.    You said you reviewed a report that was prepared

14   by Agent Del Vacchio; is that correct?

15   A.    That's correct.

16   Q.    But you yourself didn't do the search of the --

17   the forensic search of the phone; is that right?

18   A.    Can you define forensic search?

19          THE COURT:  Did you do any search of the

20   file?

21          THE WITNESS:  I reviewed the report, so yes,

22   that I consider the search of the phone.

23   BY ATTORNEY MARSHALL:

24   Q.    So you know that Agent Del Vacchio used the

25   assistance of technology to search the phone, right?

1    **A.**    Yes.

2    **Q.**    And Agent Del Vacchio, in fact, used a Cellebrite

3    physical analyzer to conduct the search; is that right?

4    **A.**    That's my understanding, yes.

5    **Q.**    And he conducted an advanced logical extraction;

6    is that right?

7    **A.**    That's correct.

8              THE COURT:  Is all that already in the

9    record?

10             ATTORNEY ALPINO:  I believe so, your Honor.

11             ATTORNEY MARSHALL:  Yes, your Honor.

12   BY ATTORNEY MARSHALL:

13   **Q.**    And the advanced logical file system extraction

14   gets all of the files on the iPhone; is that right?

15   **A.**    I don't know what it grabs from the phone.  I

16   can't testify to that.

17   **Q.**    Okay.  But you do know that this search pulled

18   down everything off of all of the allocated space on the

19   iPhone; is that correct?

20   **A.**    That is my understanding now.  Yes.

21             THE COURT:  That's also already in the

22   record in the stipulation, isn't it?

23             ATTORNEY MARSHALL:  That's correct, your

24   Honor.  The Court's indulgence.

25   BY ATTORNEY MARSHALL:

1    **Q.**    And the conversation that you referenced with

2    Mr. Kolsuz where he acknowledged the two previous stops,

3    did that occur on the jetway?

4    **A.**    I am not hundred percent sure where that occurred.

5    I don't believe both of them did.

6    **Q.**    So, they did --

7                    THE COURT:  These conversations you were

8    present at?

9                    THE WITNESS:  No, your Honor.

10                   THE COURT:  So you don't know where they

11   took place.

12                   THE WITNESS:  No, your Honor.

13                   THE COURT:  Next question.

14   BY ATTORNEY MARSHALL:

15   **Q.**    Okay.  And you weren't present on the jetway; is

16   that right?

17   **A.**    That's correct.

18   **Q.**    Okay.  So you aren't sure if any of these

19   conversations --

20                   THE COURT:  You'll have to eliminate "okay"

21   because it's a comment on the testimony.  It's a habit

22   all lawyers have --

23                   ATTORNEY MARSHALL:  Yes, your Honor.

24                   THE COURT:  But you need to -- as young as

25   you are, you need to disabuse yourself of that earlier

1    on.

2              ATTORNEY MARSHALL:  Yes, your Honor.

3              THE COURT:  Otherwise, it's very difficult

4    to break.

5              ATTORNEY MARSHALL:  Thank you for that, your

6    Honor.

7    BY ATTORNEY MARSHALL:

8    Q.    So you were not on the jetway; that's correct?

9              THE COURT:  Asked and answered.

10             Next question.

11   BY ATTORNEY MARSHALL:

12   Q.    And so you don't know whether or where these

13   prior --

14             THE COURT:  That's asked and answered, too.

15   I asked him.

16             ATTORNEY MARSHALL:  Okay.

17   BY ATTORNEY MARSHALL:

18   Q.    So you don't -- and you don't speak Turkish; is

19   that correct?

20   A.    That's correct.

21   Q.    And there were no agents present on the jetway

22   that spoke Turkish; is that correct?

23   A.    Not that I am aware.

24   Q.    And it's your understanding that a --

25             THE COURT:  How did you know if you weren't

1    on the jetway?

2                THE WITNESS:  I don't know, your Honor.

3                THE COURT:  Next question.

4    BY ATTORNEY MARSHALL:

5    Q.    Have you reviewed any -- have reviewed any

6    documents in this case to indicate what occurred on the

7    jetway?

8    A.    On the -- on February 2nd?

9    Q.    That's right.

10   A.    Yes.

11   Q.    And to your knowledge, do any of the agents

12   present on the jetway speak Turkish?

13   A.    The government agents, no.

14   Q.    And to your knowledge, was there CBP, a Customs

15   Border Protection interpreter present on the jetway?

16   A.    Not on February 2nd of 2016.

17   Q.    And on February 22nd was when Mr. Kolsuz was

18   approached on the jetway?

19   A.    I'm sorry.  Did you say February 22nd?

20   Q.    February 2nd was when Mr. Kolsuz was approached on

21   the jetway, correct?

22   A.    That's correct.

23              ATTORNEY MARSHALL:  No further questions,

24   your Honor.

25              THE COURT:  Have you ever spoken to the

1    defendant?

2              THE WITNESS:  Yes, when we interviewed him.

3              THE COURT:  In English?

4              THE WITNESS:  We used a Turkish interpreter.

5              THE COURT:  All right.  So you have never

6    spoken to him in English?

7              THE WITNESS:  No, your Honor.

8              THE COURT:  All right.

9              Anything further?

10             ATTORNEY ALPINO:  Very briefly, your Honor.

11             THE COURT:  All right.

12             REDIRECT EXAMINATION:

13   BY ATTORNEY ALPINO:

14   Q.    On the jetway -- on the jetway do you know -- did

15   anyone serve as an interpreter in the jetway?

16   A.    Yes.

17   Q.    Do you know who that individual was?

18   A.    Yes.

19   Q.    Who is that individual?

20   A.    It was a Turkish Airlines representative.

21   Q.    Does that person speak English and Turkish as a

22   part of his or her job responsibilities?

23   A.    Yes, he does.

24   Q.    Has this person assisted CBP officers with

25   interviewing individuals at Dulles previously?

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 155 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 21 of 58 PageID# 266

21

1    **A.**    Yes, he has.

2              ATTORNEY ALPINO:  Nothing further.

3              THE COURT:  All right.

4              Thank you.

5              You may step down.

6              (Witness excused).

7              THE COURT:  Any other witnesses?

8              ATTORNEY ALPINO:  No, your Honor.

9              THE COURT:  All right.

10             I'll hear from you, Mr. Richman, or your

11   colleague on the motion to suppress.

12             ATTORNEY ALPINO:  Your Honor, if I may, I

13   formally offer the exhibits and stipulation of facts

14   into evidence.

15             THE COURT:  All right.  You may do so.  Have

16   you -- have you shown it to counsel?

17             ATTORNEY RICHMAN:  If it's the stipulation,

18   your Honor, we --

19             THE COURT:  Well, there may be more.  Look

20   at it.

21             ATTORNEY ALPINO:  It's the stipulation and

22   the seven exhibits that were attached to the stipulation

23   that were filed with the court.

24             THE COURT:  All right.

25             ATTORNEY MARSHALL:  Your Honor, we have no

1    objection to its admission.

2             THE COURT:  All right.

3             You may proceed.

4             ATTORNEY MARSHALL:  Mr. Kolsuz is here on

5    the motion to suppress that he filed --

6             THE COURT:  I am aware of that.

7             ATTORNEY MARSHALL:  Your Honor has heard

8    brief facts here this morning --

9             THE COURT:  I'm sorry.

10            ATTORNEY MARSHALL:  Your Honor has heard a

11   brief amount of live testimony here this morning, but

12   the majority of the facts -- in fact, all of the facts

13   that are relevant to the Court's inquiry have been

14   stipulated to by the parties.

15            THE COURT:  Yes, I thought so as well.

16            ATTORNEY MARSHALL:  So, your Honor, the

17   facts are very clear that Mr. Kolsuz was arrested early

18   in the morning on February 3rd, 2016, and that

19   subsequent to that arrest the United States began a

20   warrantless search of his cellphone.

21            Despite the fact that the United States

22   Supreme Court has very -- has very clearly ruled that

23   any search of a cellphone after an arrest requires --

24            THE COURT:  Well, that is your contention

25   about whether Riley applies.  Riley wasn't the border

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 157 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 23 of 58 PageID# 268

23

1    search, was it?

2            ATTORNEY MARSHALL:  That is correct, your

3    Honor, and in fact --

4            THE COURT:  And so you have an initial

5    hurdle.  How do you persuade me that Riley applies to

6    this?

7            ATTORNEY MARSHALL:  Your Honor, our argument

8    quite simply is not -- is that while Riley brings us to

9    where we are here today because it created a unique

10   issue for the courts that are now starting to trickle

11   down to the courts, it is actually not dispositive of

12   our case.

13           Our argument is that this was not a border

14   search at all.  And in fact the very definition of a

15   border search implies, as the court noted in United

16   States versus Ramsey at the border.

17           This search did not occur at the border or

18   its functional equivalent.  There is undisputed

19   testimony that agent Coppolo removed the iPhone after

20   Mr. Kolsuz's arrest to a location far away -- miles away

21   from any border or its functional equivalent.

22           In fact the Ninth Circuit has also

23   articulated a temporal requirement for border searches,

24   and that is that a border search is one that occurred at

25   the last practical opportunity before an item's passage

Appeal: 16-4687   Doc: 21   Filed: 03/13/2017   Pg: 158 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 24 of 58 PageID# 269

24

1    over the international border.  That is the United

2    States versus Abbouchi.

3            Now, your Honor, from a temporal

4    perspective, there is also no argument that can be made

5    that this was a border search.  This search was

6    conducted over the course of a month, again, after

7    Mr. Kolsuz had already had a criminal complaint filed

8    against him, after the government had actually sought

9    and obtained an indictment against him, only after all

10   of those things happened did this purported border

11   search conclude.

12           And most importantly, your Honor, the Court

13   has been reminded by the Supreme Court recently on

14   multiple occasions that it must -- the touchstone of the

15   Fourth Amendment is reasonableness, and it must not

16   untether any search from the ultimate justification for

17   that search.

18           Here the record is void of any argument or

19   assertion by the government that this search actually

20   went to one of the interests or the justifications that

21   actually are -- that actually created the border search

22   exception in the first place.  Those justifications, of

23   course, as the government stated in its briefing very

24   accurately, are --

25           THE COURT:  All right.  So you argue it

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 159 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 25 of 58 PageID# 270

25

1    wasn't a boarder search.  What case would you point me

2    to that you think is factually apposite to this case

3    where it was held that it was not a border search.

4                ATTORNEY MARSHALL:  Yes, your Honor.  There

5    is a number of cases that set forth the justification --

6                THE COURT:  What are they?

7                ATTORNEY MARSHALL:  -- for the border search

8    doctrine.  For example, the Fourth Circuit, our own

9    binding authority, in United States v. Oriakhi 57 F.3rd

10   1290 from 1995 described what a border search is.  And

11   the Court stated it is a search conducted with the goal

12   to, quote, "Exclude harmful influences including

13   undeniable..." --

14               THE COURT:  You cite that case for the

15   definition, not for the facts, right?

16               ATTORNEY MARSHALL:  Your Honor, we cite this

17   case --

18               THE COURT:  Can you give me a yes or no?

19   It's -- you need to do that.  When a judge asks a

20   question, answer it, and then go on.

21               ATTORNEY MARSHALL:  Yes, your Honor, we cite

22   this -- we cite this for the definition of what a border

23   search is.

24               THE COURT:  All right.

25               Now, let's pass that.  What I want to know

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 160 of 273
Case 1:16-cr-00053-TSE    Document 27    Filed 05/01/16    Page 26 of 58 PageID# 271

26

1    is, what case do you cite to the Court that is factually

2    most apposite to this case, in other words, a case that

3    says, no, what happened here was not a border search,

4    and it's factually close to this case.

5          ATTORNEY MARSHALL:  Post Riley there are

6    very few cases that have addressed this specific issue.

7    I would submit to the Court that one from the Eastern

8    District of New York, United States versus Djibo, which

9    we referenced and cite in our brief, is directly on

10   point here, where after arrest the Court found that even

11   just a quick look of Mr. -- of the defendant's phone

12   there, could not being justified without a warrant.

13          Here, we don't dispute that there --

14   ultimately, originally, there were certainly border

15   implications at play when Mr. Kolsuz arrived at the

16   airport.  Of course, that border search included a

17   search of his luggage, and included actually a quick

18   look, while he was in the secondary inspection room

19   prior to his arrest.  And we don't dispute that was well

20   within the government's border search authority and that

21   it certainly had governmental interest at that time to

22   conduct the search that it did.

23          Our argument is that after Mr. Kolsuz's

24   arrest, a change in the calculus occurred.  The Fourth

25   Amendment requires that this Court weight the

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 161 of 273
Case 1:16-cr-00053-TSE    Document 27    Filed 05/01/16    Page 27 of 58 PageID# 272

27

1    governmental interest at play versus Mr. Kolsuz's

2    interest.

3            THE COURT:  I'm sorry.  Say that again.

4            ATTORNEY MARSHALL:  The Fourth Amendment

5    requires that the Court weight the governmental interest

6    at play against Mr. Kolsuz's privacy interests.

7            Now, certainly those governmental interest

8    warranted a search of his luggage and warranted a quick

9    look at his iPhone.  However, once he was arrested there

10   was no governmental interest that justifies a border

11   search exception which would apply and which can save

12   this search as constitutional.

13           Those are --

14           THE COURT:  In other words, a border search

15   in your view never really occurs after an arrest.  Once

16   there is an arrest, it's no longer a border search.

17           ATTORNEY MARSHALL:  Your Honor, I don't want

18   to speak so broadly as to, you know, dictate a result in

19   future cases that aren't before your Honor here.  We are

20   just arguing that today, for the purposes of this

21   ruling, the Court can -- the Court should find this was

22   not a border search, and such a decision is actually

23   very uneventful.  It's a very boring holding.  It

24   doesn't --

25           THE COURT:  I don't think it's boring.

Appeal: 16-4687    Doc: 31    Filed: 03/13/2017    Pg: 162 of 273
Case 1:16-cr-00053-TSE    Document 27    Filed 05/01/16    Page 28 of 58 PageID# 273

28

1          ATTORNEY MARSHALL:  It doesn't change any of

2     the -- what I mean to say --

3          THE COURT:  It changes the result.

4          ATTORNEY MARSHALL:  What I mean to say is

5     that --

6          THE COURT:  If I conclude this was a border

7     search, and if I conclude, contrary to what the

8     government's arguing, that it's non-routine, I then have

9     to look to see that there was reasonable suspicion or

10    probable cause.  And the result would be very different

11    from what it is if I accept your argument, which is it

12    wasn't a border search because they arrested him before

13    they searched him.

14          And in your view, Riley says that's a search

15    incident to an arrest and requires a warrant.  Isn't it

16    that simple?  And it is significant in its difference in

17    the outcome.  It isn't boring at all.

18          ATTORNEY MARSHALL:  Your Honor, it doesn't

19    require -- we don't ask that the Court interpret Riley

20    more expansively than the Supreme Court intended it to

21    be interpreted.

22          THE COURT:  Well, isn't that -- I don't even

23    know what that means.  You say don't interpret the

24    opinion beyond what the opinion says it's to be

25    interpreted.  That doesn't answer anything.  You say it

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 163 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 29 of 58 PageID# 274

29

1    was not a border search, right?

2                    ATTORNEY MARSHALL:  That is correct, your

3    Honor.

4                    THE COURT:  And you say it was not a border

5    search, as I understand it, for two reasons.  One is

6    because it occurred after an arrest, right?

7                    ATTORNEY MARSHALL:  Yes, your Honor.

8                    THE COURT:  And a second reason is that it

9    was spatially and temporally removed from the border,

10   right?

11                   ATTORNEY MARSHALL:  If I may, your Honor,

12   our primary argument would be that the search was

13   untethered from any justification or governmental

14   interest that gave rise to the border --

15                   THE COURT:  You know, if you'd speak

16   directly you'd make more progress.

17                   ATTORNEY MARSHALL:  Okay.

18                   THE COURT:  The answer is, "yes."  You say

19   that it wasn't a border search because it's temporally

20   removed from the border and its's spatially removed from

21   the border.  It follows from that that the reason you

22   have you a border search doesn't apply if you take it a

23   thousand miles away and ten days away.  Okay.  I

24   understand that argument.  I don't know whether I buy it

25   yet, but I understand it.

1           The next argument you make is Riley says

2     once you arrest somebody you got to do this.  And so

3     your argument is Riley applies because once the arrest

4     is made it's no longer a border search.  It's a search

5     incident to an arrest.  I think those are your

6     arguments, are they?

7           ATTORNEY MARSHALL:  That is correct, your

8     Honor.  Our argument is that this was no border search

9     and so regular Fourth Amendment juris prudence applies,

10    including the decision in Riley.

11          THE COURT:  All right.

12          Now, what's the government's response.

13          ATTORNEY ALPINO:  Your Honor, to start with

14    the spatially attenuated argument.

15          THE COURT:  The what?

16          ATTORNEY ALPINO:  The spatially attenuated

17    argument.

18          THE COURT:  All right.

19          ATTORNEY ALPINO:  Defense counsel states

20    cited United States versus Abbouchi, which said, "We

21    look to whether the search occurred at the last

22    practicable opportunity before its passage over the

23    international border."  That case was talking about the

24    distinguish -- distinguishing between a border search

25    and an extended border search, which is not at issue

1    here.

2              What happened here is the defendant checked

3    in for his flight, checked his luggage and got onto the

4    jetway, which is the last practicable opportunity for

5    his phone or -- for him to be searched or for his phone

6    to be seized.  That is the last point before he would

7    officially go foreign.  And --

8              THE COURT:  That's where they got his

9    telephone, right?

10             ATTORNEY ALPINO:  That's correct, your

11   Honor.

12             THE COURT:  Now, but they didn't search it

13   there.

14             ATTORNEY ALPINO:  They did not search it

15   there.

16             THE COURT:  And they searched it somewhere

17   away from there, and you contend it's a routine and not

18   a non-routine search?  How can you make that contention

19   given what the facts reflect on the devices used to

20   search it and that sort of thing?

21             ATTORNEY ALPINO:  Well, I believe it's the

22   first argument defense counsel is making, is that it's

23   not -- not even a border search --

24             THE COURT:  Yes, that's right.  But I was

25   skipping ahead to the routine, not-routine.  But go

1    ahead.  You are right to call me back to their argument.

2    The first argument that they made is that it is

3    spatially removed.  You have responded to that.

4    Temporally, you haven't.

5            ATTORNEY ALPINO:  Correct, your Honor.  The

6    length of the search doesn't change the fact that it was

7    a border search.  For example, in United States versus

8    Feiten, which is cited in our brief, the search took the

9    same amount of time that it took here, 30 days, and it

10   was still a border search.

11           We are not saying that the amount of time

12   the search took or the location where the search takes

13   place is irrelevant toward routineness or

14   non-routineness, but the Courts are clear that it

15   doesn't affect whether or not it was a border search.

16           THE COURT:  Say that last again, please.

17           ATTORNEY ALPINO:  Sure.  It's clear that the

18   location of the search and the amount of time the search

19   takes hasn't been considered in whether the search was a

20   border search.

21           For example, in Cotterman, the search took

22   place 170 miles away from the functional equivalent of

23   the border, but the search was still found to be a

24   border search.

25           THE COURT:  All right.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1              So putting to one side now that argument of

2       the defendants, let's go on to one they haven't made

3       today.  They have made it in their briefs.  Why do you

4       contend this is a routine search given the extent to

5       which you-all -- or they went into it?

6              They used a program and some other things.

7       It wasn't -- isn't a routine search just looking at it,

8       and you just look at a few things on the screen and see

9       where the last calls were, that would be routine.  But

10      they kind of held it up by its heels and shook it.

11             ATTORNEY ALPINO:  Your Honor, your Honor is

12      correct that in Cotterman and Abbouchi, for example,

13      they explained that manual searches of a cellphone would

14      be routine as opposed to the full-fledged, comprehensive

15      forensic examinations which they considered to be

16      non-routine.  Our first argument here is that there are

17      some distinguishing characteristics between the searches

18      that occurred in those cases and the search that

19      occurred here.

20             In addition, the Supreme Court has only

21      distinguished between searches of the person and

22      searches of property and hasn't distinguished between

23      certain types of property or certain types of searches.

24      So I have identified three situations where a border

25      search might not be per se reasonable or routine, and

1    that's, one, highly intrusive searches of a person; two,

2    destructive searches of property; and, three, searches

3    conducted in a particularly offensive manner.

4                And we submit that this search that occurred

5    here falls outside the scope of all three of these --

6                THE COURT:  So would you say that if they

7    had taken the phone and done a thorough, the most

8    thorough forensic analysis of the phone possible

9    electronically, that would still be a routine border

10    search?

11                ATTORNEY ALPINO:  That is our contention,

12    your Honor, yes.  Given the way the Supreme Court has

13    discussed what --

14                THE COURT:  So your view is that the line

15    between routine and non-routine is those three things

16    you just described?

17                ATTORNEY ALPINO:  Yes.

18                THE COURT:  That is offensive, whatever.

19                ATTORNEY ALPINO:  Yes.

20                THE COURT:  Go ahead.

21                ATTORNEY ALPINO:  Those are the three

22    factors the Supreme Court has considered.  It cautioned

23    against complex balancing tests in this area.

24                THE COURT:  All right.

25                Now, what do you say to the defendant's

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    argument that a search after an arrest, no matter where

2    it takes place, is no longer a border search.  The

3    person has been arrested.  And then it's a search

4    incident to an arrest, and Riley then has effect.

5         ATTORNEY ALPINO:  Your Honor, the Supreme

6    Court makes clear in Ramsey and other cases that the

7    government has broad and long-standing authority to

8    conduct warrantless searches.  It has had this authority

9    for more than 200 years and actually predates Congress's

10   proposal of the Fourth Amendment.

11        The whole point of having border search

12   authority is to allow customs officers to enforce the

13   U.S. customs laws, and that's actually what Soto Soto,

14   which the defendant cites in his brief, says.

15        Border searches are reasonable because they

16   are made by customs officers in the enforcement of the

17   customs laws, which are both civil and criminal in

18   nature.  And it's not just that -- it's important to

19   remember that customs officers have the duty and

20   authority to conduct border searches for violations of

21   any customs laws.

22        So the fact that an individual is arrested

23   for a possible violation of any particular customs law

24   or laws doesn't take away the government's authority to

25   enforce the range of the customs law that it's charged

1    with enforcing.

2           For example, in Caballero, in footnote seven

3    it says, quote, "It can be argued that the government's

4    goal of discovering unwanted persons and effects is

5    never finished.  Criminals do not always engage in a

6    single criminal activity.  Although agents had already

7    discovered Caballero's hidden carload of illegal drugs

8    they might have searched his phone for any number of

9    other possible crimes, such as money laundering, alien

10   smuggling, gun running, sex trafficking, et cetera.  All

11   of those crimes are crimes commonly involving

12   cross-border movements."

13          Here, the defendant entered the jetway.  He

14   committed to going foreign, and he and his belongings

15   were therefore subject to a border search.  When he was

16   arrested border search hadn't yet been completed, but

17   there was still an authority and a duty to complete the

18   border search, which included a search of his phone for

19   contraband, merchandise -- and merchandise exported

20   contrary -- evidence of merchandise being exported

21   contrary to law.

22          And that makes sense.  The fact that an

23   individual happens to be arrested in relation to a

24   particular crime involving cross-border movement doesn't

25   decrease the possibility, and actually likely increases

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 171 of 273
Case 1:16-cr-00053-TSE  Document 27  Filed 05/01/16  Page 37 of 58 PageID# 282

37

1    the possibility that the individuals engage in other

2    violations of US Customs laws that customs officers have

3    a duty to enforce.

4            This is contrary to the defendant's

5    assertion that after an individual is arrested any

6    search of his electronic devices could only be for the

7    purpose of searching for evidence to support a

8    conviction for the crime or crimes of which there was

9    probable cause to arrest him.

10           THE COURT:  All right.

11           Now, this -- that's a good segue.  Tell me,

12   assuming for purposes of argument, that it is a

13   non-routine search, what is it that you rely on here as

14   probable cause or reasonable suspicion?

15           ATTORNEY ALPINO:  Here, your Honor, weapons

16   parts known to be on the United States munitions list

17   were found in his checked luggage.  On the jetway he

18   admitted that those were his items, that they were

19   there, and that he did have a license to export them.

20           During the interview at Dulles a records

21   check was done to see whether he had filed an export

22   license in connection with this attempted export.  It

23   revealed no records associated with him also revealed

24   that he had never, ever registered as exporter with

25   the Director of Defense Trade Controls.

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 172 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 38 of 58 PageID# 283

38

1          In addition, here the CBP officers and

2    Special Agent Coppolo were aware of these previous stops

3    of the defendant in 2012 and 2013.  Both of those stops

4    involved various similar factual scenarios.  In each of

5    those stops he was trying to leave the country from

6    United States airports with weapons parts known to be on

7    the United States munition list in his luggage.  He

8    didn't have a license, and he was trying to take them to

9    Turkey.  Those are the key points.

10          THE COURT:  All right.  Thank you.

11          All right.  You may respond briefly.

12          ATTORNEY MARSHALL:  Thank you, your Honor.

13   I just want to touch on a couple of issues.  First of

14   all, the government cited the Feiten case just now as

15   well as in their briefing.  There, that search was

16   clearly a border search.  In that case the laptop had

17   been detained while the defendant who was interdicted at

18   the border was allowed to proceed.

19          The Feiten case cited by the government

20   clearly demonstrates the -- clearly reaches a conclusion

21   that, yes, temporally it didn't matter that they

22   withheld the laptop to conduct the border search.  At

23   that point they were still searching the laptop to see

24   if it could cross over the border into our country.

25   That truly was going to the government's in protecting

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

Appeal: 16-4687    Doc: 31    Filed: 03/13/2017    Pg: 173 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 39 of 58 PageID# 284

39

1    the sovereign territory of the United States by rooting

2    out contraband.

3              That is completely different than the

4    facts -- than the factual circumstances here, where

5    there was Mr. Kolsuz's and his iPhone had been in the

6    country since January 25th.  Upon his arrest neither he

7    nor his cellphone were going anywhere.  And it's at that

8    stage and with those governmental interests in mind that

9    the government conducted this warrantless search.

10             I also wanted to touch on some -- your

11   Honor's focus on whether this was a routine versus a

12   non-routine search.  We have clear authority from the

13   Ninth Circuit under Cotterman that this was a -- that a

14   non-routine search occurred in this instance.  There was

15   forensic computer technology utilized to extract all of

16   the information that was on the defendant's iPhone.

17             A 896-page report was generated that

18   detailed all of the information from his iPhone.  That

19   information included his GPS location, conversations

20   with his family and friends, his e-mail, his search

21   browser history.  The -- this was clearly a detailed

22   forensic search that would take it into the same scope

23   as the search in the Cotterman case.

24             I also wanted to touch on the issue of

25   whether there was then -- if your Honor does decide to

1    rule this way and find that this was a non-routine

2    search, which if it holds --

3              THE COURT:  But you say I shouldn't reach

4    that point because of the fact that it wasn't a border

5    search.

6              ATTORNEY MARSHALL:  That's correct, your

7    Honor.

8              THE COURT:  All right.  Go on.

9              ATTORNEY MARSHALL:  If your Honor does --

10   does intend to review this under the lens of the border

11   search doctrine, this was a non-routine search that was

12   conducted on Mr. Kolsuz's iPhone, and to that note the

13   government needs to show that it had reasonable

14   suspicions under the Cotterman decision to conduct that

15   search.

16             Now, the Montoya de Hernandez case from the

17   United States Supreme Court is very clear that it needs

18   to have reasonable suspicion as to that -- as to that

19   iPhone.  While the government certainly may have had

20   reasonable suspicion to -- after finding the handgun

21   parts in Mr. Kolsuz luggage, to then place him under

22   arrest, that does not equate to reasonable suspicion to

23   search his phone.

24             If you look at all the electronic device

25   cases that are analyzed in a border search doctrine, for

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 175 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 41 of 58 PageID# 286

41

1    example, the case Feiten discussed just now by the

2    government, in that case there were other factors that

3    led the agents to believe that there was, in fact child

4    pornography contraband on that electronic device.

5         Here, there is no -- there is no reasonable

6    suspicion that the government could have had except that

7    it would reasonably suspect it could find evidence

8    relating to the firearm charges that Mr. Kolsuz was

9    ultimately charged with this in case.  The government

10   hasn't articulated any factual basis for a reasonable

11   suspicion to suspect that there was any sort of, you

12   know, customs or illegal contraband on that phone.

13        The only thing they could have reasonably

14   suspected on that phone would be evidence of his

15   violations.  And again, the search for -- of that

16   cellphone the warrantless search of that cellphone for

17   such evidence was conducted well into the time period

18   during which the government filed a criminal complaint

19   and even after it sought and obtained an indictment

20   against Mr. Kolsuz.

21        The --

22        THE COURT:  Let me give you -- I want to

23   give you the last word, but I want to give you something

24   specific to respond to.  Let me ask the government just

25   to respond to that argument.  Then you can respond and

1    finish.

2              ATTORNEY MARSHALL:  Yes, your Honor.

3              THE COURT:  The argument I want you to

4    respond to is the argument that says, look, just because

5    they found these weapons parts that are not on the list,

6    why does that lead to a search or why does that give any

7    suspicion about what is on a telephone?

8              ATTORNEY ALPINO:  Your Honor, first of all,

9    we would submit that the standard is reasonable

10   suspicion of ongoing criminal activity, that it's not

11   reasonable suspicion that any particular item contained

12   contraband.  There are several cases that support that

13   proposition.

14             In Hassanshahi, for example, which is cited

15   in our brief, the defendant was being investigated for

16   violating the Iran trade embargo by providing protection

17   relays, which are physical items as opposed to maybe

18   child porn that would be found on phone.  CBP officers

19   seized the defendant's laptop, cellphone, other devices,

20   like here, sent them to HSI's office in Sterling,

21   Virginia, for further analysis.

22             The district court assessed whether there

23   was reasonable suspicion to believe that there was

24   ongoing criminal activities.  It did not inquire as to

25   whether there was reasonable suspicion that the

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 177 of 273
Case 1:16-cr-00053-TSE  Document 27  Filed 05/01/16  Page 43 of 58 PageID# 288

43

1    electronic devices themselves contained contraband, and

2    neither did the court in Kim, which involved again

3    physical items, certain meters, and neither did the

4    court in Abbouchi.

5            THE COURT:  Is it just the sort of common

6    sense, logical view that if someone is doing something

7    illegally maybe they are talking about it on their

8    phone?

9            ATTORNEY ALPINO:  So, first of all, we would

10   submit that the subjective intent here is irrelevant and

11   that we are talking about this broader authority to

12   conduct border searches.

13           THE COURT:  No, but I am talking about

14   reasonable suspicion.  She has argued that, look, just

15   because you find this contraband in his luggage, these

16   illegal arms, that that doesn't suggest that there is

17   anything on the phone.

18           And I take it what you are arguing is that

19   if he's got these contraband pieces of firearms in his

20   luggage, that common sense says the way people use

21   telephones, that may be how he bought them or where he

22   bought them and what he is going to do with them is on

23   the telephone and is talking to people.  Is that what

24   you are arguing?

25           ATTORNEY ALPINO:  It certainly -- it's

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 178 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 44 of 58 PageID# 289

44

1    certainly a viable argument, your Honor.

2              THE COURT:  Mr. Fitzpatrick wants a

3    different argument.

4              ATTORNEY FITZPATRICK:  The Court's

5    indulgence for one second.

6              (Counsel conferring).

7              ATTORNEY ALPINO:  Your Honor, the point is

8    that reasonable suspicion is a much lower standard than

9    probable cause, so here that kind of argument would be

10   acceptable.  People do frequently use their cellphones.

11   Exporters, people who do illegal exports frequently work

12   together to do so.  In addition, in illegal export cases

13   involving United States munition list control items

14   receipts and bills of lading and other items, other

15   documentation relating to illegal exports are also

16   frequently found on electronic devices.

17             THE COURT:  All right.  Thank you.

18             Now you may finish your argument.

19             Go ahead.

20             ATTORNEY MARSHALL:  Thank you, your Honor.

21   Just briefly to conclude, we would ask that the Court --

22   we would direct the Court's attention to the Caballero

23   case.

24             THE COURT:  To the which case?

25             ATTORNEY MARSHALL:  Caballero case.


MICHAEL A. RODRIQUEZ, RPR/CM/RMR

Appeal: 16-4687   Doc: 31   Filed: 03/13/2017   Pg: 179 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 45 of 58 PageID# 290

45

1          THE COURT:  Yes.

2          ATTORNEY MARSHALL:  Which was just recently

3    decided out of the Central District of California.  We

4    believe that that case provides a good background?

5          THE COURT:  Is that the case where the

6    District Court said, I am following the Ninth Circuit,

7    but if I had to do it de novo, my view would be that it

8    would have to have a warrant, and they would have to

9    have probable cause, never mind what the Ninth Circuit

10   said, that would be my view.

11         ATTORNEY MARSHALL:  Yes, your Honor.  That

12   is the correct case.  We would just point to in that

13   case -- well, let me just state it this way:  The

14   ultimate touchstone of the Fourth Amendment is

15   reasonableness, and your Honor's duty here today in

16   determining whether you should grant this motion to

17   suppress is to ultimately decide was this search

18   reasonable.

19         We would point you to the Caballero case to

20   show that although the Court there was dealing with

21   facts -- with a much less egregious search, that Court

22   still said, I really wish that I could follow the

23   decision in Riley and find that a warrant was required.

24   Here -- the Court listed eight facts there demonstrating

25   that the search here was much more invasive, much more

Appeal: 16-4687    Doc: 31    Filed: 03/13/2017    Pg: 180 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 46 of 58 PageID# 291

46

1    non-routine.

2                In fact, in that -- in the Caballero case

3    the search actually occurred at the border.  Of course,

4    that was not the case here.  This search occurred miles

5    away from the border.  There, there was a manual -- only

6    a manual quick look that was ultimately conducted.

7    Here, this was a non-routine search, a very detailed

8    search of all of the content of the cellphone.

9                The other fact that is at issue there, in

10   the Caballero case, no forensic technology or software

11   was used.  Of course, here, a forensics search was

12   conducted.  The search in Caballero was performed in

13   minutes.  This search was performed over the course of a

14   month.  The device was being brought in to the United

15   States in that case.  Of course, here, Mr. Kolsuz was

16   taking it out and --

17               THE COURT:  But hadn't the Fourth Circuit

18   said clearly that border searches can occur either

19   coming in or going out?

20               ATTORNEY MARSHALL:  Yes, your Honor.  We do

21   not -- we do not wish to dispute that fact.  Your Honor

22   is correct.  That is the law in the Fourth Circuit.  We

23   cite, I mentioned it only to draw the distinction

24   between the facts to show that here, you know, arguably,

25   the border search, the governmental interests in

Appeal: 16-4687   Doc: 21   Filed: 03/13/2017   Pg: 181 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 47 of 58 PageID# 292

47

1    declaring this to be a border search at all are at issue

2    since it was not conducted to root out contraband either

3    coming in or leaving.

4           And finally, the search in Caballero was

5    conducted only four hours after the defendant's arrest.

6    Again, from a temporal perspective this search endured

7    for days, nearly a month, while Mr. Kolsuz faced charges

8    here in federal court.

9           For that reason, your Honor, we would seek

10   that you suppress the evidence that the court -- that

11   the government gathered from Mr. Kolsuz's warrantless

12   search of his cellphone and that the Court not allow the

13   government to introduce such evidence at trial in this

14   case.

15          THE COURT:  All right.

16          Thank you.

17          I will take a brief recess in this matter.

18          (Court recessed at 2:00 o'clock p.m.)

19          (Court called to order at 2:17 p.m.)

20          THE COURT:  All right.  The record will

21   reflect that the defendant is now present in the

22   courtroom.

23          I spent some time reflecting on the

24   arguments, and I might point out to you that I found

25   your arguments helpful.  Your briefs were helpful, too.

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 182 of 273

1    I do think I understand the arguments.  You are pretty

2    far apart in some respects, but there -- they're

3    certainly plausible arguments on both sides.

4            This is a three-charge indictment charging

5    defendant with attempting to violate the Arms Export

6    Control Act and attempting to smuggle goods from the

7    United States in violation of Section 554 and conspiracy

8    to commit those offenses in violation of Section 371.

9            What's at issue here in this pretrial

10   suppression motion is to suppress the evidence

11   discovered as a result of the government's warrantless

12   search of the defendant's cellphone, and the facts are

13   set out in some detail in a stipulation of facts by the

14   parties, and I am going to decide the matter today.

15           I do that because I think I do have clearly

16   in mind your arguments and because the trial is the 16th

17   of May, and you all need to prepare, and therefore I

18   need to, as they say colloquially, fish or cut bait.

19   And so I will set out in a memorandum opinion the facts

20   and the reasons in much greater detail.

21           But let me say summarily here that the

22   defendant entered the US on January 25th, 2016, in Miami

23   on a B-2 visitor's visa.  And on February 1st, 2016,

24   there was communication among the ICE officers and

25   customs and border enforcement, and they knew that the

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    defendant had previously been stopped at Kennedy

2    attempting to export items on the munitions list to the

3    Republican of Turkey without an export license.

4            He was scheduled to take a flight from

5    Dulles to Turkey the next day, on February 2nd, 2016,

6    and they discussed at Dulles his bags should be checked

7    to determine whether they contained any firearms parts,

8    and they followed up on that.  And they did check his

9    bags.  I won't go through the names but it was -- there

10   was a lot of communication.  It's all in this

11   stipulation.

12           And there was also -- they had a report that

13   showed that on a search of his luggage on January 8,

14   2013, there had been firearms parts and a firearm that

15   were on the list, and he was detained then.  And he

16   was -- those were items that could not be legally

17   exported without a license, which he didn't have.

18           So, on February 2nd, as he began his return

19   trip to Istanbul, they checked -- and he -- checking in

20   at Miami for a series of flights that would take him and

21   his checked luggage through Cleveland and Dulles to

22   Istanbul -- what a circuitous route.  I think the flight

23   from Dulles was a Turkish Airlines flight.  But in any

24   event, he checked his luggage when it arrived at Dulles.

25           It was searched, his bags, and they found

1    various firearms parts.  Specifically, there were 18

2    handgun barrels, 22 nine-millimeter handgun magazines,

3    four .45 caliber handgun magazines, one .22 caliber

4    Glock conversion kit.  And they knew that those -- those

5    materials were on the list.  They were listed materials

6    that could not be lawfully exported from this country

7    without a license.

8         So there was lots of information about that

9    and other things, which I am not going to review in

10   detail here, but I will in the memorandum opinion, all

11   of which come from the stipulation of facts.  There were

12   customs and border patrol reports that I'll summarize.

13        Now, on the jetway the defendant made a

14   statement that was contrary to information about

15   visiting a gun dealer or gun show in Ohio.  In any

16   event, while he was on the jetway at Dulles the customs

17   and border patrol officers took his iPhone and placed it

18   in his carry-on island.

19        He was transported along with the carry-on

20   luggage to the secondary inspection area, and there they

21   manually reviewed his most recent text passage on his

22   iPhone, which was not password protected, as well as the

23   iPhone's call log listing the defendant's most recent

24   calls.

25        After this initial manual inspection, the

1    phone remained in the secondary inspection area, and

2    then they also checked to make sure he hadn't filed an

3    export license.  And he was interviewed, and he was

4    arrested at the end of that interview.  On February 3rd

5    they took custody of his iPhone, and they transported

6    his iPhone to the office, Homeland Security's office in

7    Sterling, Virginia, four miles from Dulles.

8              They turned over the iPhone to the forensic

9    agent, asked for his assistance in extracting

10   information.  Del Vacchio received the iPhone.  It was

11   in the airplane mode, meaning it couldn't access a

12   cellular network or the Internet.  He didn't change that

13   setting.  I am going to skip a number of facts.

14             But in any event, ultimately there was an

15   800-plus page report, nearly 900 pages resulting from

16   the use of a Cellebrite physical analyzer, which

17   generated a report as to what was on the phone.

18             As I said at the outset, I think the first

19   question is was the search of the phone a border search.

20   I think the parties are in agreement that whether you

21   are leaving this country or entering this country, it's

22   a border search.

23             Now, the next dispute is whether this search

24   was a routine search or a non-routine search.  Well, it

25   really depends on what search you are talking about.  If

1    you are talking about the search that occurred early on,

2    where they just check the -- how many calls, there were

3    just a few calls on there, I think that was a routine

4    search.  But that's not the search that is really at

5    issue.  It's one that led to a 896-page report.  In my

6    view, that is a non-routine search.  The arguments that

7    it's a routine search I don't find persuasive.

8         Then the question becomes, is it -- is there

9    reasonable suspicion, and I think in the course of the

10   argument I articulated what was the reasonable

11   suspicion.  I think that existed.

12        Now, what I haven't dealt with is the

13   argument that this was not a border search at all.  It

14   was a search incident to an arrest, that Riley applies.

15   I don't agree with that argument.  The California case,

16   District Court case would seem to agree with it, even

17   though it didn't reach that conclusion.  It offered in

18   dictum that it would require a warrant in these

19   circumstances.

20        I don't think there is anything in Riley

21   that suggests that it applies to border searches.  And I

22   don't think that once there is an arrest that it

23   automatically ceases to be a border search.  And I'll

24   make that more explicit and more detailed in the

25   memorandum opinion.  So I don't think the argument that

1    it's not a border search is persuasive.

2              Now, the argument was made that it was

3    temporally and spatially removed from the border.  I

4    think those are factors that should be taken into

5    account in determining whether it was routine or

6    non-routine, but I think it is pretty clear from the

7    cases that a border search can take place someways away

8    from border, and it can last longer and be temporally

9    longer.  But those factors are important in considering

10   whether it's a routine or non-routine search.

11             The search that led -- that used that, what

12   is it, Cellebrite, or whatever that program was, that

13   ended up in 896-pound -- 896-page search report I think

14   is unquestionably a non-routine search.  And I think

15   there was articulate -- reasonable articulable

16   suspicion.  So I don't think that the argument that it

17   was not a border search and that Riley applies is

18   persuasive, and I'll make that more explicit in the

19   memorandum opinion.

20             The motion to dismiss -- the motion to

21   suppress will, therefore, be denied.  Not that I think

22   that -- that I think the arguments were implausible.

23   They were not.  I think on the basis of the law as I see

24   it the result I reached is consistent with it.  Who

25   knows what the future will bring.  I don't know.  And I

1    think the existing Fourth Circuit law -- in fact, I am

2    not sure you-all spent as much time as would be useful

3    on the Ickes case.

4            I think the Ickes case does say more that

5    might be -- now, that was 2005, I think, so it was

6    before Riley and a long time ago.  But it does say

7    something about how long a search might take and where

8    and that sort of thing.  So I think Ickes still has some

9    force to it.

10           But the fundamental argument made that Riley

11   applies is not something that I found persuasive,

12   although that doesn't mean that there wasn't a plausible

13   basis to make that argument.  But I don't -- I don't

14   accept it, and so I will deny the motion to suppress.

15   We'll write an opinion.

16           I want -- the government needs to order this

17   transcript so I can look at it and use it in my

18   developing the memorandum opinion.  But I am pretty

19   clear that -- and I'll mention some of the other cases

20   that I don't think really have any role here, the

21   Montoya de Hernandez case, which was -- that's the

22   individual detained at the border for 16 hours because

23   she declined to be x-rayed and produce a monitored bowel

24   movement.  The Almeida-Sanchez case, I'll review those.

25   I don't think they are very persuasive here.

1            There isn't -- the Supreme Court hasn't been

2       clear where the line -- there is an indistinct line

3       between routine and non-routine searches.  I would be

4       troubled by just where that indistinct line was.  But I

5       have to tell if you that if there is a 896-page report

6       and a device he plugged into the thing to get it, I am

7       moved to find that it's non-routine.  I have less

8       difficulty with that.

9            And we have been through the reasonable

10      suspicion.  But I'll make it all clear in my memorandum

11      opinion, which I will produce promptly and in advance of

12      the May 16th trial.

13           Anything further in this matter today on

14      behalf of the government?

15           ATTORNEY ALPINO:  No, your Honor.

16           THE COURT:  On behalf of the defendant?

17           ATTORNEY RICHMAN:  No, your Honor.

18           THE COURT:  All right.

19           I thank counsel for your cooperation.

20           Let me -- I didn't -- I want to be clear.

21      Let's see.  Ms. Alpino, right?

22           ATTORNEY ALPINO:  Yes, your Honor.

23           THE COURT:  Are you a special or an AUSA?

24           ATTORNEY ALPINO:  A special, your Honor.

25           THE COURT:  And from where?

Appeal: 16-4687   Doc: 31   Filed: 03/13/2017   Pg: 190 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 56 of 58 PageID# 301

56

1      ATTORNEY ALPINO:  The National Security
2  Division of the Department of Justice.
3      THE COURT:  All right.
4      And you are a Public Defender now, Assistant
5  Public Defender?
6      ATTORNEY MARSHALL:  Your Honor, I am a
7  volunteer attorney at the Public Defender's office.
8      THE COURT:  All right.  And are you
9  permanent?
10     ATTORNEY MARSHALL:  No, your Honor.  I am
11  also on a six-month assignment.
12     THE COURT:  All right.  Well, you-all have
13  done well.  I hope -- it's a fairly significant case for
14  you-all to be designated to argue it.  I am surprised
15  Mr. Richman didn't want to grab the laurels himself,
16  although I used to think that.
17     I remember many, many years ago when I was
18  excited about going to court because -- it was really
19  the first week I was at the firm, and I was sent down to
20  federal court to make that argument.  I was a little
21  surprised when nobody went with me.
22     My surprise turned to dismay.  It didn't
23  take me long to figure out that I had been handed what
24  everyone in the -- the three partners involved thought
25  was a sure loser, and they didn't want to be anywhere

1    near it.  But that hasn't happened to you-all, and so

2    you are lucky.  That means that Mr. Fitzpatrick and

3    Mr. Richman have a high opinion of both of you.

4            Good luck on your -- the rest of your

5    service, and I thank counsel for your cooperation.

6            ATTORNEY RICHMAN:  Thank you, your Honor.

7            ATTORNEY ALPINO:  Thank you.

8            ATTORNEY MARSHALL:  Thank you, your Honor.

9            THE COURT:  Court stands in recess.

10           (Court adjourned at 2:33 p.m.)

11                   ---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appeal: 16-4687    Doc: 21    Filed: 03/13/2017    Pg: 192 of 273
Case 1:16-cr-00053-TSE   Document 27   Filed 05/01/16   Page 58 of 58 PageID# 303

58

```
 1                    CERTIFICATE OF REPORTER.

 2

 3              I, MICHAEL A. RODRIQUEZ, an Official Court

 4     Reporter for the United States District Court, in the

 5     Eastern District of Virginia, Alexandria Division, do

 6     hereby certify that I reported by machine shorthand, in

 7     my official capacity, the proceedings had and evidence

 8     adduced upon the suppression hearing in the case of

 9     UNITED STATES OF AMERICA v. HAMZA KOLSUZ.

10              I further certify that I was authorized and

11     did report by stenotype the proceedings and evidence in

12     said suppression hearing, and that the foregoing pages,

13     numbered 1 to 58, inclusive, constitute the official

14     transcript of said proceedings as taken from my machine

15     shorthand notes.

16

17              IN WITNESS WHEREOF, I have hereto subscribed

18     my name this _29th_ day of ____April_____, 2016.

19

20

21                              _____
                                        /S/
                                Michael A. Rodriquez, RPR/CM/RMR
22                                 Official Court Reporter

23

24

25
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

UNITED STATES OF AMERICA )
)
v. )
)        Case No. 1:16-CR-53
HAMZA KOLSUZ )
)
)

## ORDER

This matter came before the Court on defendant's motion to suppress evidence discovered as a result of the government's search of defendant's cell phone (Doc. 19).

For good cause, and for the reasons stated from the bench, which will be elucidated in a forthcoming Memorandum Opinion,

It is hereby **ORDERED** that defendant's motion to suppress is **DENIED**.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, Virginia
April 29, 2016

_____
/s/
T. S. Ellis, III
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| **v.** | ) |
| | )    **Case No. 1:16-CR-53** |
| HAMZA KOLSUZ | ) |

### MEMORANDUM OPINION

Defendant is charged in a three-count indictment with (i) attempting to export from the United States various firearms parts on the United States Munitions List ("USML") without a license, in violation of 22 U.S.C. § 2778, (ii) attempting to smuggle goods from the United States, in violation of 18 U.S.C. § 554(a), and (iii) engaging in a conspiracy to commit those offenses, in violation of 18 U.S.C. § 371. At issue is defendant's pre-trial motion to suppress evidence discovered as a result of the government's two warrantless searches of defendant's cell phone, which the government seized as defendant was about to board an airplane to leave the United States. The government first searched defendant's cell phone at the airport by reviewing the cell phone's most recent calls and text messages. Thereafter, following defendant's arrest, the government transported defendant's cell phone to an off-site facility and conducted an extensive forensic search of the information contained on the cell phone. Defendant's motion to suppress presents the following questions:

> (i) whether the search of defendant's cell phone conducted at the airport and the search of defendant's cell phone conducted at the off-site location qualify as border searches; and

> (ii) if so, whether both searches of defendant's cell phone qualify as routine border searches that do not require a warrant, probable cause, reasonable suspicion, or any level of individualized suspicion.

As the matter has been fully briefed and argued orally, it is now ripe for disposition.

1

I.[1]

On January 25, 2016, defendant, a Turkish citizen who speaks little English, entered the United States at Miami International Airport on a B2 visitor's visa.

Thereafter, on February 1, 2016, Charles Reich, the United States Customs and Border Protection ("CBP") Special Agent assigned to the New York Homeland Security Investigations ("HSI") Field Office, called CBP Supervisory Officer Mike Augustino and Special Agent Jay Culley, who were on duty at Washington Dulles International Airport ("Dulles"), and informed them (i) that defendant had previously been stopped at John F. Kennedy International Airport ("JFK") attempting to export items on the USML from the United States to the Republic of Turkey without an export license, (ii) that defendant was scheduled to fly from Dulles to Turkey the following day, February 2, 2016, and (iii) that at Dulles, defendant's checked bags should be searched to determine whether they contained any firearms parts.

Thereafter, Special Agent Reich sent a follow up email to Supervisory Officer Augustino and Special Agent Culley, providing them with (i) defendant's name, date of birth, and Turkish citizenship, (ii) the summary written by the CBP officer who interviewed defendant when he entered the United States on January 25, 2016, and (iii) defendant's flight itinerary. Gov. Ex. 1, Reich Email. The email also stated, "[n]ot sure how his English is, on 1/08/2013 (2013SZ003360701) he was stopped by CBP exodus team at jfk with gun parts. Had a Turkish speaking [CBP officer] on site." *Id.* In the same email, Special Agent Reich again asked Supervisory Officer Augustino and Special Agent Culley to examine defendant's checked bags

---

[1] The facts listed here are derived primarily from the parties' joint stipulation of facts and the government's supporting exhibits. This factual summary also benefits from the credible testimony of United States Customs and Border Protection Special Agent Adam Coppolo, presented during the April 29, 2016 hearing on defendant's motion to suppress.

2

to look for firearms parts. Special Agent Reich also requested that Supervisory Officer Augustino and Special Agent Culley ask defendant various questions.[2]

Shortly thereafter, Supervisory Officer Augustino forwarded Special Agent Reich's email to CBP's Tactical Terrorist Response Team ("TTRT") and the Counterterrorism Response Team at Dulles. Thereafter, TTRT Supervisory Officer Lauren Colgan assigned CBP Officer Jonathan Budd to the matter. Both Supervisory Officer Colgan and Officer Budd reviewed Special Agent Reich's email.

After reading Special Agent Reich's email, Supervisory Officer Colgan reviewed a CBP report summarizing the circumstances involved in the January 8, 2013 stop of defendant at JFK. This report disclosed:

> (i) that on January 8, 2013, a search of defendant's checked luggage revealed a Beretta .380 automatic pistol slide, a barrel, a guide rod, and a recoil spring;
>
> (ii) that the CBP detained the parts and referred the matter to the United States Department of State to determine whether the parts were on the USML; and
>
> (iii) that the parts were seized one week later after CBP was advised by the Department of State that the parts were listed on the USML and could not legally be exported from the United States without a license from the United States Department of State Directorate of Defense Trade Controls ("DDTC").

The CBP report also referred to an incident on December 2, 2012, in which firearms parts listed on the USML were found in defendant's luggage when he attempted to transport his luggage from the United States, through JFK, to Turkey without an export license from the Department of State. CBP agents seized these firearms parts. In addition to reviewing the CBP report,

---

[2] Specifically, Special Agent Reich asked Supervisory Officer Augustino and Special Agent Culley to ask defendant questions regarding (i) who defendant met in Florida, (ii) whether defendant received money from anyone, (iii) what tourist activities defendant engaged in during his visit, (iv) whether defendant attended a gun show in Ohio, (v) whether defendant purchased anything related to firearms, (vi) whether defendant shipped any parts out of the country, and (vii) whether anyone accompanied defendant in Ohio.

3

Supervisory Officer Colgan also reviewed TECS[3] records memorializing the December 2, 2012 and January 8, 2013 stops of defendant at JFK, which disclosed defendant's prior attempts to export firearms parts without a license.

On February 2, 2016, defendant began his return trip to Turkey by checking in at Miami International Airport for a series of flights that would take him and his checked luggage through Cleveland Hopkins International Airport and Dulles to Istanbul, Turkey. After defendant and his checked luggage arrived at Dulles, defendant's checked bags were removed from defendant's inbound United Airlines flight, but at Supervisory Officer Colgan and Officer Budd's instruction, the checked bags were not loaded onto defendant's outbound Turkish Airlines flight.

Once Supervisory Officer Colgan and Officer Budd obtained defendant's two pieces of checked luggage, they performed an outbound customs examination of the luggage and discovered various firearms parts. Specifically, the inspection revealed eighteen handgun barrels, twenty-two 9mm handgun magazines, four .45 caliber handgun magazines, and one .22 caliber Glock caliber conversion kit.[4] Based on their training and experience, Supervisory Officer Colgan and Officer Budd immediately knew that the barrels and the caliber conversion kit were listed on the USML, and therefore defendant could not lawfully remove these items from the United States without a DDTC export license.

After Supervisory Officer Colgan and Officer Budd discovered the firearms parts in defendant's checked luggage, Special Agent Culley arrived at Dulles. Shortly thereafter, Supervisory Officer Colgan, Officer Budd, Supervisory Officer Augustino, and Special Agent

---

[3] TECS is an internal database that serves as a data repository to support law enforcement "lookouts," border screening, and reporting of border inspection processes.

[4] Defendant's luggage also contained one .357 caliber handgun magazine, but it is unclear whether the CBP officers were aware of that fact at the time of the search.

4

Culley conducted an outbound customs inspection of defendant on the jetway as he attempted to board his flight to Istanbul. Although a CBP Turkish translator was not present during the outbound customs inspection, a Turkish Airlines representative acted as a translator.[5] During the outbound customs inspection, defendant admitted (i) that he was in possession of firearms parts, (ii) that he had initially flown into Miami and then travelled to Ohio, (iii) that while in Ohio, he attended a gun show where he made cash purchases of the firearms found in his checked luggage,[6] and (iv) that he did not have a federal firearms license for the firearms and was unware of any other licensing requirement. Defendant also noted that because he did not bring very much cash into the United States, he used his ATM cards to withdraw the cash needed to purchase the firearms parts found in his checked luggage. At the time of the encounter, defendant possessed approximately $2,600 in cash. Defendant claimed that he purchased the firearms parts for personal use and that he had no intention of selling them in Turkey or any other country.

On the jetway at Dulles, CBP officers took defendant's iPhone 6 Plus Model #A1524 ("iPhone") from his person and placed it in defendant's carry-on luggage. Defendant was then transported—along with his carry-on luggage—to the CBP secondary inspection area. There, Supervisory Officer Colgan used the iPhone's touch screen to navigate the iPhone's operating system—which was not password protected—to reveal defendant's most recent text messages and calls. No further inspection of defendant's iPhone was conducted at that time. Also in the secondary inspection area, Supervisory Officer Colgan used the Automated Export System

---

[5] The Turkish Airlines representative is not affiliated with CBP in any official manner, but that representative speaks Turkish and English as part of his job and has aided government agents with translation in the past.

[6] Contrary to defendant's statements on the jetway, defendant never visited a gun show in Ohio. Although defendant was briefly in Ohio on February 2, 2016, after flying from Miami, Florida to Cleveland Hopkins International Airport, he spent the entirety of his time in Ohio at the Cleveland Hopkins International Airport awaiting the departure of his flight to Dulles.

5

("AES"), a government database for information related to exports, to ascertain: (i) whether defendant had ever filed an export license with CBP at the time of any export, and (ii) whether defendant was listed as a license registrant with DDTC. The AES revealed no records associated with defendant.

CBP Special Agent Adam Coppolo then read defendant his *Miranda*[7] rights, and Special Agent Coppolo, Special Agent Culley, and CBP Special Agent James Donovan interviewed defendant. During the interview, defendant stated

(i) that he entered the United States with the intention of sightseeing in Florida with a friend, Bayram Bulut, whom defendant has known since 2006 or 2007;

(ii) that defendant was in possession of $9,000 in cash when he entered the United States;

(iii) that defendant had visited numerous gun shops, pawn shops, and a gun show while he was in Florida;

(iv) that defendant had purchased the firearms parts at the gun show in Florida;

(v) that Bulut had not purchased any of the firearms parts;

(vi) that no one had ordered the firearms parts found in his checked luggage; and

(vii) that although Bulut cautioned defendant against purchasing gun parts, defendant did not heed Bulut's warning.

The agents ended the interview of defendant in the early morning on February 3, 2016. Shortly thereafter, the agents arrested defendant, and Special Agent Coppolo took custody of defendant's iPhone. The agents also seized handgun barrels, a handgun caliber conversion kit, magazines, laser aiming modules, and two pieces of luggage.

Thereafter, Special Agent Coppolo transported defendant's iPhone approximately four miles from Dulles to the HSI office in Sterling, Virginia. There, Special Agent Coppolo

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

delivered defendant's iPhone to HSI Computer Forensic Agent Michael Del Vacchio and asked for his assistance in conducting a forensic search by extracting digital information from defendant's iPhone. When Forensic Agent Del Vacchio received defendant's iPhone, it was in airplane mode—meaning it could not access a cellular network or the Internet—and Forensic Agent Del Vacchio did not change this setting. Forensic Agent Del Vacchio connected the iPhone to a Cellebrite Physical Analyzer, a tool that extracts data from electronic devices, and conducted an advanced logical file system extraction, which copied data only from the iPhone's allocated space—space to which the phone's operating system had already written files. The Cellebrite software did not access any data stored remotely—or in the "cloud"—and instead accessed only data stored on the iPhone itself. Forensic Agent Del Vacchio did not make a complete bitstream copy of defendant's iPhone.[8]

Once the logical file system extraction was complete, the Cellebrite Physical Analyzer generated a 896-page report that Forensic Agent Del Vacchio subsequently provided to Special Agent Coppolo. The report includes the defendant's personal contact lists, photographs, videos, emails, and conversations with others using various messaging applications. The report also contains information from the iPhone's calendar, web browsing history, call logs, and physical location log, which reflected a history of the iPhone's precise GPS coordinates.

After reviewing the lengthy report, Special Agent Coppolo prepared a Report of Investigation ("ROI") regarding the search of defendant's iPhone. The report states:

> (i) that "[f]rom on or after February 2, 2016, to on or about March 3, 2016, a customs border search was conducted on [defendant's] cell phone";

---

[8] A bitstream copy obtains everything on a phone—including data from the phone's unallocated space. In other words, a bistream copy extracts not only files saved and easily accessible on an electronic device, it also extracts residual data of files that have been deleted.

7

(ii) that Special Agent Coppolo reviewed the Cellebrite report "to conduct a border search of the iPhone in order to search for violations of law, including but not limited to, violations of Title 22 United States Code Section 2778 and Title 18 United States Code Section 554";

(iii) that "[f]rom on or about February 3, 2016 to on or about March 3, 2016, SA Coppolo accessed this [Cellebrite] report pursuant to customs border search authority" and that "[a]mong other things, SA Coppolo reviewed contact lists, emails, messenger conversations (including but not limited to Kik and iChat conversations), photos and videos"; and

(iv) that on March 3, 2016, Special Agent Coppolo confirmed with Forensic Agent Del Vacchio that no other information could be obtained from the iPhone.

Gov. Ex., 7, ROI.

On March 3, 2016, after defendant had already been charged in a Criminal Complaint, a grand jury returned a three-count Indictment against defendant charging him with (i) attempting to export from the United States various firearms parts on the USML without a license, in violation of 22 U.S.C. § 2778, (ii) attempting to smuggle goods from the United States, in violation of 18 U.S.C. § 554(a), and (iii) engaging in a conspiracy to commit those offenses, in violation of 18 U.S.C. § 371. Thereafter, defendant filed a motion to suppress the evidence discovered as a result of the government's two warrantless searches of defendant's iPhone, namely (i) the initial search of the iPhone's recent calls and text messages conducted at the airport, and (ii) the forensic search conducted at the HSI office in Sterling, Virginia.

## II.

It is now well-settled that border searches are an exception to the Fourth Amendment requirement that a search be supported by a warrant and probable cause. Specifically, under the border search exception, government agents may conduct "routine" searches and seizures of persons and property at the border without obtaining a warrant or establishing any level of individualized suspicion. *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). As

8

the Supreme Court has explained, these searches are allowed because "[t]he [g]overnment's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Moreover, although the government's interest is significant at the border, the individual's privacy interest is substantially lessened because "a port of entry is not a traveler's home." *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971) (plurality opinion). In this regard, the Supreme Court has noted that an individual approaching the border should not be surprised that "[c]ustoms officers characteristically inspect luggage … ; it is an old practice and is intimately associated with excluding illegal articles from the country." *Id.* Thus, it is well-established "[t]hat searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977).

The border search exception applies to the international border and its "functional equivalent," including international airports. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973).[9] Moreover, although the Supreme Court has never squarely addressed whether the border search exception applies to individuals and objects *exiting* the United States, the Fourth Circuit has addressed this question and held that a border search "conducted upon a person *exiting* from the country" is "properly within the border search exception to the Fourth Amendment." *United States v. Oriakhi*, 57 F.3d 1290, 1297 (4th Cir. 1995) (emphasis in original).

---

[9] *See, e.g.*, *United States v. Lawson*, 461 F.3d 697, 700 (6th Cir. 2006) (holding that an international airport is the "functional equivalent" of the border); *United States v. Klein*, 592 F.2d 909, 911 n.1 (5th Cir. 1979) (same).

9

Accordingly, the question presented here is whether the two warrantless searches of defendant's iPhone—the initial inspection at the airport and the more sophisticated forensic search conducted off-site at the HSI office—qualify as routine border searches that do not require a warrant or individualized suspicion.

### III.

Defendant first contends that the evidence discovered as a result of the government's second warrantless search of defendant's iPhone—the search conducted at the HSI office—must be suppressed because that search was not a border search, and therefore under the Supreme Court's recent decision in *Riley v. California*, 134 S. Ct. 2473 (2014), the search of defendant's iPhone required a warrant and probable cause. *Id.* 2484-85, 2489-91 (2014) (holding that a search incident to arrest of a cell phone requires a warrant and probable because a search of the digital information contained on a cell phone is categorically different from a search of other personal effects). Specifically, defendant contends that the iPhone search conducted at the HSI office was not a border search because (i) the search occurred after defendant was arrested, and (ii) the search was spatially and temporally attenuated from the border search of defendant's other personal effects.

Yet, as the government correctly contends, defendant's argument fails in both respects. To begin with, contrary to defendant's contention, the fact of arrest does not abrogate the government's authority to complete a border search. The Fourth Circuit and other circuits have consistently held that the government may conduct a border search after arresting an individual. *See United States v. Ickes*, 393 F.3d 501, 507 (4th Cir. 2005) (holding that a post-arrest search of

10

defendant's laptop was a border search).[10] To conclude otherwise would be to encourage border agents to refrain from making a lawful arrest until after completing a border search in its entirety, a result that could place border agents and society in danger.

Moreover, the fact that the forensic search of defendant's iPhone occurred four miles from Dulles and was not completed until approximately one month after the phone was seized does not alter the conclusion that the search of defendant's iPhone was a border search. This is so because, as several courts have held, an off-site forensic search of an electronic device over a long period of time is nonetheless a border search where, as here, the electronic device was seized at the border, the device was never cleared to pass through the border, and therefore the defendant never "regain[ed] an expectation of privacy in [the electronic device]." *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013).[11]

Thus, contrary to defendant's contention, the post-arrest, off-site forensic search of defendant's iPhone is not governed by *Riley*, but is instead a border search, which does not require a warrant supported by probable cause. Importantly, however, this conclusion does not end the analysis. It remains to be resolved whether the two searches of defendant's iPhone—the

---

[10] *See, e.g.*, *United States v. Calderon-Quinonez*, 382 F. App'x 540, 541 (9th Cir. 2010) (holding that the seizure of cocaine following an arrest was a valid border search); *United States v. Bates*, 526 F.2d 966, 967-68 (5th Cir. 1976) (concluding that a search of an individual's vehicle after the arrest of that individual was a valid border search). *But see United States v. Caballero*, No. 15cr2738-BEN, 2016 WL 1546731, at *5-7 (S.D. Cal. Apr. 14, 2016) (holding that under Ninth Circuit precedent, a post-arrest search of a cellphone was a valid border search that required reasonable suspicion, but noting in dictum that *Riley* may compel the conclusion that a post-arrest search of a cell phone at the border requires a warrant and probable cause).

[11] *See also United States v. Cotterman*, 709 F.3d 952, 961-62 (9th Cir. 2013) (en banc) (concluding that a search of defendant's laptop that was seized at the border and examined 170 miles away in a specialized lab was a border search because the laptop was seized at the border and had not been cleared to pass through the border); *United States v. Feiten*, No. 15-20631, 2016 WL 894452, at *2 (E.D. Mich. March 9, 2016) (holding that an off-site, month-long forensic search of a laptop was a border search).

11

initial search conducted at the airport and the forensic search conducted off-site at the HSI office—were routine border searches or nonroutine border searches.

**IV.**

Defendant next contends that the evidence obtained as a result of searching defendant's iPhone must be suppressed because both searches of defendant's iPhone were nonroutine border searches that required some level of individualized suspicion. In response, the government contends (i) that both searches of defendant's iPhone were routine border searches, and (ii) even assuming the searches were nonroutine, the government had sufficient individualized suspicion to conduct both searches.

**A.**

The Supreme Court has made clear that under the border search exception, only routine border searches are wholly immune from the typical Fourth Amendment requirements, whereas nonroutine border searches must rest on some degree of particularized suspicion. *Montoya de Hernandez*, 473 U.S. at 541. Although the Supreme Court has not often addressed the distinction between routine and nonroutine searches, it has provided some guidance for determining what constitutes a routine search. On the one hand, in *United States v. Flores-Mantano*, the Supreme Court held that "the [g]overnment's authority to conduct [routine] suspicionless inspections at the border includes the authority to remove, disassemble, and reassemble a vehicle's fuel tank." 541 U.S. at 155. In reaching this conclusion, the Supreme Court determined (i) that an individual's privacy interest in the contents of a vehicle's gas tank was less than an individual's privacy interest in the contents of a vehicle's passenger compartment, (ii) that such searches of a vehicle's gas tank were relatively brief, and (iii) that the possibility of permanent damage to a car was remote. *Id*. at 154-55.

12

On the other hand, in *United States v. Montoya de Hernandez*, the Supreme Court determined that a seizure "beyond the scope of a routine customs search and inspection" occurred when the defendant was detained at the border for sixteen hours after she declined to be x-rayed and to produce a monitored bowel movement because custom officials suspected that defendant had swallowed balloons of cocaine in an effort to smuggle drugs across the border. 473 U.S. at 532-36, 541. After a sixteen-hour detention, border officials obtained a court order to conduct a rectal examination, which disclosed balloons of cocaine in the defendant's bowel. *Id.* at 535-36. The Supreme Court held that the seizure was not routine, but nonetheless concluded that the nonroutine seizure was constitutional because it was justified by the customs officials' reasonable suspicion that the defendant was smuggling drugs in her alimentary canal. *Id.* at 541.

Although the Supreme Court has not made pellucid exactly what renders a border search nonroutine—and what level of individualized suspicion is necessary for nonroutine searches—circuit courts have looked to the intrusiveness of the search in distinguishing between routine and nonroutine border searches. *See, e.g.*, *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("[T]he level of intrusion into a person's privacy is what determines whether a border search is routine.").[12] In this regard, circuit courts have consistently held that searches of an individual's outer clothing, luggage, and personal effects are routine searches,[13] whereas more physically intrusive searches—such as strip searches, alimentary canal searches, x-rays, and the removal of

---

[12] *See also United States v. Braks*, 842 F.2d 509, 512 (1st Cir. 1988) (applying several factors to determine whether a search is sufficiently intrusive to be a nonroutine border search).

[13] *See, e.g.*, *United States v. Johnson,* 991 F.2d 1287, 1291-92 (7th Cir. 1993) (holding that "the search of a border entrant's suitcase, purse, wallet, and overcoat simply is not sufficiently intrusive to be considered nonroutine"); *United States v. Ezeiruaku*, 936 F.2d 136, 140-41(3d Cir. 1991) (holding that examination of luggage at the border was routine); *United States v. Benevento*, 836 F.2d 60, 68 (2d Cir. 1987) (same).

13

an artificial limb—are nonroutine searches requiring particularized reasonable suspicion.[14] Less clear, however, is whether digital searches of electronic devices—such as computers and cell phones—count as routine border searches.

In this regard, the Fourth Circuit in *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005), addressed a digital border search of an electronic device. There, as part of a routine border inspection, the government discovered, *inter alia*, a video camera with "a tape of a tennis match which focused excessively on a young boy" and "several albums containing photographs of provocatively-posed prepubescent boys, most nude or semi-nude." *Id.* at 502, 503. The government agents arrested the defendant, and continued to search the van, discovering a computer and approximately seventy-five disks. *Id.* After seizing the computer and disks, government agents searched the contents of these electronic devices and found that they contained child pornography. *Id.* Specifically, government agents manually investigated the contents of the computer and the disks by accessing their content in the same way a typical user would do so; the government did not conduct a sophisticated forensic analysis of the contents of the computer and the disks. *Id.* The Fourth Circuit in *Ickes* held that the manual digital border search of the computer and disks was routine, and therefore did not require any level of suspicion. *Id.* at 505-06. The Fourth Circuit reached this conclusion by comparing computer files to the physical contents of any other "cargo" subject to a routine search and inspection at the border. *Id.* at 504. In this regard, the Fourth Circuit held that a manual review of electronic files

---

[14] *See, e.g., United States v. Uricoechea-Casallas*, 946 F.2d 162, 166 (1st Cir. 1991) (applying a "reasonable suspicion" standard to a strip search at the border); *Rivas v. United States*, 368 F.2d 703, 710 (9th Cir. 1966) (holding that an alimentary canal search was a nonroutine border search); *United States v. Vega-Barvo*, 729 F.2d 1341, 1349 (11th Cir. 1984) (holding that an x-ray was a nonroutine border search); *United States v. Sanders*, 663 F.2d 1, 3 (2d Cir. 1981) (holding that removal of artificial limb was a nonroutine border search).

contained on a computer is no different than a manual review of papers contained in luggage, a classic example of a routine border search. *Id.* at 505-06.[15]

Although *Ickes* clearly stands for the proposition that a manual digital search of an electronic device is a routine border search, that decision does not address whether more sophisticated forensic searches of electronic devices at the border may properly be classified as routine border searches. In this regard, a district court in this circuit recently addressed whether a forensic search of a cell phone is a routine border search. *See United States v. Saboonchi*, 990 F. Supp.2d 536, 560 (D. Md. 2014). In *Saboonchi*, border agents confiscated two cell phones and a flash drive after stopping the defendant and his wife at the border. *Id.* at 539. The border agents searched both cell phones by creating " 'a perfect bitstream copy' "—a complete copy—" 'of the original storage device' " and then using "specialized software to comb through the data ... searching the full contents of the [copied] hard drive, examining the properties of individual files, and probing the drive's unallocated 'slack space' to reveal deleted files." *Id.* at 547 (quoting Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 540 (2005)). The government argued that under *Ickes*, the forensic searches were routine border searches, and therefore not subject to a reasonable suspicion requirement. *Id.* at 544, 546. But the court in *Saboonchi* distinguished *Ickes* on the ground that *Ickes* involved a manual digital search, whereas the search at issue in *Saboonchi* was a forensic digital search. *Id.* at 546.[16] Thus, the

---

[15] *See also United States v. Arnold*, 533 F.3d 1003, 1008 (9th Cir. 2008) (holding that a manual search of a computer's contents was a routine border search because it was no different than a manual search of physical luggage).

[16] In this regard, the court in *Saboonchi* noted (i) that "an integral part of a forensic examination is the use of technology-assisted search methodology, where the computer searches vast amounts of data that would exceed the capacity of a human reviewer to examine in any reasonable amount of time," and (ii) that "[t]he techniques used during a forensic search can be distinguished from a conventional computer search"—such as the manual search at issue in *Ickes*—"in which a

15

district court in *Saboonchi* concluded that the holding of *Ickes* was limited to manual digital border searches of electronic devices, and hence did not apply to significantly more intrusive forensic digital searches. *Id.* at 569. Ultimately, the court in *Saboonchi* held that forensic digital searches are nonroutine border searches, and therefore reasonable suspicion is required, on the ground that "[i]t is difficult to conceive of a property search more invasive or intrusive than a forensic computer search—it essentially is a body cavity search of a computer." *Id.* at 569.

Although the line between routine and nonroutine border searches remains somewhat indistinct, the juxtaposition of the two searches of defendant's iPhone well-illustrates where the dividing line exists with respect to the border searches of electronic devices. The first of these searches—the manual inspection of text messages and recent calls on defendant's iPhone conducted at the aiport—is clearly a routine border search under the Fourth Circuit's decision in *Ickes*. 393 F.3d at 505-06. This search, like the search in *Ickes*, was conducted by accessing the content of defendant's iPhone in the same manner as a typical user, namely by using the touch screen to navigate the phone's operating system to reveal defendant's recent text messages and calls. *Id.* at 503. Thus, the manual search of defendant's iPhone conducted at the aiport was a routine border search that did not require individualized suspicion.

Importantly, however, *Ickes* does not dictate the outcome with respect to the second, significantly more extensive forensic search of defendant's iPhone. Unlike in *Ickes*, in conducting the forensic search here, government agents (i) seized defendant's iPhone, (ii) moved the iPhone to an off-site location, (iii) used the Cellebrite Physical Analyzer to perform a logical file system extraction of the hard drive's allocated space, and (iv) used the Cellebrite Physical Analyzer to generate an 896-page report that includes, *inter alia*, information from defendant's

---

Customs officer may operate or search an electronic device in much the same way that a typical user would use it." *Id.* at 547.

16

contact lists, photographs, videos, emails, web browsing history log, and physical location log. Thus, it remains to be determined whether the off-site forensic search of defendant's iPhone was a nonroutine border search that required some level of individualized suspicion.

In addressing this question, it is appropriate to consider the Supreme Court's decision in *Riley*. Although that decision does not specifically address a search of a cell phone conducted at the border, the Supreme Court in *Riley* made clear that cell phones are categorically different from other personal effects, such as containers. 134 S. Ct. at 2484-85, 2489-91. Specifically, in light of the "immense storage capacity" of modern cell phones and the variety of information stored on cell phones, the Supreme Court concluded that "a cell phone would typically expose to the government far more than the most exhaustive search of a house." *Id.* at 2489, 2491.[17] Accordingly, the Supreme Court in *Riley* concluded that to allow officers to conduct a warrantless search of a cell phone incident to arrest "would untether" the search incident to arrest exception "from the [historical] justifications underlying [the doctrine]," namely officer safety and preventing the destruction of evidence. *Id.* at 2485.

Since the Supreme Court's decision in *Riley*, at least two district courts—but no circuit courts—have squarely addressed whether the rationale of *Riley* is relevant in analyzing whether a border search of an electronic device, such as a laptop or a cell phone, is a routine or nonroutine border search. *See United States v. Kim*, 103 F. Supp.3d 32, 54-59 (D. D.C. 2015); *United States*

---

[17] Indeed, the Supreme Court in *Riley* noted that the suggestion that a data search of a cell phone is "materially indistinguishable" from searches of physical items was "like saying a ride on horseback is materially indistinguishable from a flight to the moon" because "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 2488-89.

17

*v. Feiten*, No. 15-20631, 2016 WL 894452, at *4-7 (E.D. Mich. March 9, 2016).[18] The court in *Kim* held that in light of *Riley*, an off-site extensive forensic search of an electronic device is a nonroutine border search that requires some level of individualized suspicion because an individual's privacy interest implicated by such a search outweighs the government's interest in conducting a forensic search of a cell phone at the border. 103 F. Supp.3d at 56-57. In contrast, the court in *Feiten* held that an extensive forensic search of an electronic device is a routine border search that does not require individualized suspicion because although "[l]aptops and cell phones may be new and increasingly capacious containers, searching the effects, digital or otherwise, of those who present themselves at the international border for inspection is an old practice ... intimately associated with excluding illegal articles from the country." 2016 WL 894452, at *6 (internal quotation marks omitted).

Although the courts in *Kim* and *Feiten* reached different results, both courts agreed that in considering the question whether *Riley* compels a conclusion that an offsite forensic search of an electronic device was a nonroutine border search, it is appropriate to "assess[], on the one hand, the degree to which [the search] intrudes upon an individual's privacy, and, on the other, the degree to which it is needed for the promotion of legitimate governmental interest," and as part of that assessment, it is appropriate to consider whether a particular application of the border

---

[18] It is also worth noting that the court in *Saboonchi* addressed on a motion for reconsideration the question whether the Supreme Court's decision in *Riley* affected its prior ruling that a forensic digital search of a cell phone was a nonroutine border search. *United States v. Saboonchi*, 48 F. Supp.3d 815, 816 (D. Md. 2014). The court in *Saboonchi* denied the defendant's motion for reconsideration on two grounds: (i) that the Supreme Court in *Riley* did not explicitly rule on the border search exception, and (ii) that in any event, the district court's prior holding that a forensic digital search of a cell phone was nonroutine was consistent with the principles the Supreme Court outlined in *Riley*. *Id.* at 816.

search exception would "untether the rule from the justifications underlying the [border search] exception." *Riley*, 134 S. C.t at 2484, 2485 (internal quotation marks and citations omitted).[19]

It is appropriate to apply the same analytical framework here. With respect to the privacy concerns involved, an individual's privacy interest in the information contained on his cell phone is much greater than an individual's privacy interest in the contents of his luggage or other personal effects. Indeed, a cell phone cannot fairly be compared to an ordinary container that might be searched at the border because as the Supreme Court in *Riley* made clear, "[a] phone not only contains in digital form many sensitive records previously found in the home," but also "a broad array of private information never found in a home in any form—unless the phone is [in the home]." *Id.* at 2491.[20] As one court has noted, "[i]t is difficult to conceive of a property search more invasive or intrusive" than a sophisticated, digital search of a cell phone because such a search is "essentially [] a body cavity search" of the cell phone. *Saboonchi*, 990 F. Supp.2d at 569. Thus, even at the border, an individual has a significant privacy interest in the digital contents of his cell phone.

In opposition to the conclusion that an individual has a significant privacy interest in the digital contents of a cell phone, the government contends that the forensic search of defendant's iPhone was not as extensive as it could have been. In support of this argument, the government

---

[19] *Kim*, 103 F. Supp.3d at 55 ("[F]ollowing the approach utilized in *Riley*, the Court must proceed 'by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy, and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."); *Feiten*, 2016 WL 894452, at *5 ("The appropriate application of *Riley* to the instant case, therefore, is to determine whether allowing agents to forensically search an entrant's laptop without [some individualized suspicion] would necessarily untether *that* rule from the historical justifications underlying it.") (emphasis in original).

[20] In this respect, it is worth noting that to the extent the court in *Feiten* analyzed cell phone searches at the border by comparing cell phones to containers, 2016 WL 894452, at *5, the analysis was inconsistent with the Supreme Court's conclusion in *Riley* that cell phones are categorically distinct from other containers. 134 S. Ct. at 2488-89.

19

points out that the forensic search in issue here, unlike the search in *Saboonchi*, did not involve a complete bitstream copy of both the allocated and unallocated space on the cell phone's hard drive and the use of keywords to search the copied drive for specific information. 990 F. Supp. at 539. In other words, the government attempts to distinguish an extensive forensic search of a cell phone from a *very* extensive forensic search of a cell phone. This argument fails because it draws too fine a distinction. The forensic search in issue here was not as extensive as the forensic search in *Saboonchi*, to be sure, but both searches involved the use of specialized software to copy a large amount of data from an individual's cell phone. It is not significant that the forensic search in *Saboonchi* involved the copying of all the data contained on a cell phone's hard drive, whereas the forensic search in issue here involved only the copying of the allocated space on the iPhone's hard drive. The data copied here was substantial enough to fill 896 printed pages with information concerning defendant's contacts, his correspondence, his schedule, the phone's web browsing history, the phone's call logs, and a physical location log, which reflected a history of defendant's precise GPS coordinates. As the Supreme Court in *Riley* noted, such an immense amount of disparate personal information allows the government to reconstruct "an individual's private life." *Riley*, 134 S. Ct. at 2489. Thus, although the forensic search of defendant's iPhone did not involve the copying of every bit of data contained on the phone's hard drive, it nonetheless implicated significant privacy interests. To suggest otherwise is like suggesting that a strip search does not implicate a significant privacy interest so long as the government does not look between the person's toes.

The government, as a sovereign, also has a significant interest at the border in protecting its territory and national security "by stopping and examining persons crossing into this country." *Ramsey*, 431 U.S. at 616. These significant governmental interests justify a wide range of

warrantless border searches. *Id.* Importantly, however, as the district court in *Kim* recognized, although "there is [circuit court] authority that states that the government's broad authority at the border extends to those exiting the country as well as those coming in," the Supreme Court has consistently justified the government's interests at the border "in terms of threats posed at the point of *entry*." *Kim*, 103 F. Supp.3d at 56 (emphasis added).[21] In this regard, none of the significant government interests in monitoring what *enters* the country applies where, as here, the object of a warrantless border search was *exiting* the country.[22] Of course, the government has an interest that justifies some suspicionless border searches of *departing* persons and their effects, namely potential violations of the export control laws.[23] But this interest is not directly implicated where, as here, a government agent conducts a forensic search of a cell phone, as the digital contents of a cell phone are not banned by export control regulations. This is not to say that digital information contained on a cell phone will not be useful in discovering illegally

---

[21] *See, e.g.*, *Montoya de Hernandez*, 473 U.S. at 537 (noting that the border search exception is justified on the basis of "regulat[ing] the collection duties and … prevent[ing] the introduction of contraband into this country."); *Ramsey*, 431 U.S. at 620 ("The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country."); *Thirty-Seven Photographs*, 402 U.S. at 376 ("Customs officials characteristically inspect luggage and their power to do so is not questioned … ; it is an old practice and is intimately associated with excluding illegal articles from the country."); *Carroll v. United States*, 267 U.S. 132, 154 (1925) ("Travelers may be [stopped and searched] in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belonging as effects which may be lawfully brought in.").

[22] This conclusion distinguishes the present case from *Feiten*, in which the court held that the government's interest in searching the cell phone of a traveler *entering* the United States was significant because " '[t]he [g]overnment's interest *in preventing the entry of unwanted persons and effects* is at its zenith at the international border.' " 2016 WL 894452, at *5 (quoting *Flores-Montano*, 541 U.S. at 152) (emphasis in original).

[23] *See, e.g.*, *United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003) (finding that a border search of a large cargo container before it left the country was routine because "the United States' interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself").

21

exported goods; indeed, such information will often be quite useful. For example, as the government notes, a cell phone may contain digital receipts of weapons parts purchases, images of weapons parts, or other information related to things an individual seeks to export illegally. Yet, all of this information is merely indirect evidence of the things an individual seeks to export illegally—not the things themselves—and therefore the government's interest in obtaining this information is less significant than the government's interest in directly discovering the items to be exported illegally.

Moreover, it is worth noting that any digital information contained on a cell phone that is relevant to exporting goods illegally can be easily obtained once a border agent establishes some level of individualized suspicion. And in the absence of some individualized suspicion that an individual seeks to export items illegally, there is little, if any, justification for a forensic search of a cell phone belonging to a traveler exiting the United States. This is especially true where, as here, the government has already arrested the defendant, seized his phone, and transported the phone to a secure location for further analysis.

In sum, although the manual search of defendant's iPhone conducted at the airport was a routine border search, the subsequent forensic search of defendant's iPhone conducted at the HSI office in Sterling, Virginia was a nonroutine border search requiring some level of individualized suspicion.

**B.**

It is next appropriate to consider what level of particularized suspicion is required to conduct a nonroutine border search of a cell phone. Defendant contends that the forensic search of his iPhone required a warrant supported by probable cause. Yet, defendant cites no case—nor have any been found—that stands for the proposition that more than reasonable suspicion is

22

required for a nonroutine border search or seizure of any kind or extent. Indeed, even where physically intrusive body searches have been in issue, courts have consistently held that no more than reasonable suspicion is required.[24] Thus, although the Supreme Court's decision in *Riley* appears to indicate that cell phones deserve the highest level of Fourth Amendment protection available, the highest protection available for a border search is reasonable suspicion. Accordingly, a nonroutine border search of a cell phone is constitutional if it is supported by reasonable suspicion.

The Supreme Court has defined reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The standard is met when a law enforcement officer can point to "specific and articulable facts" and rational inferences that can be drawn from those facts indicating that criminal activity "may be afoot." *Terry v. Ohio*, 392 U.S. 1 (1968). A court's determination in this regard must be based upon the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Importantly, as the Supreme Court has made clear, the reasonable suspicion standard relates to ongoing or imminent crime. *See Cortez*, 449 U.S. at 417 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Accordingly, the question presented here is whether prior to the forensic search of defendant's iPhone, a reasonable officer could point to specific and articulable facts to support a conclusion that there was reasonable suspicion that defendant was engaged in ongoing criminal activity.

---

[24] *See, e.g.*, *Uricoechea-Casallas*, 946 F.2d at 166 (noting that a "reasonable suspicion" standard applies to a strip search at the border); *Rivas*, 368 F.2d at 710 (holding that an alimentary canal search is a nonroutine border search that requires some particularized suspicion); *Vega-Barvo*, 729 F.2d at 1349 (holding that an x-ray is a nonroutine border search that requires reasonable suspicion); *Sanders*, 663 F.2d at 3 (holding that removal of artificial limb is nonroutine border search that requires some particularized suspicion).

23

Here, the government had more than reasonable suspicion that defendant was attempting to export weapons parts listed on the USML without a license, in violation of the Arms Export Control Act, 22 U.S.C. § 2778. Specifically, prior to the search of defendant's iPhone, Special Agent Reich informed Supervisory Officer Augustino and Special Agent Culley:

(i) of defendant's name, date of birth, and citizenship,

(ii) that defendant had previously been stopped at JFK attempting to export items on the USML from the United States to Turkey without a license,

(iii) about the summary that had been written by the CBP officer who interviewed defendant when he entered the United States on January 25, 2016, and

(iv) that defendant was scheduled to take a flight from Dulles to Turkey on February 2, 2016.

Supervisory Officer Colgan and Officer Budd were also aware of this information, as they had reviewed Special Agent Reich's email. In addition, Supervisory Officer Colgan reviewed the CBP report that summarized the January 8, 2013 stop of defendant at JFK. And Supervisory Officer Colgan reviewed TECS records memorializing the December 2, 2012 and January 8, 2013 stops of defendant at JFK, which disclosed defendant's prior attempts to export firearms parts without a license. Moreover, prior to both searches of defendant's iPhone, the outbound customs exam of defendant's two pieces of checked luggage revealed various firearms parts listed on the USML, and defendant admitted on the jetway that he did not have the requisite DDTC license to export these items. Thereafter, Supervisory Officer Colgan used the AES to confirm (i) that defendant had never filed an export license with CBP at the time of any export, and (ii) that defendant was not listed as a license registrant with the DDTC.

Given these facts, government agents reasonably suspected that they would discover information on defendant's iPhone related not only to attempted export violations they had already discovered, but perhaps also information related to other ongoing attempts to export

24

illegally various firearms parts. Specifically, government agents reasonably suspected that defendant's iPhone contained digital receipts of weapons parts purchases, images of weapons parts, or other information related to items an individual seeks to export illegally. In addition, government agents could have reasonably suspected that defendant's iPhone contained information that would reveal the identity of co-conspirators, some of whom may have been attempting to smuggle firearms parts out of the country in the imminent future.

Thus, prior to conducting the off-site forensic search of defendant's iPhone, the border officials clearly had a "particularized and objective basis for suspecting" defendant of attempting to commit an ongoing or imminent crime. *Cortez*, 449 U.S. at 417. Indeed, in light of the extensive evidence the border agents had already discovered, even if probable cause were required here—which it is not—the government agents had sufficient evidence to meet that higher standard.

In sum, the two searches of defendant's iPhone were reasonable under the Fourth Amendment because the first search—the manual search conducted at the airport—was a routine border search that did not require any level of individualized suspicion, and the second search— the forensic search conducted at the HSI office—was a nonroutine border search justified by more than reasonable suspicion.

V.

Accordingly, for these reasons, defendant's motion to suppress the evidence obtained as a result of the government's two searches of defendant's iPhone must be denied.

An appropriate Order has already issued.

Alexandria, Virginia
May 5, 2016

/s/

T. S. Ellis, III
United States District Judge

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )  **Case No. 1:16-CR-53** |
| HAMZA KOLSUZ | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A grand jury indictment issued on March 2, 2016, charging defendant with (i) one count of conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, (ii) one count of attempting to export firearm parts without the requisite license, in violation of 22 U.S.C. § 2778, and (iii) one count of smuggling goods from the United States, in violation of 18 U.S.C. § 554.

At the arraignment, defendant waived formal reading of the indictment, pled not guilty, and requested a trial by jury. By agreement of the parties, the trial was set for May 16, 2016. Shortly thereafter, on March 11, 2016, a discovery order issued,[1] and discovery apparently proceeded without conflict, as no motions were filed concerning discovery. Defendant then filed a timely motion to suppress evidence discovered on defendant's iPhone. An evidentiary hearing was held, following which defendant's motion to suppress was denied for the reasons stated in the Memorandum Opinion dated May 5, 2016. *See United States v. Kolsuz*, No. 1:16-CR-53, --- F. Supp.3d ---, 2016 WL 2658156, at *3-4, *6-13 (E.D. Va. May 5, 2016).

Shortly thereafter, on May 6, 2016, defendant filed a notice waiving his right to a trial by jury. *United States v. Kolsuz*, No. 1:16-CR-53 (E.D. Va. May 6, 2016) (Notice) (Doc. 31). And

---

[1] *United States v. Kolsuz*, No. 1:16-CR-53 (E.D. Va. March 11, 2016) (Order) (Doc. 16).

on May 9, 2016, the government filed a notice consenting to a non-jury bench trial. *United States v. Kolsuz*, No. 1:16-CR-53 (E.D. Va. May 9, 2016) (Notice) (Doc. 34). That same day, an Order issued continuing the trial date from May 16, 2016, until May 18, 2016. *United States v. Kolsuz*, No. 1:16-CR-53 (E.D. Va. May 9, 2016) (Order) (Doc. 32). Shortly thereafter, on May 16, 2016, an Order issued (i) directing the government to file proposed findings of fact and conclusions of law, and (ii) advising defendant that he could also file proposed findings of fact and conclusions of law, but was not required to do so. *United States v. Kolsuz*, No. 1:16-CR-53 (E.D. Va. May 16, 2016) (Order) (Doc. 37). Accordingly, the government filed proposed findings of facts and conclusions of law; defendant did not do so.

On May 18, 2016, a two-day bench trial commenced. In the course of the trial, the government presented approximately 40 exhibits, including several stipulations of fact, and the testimony of the following seven witnesses:

(i) United States Customs and Border Protection ("CBP") Supervisory Officer Lauren Colgan;

(ii) Turkish Airlines representative Sercan Cimrin;

(iii) Perihan Sucu, a Turkish to English and English to Turkish interpreter;

(iv) CBP Agricultural Specialist Saadet Aydin;

(v) Homeland Security Investigations ("HSI") Special Agent Matthew Fede;[2]

(vi) Marc Benowitz, a salesman at Benson's Gun Shop in Long Island, New York; and

(vii) HSI Special Agent Adam Coppolo.

Following the government's presentation of evidence, defendant moved for judgment of acquittal pursuant to Rule 29, Fed. R. Crim. P., and that motion was denied from the bench on

_____

[2] HSI is a division of United States Immigration and Customs Enforcement.

2

the ground that the government had presented ample evidence to support a finding beyond a reasonable doubt that defendant was guilty of the three counts charged in the indictment. Defendant was then advised that he was not required to present any evidence or to testify, as the government had the burden of proof, and defendant had no burden to prove his innocence. Nonetheless, defendant elected to testify and was cross-examined.

At the conclusion of the evidence, in order to give the parties an opportunity to review the transcript, which was prepared expeditiously, the parties were directed in lieu of closing arguments to file briefs setting forth proposed findings of facts and conclusions of law. Neither party has requested a statement of "the court's ... specific findings of fact in open court or in a written decision or opinion" pursuant to Rule 23(c), Fed. R. Crim. P. Nevertheless, the nature of the case and the substantial volume of testimony presented at trial warrant the written findings of fact and conclusions of law recorded here.

## **FINDINGS OF FACT**

1. On or about November 7, 2012, defendant Hamza Kolsuz, a Turkish citizen who speaks little English, entered the United States via John F. Kennedy International Airport ("JFK Airport") on a B-1/B-2 business and visitor's visa.

2. A few weeks later, on or about December 2, 2012, defendant checked in at JFK Airport for a flight to Istanbul, Republic of Turkey ("Turkey") via Amsterdam, Netherlands. Defendant also checked luggage containing the following firearm parts:

   - Forty upper receivers for semi-automatic pistols,
   - Twenty grip modules for Sig Sauer P-250 pistols,
   - Sixteen barrels for semi-automatic pistols,
   - Twenty-six magazines for firearms,
   - Sixty springs or other internal parts for pistols, and
   - One Smith & Wesson 6900 series pistol grip.

3. When defendant checked in to his December 2, 2012 flight at JFK Airport, he was accompanied by two brothers, Bayram Bulut and Saffet "Rocco" Bulut. Defendant has known Bayram Bulut since 2007, and has known Rocco Bulut since 2009 or 2010.

4.  After defendant checked in to his flight at JFK Airport, CBP officers discovered the firearm parts contained in defendant's checked luggage and stopped defendant from boarding his flight to Turkey.

5.  Shortly thereafter, Special Agent Matthew Fede[3] interviewed defendant individually[4] with the assistance of CBP Agricultural Specialist Saadet Aydin, a qualified and experienced Turkish to English and English to Turkish interpreter.[5]

6.  During Special Agent Fede's interview of defendant at JFK Airport on December 2, 2012, defendant stated (i) that defendant owned and operated a business in Turkey that manufactured automobile parts, (ii) that defendant also purchased firearm parts in order to engrave them and sell them to individuals in Turkey, (iii) that defendant preferred to purchase firearm parts in the United States rather than in Turkey because firearm parts are much cheaper in the United States than they are in Turkey, (iv) that defendant had purchased the firearm parts found in his checked luggage from Bayram Bulut and Rocco Bulut and intended to export these firearm parts to Turkey, and (v) that defendant had also mailed a parcel containing firearm parts to Turkey.

7.  After speaking with defendant individually at JFK Airport on December 2, 2012, Special Agent Fede, continuing to rely on Aydin's interpreting services, advised defendant, Bayram Bulut, and Rocco Bulut of the licensing requirements for exporting firearm parts. Specifically, Special Agent Fede methodically gave a presentation, known as the Project Shield America presentation,[6] advising the three individuals of various federal regulations regarding exports, including (i) the federal requirement to obtain an export license from the United States Department of State's ("DOS") Directorate of Defense Trade Controls ("DDTC") for defense articles that are listed on the United States Munitions List ("USML"), and (ii) the process for obtaining a DDTC license.

---

[3] Special Agent Fede has approximately twenty years' experience in law enforcement.

[4] Special Agent Fede also interviewed Bayram Bulut and Rocco Bulut individually.

[5] Although Aydin is a CBP Agricultural Specialist, she also routinely serves as an interpreter for CBP agents at JFK Airport. Special Agent Fede instructed Aydin to interpret into Turkish for defendant and the Bulut brothers precisely everything that Special Agent Fede said to them.

[6] Before this instance, Special Agent Fede had presented the Project Shield America presentation "hundreds of times." Trial Tr. at 84 (May 19, 2016). Special Agent Fede based his Project Shield America presentation to defendant and the Bulut brothers on a government-provided publication describing the program.

8. That same day at JFK Airport, Special Agent Fede further advised defendant and the Bulut brothers (i) that the vast majority of all firearm parts are listed on the USML, and therefore could not be exported without the requisite DDTC license, (ii) that there is no license exception for exporting goods through a mail service, (iii) that based on Special Agent Fede's training and experience, the firearm parts discovered in defendant's luggage were likely listed on the USML, and (iv) that any attempt to export items listed on the USML without the requisite DDTC license could result in sanctions, such as seizure of the goods, fines, loss of exporting privileges, and criminal charges that could result in imprisonment.

9. During Special Agent Fede's Project Shield America presentation at JFK Airport on December 2, 2012, Special Agent Fede allowed the three individuals to ask questions, but none availed himself of that opportunity. Special Agent Fede testified that based on defendant's facial expressions, and the fact that he did not ask for clarification or explanation at any point during the presentation, it appeared to Special Agent Fede that defendant understood the content and import of the Project Shield America presentation.

10. At the conclusion of the Project Shield America presentation, CBP detained the firearm parts contained in defendant's checked luggage in order to determine whether these firearm parts were listed on the USML, and therefore could not be exported without the requisite DDTC license. Special Agent Fede advised defendant that the items were detained for a license determination, and CBP agents provided defendant with paperwork reflecting the same. Special Agent Fede then explained that defendant could take steps to find out whether the parts detained were listed on the USML, and therefore ultimately seized as a consequence of defendant's attempt to export the firearm parts without a DDTC license. Special Agent Fede gave defendant his business card so that defendant might contact Special Agent Fede if defendant wished to question whether the detained firearm parts had been seized. Defendant never contacted Special Agent Fede. Defendant testified that before defendant left the United States on or about January 8, 2013, defendant attempted to ascertain the status of the parts that were detained on December 2, 2012, but was unsuccessful. This testimony is not credible. In any event, defendant made no more attempts to ascertain the status of the firearm parts detained on December 2, 2012.

11. Thus, at least by December 2, 2012, defendant had knowledge (i) that a DDTC license was required to export any firearm parts listed on the USML, (ii) that the vast majority of all firearm parts are listed on the USML, and (iii) that the firearm parts defendant had attempted to export on December 2, 2012, including magazines and barrels, were likely listed on the USML. Accordingly, it is clear beyond a reasonable doubt that defendant knew on December 2, 2012, and thereafter, that it was generally unlawful to export the vast majority of firearm parts from the United States without a license or authorization from the DDTC.

12. Defendant did not fly to Turkey on December 2, 2012, as he had planned, but instead remained in the United States for approximately one additional month.

13. On or about December 14, 2012, defendant, Bayram Bulut, and an unidentified third Turkish-speaking individual entered Benson's Gun Shop in Long Island, New York. There, the three individuals were greeted and assisted by salesman Marc Benowitz. The unidentified third individual was the spokesperson for the group, but it was clear that the three individuals were there together, and that all three individuals understood what occurred during the interaction, because the three individuals, who were standing together, spoke in Turkish among themselves throughout the encounter with Benowitz. During this encounter, the third individual, on behalf of the group, attempted to purchase a large quantity of firearms and firearms parts.

14. Specifically, the third individual asked Benowitz to ship a number of AR-15 rifles and Colt 45 pistols—or parts for these firearms—to Turkey. The third individual explained to Benowitz that these firearms or firearm parts would replace the firearm parts that had been detained on December 2, 2012, and showed Benowitz a receipt reflecting the firearm parts that had been detained at JFK Airport on December 2, 2012. The third individual further explained (i) that these firearm parts had been detained because on December 2, 2012, the individuals did not understand the rules for exporting firearm parts, (ii) that the three individuals believed that the detained firearm parts would be returned, and (iii) that the three individuals had found an exporter, but the exporter was too expensive.

15. Benowitz's testimony concerning what the third individual told Benowitz regarding the firearm parts that were seized at JFK Airport on December 2, 2012, further confirms that as of December 2, 2012, defendant knew that it was generally unlawful to export firearm parts from the United States without a license or other written authorization from the DDTC.

16. Benowitz told the three individuals that he would inquire as to whether he could provide the requested firearms or firearm parts and whether he could ship them to Turkey. Benowitz then gave the third individual his business card, and the three individuals left the store. Shortly thereafter, Benowitz called a police hotline to report the encounter because he was suspicious of the attempted firearms transaction. Benowitz never again heard from the three individuals.

17. On or about January 8, 2013, defendant checked in at JFK Airport for a flight to Istanbul, Turkey via Paris, France. Although defendant had not obtained a DDTC license—nor taken any steps to do so—he again checked luggage containing various firearm parts, specifically:

- One Beretta slide,
- One Barrel,
- One Beretta recoil spring, and

6

- One Beretta guide rod.

18. Shortly after defendant checked his luggage, uniformed law enforcement officers detained the firearm parts contained in defendant's luggage.

19. The next day, January 9, 2013, defendant flew from JFK Airport to Istanbul, Turkey.

20. Shortly thereafter, the DDTC determined that all of the firearm parts detained from defendant on December 2, 2012, and on January 8, 2013, were listed on the USML, and therefore could not be exported from the United States without a license or other written authorization from the DDTC. Accordingly, on January 15, 2013, CBP agents formally seized these firearm parts, and the firearm parts were never returned to defendant.

21. The seized firearm parts were worth more than $10,000.

22. More than a year later, on or about March 15, 2014, Rocco Bulut checked in at Newark Liberty International Airport ("Liberty Airport") for a flight to Istanbul, Turkey via Frankfurt, Germany with checked luggage containing the following firearm parts:

- One Beretta slide catch spring,
- One Beretta firing pin catch retaining pin,
- One Beretta hammer release lever pin,
- One Beretta hammer spring cap,
- One Beretta trigger bar release plunger,
- One Beretta trigger spring,
- One Beretta ejector spring pin,
- One Beretta trigger pin,
- One Beretta disassembling latch release,
- One Beretta trigger bar spring,
- One Beretta trigger,
- One Beretta slide release,
- One Beretta magazine release button,
- One Beretta hammer,
- One Beretta hammer spring strut,
- One Berretta hammer spring,
- One Beretta disassembly latch,
- One Beretta hammer release lever,
- One Beretta firing pin catch lever,
- One Beretta hammer pin,
- One Berretta ejector,
- One Beretta trigger bar,
- One Beretta handgrip,

- Nine Glock trigger assemblies,
- Five Glock locking blocks,
- Three Glock magazine catch springs,
- One Glock recoil spring,
- Ten Glock spacer sleeves,
- Four Glock magazine catches,
- One Glock firing pin,
- One Glock trigger housing,
- Two Glock slide lock springs,
- One Glock recoil spring assembly,
- Four Glock extractors,
- Eight Glock slide stop levers,
- Five Glock trigger pins,
- Six Glock slide cover plates,
- Three Glock slide locks,
- One magazine spring,
- One magazine floor plate,
- Two magazine followers,
- Three magazine seats,
- One Glock magazine seat,
- Two recoil springs,
- Three Sig Sauer kits (PKIT-250-9),
- Nineteen magazine spring followers and seats,
- Twenty-two Sig Sauer triggers,
- Six slide catch lever assemblies,
- Nineteen magazine floor plates and bottoms,
- One main spring seat,
- One take down lever, and
- One ejector.

23. All of these firearm parts were and are listed on the USML, and therefore could not be exported from the United States without a license or other written authorization from the DDTC. As Rocco Bulut did not have the requisite DDTC license or authorization to export these firearm parts, CBP agents formally seized these firearms parts and never returned them to Rocco Bulut.

24. In 2015, defendant learned that Rocco Bulut had been stopped at Liberty Airport in 2014 and that the firearm parts contained in Rocco Bulut's luggage at that time had been detained and later seized. This fact is further evidence that defendant was on notice that it was illegal to export firearm parts from the United States without a license or authorization from the DDTC.

8

25. Thereafter, from October 2015 until on or about January 26, 2016, defendant and Bayram Bulut communicated via Kik and iChat[7] regarding: (i) the purchase and pricing of firearm parts, (ii) firearm parts that Bayram Bulut had purchased, (iii) defendant's payment for firearm parts, (iv) defendant and Bayram Bulut's current inventory of firearm parts, (v) steps to avoid detection from law enforcement and customs officials, (vi) plans to export firearm parts through the mail, and (vii) plans to meet in the United States so that defendant could purchase firearm parts from Bayram Bulut and attempt to export these firearm parts from the United States to Turkey. *See* Gov. Ex. ("GX") 32; GX 33A-33N.[8]

26. Specifically, these Kik and iChat conversations reflect: (i) that defendant was in business with Bayram Bulut to purchase large quantities of firearm parts worth thousands of dollars in the United States;[9] (ii) that defendant and Bayram Bulut sought to purchase firearm parts in the United States in order to assemble complete firearms in Turkey;[10] (iii) that defendant was aware of the risk associated with exporting firearm parts from the United States, GX 33G at 504 (noting that the "surroundings are troublesome … very bad" for "transport[ing]" firearm parts); (iv) that defendant considered the rules and regulations regarding exporting firearm parts from the United States to be "tight-assed," GX 33G at 506; (v) that defendant was interested in exporting "forbidden" firearm parts because such parts are "more precious," GX 33G at 507; (vi) that defendant and Bayram Bulut sought to avoid law enforcement detection of their efforts to transport firearm parts from the United States to Turkey;[11] and (vii) that defendant and Bayram Bulut desired to avoid repeating the mistakes that led to the discovery of firearm parts at JFK Airport in 2012 and 2013.[12]

---

[7] iChat and Kik are iPhone applications for sending messages.

[8] These iChat and Kik conversations were obtained as a result of a border search of defendant's iPhone. *See Kolsuz*, 2016 WL 2658156, at *3-4, *6-13 (concluding that the off-site, forensic search of defendant's iPhone was a lawful nonroutine border search because the search was supported by reasonable suspicion).

[9] *See, e.g.*, GX 33A at 353 (discussing spending "12 thousand" on firearm parts as part of a "[b]ig job"); GX 33D at 392 (discussing spending "13 thousand … 20 with expenses" on certain firearm parts); GX 33F at 439-40 (defendant asking "[w]hat are you thinking to send me[,] how much money[?]" and Bayram Bulut responding "3000 in my hands"); GX 33G at 510 (defendant stating "[my] estimation we'll clear this job in two months"); GX 33K at 780 (defendant stating "I will sell whatever you buy," to which Bayram Bulut replied, "I don't want to spend money for the things with no return or make us wait"); GX 33K at 785 (defendant stating "[t]here are clients for 10 thousand," to which Bayram Bulut replied, "I am working on the job as you told me, you can bind the customers").

[10] *See, e.g.*, GX 33A at 356, 361 (Bayram Bulut stating after discussing specific types of firearms, "[y]ou need pipe for everything" and "[t]ell me those that you need, those have

9

27. These Kik and iChat conversations further confirm that defendant knew that it was generally unlawful to export firearm parts from the United States without a license or authorization from the DDTC.

28. On or about January 14, 2016, in a Kik messaging conversation, defendant told Bayram Bulut, "I will sell whatever you buy," and Bulut responded, "I will buy pipes for 19 and 17 ... 10 of them." GX 33 at 780-82. The testimony presented at trial made clear that the term "pipes" refers to gun barrels. These Kik messages confirm that defendant and Bayram Bulut were in business together to transport firearm parts from the United States to Turkey.

29. Shortly thereafter, on January 15, 2016, Lone Wolf Distributors ("Lone Wolf") billed Bayram Bulut for an online order for five 9mm Glock 17 threaded barrels and five 9mm Glock 19 barrels that was sent to Bayram Bulut at 1145 Middle Country Rd., Middle Island, NY 11953-2527. *See* GX 39, Lone Wolf Invoice.

30. The Lone Wolf Invoice states, *inter alia*, that "[t]his order may contain items that are export controlled" and that the "[p]urchaser assumes all responsibility to comply with Federal export laws pertaining to these items." *Id.* This confirms that Bayram Bulut was on notice of laws regulating the exportation of firearm parts.

31. On or about January 19, 2016, Bayram Bulut sent defendant Kik messages, including a photograph of ten Alpha Wolf boxes and a photograph of a firearm barrel labeled "Alpha Wolf 17-9mm" resting on top of a package from Lone Wolf dated January 15, 2016, and addressed to Bayram Bulut at the same address reflected in the Lone Wolf Invoice. GX at 32 at 255-57.

32. On or about January 25, 2016, defendant travelled from Istanbul, Turkey to Miami International Airport on a B-2 visitor's visa.

---

business with me and I will deal with them"); GX 33G at 499-503 (discussing specific firearm parts that were needed for specific firearms).

[11] Specifically, after Bayram Bulut asked defendant, "how do you think to go out from [the United States]" and "will there be a problem in the customs," defendant replied, "there won't be, if it is something logical." GX 33G at 512-13. Bayram Bulut then instructed defendant to "think about something" and to "[e]xplore there, customs." *Id.* at 513, 515. Defendant and Bayram Bulut then discussed a plan to avoid detection by hiding firearm parts in large metal items, such as a plastic injection oil cooler tank and pressure drains. *Id.* at 515-17.

[12] *See, e.g.*, GX 33M at 825-26 (Bayram Bulut stating "[h]ave to be ready for everything all the time ... have to think the worst ... [w]e have to be ready for every scenario in order not to live the same things again," and defendant replying "Ok ... we calculate every detail anyway").

10

33. Shortly thereafter, defendant and Bayram Bulut visited the Hialeah Range & Gun Shop in Hialeah, Florida. There, defendant and Bayram Bulut showed interest in purchasing Glock 17, Glock 19, and Sig Sauer .357 caliber magazines. Bayram Bulut purchased approximately ten Glock magazines and paid in cash.

34. On or about February 2, 2016, defendant began his return trip to Istanbul, Turkey. Specifically, defendant checked in at Miami International Airport for a domestic flight to Cleveland Hopkins International Airport ("Hopkins Airport"). Once at Hopkins Airport, defendant checked in for a flight from Hopkins Airport, through Washington Dulles International Airport ("Dulles"),[13] to Istanbul, Turkey. The flight from Hopkins Airport to Dulles was a United Airlines flight, and the flight from Dulles to Istanbul, Turkey was a Turkish Airlines flight.

35. Defendant and Bayram Bulut specifically planned that defendant would check his luggage for his international flight at Hopkins Airport rather than at Miami International Airport in order to decrease the risk of getting caught. *See* GX 33J at 747-48 (defendant stating "[w]e shouldn't be like in New York," and Bayram Bulut suggesting "let's board from Ohio" and "[y]ou will pass to Ohio [from Florida] and you will board and go from there").

36. On or about February 2, 2016, while defendant was waiting to board his flights, Bayram Bulut instructed defendant via iChat how to avoid detection by law enforcement while attempting to export firearm parts to Turkey, and defendant sent Bayram Bulut status updates concerning his circuitous journey to Turkey and as to whether the firearm parts had been detected by law enforcement.[14]

37. After defendant and his checked luggage arrived at Dulles, CBP Supervisory Officer Lauren Colgan and CBP Officer Jonathan Budd coordinated with Turkish Airlines and United Airlines to remove defendant's two pieces of checked luggage from the United Airlines airplane and to detain the checked luggage rather than to allow them to be loaded on the Turkish Airlines flight.

38. Once CBP Supervisory Officer Colgan and CBP Officer Budd obtained defendant's two pieces of checked luggage, they examined the luggage and discovered the following firearm parts:

---

[13] Dulles is located in the Eastern District of Virginia.

[14] *See* GX 35 at 37 (Bayram Bulut stating "if there is a problem when you give the baggage they may announce your name, you should be listening carefully, god willing there won't be any problem," and defendant stating "God willing there won't be any problem"); *id.* at 50 (Bayram Bulut instructing defendant to declare some of the firearm parts in his luggage, and defendant stating "I am an ignorant guy I will tell anyway"); *id.* at 52 (defendant stating "I gave the bags"); *id.* at 76 (defendant stating "[b]aggage will come god willing," and Bayram Bulut stating "[i]t will come, don't worry" and "[i]f there is something they will find you"); *id.* at 81 (defendant stating "I passed"); *id.* at 88 (defendant stating "job done").

- Four 9mm Glock 31 round magazines,
- Four 9mm Glock 17 round magazines,
- Four 9mm Glock 15 round magazines,
- One 9mm Smith & Wesson 17 round magazine,
- Eight 9mm Glock 10 round magazines,
- Four .45 caliber Glock 13 round magazines,
- One 9mm Smith & Wesson 32 round magazine,
- One 9mm handgun barrel,
- Four 9mm Sig Sauer handgun barrels,
- One 9mm threaded Sig Sauer handgun barrels,
- One 9mm threaded Glock 26 barrel,
- One .45 caliber threaded Glock 21 barrel,
- Five 9mm threaded Glock 19 barrels,
- Five 9mm threaded Glock 17 barrels,
- One .22 caliber Glock caliber conversion kit, and
- One .357 caliber Glock 15 round magazine.

39. While CBP Supervisory Officer Colgan and CBP Officer Budd conducted the outbound customs examination of defendant's two pieces of checked luggage, defendant proceeded to the jetway and attempted to board the Turkish Airlines flight to Istanbul, Turkey.

40. After discovering the firearm parts in defendant's checked luggage, CBP Supervisory Officer Colgan and other CBP agents stopped defendant on the jetway and conducted an initial interview of defendant with the assistance of Sercan Cimrin, a Turkish Airlines flight supervisor who routinely interprets from Turkish to English and English to Turkish as part of his employment with Turkish Airlines.[15] During this interview, defendant acknowledged possession of the firearm parts in his checked luggage, but explained that he thought he did not need a federal firearms license ("FFL") to export these items because they were firearm parts, not fully-assembled firearms.[16]

41. The CBP agents then transported defendant from the jetway to the international arrivals terminal. There, the CBP agents searched defendant's two pieces of checked luggage a second time, and also searched defendant's carry-on luggage. These searches did not reveal any additional firearm parts. CBP agents also searched defendant's iPhone, which contained communications between defendant and Bayram Bulut.

---

[15] CBP agents have used Cimrin as an interpreter on many other occasions.

[16] Importantly, whether or not an FFL is required to export firearm parts from the United States is irrelevant to the requirement that any firearm parts listed on the USML may not be exported from the United States without a license or authorization from the DDTC.

42. CBP Supervisory Officer Colgan then checked to see if defendant had filed any export licenses in the CBP's automated export system, a database of any individuals registered to export weapons or defense articles listed on the USML. Defendant was not listed in the CBP automated export system.

43. Shortly thereafter, Special Agent Coppolo interviewed defendant, relying on Perihan Sucu, a qualified Turkish to English and English to Turkish interpreter.[17] During the interview, defendant (i) stated that on January 25, 2016, defendant travelled to Florida to visit Bayram Bulut, (ii) stated that while in Florida, defendant and Bayram Bulut visited pawn shops, gun stores, and a gun show, (iii) stated that defendant—not Bayram Bulut—purchased various firearm parts in Florida, even though Bayram Bulut advised defendant not to do so, (iv) acknowledged defendant's December 2, 2012 and January 8, 2013 encounters with law enforcement at JFK Airport, (v) stated that defendant hired an attorney to recover the firearm parts detained on December 2, 2012, but that the attorney was unsuccessful, and (vi) stated that he believed an FFL was not required to export the firearm parts discovered in his luggage on February 2, 2016.[18]

44. Defendant was not allowed to board his February 2, 2016 Turkish Airlines flight to Istanbul, Turkey.

45. The firearm parts discovered in defendant's checked luggage were detained by the CBP in order to ascertain whether these firearm parts were listed on the USML. The DDTC later determined that all of the firearm parts detained from defendant's checked luggage on February 2, 2016, were listed on the USML, and therefore could not be exported from the United States without a license or other written authorization from the DDTC. Accordingly, these firearm parts were seized.

---

[17] Sucu was not physically present during the interview; she provided her services via telephone. Special Agent Coppolo instructed Sucu to interpret everything that was said word-for-word and was satisfied that Sucu did so.

[18] As already noted, whether or not an FFL is required to export firearm parts from the United States is irrelevant to the requirement that any firearm parts listed on the USML may not be exported from the United States without a license or authorization from the DDTC.

46. Defendant, Bayram Bulut, and Rocco Bulut, have never registered—nor have they applied to register—with the DDTC for a license or any other authorization to export from the United States defense articles listed on the USML.[19] Nor did defendant, Bayram Bulut, or Rocco Bulut do anything to ascertain whether the firearm parts that were detained on various occasions were ultimately seized.[20] This further confirms that they knew it was generally unlawful to export firearm parts without a license or other written authorization from the DDTC.

47. As noted already, defendant's testimony is not credible, particularly with respect to defendant's testimony that on February 2, 2016, he did not know it was generally unlawful to export the firearm parts in issue without a license or authorization from the DDTC. This conclusion is confirmed by (i) defendant's repeated evasive answers to questions on cross-examination, (ii) the internal inconsistency of defendant's testimony, and (iii) credible evidence directly contrary to defendant's self-serving testimony.

48. For example, defendant's testimony regarding Special Agent Fede's December 2, 2012 Project Shield America presentation is not credible. In this regard, defendant testified: (i) that Special Agent Fede told defendant that the firearm parts in defendant's luggage "were not illegal" and "would not lead to [his] arrest," Trial Tr. at 5 (May 19, 2016); (ii) that Special Agent Fede told defendant that Special Agent Fede did not know anything about export regulations, *id.* at 15-16; and (iii) that Special Agent Fede did not explain any export requirements to defendant, *id.* at 50. This testimony by defendant is not credible because it is directly contrary to the credible testimony of Special Agent Fede.[21] Thus, in light of Special Agent Fede's credible testimony, there can be no doubt that defendant's testimony regarding Special Agent Fede's December 2, 2012 Project Shield America presentation is not credible.

---

[19] Foreign nationals, with certain exceptions, may not receive a license or other authorization from the DDTC to export defense articles from the United States. *See* 22 C.F.R. § 120.1(c)(1).

[20] As already noted, defendant stated that he hired an attorney and took other steps to ascertain the status of the parts that were detained on December 2, 2012, but that these efforts were unsuccessful. *See supra*, Findings of Fact ("FF") 10, 43. But as stated already, this testimony is not credible. *See supra*, FF 10. In any event, even assuming, *arguendo*, that defendant hired an attorney to assist defendant in ascertaining whether the firearm parts detained on December 2, 2012, had been ultimately seized, this further bolsters the conclusion that defendant was on notice that it was generally unlawful to export firearm parts from the United States without a license or authorization from the DDTC.

[21] Specifically, as already noted, Special Agent Fede testified that on December 2, 2012, Special Agent Fede presented to defendant and the Bulut brothers the same comprehensive Project Shield America presentation that Special Agent Fede had presented hundreds of times in the past. This presentation emphasized the DDTC licensing requirement for exporting firearm parts listed on the USML and the possibility of punishment, including incarceration, for any attempt to

14

49. Similarly not credible is defendant's testimony regarding his reasons for attempting to export firearm parts to Turkey. This testimony is contrary to other credible evidence presented by the government and inconsistent with other statements made by defendant. In this regard, defendant testified: (i) that defendant purchases firearm parts in connection with his hobby of engraving firearm parts so that he can give some of the engraved parts to friends and sell others to individuals in Turkey; (ii) that this hobby makes up a "[v]ery small amount" of defendant's livelihood, Trial Tr. at 75-76 (May 19, 2016); and (iii) that defendant prefers to purchase firearm parts in the United States because firearm parts are much cheaper in the United States than they are in Turkey. This testimony by defendant is inconsistent with the obvious fact that there is no purpose or reason to engrave firearm springs and other internal firearm parts that were found in defendant's checked luggage. Moreover, defendant's testimony that his hobby of engraving firearm parts comprises a very small amount of his livelihood cannot be squared with defendant's later testimony that the firearm parts seized in 2012 and 2013 were worth more than $10,000.[22] Furthermore, in the iChat and Kik conversations between defendant and Bayram Bulut, defendant never mentions his purported firearm-engraving hobby; rather, these conversations show that defendant was in business with Bayram Bulut selling—and agreeing to sell—large quantities of firearm parts worth thousands of dollars in the United States.[23] Thus, in light of all the evidence presented at trial, defendant's testimony that he attempted to export firearm parts in connection with a mere hobby is not credible, and indeed, it is a deliberate effort to conceal defendant's unlawful actions by making it appear that defendant lacked knowledge that it was generally unlawful to export firearm parts from the United States without a license or authorization from the DDTC.

---

export firearm parts listed on the USML without the requisite DDTC license. *See supra*, FF 7-9. It is worth noting that Special Agent Fede has approximately twenty years of law enforcement experience, and unlike defendant, Special Agent Fede has no incentive to lie in this case.

[22] Indeed, based on defendant's testimony that firearm parts in the United States cost as little as one-tenth of what the same parts cost in Turkey, successfully exporting firearm parts worth approximately $10,000 from the United States to Turkey creates an immediately lucrative business opportunity in Turkey. *See* Trial Tr. at 198 (May 18, 2016) (defendant explaining that "[a] part that [he] would buy for $100 ... in Turkey I can get here [in the United States] for anywhere between $10 to $20").

[23] *See, e.g.*, GX 33A at 353 (discussing spending "12 thousand" on firearm parts as part of a "[b]ig job"); GX 33D at 392 (discussing spending "13 thousand ... 20 with expenses" on certain firearm parts); GX 33F at 439-40 (defendant asking "[w]hat are you thinking to send me[,] how much money[?]" and Bayram Bulut responding "3000 in my hands"); GX 33G at 510 (defendant stating "[my] estimation we'll clear this job in two months"); GX 33K at 780 (defendant stating "I will sell whatever you buy," to which Bayram Bulut replied, "I don't want to spend money for the things with no return or make us wait"); GX 33K at 785 (defendant stating "[t]here are

50. As already noted in FF 10, defendant testified that before defendant left the United States on or about January 8, 2013, defendant hired an attorney and attempted to ascertain the status of the parts that were detained on December 2, 2012, but was unsuccessful. This testimony is not credible because apart from defendant's testimony, there is no evidence that defendant took any steps to ascertain the status of the firearm parts that had been detained on December 2, 2012. This conclusion further confirms that defendant had knowledge that it was generally unlawful to export firearm parts without a license or authorization from the DDTC.

51. Defendant's testimony regarding defendant's December 14, 2012 visit to Benson's Gun Shop further demonstrates that defendant's testimony is not credible. Specifically, upon observing a photograph of defendant, Bayram Bulut, and a third individual standing near the checkout counter at Benson's Gun Shop, defendant testified that he did not know the third individual and did not enter Benson's Gun Shop with that individual on December 14, 2012; indeed, defendant insisted that he had entered Benson's Gun Shop accompanied by only Bayram Bulut. *See* GX 28, Counter Photograph. Yet, after defendant reviewed a second photograph that clearly shows defendant and Bayram Bulut walking away from the checkout counter in Benson's Gun Shop with the third individual, defendant testified that he recognized the third individual and that defendant did in fact visit Benson's Gun Shop with that individual. *See* GX 29, Walking Photograph. In an attempt to explain this blatant contradiction in his testimony, defendant stated that he did not immediately recognize the third individual in the first photograph, but this explanation is unpersuasive because (i) the third individual can be observed in the first photograph just as easily as he can be observed in the second photograph, and (ii) an inability to identify the third individual immediately in the first photograph does not explain why defendant insisted initially that he entered Benson's Gun Shop accompanied by only Bayram Bulut. Thus, defendant's attempted explanation is unpersuasive; instead, he was simply caught in a lie; he knew the identity of the third individual in the photographs, as he entered Benson's Gun Shop accompanied by the third individual and Bayram Bulut, as indeed was confirmed by the credible testimony of Benowitz. *See supra*, FF 13.

---

clients for 10 thousand," to which Bayram Bulut replied, "I am working on the job as you told me, you can bind the customers").

52. Similarly not credible is defendant's testimony with respect to defendant's circuitous flight path from Florida, through Hopkins Airport in Ohio, through Dulles, to Istanbul, Turkey. Defendant testified that he booked the flight to Hopkins Airport in Ohio because defendant and Bayram Bulut had initially planned to stay in Ohio for two days in order to purchase additional firearm parts. According to defendant, these plans were later cancelled, but defendant nonetheless flew to Hopkins Airport because he had already booked that flight. Importantly, however, defendant's flight from Hopkins Airport to Dulles was scheduled to depart only a few hours after defendant was scheduled to land in Cleveland. *See* GX 34; GX 35. Thus, contrary to defendant's testimony, there was little time—and certainly not two days—for defendant to leave Hopkins Airport and visit other locations in Ohio. Moreover, defendant's testimony and the iChat and Kik conversations between defendant and Bayram Bulut reflect that defendant booked his circuitous flight path so that defendant could check his luggage for the international flight at Hopkins Airport in Ohio—rather than at Miami International Airport in Florida—in an attempt to decrease the likelihood that defendant would be caught attempting to export firearm parts from the United States without a DDTC license.[24] These inconsistent statements point persuasively—indeed, beyond a reasonable doubt—to the conclusion that defendant's testimony regarding his circuitous flight path is not credible, and that contrary to defendant's testimony, defendant deliberately decided to travel through Hopkins Airport in Ohio in an attempt to avoid detection by law enforcement of the firearm parts in his luggage.

53. Defendant also testified that defendant had personally purchased all the firearm parts discovered in defendant's checked luggage at Dulles and that Bayram Bulut had not purchased any of these firearm parts. Yet, contrary to defendant's statements, Bayram Bulut purchased firearm parts from Lone Wolf and the Hialeah Gun Store & Range on behalf of defendant. *See supra*, FF 29-31, 33. Thus, defendant clearly lied about who purchased at least some of the firearm parts discovered at Dulles, presumably in an attempt to protect Bayram Bulut from investigation and prosecution.

54. Thus, defendant's testimony at trial is not credible in several respects, and therefore defendant's statements that he did not know it was generally unlawful, without the requisite DDTC license, to export the firearm parts discovered in his luggage at Dulles carry no weight. Indeed, contrary to defendant's testimony in this regard, it is abundantly clear—indeed, beyond a reasonable doubt—that defendant knew it was generally unlawful to export firearm parts from the United States without a license or authorization from the DDTC.

---

[24] *See* Trial Tr. at 73 (May 19, 2016) ("[M]y items in New York were confiscated, and I wasn't told anything about them, so that I wouldn't go through the same thing I did choose to try to depart from another state."); GX 33J at 747-48 (defendant stating "[w]e shouldn't be like in New York," and Bayram Bulut suggesting "let's board from Ohio" and "[y]ou will pass to Ohio [from Florida] and you will board and go from there").

## CONCLUSIONS OF LAW

The indictment charges defendant with (i) one count of conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, (ii) one count of attempting to export firearm parts without the requisite license, in violation of 22 U.S.C. § 2778, and (iii) one count of smuggling goods from the United States, in violation of 18 U.S.C. § 554. Each count is addressed separately below, beginning with the predicate offenses charged in Counts II and III.

### A. Count II

Count II charges defendant with attempting to export from the United States various firearm parts discovered in defendant's luggage at Dulles on February 2, 2016, without the requisite DDTC license in violation of § 2778 of the Arms Export Control Act ("AECA").

The AECA regulates the export of arms, ammunition, and other military and defense technology. Specifically, § 2778(a)(1) authorizes the President (i) to create the USML, which designates many items as "defense articles and defense services," and (ii) to promulgate "regulations for the import and export of such articles and services." *Id.* The President has delegated this authority to the DOS,[25] which publicly maintains the USML and promulgates the regulations that implement the AECA, namely the International Traffic in Arms Regulations ("ITAR"). *See* 22 C.F.R. §§ 120-130. The DDTC of the DOS administers the ITAR, and therefore regulates the export of defense articles listed on the USML. Importantly, under § 2778(b)(2), "no defense articles or defense services designated by the [USML]," with limited exception, "may be exported ... without a license" from the DDTC. *Id.*[26] And under § 2778(c),

---

[25] *See* Exec. Order No. 11,958, 42 Fed. Reg. 4311 (Jan. 24, 1977).

[26] *See also* 22 C.F.R. § 123.1(a) ("Any person who intends to export ... a defense article must obtain the approval of the [DDTC]."); 22 C.F.R. § 127.1(a)(1) ("Without first obtaining the

18

an individual who "willfully violates any provision" of the AECA, including § 2778(b)(2), may

be fined up to one million dollars, imprisoned for a term of up to 20 years, or both. *Id.* § 2778(c).

In order to prove that defendant is guilty of attempting to export various defense articles

listed on the USML without a license or other written authorization from the DDTC, in violation

of § 2778(b)(2), (c), the government must prove each of the following four elements beyond a

reasonable doubt:

> (i) that defendant knowingly attempted to export from the United States, in the Eastern District of Virginia, a defense article listed on the USML;
>
> (ii) that a license or written approval was required from the DDTC prior to the attempted export of the defense article;
>
> (iii) that defendant did not obtain a license or other written approval from the DDTC before attempting to export the defense article; and
>
> (iv) that defendant acted willfully.

With respect to the willfulness element, neither the AECA nor the regulations implementing the

AECA define the term "willfully." Importantly, however, the Fourth Circuit has made clear that

"willfulness under the AECA requires only general knowledge of illegality," and therefore a

defendant's "true belief as to the illegality of" exporting the items in issue is "sufficient to

establish culpability under [the] AECA even if unaccompanied by knowledge of the contents of

the USML." *United States v. Bishop*, 740 F.3d 927, 935 (4th Cir. 2014). In this regard, the

Fourth Circuit has explained that "it would be unwarranted for courts to draw from the word

'willful' a desire on the part of Congress to require not simply general knowledge of an export's

---

required license or other written approval from the [DDTC], it is unlawful ... [t]o export or attempt to export from the United States any defense article... ."). The term "[e]xport" is defined as "[s]ending or taking a defense article out of the United States in any manner except by mere travel outside of the United States by a person whose personal knowledge includes technical data." 22 C.F.R. § 120.17.

illegality, but specific knowledge of the particulars of [the USML]." *Id.* at 933-34.[27] This standard strikes "a balance between punishing those who intentionally violate the law and ensnaring individuals who make honest mistakes," and therefore "eliminat[es] any genuine risk of holding a person criminally responsible for conduct which he could not reasonably understand to be proscribed." *Id.* at 933. Thus, to establish willfulness beyond a reasonable doubt in the present case, the United States must prove that defendant knew it was generally unlawful to export the firearm parts in issue from the United States without a license or authorization from the DDTC.

Here, the government has proved beyond a reasonable doubt all four elements of the offense charged against defendant in Count II, namely attempting to export firearm parts listed on the USML without a license or authorization from the DDTC, in violation of § 2778. Specifically, based on all the evidence presented at trial, the government has proved beyond a reasonable doubt:

> (i) that on or about February 2, 2016, defendant knowingly attempted to export from the United States, in the Eastern District of Virginia, firearm parts listed on the USML, including (a) a handgun barrel, (b) a .22 caliber Glock caliber conversion kit, and (c) 9mm, .45 caliber, and .357 caliber handgun magazines, *see supra*, FF 34-38;
>
> (ii) that a license or written approval was required from the DDTC prior to the attempted export of these firearm parts on February 2, 2016, *see supra*, FF 45;
>
> (iii) that defendant did not obtain a license or other written approval from the DDTC before attempting to export these firearm parts, *see supra*, FF 46; and

---

[27] In reaching this conclusion, the Fourth Circuit relied on the Supreme Court's decision in *Bryan v. United States*, 524 U.S. 184 (1998). There, the Supreme Court addressed the meaning of "willfully … dealing in firearms" without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A), (D). *Id.* at 191-92. The Supreme Court in *Bryan* held that "to establish a 'willful' violation of the statute, the [g]overnment must prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* at 192. In so holding, the Supreme Court rejected the defendant's argument that the government also had to prove that the defendant knew of the particular federal licensing requirement in issue. *Id.* at 196.

(iv) that defendant acted willfully—that is, defendant knew it was generally unlawful to export the firearm parts in issue from the United States without a license or authorization from the DDTC, *see supra*, FF 7-11, 14-15, 17-18, 22-24, 26-27, 35-36, 43, 47-53.

With respect to the conclusion that defendant acted willfully, the evidence presented at trial makes clear—indeed, beyond a reasonable doubt—that defendant knew it was generally unlawful, without the requisite DDTC license, to export the firearm parts detained on February 2, 2016. To begin with, when defendant attempted to export similar firearm parts in 2012 and 2013, (i) CBP and HSI agents precluded defendant from exporting those firearm parts and detained the firearm parts, and (ii) Special Agent Fede advised defendant of various federal regulations regarding exports, including the federal requirement to obtain an export license from the DDTC for defense articles that are listed on the USML, as well as the process for obtaining a DDTC license. *See supra*, FF 4-11. Specifically, as already noted, Special Agent Fede advised defendant:

(i) that there is a federal requirement to obtain an export license from the DDTC for any defense articles listed on the USML,

(ii) that the vast majority of all firearm parts are listed on the USML, and therefore may not be exported without a license or other written authorization from the DDTC,

(iii) that there is no license exception for exporting goods through a mail service,

(iv) that based on Special Agent Fede's training and experience, the firearm parts discovered in defendant's luggage on December 2, 2012, were likely listed on the USML, and

(v) that any attempt to export items listed on the USML without a license or authorization from the DDTC could result in sanctions, such as seizure of the goods, fines, loss of exporting privileges, and criminal charges that could result in imprisonment.

*See supra*, FF 7-8.

21

Moreover, the incident at Benson's Gun Shop on December 14, 2012, confirms that defendant knew it was generally unlawful to export firearm parts without a license or authorization from the DDTC, as the individual speaking on behalf of the group of three individuals, including defendant, explained to Benowitz that defendant had previously attempted to export firearm parts but was unsuccessful because at the time—on December 2, 2012— defendant did not know the relevant rules and regulations. Indeed, as already noted, Special Agent Fede advised defendant of the relevant rules and regulations on December 2, 2012.

In addition, defendant also acknowledged that prior to his February 2, 2016 attempt to export firearm parts, defendant learned that on March 15, 2014, Rocco Bulut's attempt to export firearm parts had failed and that the firearm parts discovered in Rocco Bulut's luggage were detained and never returned to Rocco Bulut. Thus, by February 2, 2016, it is clear beyond a reasonable doubt that defendant was on notice that it was generally unlawful to export firearm parts without a DDTC license.

Furthermore, the iChat and Kik conversations between defendant and Bayram Bulut during the months leading up to defendant's 2016 trip to the United States make clear beyond a reasonable doubt that on February 2, 2016, defendant knew it was generally unlawful to export firearm parts without a DDTC license.[28] Specifically, the iChat and Kik conversations reflect:

> (i) that defendant was aware of the risk associated with exporting firearm parts from the United States, GX 33G at 504 (noting that the "surroundings are troublesome ... very bad" for "transport[ing]" firearm parts);
>
> (ii) that defendant considered the rules and regulations regarding exporting firearm parts from the United States to be "tight-assed," GX 33G at 506;

---

[28] Although there was no objection to the admissibility of the statements made by Bayram Bulut reflected in the Kik and iChat conversations between defendant and Bayram Bulut, it is worth noting that these statements are admissible. *See* Rule 801(d)(2)(E), Fed. R. Evid. (providing that statements "made by [a] party's coconspirator during and in furtherance of the conspiracy" are admissible because such statements are not hearsay).

(iii) that defendant was interested in exporting "forbidden" firearm parts because such parts are "more precious," GX 33G at 507;

(iv) that defendant sought to avoid law enforcement detection;[29] and

(v) that defendant and Bayram Bulut sought to avoid repeating the mistakes that led to the discovery of firearm parts in 2012 and 2013.[30]

Similarly, defendant's iChat communications with Bayram Bulut on or about February 2, 2016, when defendant was travelling from Miami International Airport through Hopkins Airport to Dulles, clearly show that defendant was aware that it was generally unlawful to export firearm parts from the United States without a DDTC license, as these conversations reflect (i) that defendant provided Bayram Bulut status updates regarding the firearm parts during his journey, (ii) that defendant was worried that the firearm parts contained in his luggage would be found, and (iii) that defendant sought to avoid law enforcement scrutiny by taking a circuitous flight path from Florida, through Hopkins Airport in Ohio, through Dulles, to Istanbul, Turkey.[31]

---

[29] Specifically, after Bayram Bulut asked defendant, "how do you think to go out from [the United States]" and "will there be a problem in the customs," defendant replied, "there won't be, if it is something logical." GX 33G at 512-13. Bayram Bulut then instructed defendant to "think about something" and to "[e]xplore there, customs." *Id.* at 513, 515. Defendant and Bayram Bulut then discussed a plan to avoid detection by hiding firearm parts in large metal items, such as a plastic injection oil cooler tank and pressure drains. *Id.* at 515-17.

[30] *See* GX 33M at 825-26 (Bayram Bulut stating "[h]ave to be ready for everything all the time ... have to think the worst ... [w]e have to be ready for every scenario in order not to live the same things again," and defendant replying "Ok … we calculate every detail anyway"); *See* GX 33J at 747-48 (defendant stating "[w]e shouldn't be like in New York," and Bayram Bulut suggesting "let's board from Ohio" and "[y]ou will pass to Ohio [from Florida] and you will board and go from there").

[31] *See* GX 35 at 37 (Bayram Bulut stating "if there is a problem when you give the baggage they may announce your name, you should be listening carefully, god willing there won't be any problem," and defendant stating "God willing there won't be any problem"); *id.* at 50 (Bayram Bulut instructing defendant to declare some of the firearm parts in his bags, and defendant stating "I am an ignorant guy I will tell anyway"); *id.* at 52 (defendant stating "I gave the bags"); *id.* at 76 (defendant stating "[b]aggage will come god willing," and Bayram Bulut stating "[i]t will

Thus, the evidence presented at trial establishes beyond a reasonable doubt that defendant knew it was generally unlawful to export the firearm parts detained from defendant's checked luggage at Dulles on February 2, 2016 without a license or authorization from the DDTC. Accordingly, as the government has proved beyond a reasonable doubt all four elements of the offense charged against defendant in Count II, defendant must be found guilty of that offense, namely attempting to export firearm parts listed on the USML without a license or authorization from the DDTC, in violation of 22 U.S.C. § 2778.

### B. Count III

Count III charges defendant with attempting to export from the United States various firearm parts discovered in defendant's luggage at Dulles on February 2, 2016, in violation of § 554(a), which provides that "[w]hoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, ... shall be fined under this title, imprisoned not more than 10 years, or both." *Id.*

In order to establish that defendant is guilty of violating § 554(a), the government must prove each of the following elements beyond a reasonable doubt:

(i) that defendant fraudulently or knowingly attempted to export or send from the United States, within the Eastern District of Virginia, firearms parts;

(ii) that the attempted export was contrary to any law or regulation of the United States; and

(iii) that defendant knew that the exportation or sending of the merchandise was contrary to law or regulation.

---

come, don't worry" and "[i]f there is something they will find you"); *id.* at 81 (defendant stating "I passed"); *id.* at 88 (defendant stating "job done").

24

Here, the government has proved beyond a reasonable doubt all three elements of this offense. Specifically, the government has proved beyond a reasonable doubt:

(i) that on or about February 2, 2016, defendant fraudulently or knowingly attempted to export or send from the United States, within the Eastern District of Virginia, firearms parts, including (a) a handgun barrel, (b) a .22 caliber Glock caliber conversion kit, and (c) 9mm, .45 caliber, and .357 caliber handgun magazines, *see supra*, FF 34-38;

(ii) that the attempted export of these firearm parts on February 2, 2016, was contrary to any law or regulation of the United States—namely, 22 U.S.C. § 2778(b)(2), (c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1, *see supra*, FF 45-46; and

(iii) that defendant knew that the exportation or sending of the firearm parts in issue was contrary to law or regulation, *see supra*, FF 7-11, 14-15, 17-18, 22-24, 26-27, 35-36, 43, 47-53.

With respect to the third element, it is important to note that the knowledge requirement for § 554 is essentially the same as the willfulness requirement for § 2778.[32] Thus, for the reasons already stated, it is clear beyond a reasonable doubt that defendant knew it was generally unlawful to export the firearm parts in issue from the United States without a license or authorization from the DDTC.

Accordingly, as the government has proved beyond a reasonable doubt all three elements of the offense charged in Count III, defendant must be found guilty of that offense, namely smuggling goods from the United States, in violation of 18 U.S.C. § 554.

## C. Count I

Count I charges defendant with conspiracy to commit an offense against the United States, in violation of § 371, which provides that if "two or more persons conspire ... to commit

---

[32] Although § 2778 uses the term "willfully," whereas § 554 uses the term "knowingly," as already noted, the Fourth Circuit has explained that the term "willfully" in § 2778 means "general knowledge of an export's illegality." *Bishop*, 740 F.3d at 933. Thus, there is no material difference between the "willfully" requirement in § 2778 and the "knowingly" requirement in § 554.

any offense against the United States … , and one or more of such persons do any act to effect the object of the conspiracy, each shall be" punished by up to five years in prison. *Id.* As the Fourth Circuit has made clear, "[t]o prove a § 371 conspiracy, the government must show 'an agreement to commit an offense, willing participation by the defendant, and an overt act in furtherance of the conspiracy." *United States v. McNeal*, 818 F.3d 141, 149 (4th Cir. 2016) (quoting *United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004)). The government must also prove "that the accused possessed 'at least the degree of criminal intent necessary for the substantive offense itself.' " *Id.* (quoting *Ingram v. United States*, 360 U.S. 672, 678 (1959)). Accordingly, here, the government must prove each of the following elements beyond a reasonable doubt:

> (i) that defendant entered a conspiracy by agreeing with one or more persons to do something prohibited by federal law;
>
> (ii) that defendant knew of the conspiracy and willfully joined the conspiracy; and
>
> (iii) that at some point during the existence of the conspiracy, one of the members of the conspiracy knowingly performed, in the Eastern District of Virginia, one of the overt acts charged in the indictment in order to accomplish the object or purpose of the conspiracy.

Here, the government has proved beyond a reasonable doubt all three elements of the offense charged against defendant in Count I, namely conspiracy to commit an offense against the United States, in violation of § 371. Specifically, based on all the evidence presented at trial, the government has proved beyond a reasonable doubt:

> (i) that defendant and Bayram Bulut knowingly and willfully agreed to violate United States law by (a) exporting defense articles from the United States without having first obtained a license or written approval from the DDTC, in violation of § 2778(b)(2), (c), and (b) fraudulently or knowingly exporting merchandise, articles, or objects contrary to United States law, in violation of § 554(a), *see supra*, FF 2-4, 13-14, 25-26, 28-29, 31-36;

26

(ii) that defendant knew of the conspiracy and willfully joined the conspiracy, *see supra*, FF 5-9, 11, 14, 24, 25-27, 28-29, 31-36; and

(iii) that at some point during the existence of the conspiracy, defendant performed, in the Eastern District of Virginia, an overt act to accomplish the object or purpose of the agreement—specifically, on February 2, 2016, at Dulles, defendant attempted to export firearm parts listed on the USML without a license or authorization from the DDTC, *see supra*, FF 34-37, 45-46.

Accordingly, as the government has proved beyond a reasonable doubt all three elements of the offense charged in Count I, defendant must be found guilty of that offense, namely conspiracy to commit an offense against the United States, in violation of § 371.

## D. Willful Blindness

Finally, it is worth noting that with respect to all three counts charged against defendant, there is an alternative basis for establishing that defendant knew it was generally unlawful to export firearm parts without a license or authorization from the DDTC. Specifically, even assuming, *arguendo*, that defendant did not actually know it was generally unlawful to export the firearm parts in issue without a license or authorization from the DDTC, the knowledge requirement is met with respect to all three counts beyond a reasonable doubt because defendant was willfully blind to facts he should have known. This alternative means of proving knowledge is unnecessary here, as the mountain of evidence establishes beyond a reasonable doubt that defendant actually knew it was generally unlawful to export firearm parts from the United States without a license or authorization from the DDTC. Nonetheless, as an alternative basis, the entirety of the evidence establishes beyond a reasonable that defendant was, at a minimum, willfully blind to facts that make certain that it was generally unlawful to export the firearm parts in issue from the United States without a license or authorization from the DDTC.

As the Fourth Circuit has made clear, a factfinder "may rely on willful blindness" to establish the knowledge element of a crime " 'when the defendant asserts a lack of guilty

knowledge but the evidence supports an inference of deliberate ignorance.' " *United States v. Zayyad*, 741 F.3d 452, 463 (4th Cir. 2014) (quoting *United States v. Ruhe*, 191 F.3d 376, 384 (4th Cir. 1999)). In this regard, "the doctrine of willful blindness permits the government to prove knowledge by establishing that the defendant 'deliberately shield[ed] [himself] from clear evidence of critical facts that are strongly suggested by the circumstances.' " *United States v. Jinwright*, 683 F.3d 471, 478-79 (4th Cir. 2012) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)). Although the Fourth Circuit has not addressed the operation of the willful blindness doctrine in the context of the AECA or other weapons smuggling charges, it is appropriate to apply the doctrine of willful blindness here because that doctrine applies to crimes that prohibit exporting firearm parts in the same manner that the doctrine of willful blindness applies to any other crime with a knowledge requirement.[33]

Here, assuming, *arguendo*, that defendant lacked actual knowledge that it was generally unlawful to export the specific firearm parts discovered in defendant's luggage on February 2,

---

[33] A search of published circuit decisions discloses no decisions addressing the operation of the doctrine of willful blindness in the context of the ACEA, and only one decision addressing the doctrine of willful blindness in the context of § 554. Specifically, in *United States v. Galimah*, 758 F.3d 928 (8th Cir. 2014), the Eighth Circuit concluded that a willful blindness jury instruction was proper with respect to a charge under § 554 because the evidence presented, including "warnings encountered in purchasing the weapons," was sufficient to support the inference that defendant knew he was violating the law. *Id.* at 932. In addition, at least two other circuits have applied the doctrine of willful blindness in the context of other crimes prohibiting certain exports. In *United States v. Elashyi*, 554 F.3d 480, 492 (5th Cir. 2008), the Fifth Circuit held that a deliberate ignorance jury instruction was appropriate because the "evidence supported inferences that [d]efendants were subjectively aware of a high probability of the existence of illegal conduct and that they purposely contrived to avoid learning of the illegal conduct." *Id.* at 504. And in *United States v. Soussi*, 316 F.3d 1095 (10th Cir. 2002), the Tenth Circuit upheld a deliberate indifference jury instruction when there was strong evidence that defendant knew his exports were illegal, but claimed that he did not "extensively study" the federal government document clarifying the export ban, and therefore did not have actual knowledge of the ban. *Id.* In so holding, the Tenth Circuit concluded that defendant's failure to study the document was evidence that defendant "deliberately refused to read the document ... , presumably because he wanted to avoid unequivocal knowledge that it was illegal for him to engage the transaction." *Id.*

28

2016, without a DDTC license, the evidence reflects beyond a reasonable doubt that defendant was willfully blind to facts he should have known. Specifically, when defendant attempted to export firearm parts in 2012 and 2013, (i) those firearm parts were similar to the firearm parts detained at Dulles on February 2, 2016, and (ii) on December 2, 2012, Special Agent Fede advised defendant of the federal requirement to obtain a license from the DDTC for defense articles—including most firearm parts—listed on the USML before exporting such items. Thus, at least by December 2, 2012, defendant knew, at a minimum, that it was highly probable that it was generally unlawful to export most firearm parts from the United States without a DDTC license. Thereafter, defendant deliberately closed his eyes to facts that confirm it was generally unlawful to detain the firearm parts in issue here without the requisite DDTC license. Indeed, defendant not only failed to take steps to discover whether the firearm parts detained in 2012 and 2013 were ultimately seized because they were listed on the USML, but also failed to take any steps to determine whether the specific firearms defendant attempted to export on February 2, 2016, were listed on the USML, despite knowledge that most firearm parts were listed on the USML, and therefore could not be exported without a license or authorization from the DDTC.

Thus, as an alternative theory of establishing knowledge with respect to all three counts, the evidence presented at trial establishes beyond a reasonable doubt that defendant was willfully blind to facts that made certain it was generally unlawful to export the firearm parts in issue without a license or authorization from the DDTC.[34]

---

[34] It is worth noting that under the willful blindness theory of proof of knowledge, it is unnecessary to rely on defendant and Bayram Bulut's iChat and Kik conversations, which were obtained as a result of a nonroutine border search of defendant's iPhone. *See Kolsuz*, 2016 WL 2658156, at *3-4, *6-13.

## E. Conclusion

Accordingly, and for the reasons stated here, defendant is guilty of all three counts charged in the indictment. An appropriate Order will issue.

Alexandria, Virginia
June 23, 2016

/s/

_____
T. S. Ellis, III
United States District Judge

30

```
            IN THE UNITED STATES DISTRICT COURT FOR THE
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division

UNITED STATES OF AMERICA,              )
                                       )
                        Plaintiff,     )
                                       )
v.                                     )  CRIMINAL ACTION
                                       )
HAMZA KOLSUZ,                          )  1:16-cr-53
                                       )
                        Defendant.     )
_____)
```

                    REPORTER'S TRANSCRIPT

                    <u>BENCH TRIAL</u>

                    Friday, July 1, 2016

                         ---


<u>BEFORE</u>:        THE HONORABLE T.S. ELLIS, III
                Presiding

<u>APPEARANCES</u>:   HEATHER ALPINO, AUSA
                DENNIS FITZPATRICK, AUSA
                United States Attorney's Office
                2100 Jamieson Ave.
                Alexandria, VA 22314

                    For the Government

                ERICA L. MARSHALL, ESQ.
                Cause of Action
                1875 Eye Street, NW, Suite 800
                Washington, DC 20006

                    For the Defendant

                         ---


                MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                    Official Court Reporter
                USDC, Eastern District of Virginia
                    Alexandria, Virginia

1                              INDEX

2

3     RECAPITULATION BY THE COURT                         5

4     PROCEEDINGS RE:  SCHEDULING MATTERS                 10

5

6           (Court recessed)

7                              ---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
 1                        PROCEEDINGS

 2

 3              (Court called to order in USA v. Hamza

 4    Kolsuz.)

 5              THE COURT:  All right.  Are the parties in

 6    Kolsuz here?

 7              ATTORNEY MARSHALL:  Yes, your Honor.

 8              THE CLERK:  United States versus Hamza

 9    Kolsuz, criminal case 16-cr-53.

10              THE COURT:  All right.  Who is here for the

11    government?

12              ATTORNEY ALPINO:  Good morning, your Honor.

13    Heather Alpino and Dennis Fitzpatrick for the United

14    States.

15              ATTORNEY FITZPATRICK:  Good morning, your

16    Honor.

17              THE COURT:  All right.  Good morning.

18              And for the defendant, who is here?

19              ATTORNEY MARSHALL:  Hi, your Honor.  This is

20    Erica Marshall for Defendant Hamza Kolsuz.

21              We also have an interpreter present with us.

22              THE COURT:  Has he been sworn in this case

23    before?

24              ATTORNEY MARSHALL:  I believe that he was

25    sworn in an earlier motions hearing.
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1       THE COURT:  Well, let's have him come to the

2  podium, then.  We'll do it again.

3       The record will reflect that Mr. Kolsuz is

4  now in the courtroom in the custody of the marshals.

5       Good morning, Mr. Kolsuz.

6       No, it's the interpreter that I need to have

7  sworn, Mr. Kolsuz.  You may be seated, sir.

8       Would you give us your name and

9  qualifications as an interpreter, please.

10       THE INTERPRETER:  My name is Hayri

11  Berberoghu.  I was born in Turkey.  I have been

12  interpreting, let's say 35, 40 years in the court system

13  in the United States.

14       THE COURT:  Have you done so in Federal

15  Court?

16       THE INTERPRETER:  Yes, sir, I did.

17       THE COURT:  And have you done so in this

18  court before?

19       THE INTERPRETER:  Yes, I did.

20       THE COURT:  And are you able to translate

21  from English to Turkish and Turkish to English as the

22  languages are spoken?

23       THE INTERPRETER:  Yes, sir, I am.

24       THE COURT:  All right, sir.  You are fully

25  competent and qualified to serve as an interpreter.  I

1  will have the deputy clerk administer the oath to you

2  now.

3              (Interpreter sworn by clerk.)

4              THE COURT:  If I go too quickly or if you

5  miss something, raise your hand and I will stop the

6  proceeding so that you can catch up.

7              THE INTERPRETER:  Understood.

8              RECAPITULATION BY THE COURT

9              THE COURT:  All right.  Now, I issued -- I

10  heard the trial in this case -- it was tried to the

11  bench -- and I issued facts and conclusions of law.

12             The purpose of this hearing today is for me

13  to announce that I've found the defendant guilty of one

14  count of conspiracy to commit an offense against the

15  United States in violation of 18 USC Section 371, one

16  count of attempting to export firearm parts without the

17  requisite license, in violation of 22 USC Section 2278,

18  and one count of smuggling goods from the United States

19  in violation of 18 USC Section 554.

20             ATTORNEY MARSHALL:  Your Honor, apologize.

21  I would like to stop you for one second.  I think the

22  interpreter needed to get his device --

23             THE COURT:  Oh, I'm sorry.  So ahead, sir.

24  I will wait until you are fully equipped.

25             Thank you, Ms. Marshall, for calling that to

1    my attention.

2               Can you hear me now, sir?

3               THE INTERPRETER:  Yes, sir.

4               THE COURT:  All right.  I will begin again.

5               This matter came before the Court for a

6    nonjury trial.  And after hearing evidence I recessed

7    the matter, had a transcript prepared and allowed the

8    parties to submit proposed findings and conclusions, or

9    briefing, on the issues.

10              During the course of the trial I elicited

11   testimony from a number -- or the government elicited

12   testimony from a number of witnesses, introduced a

13   number of documents.

14              Following the government's presentation, the

15   defendant moved for judgment of acquittal pursuant to

16   Rule 29.

17              I denied that motion from the bench on the

18   ground that the government had presented ample evidence

19   from which the Court could find beyond a reasonable

20   doubt the elements of all three charged offenses.

21              The defendant was then advised that he was

22   not required to present any evidence or testify, as the

23   government had the burden of proof, and he had no burden

24   to prove his innocence.

25              He elected to testify after being advised by

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    counsel.  He testified and he was cross-examined.

2            At the conclusion of the evidence, in order

3    to give the parties an opportunity to review a

4    transcript, which was expeditiously prepared by

5    Mr. Rodriquez -- in fact, I think you did it in, what,

6    three or four days?

7                THE REPORTER:  Yes, Judge.

8                THE COURT:  -- the parties were then

9    directed, in lieu of closing arguments, to file briefs

10   setting forth proposed findings of fact and conclusions

11   of law.

12           Neither party had requested specific

13   findings in open court or in a written decision or

14   opinion, but I nevertheless decided that a written

15   decision and opinion was appropriate in the case, and I

16   issued one on June 23rd.  I issued written findings of

17   fact and conclusions of law, finding defendant guilty of

18   all three counts charged in the indictment.

19           So first I want to confirm -- let's see.

20           Ms. Alpino --

21                ATTORNEY ALPINO:  Yes, your Honor.

22                THE COURT:  -- you are the prevailing party.

23   In the findings of fact, did I omit any facts that you,

24   as the prevailing party, think should be in there?

25                ATTORNEY ALPINO:  I don't believe so,

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    your Honor.

2            THE COURT:  All right.

3            Now I also, I think, Ms. Marshall, directed

4    that the Court's findings and conclusions be translated

5    into Turkish for the defendant.  Has that occurred?

6            ATTORNEY MARSHALL:  Your Honor, we are in

7    the processes of getting those translated and we expect

8    it to be completed by July 5th.  We have spoken over the

9    phone with our client and advised him of your findings

10   of guilt.

11           THE COURT:  Well, I would have thought that

12   all it would take would be for this translator to sit

13   down -- I doubt they were more than, what was it, about

14   20 pages in length?  And in a matter of 30 minutes they

15   could have been translated.  And that's what I had in

16   mind when I directed that.

17           ATTORNEY MARSHALL:  Your Honor, on the date

18   of your -- the date that your decision was issued, which

19   was last Friday, we immediately contacted interpreter

20   companies who translate in the Turkish language, and it

21   was estimated to us that it would take at least a -- two

22   days' worth of interpreter service if we did an

23   in-person translation, or it would alternatively take

24   approximately until July 5th to translate it.

25           We actually received other --

```
 1          THE COURT:  Well, I don't question your
 2    efforts.  I am sure you looked into it.  But, you know,
 3    he is sitting here translating what I am saying, and he
 4    could do that for 20 pages in far less than two weeks,
 5    three weeks or a month.
 6          ATTORNEY MARSHALL:  Your Honor, even the --
 7    we did seek out people to give us an estimate of time in
 8    terms of direct translation, just oral translation with
 9    the client at the jail, and it was estimated that it
10    would take far longer than just 30 minutes because of
11    the dense legal writing that was involved in the brief.
12    It would have required -- our estimate that we got --
13    the quote we got was it would require two full days'
14    worth of translation to meet with our client in the
15    jail.
16          For that reason, we opted to go with the
17    paper route and --
18          THE COURT:  All right.
19          ATTORNEY MARSHALL:  -- we will have that by
20    July 5th.
21          We have spoken in general terms with --
22    about your Honor's findings with our client.
23          THE COURT:  All right.
24          Well, I am going to proceed now to set a
25    sentencing date.
```

```
 1              ATTORNEY MARSHALL:  Yes, your Honor.  We
 2    have advised our client accordingly as well.
 3              THE COURT:  Come to the podium, Mr. Kolsuz.
 4              THE DEFENDANT:  (Complies.)
 5         PROCEEDINGS RE:  SCHEDULING MATTERS
 6              THE COURT:  Mr. Kolsuz, the Court has found
 7    you guilty of --
 8              THE DEFENDANT:  Yes.
 9              THE COURT:  Oh, I'm sorry.  Can you keep it
10    down just a little, please?  In other words, I don't
11    need to hear the Turkish.
12              Well, I don't think I am going to be
13    successful.
14              All right.  Mr. Kolsuz, the Court has found
15    you guilty of the charges alleged in the indictment, and
16    I understand from your counsel that efforts -- that she
17    has discussed the findings in general with you, and that
18    the process of having the Court's written findings and
19    conclusions of law to be translated orally for you into
20    Turkish...
21              The Court will now -- having found you
22    guilty of all charges, the Court is now going to order
23    the preparation of a presentence investigation report.
24    This is a vitally important document, Mr. Kolsuz,
25    because it's the document on which the Court will
```

MICHAEL A. RODRIGUEZ, RPR/CM/RMR

1    chiefly rely in imposing an appropriate sentence.

2              So you should pay careful attention to the

3    preparation of this report; and, indeed, you have a role

4    to play in its preparation.  You will be asked by a

5    probation officer to provide information about your

6    family, your background, your education, your work

7    experience, your health and financial conditions, your

8    version of the offense conduct, your criminal history,

9    if any, and, indeed, anything that might be material to

10   the Court's sentencing decision.  And you may have your

11   counsel, Ms. Marshall, with you when you provide that

12   information to the probation officer.

13             When the report is completed, you will be

14   provided a copy and so will your counsel.  You'll have

15   an opportunity to have it translated orally for you into

16   Turkish.

17             And then, after consulting with your

18   attorney with the aid of an interpreter, you will have

19   an opportunity to call to the Court's attention any

20   corrections or objections you have to the facts,

21   conclusions or calculations contained in the report.

22             The government will also have an opportunity

23   to call to the Court's attention any objections or

24   corrections it has to the report.

25             If you dispute any of those asserted by the

1    government or the government disputes any objections or

2    corrections that you assert, then the Court will hold a

3    hearing and permit you to offer evidence, to

4    cross-examine evidence by the government, and then the

5    Court will issue findings before imposing sentence.

6          Now, at the time of sentencing, Mr. Kolsuz,

7    you'll have the right of allocution.  That means you

8    will have the right to address the Court and to say

9    anything at all you wish to the Court by way of

10   extenuation, mitigation or, indeed, anything you think

11   the Court should know before sentence is imposed.  You

12   won't be required to address the Court, but you will

13   have the opportunity to do so.

14          And, of course, Ms. Marshall will also have

15   the opportunity to address the Court on your behalf.

16          Now you may be seated.

17          THE DEFENDANT:  (Complies.)

18          THE COURT:  Ms. Marshall and Ms. Alpino, I

19   don't know -- haven't made any searching investigation

20   into what the guidelines are in this case.  How long has

21   he been in custody now?

22          ATTORNEY MARSHALL:  Your Honor, he has been

23   in custody, I believe, since February 3rd of 2016.

24          THE COURT:  All right.  So how many

25   months -- that's March, April, May, June.  So he has

1    already been in custody four to six months, then.

2              ATTORNEY MARSHALL:  That is correct.

3              THE COURT:  I don't know whether -- what the

4    guidelines are.  Do you?

5              ATTORNEY ALPINO:  It's 63 to 78 months, Your

6    Honor.

7              THE COURT:  How much?

8              ATTORNEY ALPINO:  63 to 78 months, your

9    Honor.

10             THE COURT:  What elevates them?

11             ATTORNEY ALPINO:  That's the base level,

12   your Honor.  That's the base offense level of 26, with a

13   criminal category of 1.

14             THE COURT:  I see.  So what statute is it

15   that takes the base offense level that high?

16             ATTORNEY ALPINO:  2778, your Honor, the Arms

17   Export Control Act.

18             THE COURT:  All right.  Well, I was

19   concerned, Ms. Marshall, that the guidelines might be

20   below that, and I didn't want the sentencing to go

21   beyond what the sentence might be.  But it seems to me

22   that that's not a serious risk.

23             So I am going to set the sentencing for the

24   7th of October at 9:00 a.m.

25             ATTORNEY MARSHALL:  Thank you, your Honor.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
1    We are available that date.

2              THE COURT:  Anything further to be

3    accomplished in this matter today?

4              I'll enter an order making clear that -- the

5    findings of guilty on the three -- the three charges.

6              Anything else on behalf of the government?

7              ATTORNEY ALPINO:  Nothing further, your

8    Honor.

9              THE COURT:  All right.  I thank counsel for

10   your cooperation.

11             (Court recessed in USA v Hamza Kolsuz.)

12

13                         ---

14

15

16

17

18

19

20

21

22

23

24

25
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1

2                              CERTIFICATE

3

4            I, MICHAEL a. RODRIQUEZ, an Official Court

5    Reporter for the United States District Court, in the

6    Eastern District of Virginia, Alexandria Division, do

7    hereby certify that I reported by machine shorthand, in

8    my official capacity, the proceedings had upon the bench

9    trial in the case of UNITED STATES OF AMERICA v. HAMZA

10   KOLSUZ.

11

12           I further certify that I was authorized and

13   did report by stenotype the proceedings in said bench

14   trial, and that the foregoing pages, numbered 1 to 15,

15   inclusive, constitute the official transcript of said

16   proceedings as taken from my machine shorthand notes.

17

18           IN WITNESS WHEREOF, I have hereto subscribed

19   my name this   12th   day of   December         , 2016.

20

21

22                          _____
                                       /s/
                            Michael a. Rodriquez, RPR/CM/RMR
23                             Official Court Reporter

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )    **Case No. 1:16-CR-53** |
| HAMZA KOLSUZ | ) |

## ORDER

This matter came before the Court for a nonjury trial in which the government charged defendant with (i) one count of conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, (ii) one count of attempting to export firearm parts without the requisite license, in violation of 22 U.S.C. § 2778, and (iii) one count of smuggling goods from the United States, in violation of 18 U.S.C. § 554.

During the course of the trial, the government elicited testimony from a number of witnesses and introduced a number of documents in support of the charged offenses. Following the government's presentation of evidence, defendant moved for judgment of acquittal pursuant to Rule 29, Fed. R. Crim. P., and that motion was denied from the bench on the ground that the government had presented ample evidence to support a finding beyond a reasonable doubt that defendant was guilty of the three counts charged in the indictment. Defendant was then advised that he was not required to present any evidence or to testify, as the government had the burden of proof, and defendant had no burden to prove his innocence. Nonetheless, defendant elected to testify and was cross-examined.

At the conclusion of the evidence, in order to give the parties an opportunity to review the transcript, which was prepared expeditiously, the parties were directed in lieu of closing arguments to file briefs setting forth proposed findings of facts and conclusions of law. Neither

1

party requested a statement of "the court's ... specific findings of fact in open court or in a written decision or opinion" pursuant to Rule 23(c), Fed. R. Crim. P. Nevertheless, the nature of the case and the substantial volume of testimony presented at trial warranted written findings of fact and conclusions of law. Thus, on June 23, 2016, written findings of fact and conclusions of law issued finding defendant guilty of all three counts charged in the indictment. *United States v. Kolsuz*, No. 1:16-CR-53 (E.D. Va. June 23, 2016) (Findings of Fact and Conclusions of Law) (Doc. 52).

Accordingly, based on the findings of fact and conclusion of law,

Defendant is **FOUND GUILTY** of (i) one count of conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, (ii) one count of attempting to export firearm parts without the requisite license, in violation of 22 U.S.C. § 2778, and (iii) one count of smuggling goods from the United States, in violation of 18 U.S.C. § 554.

It is hereby **ORDERED** that sentencing is **SCHEDULED** for 9:00 a.m., Friday, October 7, 2016.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, Virginia
July 1, 2016

T. S. Ellis, III
United States District Judge

2

AO 245B (Rev. 09/11)(VAED rev. 2) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

UNITED STATES OF AMERICA

v.

Case Number:    1:16-CR-0053-TSE-1

HAMZA KOLSUZ

Defendant.

USM Number:  89616-083

Defendant's Attorney:   Todd M. Richman, Esq.

## JUDGMENT IN A CRIMINAL CASE

The defendant was found guilty at a Bench trial on Counts 1 & 2 of the Indictment after a plea of not guilty.

Accordingly, the defendant is adjudicated guilty of the following counts involving the indicated offenses.

| Title and Section | Nature of Offense | Offense Class | Offense Ended | Count |
|---|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit an Offense Against the United States | Felony | February 2, 2016 | 1 |
| 22 U.S.C. §§ 2778(b) and (c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1 | Arms Export Control Act | Felony | February 2, 2016 | 2 |

On motion of the United States, the Court has dismissed the remaining count in the indictment (Count 3) as to defendant HAMZA KOLSUZ.

As pronounced on October 7, 2016, the defendant is sentenced as provided in pages 2 through 6 of this Judgment. The sentence is imposed pursuant to 18 U.S.C. § 3553 and the Sentencing Reform Act of 1984.

It is ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

Signed this 7th day of October, 2016.

/s/

T. S. Ellis, III
United States District Judge

J.A. 262

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case
Sheet 2 - Imprisonment

| Defendant's Name: | KOLSUZ, HAMZA |
|---|---|
| Case Number: | 1:16-CR-0053-TSE-1 |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of THIRTY (30) MONTHS. This term of imprisonment consists of a term of THIRTY (30) MONTHS on Count 1 and a term of THIRTY (30) MONTHS on Count 2, these terms to be served concurrently with one another.

The defendant is remanded to the custody of the United States Marshal pending an immigration detainer.

# RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to_____

at_____, with a certified copy of this Judgment.

_____
UNITED STATES MARSHAL

By      _____
DEPUTY UNITED STATES MARSHAL

J.A. 263

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case

Sheet 3 – Supervised Release

| | |
|---|---|
| **Defendant's Name:** | **KOLSUZ, HAMZA** |
| **Case Number:** | **1:16-CR-0053-TSE-1** |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a total term of THREE (3) YEARS. This term consists of a term of THREE (3) YEARS on Count 1 and a term of THREE (3) YEARS on Count 2, these terms to run concurrently with one another.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of Supervised Release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and periodic drug tests thereafter, as determined by the court.

The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or restitution obligation, it is a condition of Supervised Release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

## STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court set forth below:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance or any paraphernalia related to such substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer for a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case
Sheet 3A – Supervised Release

| | |
|---|---|
| **Defendant's Name:** | **KOLSUZ, HAMZA** |
| **Case Number:** | **1:16-CR-0053-TSE-1** |

# SPECIAL CONDITIONS OF SUPERVISION

While on Supervised Release pursuant to this Judgment, the defendant shall also comply with the following additional special conditions:

1) As a condition of supervised release, upon completion of the term of imprisonment, the defendant is to be surrendered to a duly-authorized immigration official of the Department of Homeland Security Bureau of Immigration and Customs Enforcement for deportation or removal proceedings in accordance with established procedures provided by the Immigration and Naturalization Act, 8 U.S.C. Section 1101, et seq. Defendant must cooperate with immigration officials in connection with any deportation or removal proceedings.

2) If, at any time, the defendant illegally reenters the United States during the term of supervised release, his illegal reentry will be a violation of supervised release, as well as a violation of law.

3) If ordered removed or deported, the defendant shall not re-enter the United States without the advance written permission of the Secretary of the Department of Homeland Security or the Attorney General.

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

| Defendant's Name: | KOLSUZ, HAMZA |
| Case Number: | 1:16-CR-0053-TSE-1 |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

| Count | Assessment | Fine | Restitution |
|---|---|---|---|
| 1 | $100.00 | $0.00 | $0.00 |
| 2 | $100.00 | $0.00 | $0.00 |
| **TOTALS:** | **$200.00** | **$0.00** | **$0.00** |

## FINES

No fines have been imposed in this case.

The Court does not impose any cost for prosecution, imprisonment, or supervised release.

## RESTITUTION

No restitution has been imposed in this case.

J.A. 266

AO 245B (Rev. 09/11) (VAED rev. 2) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

| | |
|---|---|
| **Defendant's Name:** | **KOLSUZ, HAMZA** |
| **Case Number:** | **1:16-CR-0053-TSE-1** |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

The special assessment shall be due in full immediately.

The defendant shall forfeit the defendant's interest in the following property to the United States:

   SEE Preliminary Order of Forfeiture entered by the Court on October 7, 2016.

The Court does not impose any cost for prosecution, imprisonment, or supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed. Payments shall be applied in the following order: (1) assessment (2) restitution principal (3) restitution interest (4) fine principal (5) fine interest (6) community restitution (7) penalties and (8) costs, including cost of prosecution and court costs.

Nothing in the court's order shall prohibit the collection of any judgment, fine, or special assessment by the United States.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Crim. No.  1:16-CR-53 (TSE) |
| | ) | |
| HAMZA KOLSUZ, | ) | |
| | ) | |
| Defendant. | ) | |

<u>NOTICE OF APPEAL</u>

The defendant in the above-styled case hereby notes his appeal to the United States Court of

Appeals for the Fourth Circuit from the Judgment in a Criminal Case signed by this Court on the 7th

day of October, 2016 and entered on the docket on the 18th day of October, 2016.

Respectfully submitted on this 21st day of October, 2016.

HAMZA KOLSUZ

By Counsel

_____/s/_____
Todd M. Richman
Virginia Bar No. 41834
Attorney for Mr. Kolsuz
Federal Public Defender
1650 King Street, Ste. 500
Alexandria, VA  22314
Phone: 703-600-0845
Fax: 703-600-0880
Todd_Richman@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of October, 2016, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Dennis Fitzpatrick
Assistant United States Attorney
Heather Alpino
Special Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314


                                    /s/
                          _____
                          Todd M. Richman
                          Virginia Bar No. 41834
                          Attorney for Mr. Kolsuz
                          Assistant Federal Public Defender
                          1650 King Street, Ste. 500
                          Alexandria, VA  22314
                          Phone: 703-600-0845
                          Fax: 703-600-0880
                          Todd_Richman@fd.org