No. 16-4687

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

PLAINTIFF/APPELLEE,

v.

HAMZA KOLSUZ,

DEFENDANT/APPELLANT.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION
THE HONORABLE T. S. ELLIS, III, U.S. DISTRICT JUDGE

ANSWERING BRIEF OF APPELLEE
UNITED STATES OF AMERICA

DANA BOENTE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF VIRGINIA

MARY B. MCCORD
ACTING ASSISTANT ATTORNEY
GENERAL FOR NATIONAL SECURITY

JEFFREY M. SMITH
HEATHER ALPINO
NATIONAL SECURITY DIVISION
U.S. DEPARTMENT OF JUSTICE
950 PENNSYLVANIA AVE, NW
ROOM 6500
WASHINGTON, DC 20530
TELEPHONE: (202) 532-0220

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION .................................................... 1

STATEMENT OF ISSUES PRESENTED ........................................... 1

STATEMENT OF THE CASE ............................................................ 1

   I.   The Arms Export Control Act ..................................................... 2

   II.  Factual Background ...................................................................... 4

        A.  Kolsuz's Conduct ............................................................. 4

        B.  The Border Search ........................................................... 7

   III.  Procedural Background ............................................................. 13

SUMMARY OF ARGUMENT ......................................................... 14

ARGUMENT ................................................................................... 16

   I.   The Search Was a Lawful Border Search .................................. 16

        A.  Standard of Review .......................................................... 16

        B.  The Border Search Doctrine ............................................. 16

        C.  The Government Conducted a Border Search
            of Kolsuz's Effects ......................................................... 19

        D.  A Border Search Does Not Require a Warrant
            or Probable Cause ........................................................... 26

        E.  Even if Reasonable Suspicion Was Required,
            It Was Clearly Present in this Case ................................. 32

        F.  The Cases Cited by Kolsuz Do Not Support
            His Argument .................................................................. 39

i

II.    Suppression Would Be Unwarranted in Any Event
       Because Law Enforcement Agents Acted in Good Faith.........................41

III.   The Convictions on Counts 2 and 3 Should Be Affirmed
       for the Additional Reason That, as the District Court's
       Findings Make Clear, the Challenged Evidence Was Not
       Necessary To Demonstrate Kolsuz's Guilt Beyond a
       Reasonable Doubt ......................................................................................42

CONCLUSION .......................................................................................................44

STATEMENT WITH RESPECT TO ORAL ARGUMENT ...........................45

CERTIFICATE OF COMPLIANCE...................................................................46

CERTIFICATE OF SERVICE.............................................................................47

# TABLE OF AUTHORITIES

## Cases

*Abidor v. Johnson,* 2016 WL 3102017 (E.D.N.Y. June 2, 2016) ............................ 30

*Abidor v. Napolitano,* 990 F. Supp. 2d 260 (E.D.N.Y. 2013) ................................ 32

*Almeida-Sanchez v. United States,* 413 U.S. 266 (1973) ................................ 14, 16, 28

*Arizona v. Fulminante,* 499 U.S. 279 (1991) ................................................ 42

*Ashwander v. TVA,* 297 U.S. 288 (1936) .................................................... 34

*Bradley v. United States,* 299 F.3d 197 (3d Cir. 2002) ................................ 17, 31

*California Bankers Ass'n v. Shultz,* 416 U.S. 21 (1974) ................................ 16

*Carroll v. United States,* 267 U.S. 132 (1925) .......................................... 17

*Chimel v. California,* 395 U.S. 752 (1969) ............................................... 28

*Davis v. United States,* 564 U.S. 229 (2011) ............................................ 41

*Defense Distributed v. U.S. Dep't of State,* 838 F.3d 451 (5th Cir. 2016)............ 19, 40

*Erickson v. Doe,* 2015 WL 4041316 (E.D. Mich. July 1, 2015)............................. 23

*Gonzales-Alonso v. United States,* 379 F.2d 347 (9th Cir. 1967)........................ 22

*Herring v. United States,* 555 U.S. 135 (2009) .......................................... 41

*House v. Napolitano,* 2012 WL 1038816 (D. Mass. Mar. 28, 2012) ........................ 21

*INS v. Delgado,* 466 U.S. 210 (1984) ..................................................... 36

*Pennsylvania Bd. of Prob. & Parole v. Scott,* 524 U.S. 357 (1998)...................... 41

*Riley v. California,* 134 S. Ct. 2473 (2014) ....................................... 28, 29, 30

*Terry v. Ohio,* 392 U.S. 1, 21 (1968) .................................................... 37

*United States v. Abbouchi,* 502 F.3d 850 (9th Cir. 2007) .................................... 23, 37

*United States v. Alfaro-Moncada,* 607 F.3d 720 (11th Cir. 2010) .............................32

*United States v. Arnold,* 533 F.3d 1003 (9th Cir. 2008)....................................... 27, 33

*United States v. Asbury,* 586 F.2d 973 (2d Cir. 1978)................................................31

*United States v. Bates,* 526 F.2d 966 (5th Cir. 1976)..................................................22

*United States v. Bilir,* 592 F.2d 735 (4th Cir. 1979) ..................................................21

*United States v. Bishop,* 740 F.3d 927 (4th Cir. 2014)................................................43

*United States v. Blue,* 2015 WL 1519159 (N.D. Ga. Apr. 1, 2015) ................. 22, 30

*United States v. Boumelhem,* 339 F.3d 414 (6th Cir. 2003)........................... 19, 20, 40

*United States v. Brown,* 499 F.2d 829 (7th Cir. 1974) ...............................................31

*United States v. Bunty,* 617 F. Supp. 2d 359 (E.D. Pa. 2008)....................................32

*United States v. Caballero,* 178 F. Supp. 3d 1008 (S.D. Cal. 2016) ................. 30, 36

*United States v. Calderon-Quinonez,* 382 F. App'x 540 (9th Cir. 2010) ...................22

*United States v. Cano,* 2016 WL 6920449 (S.D. Cal. Nov. 23, 2016) ....................30

*United States v. Cardona,* 769 F.2d 625 (9th Cir. 1985)...................................... 20, 40

*United States v. Carreon,* 872 F.2d 1436 (10th Cir. 1989) .........................................31

*United States v. Chappell,* 691 F.3d 388 (4th Cir. 2012) ...........................................34

*United States v. Charleus,* 871 F.2d 265 (2d Cir. 1989)............................................31

*United States v. Chaudhry,* 424 F.3d 1051 (9th Cir. 2005)........................................32

*United States v. Cortez,* 449 U.S. 411 (1981) ...........................................................39

*United States v. Cotterman,* 709 F.3d 952 (9th Cir. 2013)..........12, 21, 27, 32, 33, 38

*United States v. Craig,* 861 F.2d 818 (5th Cir. 1988) .................................................42

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) .........................2

*United States v. Djibo,* 151 F. Supp. 3d 297 (E.D.N.Y. 2015) .................................40

*United States v. Duncan,* 693 F.2d 971 (9th Cir. 1982)............................................23

*United States v. Feiten,* 2016 WL 894452 (E.D. Mich. Mar. 9, 2016) ....................30

*United States v. Flores-Montano*, 541 U.S. 149 (2004)...................... 14, 16, 18, 26, 31

*United States v. Gonzales*, 658 F. App'x 867 (9th Cir. 2016) ...................................29

*United States v. Graham*, 824 F.3d 421 (4th Cir. 2016)........................................ 29, 34

*United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006) ........................................ 37, 39

*United States v. Hassanshahi*, 75 F. Supp. 3d 101 (D.D.C. 2014) .................... 21, 35

*United States v. Hensley,* 469 U.S. 221 (1985) .........................................................39

*United States v. Hernandez*, 2016 WL 471943 (S.D. Cal. Feb. 8, 2016) .................30

*United States v. Himmelwright*, 551 F.2d 991 (5th Cir. 1977) ...................................31

*United States v. Humphries*, 308 F. App'x 892 (6th Cir. 2009) ................................23

*United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005) .........................................passim

*United States v. Jackson*, 728 F.3d 367 (4th Cir. 2013) ............................................16

*United States v. Johnson*, 400 F.3d 187 (4th Cir. 2005) ............................................42

*United States v. Jones*, 584 F.3d 1083 (D.C. Cir. 2009)...........................................36

*United States v. Kelly*, 302 F.3d 291 (5th Cir. 2002) ................................................31

*United States v. Kim*, 103 F. Supp. 3d 32 (D.D.C. 2015)................................... 39, 40

*United States v. Kimbrough*, 477 F.3d 144 (4th Cir. 2007) .......................................16

*United States v. Leininger,* 2016 WL 6476310 (S.D. Cal. Nov. 2, 2016) ................37

*United States v. Levy,* 803 F.3d 120 (2d Cir. 2015) ....................................................37

*United States v. Linarez-Delgado,* 259 F. App'x 506 (3d Cir. 2007)...................27, 32

*United States v. Lopez,* 2016 WL 7370030 (S.D. Cal. Dec. 20, 2016).............. 30, 33

*United States v. McMurray,* 747 F.2d 1417 (11th Cir. 1984)....................................31

*United States v. Mendez,* 2017 WL 928460 (D. Ariz. Mar. 9, 2017) ................ 24, 30

*United States v. Molina-Gomez,* 781 F.3d 13 (1st Cir. 2015) ....................................34

*United States v. Molina-Isidoro,* __ F. Supp. 3d __,
2016 WL 8138926 (W.D. Tex. Oct. 7, 2016) .................................................. 30, 35

*United States v. Montoya de Hernandez,* 473 U.S. 531 (1985) ........... 17, 18, 24, 26, 31

*United States v. Oriakhi,* 57 F.3d 1290 (4th Cir. 1995) .....................................passim

*United States v. Pickett,* 598 F.3d 231 (5th Cir. 2010) ..............................................32

*United States v. Poole,* 640 F.3d 114 (4th Cir. 2011) .................................................42

*United States v. Ramos,* 190 F. Supp. 3d 992 (S.D. Cal. 2016)....................24, 25, 30

*United States v. Ramsey,* 431 U.S. 606 (1972) .................................................16, 26, 28

*United States v. Rivas,* 157 F.3d 364 (5th Cir. 1998) .................................................31

*United States v. Robles,* 45 F.3d 1 (1st Cir. 1995) .............................................. 26, 31

*United States v. Rodriguez,* 592 F.2d 553 (9th Cir. 1979)...........................................31

*United States v. Saboonchi,* 990 F. Supp. 2d 536 (D. Md. 2014).............................21

*United States v. Saboonchi,* 48 F. Supp. 3d 815 (D. Md. 2014) ........................ 29, 30

*United States v. Seljan,* 547 F.3d 993 (9th Cir. 2008).................................................31

vi

*United States v. Sokolow*, 490 U.S. 1 (1989) ................................................................ 36

*United States v. Stewart*, 729 F.3d 517 (6th Cir. 2013) ........................................ 20, 32

*United States v. Thirty-Seven Photographs*, 402 U.S. 363 (1971) ................................. 18

*United States v. Vega-Barvo*, 729 F.2d 1341 (11th Cir. 1984) ................................. 31

*United States v. Whitted*, 541 F.3d 480 (3d Cir. 2008) .............................................. 32

*United States v. Yang*, 286 F.3d 940 (7th Cir. 2002) ................................................ 17

*United States v. Young*, 2013 WL 885288 (W.D.N.Y. Jan. 16, 2013) ..................... 22

*United States v. Young*, 2013 WL 885170 (W.D.N.Y. Mar. 8, 2013) ..................... 22

*United States v. Zayyad*, 741 F.3d 452 (4th Cir. 2014) ............................................ 43

## Statutes

18 U.S.C. § 371 ....................................................................................................... 1, 42

18 U.S.C. § 554 ....................................................................................................... 2, 42

18 U.S.C. § 3231 .......................................................................................................... 1

22 U.S.C. § 2778 ........................................................................................... 2, 3, 4, 42

28 U.S.C. § 1291 .......................................................................................................... 1

Act of July 31, 1789, ch. 5, 1 Stat. 29 ..................................................................... 18

## Other Authorities

22 C.F.R. §§ 120-130 ............................................................................................ 2, 3, 4

5 Wayne R. LaFave, Search & Seizure § 10.5(a) (5th ed. 2012) ........................... 18

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

1.     Whether the arrest of a foreign national seeking to depart the United States with export-controlled weapons parts abrogates the government's authority to complete an ongoing border search.

2.     Whether a border search may include a technology-assisted review of a cell phone when the government has reasonable suspicion that the phone contains evidence relating to an ongoing conspiracy to unlawfully export weapons parts.

3.     Whether good faith reliance on binding appellate precedent precludes suppression of the evidence from the search of the cell phone in this case.

4.     Whether any asserted error was harmless beyond a reasonable doubt with regard to Counts 2 and 3, where the district court's findings of fact and conclusions of law make clear that the challenged evidence was unnecessary to the finding of guilt.

## STATEMENT OF THE CASE

On March 2, 2016, a grand jury in the Eastern District of Virginia returned a three-count indictment against Hamza Kolsuz charging him with (1) conspiring, in violation of 18 U.S.C. § 371, to violate the Arms Export Control Act, 22 U.S.C.

1

§§ 2778(b)(2) and (c) and 22 C.F.R. §§ 121.1, 123.1, and 127.1, and 18 U.S.C. § 554(a); (2) willfully attempting to export from the United States to the Republic of Turkey handgun barrels, handgun magazines, and a Glock caliber conversion kit, all of which were and are designated as defense articles, without first having obtained a license or written approval, in violation of the Arms Export Control Act; and (3) smuggling goods from the United States, in violation of 18 U.S.C. § 554(a). JA14–18. After a bench trial, the district court found Kolsuz guilty of all three counts. JA11. At a sentencing hearing on October 7, 2016, the district court merged Counts 2 and 3 and sentenced Kolsuz to two concurrent sentences of thirty months' imprisonment, followed by three years of supervised release. JA262–64.

## I.    The Arms Export Control Act

Throughout our nation's history, Congress and the President have controlled and regulated the export of weapons and the trade of goods and services with designated foreign nations and foreign nationals in order to protect national security and to further national foreign policy interests. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 322–24 (1936) (summarizing the extensive use throughout the nation's history of embargoes and export controls). Currently, several federal statutes impose limitations and licensing requirements on the export or transfer of goods, technology, and services from the United States and within the United States to a foreign national.

2

One of these statutes, the Arms Export Control Act, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States," to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The Act authorizes the President to, among other things, designate items as defense articles and defense services by placing them on the "United States Munitions List." *Id.* With certain exceptions not relevant here, "no defense articles or defense services . . . may be exported or imported without a license for such export or import." 22 U.S.C. § 2778(b)(2). "Decisions on issuing export licenses . . . shall take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements." 22 U.S.C. § 2778(a)(2).

To implement the Act, the Department of State has promulgated the International Traffic in Arms Regulations. 22 C.F.R. §§ 120-130; *see also* Exec. Order No. 13,637. These regulations set forth the U.S. Munitions List that defines defense articles and defense services. 22 C.F.R. §§ 120.2, 121.1. The U.S. Munitions List sets forth twenty-one categories of defense articles, ranging from firearms parts to military equipment to missiles, that are subject to export licensing controls. 22 C.F.R. § 121.1.

3

The State Department's Directorate of Defense Trade Controls administers the International Traffic in Arms Regulations and regulates the export of defense articles. Pursuant to the regulations, exporting, or attempting to export, a defense article from the United States without a license or written approval is unlawful. 22 C.F.R. § 127.1(a)(1). The Arms Export Control Act establishes criminal penalties for any willful violation of the Act or the implementing regulations. 22 U.S.C. § 2778(c).

## II.     Factual Background

### A.     Kolsuz's Conduct

On December 2, 2012, Kolsuz, a Turkish national, accompanied by brothers Bayram and Saffet "Rocco" Bulut, checked in at John F. Kennedy ("JFK") International Airport in New York for a flight to Istanbul via Amsterdam. JA217. Agents searched Kolsuz's luggage and found 163 firearms parts. *Id.* During a subsequent interview of the three men by a U.S. Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") special agent, Kolsuz explained, among other things, that he had purchased the firearms parts from the Bulut brothers to resell in Turkey. JA218. The HSI special agent then gave Kolsuz and the Bulut brothers a comprehensive presentation regarding the licensing requirements for exporting firearms parts. JA218. During this presentation, the special agent informed the three individuals that the vast majority of all firearms parts are listed on the U.S. Munitions List; the firearms parts in Kolsuz's checked luggage were likely listed on that list; and any attempt to export items listed on the list without

4

the requisite license could result in criminal charges and imprisonment. JA219. At the conclusion of the presentation, U.S. Customs and Border Protection ("CBP") officers detained the firearms parts for a licensing determination. JA219, 228. Agents ultimately determined that the firearms parts were listed on the U.S. Munitions List and that Kolsuz did not have an export license for them. JA219, 228. The firearms parts were seized and never returned to Kolsuz. JA219, 221, 228. Neither Kolsuz nor either of the Bulut brothers was arrested. Although the HSI special agent provided Kolsuz with his business card, Kolsuz took no subsequent steps to ascertain the status of the firearms parts. JA219, 230.

Twelve days later, Kolsuz and Bayram Bulut entered a gun store in Long Island, New York and attempted to purchase a large quantity of firearms and firearms parts to be shipped to Turkey. JA220. Early the next month, on January 8, 2013, Kolsuz checked in at JFK Airport for a flight to Istanbul via Paris. JA220. Although he again had taken no steps to obtain a license, Kolsuz checked luggage containing four firearms parts. JA220–21. As with the December 2, 2012 stop at JFK Airport, these firearms parts were identified in a search of Kolsuz's luggage, detained for a licensing determination, found to be listed on the U.S. Munitions List, and never returned to Kolsuz. JA221. Again, Kolsuz was not arrested.

On March 15, 2014, Rocco Bulut checked in for a flight from Newark Liberty International Airport to Istanbul, via Frankfurt, with luggage containing dozens of

firearms parts listed on the U.S. Munitions List.  JA221–22.  Kolsuz subsequently

learned that CBP officers seized these firearms parts from Rocco Bulut.  JA222.

From October 2015 until on or about January 26, 2016, Kolsuz and Bayram

Bulut communicated via Kik and iChat internet messaging services regarding: (1) the

purchase and pricing of firearms parts, (2) payment for those parts, (3) Kolsuz and

Bayram's current inventory of parts, (4) steps to avoid detection from law

enforcement and customs officials, and (5) plans to meet in the United States so that

Kolsuz could purchase firearms parts and export those parts to Turkey.  JA223.

On January 25, 2016, Kolsuz traveled from Istanbul to Miami, entering the

United States on a B-2 non-resident visa (*i.e.*, a tourist visa).  JA224.  While in Florida,

Kolsuz and Bayram Bulut went to a gun store and purchased ten Glock magazines.

JA224–25.  Prior to Kolsuz's arrival in the United States, Bayram had already

purchased ten Glock barrels, and he had sent Kolsuz photographs of those barrels.

JA224.

On February 2, 2016, Kolsuz began his return trip to Istanbul by checking in

for a flight from Miami International Airport to Cleveland Hopkins International

Airport.  JA225.  Once in Cleveland, Kolsuz checked in for a flight to Istanbul,

through Washington Dulles International Airport.  *Id.*  Kolsuz and Bayram specifically

planned for Kolsuz to check his luggage for his international flight in Cleveland rather

than Miami because they believed this would decrease the likelihood of their illegal

6

activities being detected. *Id.* While Kolsuz was waiting to board, Bayram instructed Kolsuz via iChat on how to avoid detection by law enforcement, and Kolsuz provided Bayram with updates regarding his circuitous journey to Turkey and whether the firearms parts had been detected by law enforcement. *Id.*

After he arrived at Dulles International Airport, Kolsuz attempted to board his flight to Istanbul, Turkey, with luggage containing twenty-seven handgun magazines (including the types that he and Bayram Bulut had purchased in Florida), eighteen handgun barrels (including the types that Bayram Bulut had purchased prior to Kolsuz's arrival in the United States), and one handgun caliber conversion kit. JA224–26. All of these firearms parts are defense articles listed on the U.S. Munitions List, and they therefore could not lawfully be exported without a license or other written approval from the State Department's Directorate of Defense Trade Controls. JA227. Kolsuz has never, at any time, registered, or applied to register, with the Directorate of Defense Trade Controls to export defense articles, nor has he ever applied for or received any licenses or other written approval from the Directorate to export defense articles. JA228. The same is true of both Bayram and Rocco Bulut. *Id.*

## B.     The Border Search

On February 1, 2016, the day before Kolsuz arrived at Dulles International Airport planning to board a flight to Turkey, HSI Special Agent Charles Reich called

CBP Supervisory Officer Mike Augustino, who was on duty at Dulles. JA86. Special Agent Reich informed Supervisory Officer Augustino that Kolsuz had been stopped at JFK Airport attempting to export items on the U.S. Munitions List from the United States to Turkey without a license, in violation of the Arms Export Control Act, and that Kolsuz was scheduled to take a flight from Dulles to Istanbul, Turkey the next day, February 2, 2016. JA86-87. Reich explained that he wanted Kolsuz's checked bags to be searched to determine whether they contained firearms parts. *Id.* Reich thereafter called the HSI agent on duty at Dulles, Special Agent Jay Culley, and told him the same. JA87.

Reich followed up on the phone calls by sending an email to Augustino and Culley. JA99-100. The email included Kolsuz's name, date of birth, and country of citizenship (Turkey), as well as Kolsuz's flight itineraries and the summary that had been written by the CBP officer who interviewed Kolsuz during the secondary inspection when he entered the United States on January 25, 2016. JA99. The email also explained that Kolsuz had been stopped at JFK on January 8, 2013 with firearms parts and requested that Augustino and Culley examine Kolsuz's checked bags for firearms parts. JA87, 99. Reich also requested that they ask Kolsuz certain questions, including: (1) "who he met in Florida;" (2) "did he get money from anyone (believe he met guy from [New York] on probation for gun related offenses who traveled there last week);" (3) "did he attend gun show in Ohio (there was one this past weekend);"

8

(4) "did he purchase anything firearms related;" (5) "[d]id he ship any parts out;" and (6) "did he go with anyone to Ohio." JA99–100. Augustino forwarded Reich's email to CBP's Tactical Terrorist Response and Counterterrorism Response Teams at Dulles, asking them to "note the questions provided" and to coordinate with Turkish Airlines to obtain access to Kolsuz's checked luggage. JA88, 98-99.

CBP Supervisory Officer Lauren Colgan and CBP Officer Jonathan Budd, both members of the Tactical Terrorist Response Team, received and reviewed Reich's email. JA88. Colgan also accessed and reviewed the CBP seizure report related to the January 8, 2013 seizure of firearms parts from Kolsuz. JA88. That report also referenced the December 2, 2012 seizure of firearms parts that Kolsuz had attempted to transport from the United States to Turkey without an export license. JA88–89. Colgan also reviewed records from the Department of Homeland Security's TECS database[1] memorializing the December 2, 2012 and January 8, 2013 stops of Kolsuz at JFK Airport. JA89.

After Kolsuz and his checked luggage arrived at Dulles on February 2, 2016, Colgan and Budd coordinated with Turkish Airlines and United Airlines to get access to Kolsuz's two checked bags. JA89. Colgan and Budd initiated an outbound

---

[1] TECS is a law enforcement database that contains temporary and permanent enforcement, inspection, and intelligence records relevant to the anti-terrorism and law enforcement missions of CBP and other federal agencies. *See* 73 Fed. Reg. 77778 (Dec. 19, 2008).

customs examination of the luggage that resulted in the discovery of various firearms parts that cannot lawfully be exported from the United States without a license. JA89–90. Specifically, the inspection revealed eighteen handgun barrels, twenty-two 9mm handgun magazines, four .45 caliber handgun magazines, and one .22 caliber Glock caliber conversion kit. JA90.[2] Based on their training and experience, Colgan and Budd immediately knew that the barrels and the caliber conversion kit are listed on the U.S. Munitions List and could not lawfully be exported from the United States without a license. *Id.*[3]

HSI Special Agent Culley arrived at Dulles as Colgan and Budd were reviewing the contents of Kolsuz's checked bags. *Id.* Culley had previously reviewed Reich's email, was aware of the two previous stops of Kolsuz as a result of his conversation with Reich, and had reviewed TECS records documenting the two earlier stops. *Id.* After the firearms parts were found in Kolsuz's checked luggage, the officers conducted an outbound customs inspection of Kolsuz on the jetway as he attempted to board his flight to Istanbul. JA90. After he was asked whether he had anything to declare, Kolsuz admitted that there were barrels and/or magazines in his checked

---

[2] Kolsuz's luggage also contained one .357 caliber handgun magazine, another item that is on the U.S. Munitions List, but it is unclear whether the CBP officers were aware of it at the time they approached Kolsuz. JA90.

[3] Colgan also believed (correctly) that the magazines were on the U.S. Munitions List, but she did not officially seize them until after she confirmed this by reviewing a State Department memorandum. JA90.

luggage. JA90. Kolsuz stated that he initially flew from Turkey to Miami and then travelled to Ohio. JA91. He claimed that he had attended a gun show in Ohio where he made cash purchases for the items found in his checked luggage. JA91. When agents asked Kolsuz whether he had any licenses to export any of the items found in his checked luggage, he responded that he neither had nor needed a license to lawfully export the items from the United States. JA91. Kolsuz further claimed that the items in his luggage were solely for personal use, and that he had no intention of selling them in Turkey or in any other country. *Id.*

The agents brought Kolsuz, who was not then under arrest, to the CBP secondary inspection area where Supervisory Officer Colgan manually reviewed Kolsuz's iPhone, which was not password-protected, viewing his most recent text messages and a call log listing his most recent calls. JA92. She also queried the Automated Export System, a government database, to ascertain whether Kolsuz had ever filed an export license with CBP at the time of any export, and whether Kolsuz was listed as a license registrant with the Directorate of Defense Trade Controls. JA92. This query revealed no records associated with Kolsuz. *Id.*

HSI Special Agent Adam Coppolo then read Kolsuz his *Miranda* rights. JA92. Kolsuz waived his right to remain silent and stated, among other things, that he entered the United States with the intention of sightseeing in Florida with Bayram Bulut, he was in possession of $9,000.00 when he entered the United States, and he

11

had visited numerous gun shops, pawn shops, and a gun show while he was in

Florida. JA92–93. Kolsuz stated that he had personally purchased the firearms parts

in his luggage at the gun show. JA93. After the conclusion of the interview, early in

the morning on February 3, 2016, Coppolo took custody of the iPhone, and the

agents arrested Kolsuz. JA93.

Coppolo transported Kolsuz's iPhone to HSI's office in Sterling, Virginia.

JA93. Coppolo provided the phone to an HSI computer forensic agent. *Id.* The

phone was already in "airplane mode" when the forensic agent received it—meaning

it was set so that it could not connect to the cloud, the internet, or another device—

and the agent did not change this setting. JA93. The forensic agent connected the

phone to a Cellebrite Physical Analyzer and conducted a logical file system extraction

of the phone. *Id.* This process extracts only the device's file system and accesses only

the phone's allocated space, *id.*, meaning the area in the device's memory that stores

data in an organized manner and contains the operating system and user data.[4] The

extraction was completed by March 3, 2016. JA94. Once the extraction was

complete, the Cellebrite Physical Analyzer generated a report that was subsequently

---

[4] The review thus did not search unallocated space, which the Ninth Circuit has explained "is space on a hard drive that contains deleted data, usually emptied from the operating system's trash or recycle folder, that cannot be seen or accessed by the user without the use of forensic software." *United States v. Cotterman*, 709 F.3d 952, 958 n.5 (9th Cir. 2013) (en banc) (quotation marks omitted). Allocated space includes undeleted files as well as device backup files, which are created based on the phone's user settings to protect against data loss.

12

provided to Coppolo for review. *Id.* The report included Kolsuz's contact lists, emails, messenger conversations (including Kik, iChat, and WhatsApp conversations), photographs, and videos. *Id.*

## III. Procedural Background

On March 30, 2016, Kolsuz filed a motion to suppress evidence from his phone, arguing that the search violated the Fourth Amendment. JA5. After a hearing, the district court denied the motion, finding that the review of the phone's contents was part of a lawful border search. JA199-201. The district court held that "the fact of arrest [during an ongoing border search] does not abrogate the government's authority to complete a border search." JA199. The district court found that the portion of the search in which an agent manually reviewed information on Kolsuz's phone was "a routine border search that did not require any level of individualized suspicion," and the technology-assisted Cellebrite review was a "nonroutine border search" that could be justified by reasonable suspicion. JA201-14. The court found that the government easily met this standard. JA214.

On June 23, 2016, after a bench trial, the district court issued written findings of fact and conclusions of law, finding that Kolsuz was guilty beyond a reasonable doubt of each of the three charges against him. JA244. The district court concluded that the government proved beyond a reasonable doubt that Kolsuz acted willfully based on two alternative theories, each of which was sufficient on its own. JA235-43.

13

Under one theory, the court found that Kolsuz knew that his conduct was unlawful based in part on evidence that had been obtained from the search of Kolsuz's phone, namely iChat and Kik messages between Kolsuz and Bayram Bulut. JA236-38. Under the alternative theory, the court found that Kolsuz acted with at least willful blindness toward the legality of his conduct (which is sufficient to establish willfulness). JA243. Under this second theory, the court found that it was "unnecessary to rely on [Kolsuz's] and Bayram Bulut's iChat and Kik conversations" – the only trial evidence that resulted from the technology-assisted Cellebrite review of Kolsuz's phone – because ample other evidence established that Kolsuz acted with at least willful blindness. *Id.*

## SUMMARY OF ARGUMENT

When Kolsuz "approache[d] the border" in an effort to leave the United States,[5] he subjected himself and the property he carried with him to a search that was "'reasonable simply by virtue of the fact that [it] occur[red] at the border.'" *United States v. Ickes*, 393 F.3d 501, 505 & n.1 (4th Cir. 2005) (quoting *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004)). Border searches are "exempt[]" from both the probable cause and warrant requirements that pertain to most searches conducted in the interior because of "fundamental principles of national sovereignty, which apply

---

[5] An international airport such as Dulles is the "functional equivalent of a border" for purposes of the border-search doctrine. *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973).

14

equally to exit and entry searches." *United States v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995).

When agents found the weapons parts that Kolsuz was attempting to export illegally in his luggage, they had probable cause to arrest him. That arrest did not terminate the border search authority. *See Ickes*, 393 F.3d at 503. Particularly given the "important national security interests [that were] at stake" from an ongoing conspiracy to unlawfully export weapons parts, agents were fully justified in reviewing the information on Kolsuz's phone, which included his recent communications with his coconspirator. *Id.* at 505. Even assuming *arguendo* that such a search required reasonable suspicion, the district court correctly found that the government easily met (and exceeded) that standard. JA214.

The district court was thus correct to deny suppression of the evidence found on the phone because the search was legal. This Court could also affirm the denial of the suppression motion on the alternative basis that the agents acted in good faith based on binding Supreme Court and Fourth Circuit precedent. Finally, this Court could affirm the convictions on Counts 2 and 3 on the alternative basis that admission of the evidence obtained from the phone was harmless beyond a reasonable doubt in light of other evidence that the judge expressly found was sufficient to establish Kolsuz's willfulness, as made clear in the district court's findings of fact and conclusions of law.

15

# ARGUMENT

## I.    The Search Was a Lawful Border Search

### A.    Standard of Review

In evaluating an appeal regarding the suppression of evidence, this Court reviews the district court's factual findings for clear error and its legal conclusions de novo.  *United States v. Jackson*, 728 F.3d 367, 372-73 (4th Cir. 2013).  Because the district court denied the suppression motion, this Court views the relevant facts in the light most favorable to the government.  *United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007).

### B.    The Border Search Doctrine

As old as the Republic itself, the Fourth Amendment border search doctrine is an aspect of national sovereignty and a vital tool for the protection of national security and the prevention of transborder crime.  Pursuant to the doctrine, "those entering and leaving the country may be examined as to their belongings and effects . . . without violating the Fourth Amendment."  *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 63 (1974).  Border searches "are reasonable simply by virtue of the fact that they occur at the border."  *United States v. Ramsey*, 431 U.S. 606, 616 (1972).

The right to control who and what crosses national borders is "an incident of every independent nation.  It is part of its independence."  *Almeida-Sanchez v. United States*, 413 U.S. 266, 291 (1973); *accord United States v. Flores-Montano*, 541 U.S. 149, 153

(2004) ("It is axiomatic that the United States as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."). As this Court has explained, "inherent in national sovereignty are the overarching rights of a nation to defend itself from outside threats, to act in relation to other nations, and to secure its territory and assets." *United States v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995). The ability to conduct warrantless searches of people and property entering or leaving the United States serves the need for "national self-protection." *Carroll v. United States*, 267 U.S. 132, 154 (1925).

Never has this principle been more important than it is today. Courts have recognized that "it is beyond peradventure" that "'the events of September 11, 2001, only emphasize the heightened need to conduct searches' at our borders." *Bradley v. United States*, 299 F.3d 197, 202 (3d Cir. 2002) (quoting *United States v. Yang*, 286 F.3d 940, 944 n.1 (7th Cir. 2002)). And this "realization that important national security interests are at stake has resulted in courts giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officials." *United States v. Ickes*, 393 F.3d 501, 505 (4th Cir. 2005) (internal quotation marks omitted).

In addition to protecting sovereignty and national security, the border search doctrine has long been essential to combatting transnational crime. *E.g.*, *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) (finding that the "longstanding

17

concern for the protection of the integrity of the border" is "heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics"); Act of July 31, 1789, ch. 5, 1 Stat. 29, 42-43 (provision of customs statute enacted by first Congress that permitted warrantless searches to assist "the collection of the duties imposed by law on the tonnage of ships or vessels").

This "greater interest on the side of the government at the border is coupled with a lesser interest on the side" of the traveler. *Ickes*, 393 F.3d at 506. When a person approaches an international border, he should "not be surprised" that his effects are subject to search. *Id.* (citing *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971) (plurality opinion)); *accord* 5 Wayne R. LaFave, Search & Seizure § 10.5(a), at 232 (5th ed. 2012) ("[S]ince the individual crossing a border is on notice that certain types of searches are likely to be made, his privacy is less invaded by those searches.") (internal quotation marks omitted). "The individual traveler determines the time and place of the search by his own actions, and he thus has ample opportunity to diminish the impact of that search by limiting the nature and character of the effects which he brings with him." LaFave, *supra*, § 10.5(a), at 232.

Thus, at the border, the balance of interests is both "qualitatively different" and "struck much more favorably" to the government than in the interior. *Montoya de Hernandez*, 473 U.S. at 538, 540, 544; *accord Flores-Montano*, 541 U.S. at 152. Whatever

the rules that apply to other types of searches, "our law is clear that searches at the border are a different matter altogether." *Ickes*, 393 F.3d at 503.

## C. The Government Conducted a Border Search of Kolsuz's Effects

The border search conducted in this case is a quintessential example of the doctrine's importance to national sovereignty, national security, and the prevention of transnational crime. Kolsuz, a foreign national, was admitted to the United States on a temporary, non-resident, tourist visa. He used this privilege to participate in a conspiracy to unlawfully export weapons parts from the United States to Turkey. The border search in this case played a crucial role in uncovering both the weapons parts that Kolsuz sought to take to Turkey and the associated communications between Kolsuz and his coconspirator that were found on Kolsuz's phone.

The export of weapons parts in violation of the Arms Export Control Act directly implicates both "the public's keen interest in restricting the export of defense articles" and "the government's exceptionally strong interest in national defense and national security." *Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 458-59 (5th Cir. 2016) (internal quotation marks omitted); *accord United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003) ("The United States's interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself."). The review of Kolsuz's phone was conducted to uncover additional information about the ongoing, illegal export of weapons—including information

19

about any additional weapons part shipments either by freight or in the custody of a coconspirator—a purpose that fits within the core of the rationale underlying the border search doctrine.

That this search took place when Kolsuz was seeking to leave rather than enter the United States is of no moment. As this Court has held: "The rationale for exempting border searches from the Fourth Amendment's probable cause and warrant requirements rests on fundamental principles of national sovereignty, which apply *equally* to exit and entry searches." *Oriakhi*, 57 F.3d at 1296 (emphasis added). Specifically, these principles "apply to the sovereign interest of protecting and monitoring exports from the country." *Id.* at 1297; *accord United States v. Cardona*, 769 F.2d 625, 629 (9th Cir. 1985) ("The fact that this case involves an exit search does not alter our analysis."). Indeed, it would not make sense to find that travelers exiting the country have a greater reasonable expectation of privacy than those entering, as "the departure from the United States is almost invariably followed by an entry into another country which will likely conduct its own border search." *Oriakhi*, 57 F.3d at 1302 (Phillips, S.J., specially concurring); *accord Boumelhem*, 339 F.3d at 423. And the government's interest in departing passengers and property is comparable to its interest in those entering, as demonstrated by the crimes in this case.

Nor does it matter that the phone that was detained at the border was, in part, searched at a different location. *See, e.g.*, *United States v. Stewart*, 729 F.3d 517, 526 (6th

Cir. 2013) (detention of computer at border followed by review at a secondary

location twenty miles away was a valid border search); *United States v. Cotterman*, 709

F.3d 952, 962 (9th Cir. 2013) (detention of computer at border followed by forensic

examination at a site 170 miles away was a border search);[6] *United States v. Hassanshahi*,

75 F. Supp. 3d 101 (D.D.C. 2014) (lawful border search where computer was detained

at Los Angeles International Airport and searched in Virginia); *United States v.*

*Saboonchi*, 990 F. Supp. 2d 536, 548-49, 561 (D. Md. 2014) (lawful border search where

cell phones were detained at border crossing near Buffalo, shipped, imaged, and

returned to defendant in Baltimore; border search can be conducted "over the course

of several days, weeks, or months"); *House v. Napolitano*, 2012 WL 1038816 (D. Mass.

Mar. 28, 2012) (border search doctrine applied where computer and other devices

were seized at Chicago O'Hare International Airport, held for seven weeks, and

returned via mail from New York). Kolsuz concedes as much. Appellant's Br. 17

(stating that the district court's conclusion "that the location and timing of the iPhone

---

[6] As *Cotterman* explains, an offsite examination does not transform a search into
an extended border search. *See Cotterman*, 709 F.3d at 961-62. Even if it did, however,
it would make no difference to the outcome of this case. Extended border searches
are justified by reasonable suspicion, *United States v. Bilir*, 592 F.2d 735 (4th Cir. 1979),
which was present in this case, *see infra* Part I.E.

search did 'not alter the conclusion that the search of defendant's iPhone was a border search' . . . is not in dispute") (quoting JA200).

Finally, the fact that Kolsuz was arrested did not terminate the border search authority. Indeed, as the district court observed, JA199-200, this is precisely what occurred in *Ickes*, where the defendant was arrested prior to the computer search that uncovered child pornography. *See* 393 F.3d at 503. *See also United States v. Calderon-Quinonez*, 382 F. App'x 540, 541 (9th Cir. 2010) (seizure conducted after arrest was "proper . . . border search"); *United States v. Bates*, 526 F.2d 966, 967-68 (5th Cir. 1976) (search of vehicle after defendant was arrested was a lawful border search); *Gonzales-Alonso v. United States*, 379 F.2d 347, 349 (9th Cir. 1967) (second, more thorough search of defendant at secondary location away from the border conducted after defendant was arrested was a lawful border search); *United States v. Blue*, 2015 WL 1519159, at *2 (N.D. Ga. Apr. 1, 2015) (review of information on defendant's cell phone after he was arrested fell "within the well-established parameters of a border search requiring no warrant"); *United States v. Young*, 2013 WL 885288, at *1-2 (W.D.N.Y. Jan. 16, 2013), *adopted by* 2013 WL 885170 (W.D.N.Y. Mar. 8, 2013) ("review of the contents of defendant's cellular telephones" conducted after he was arrested "was a permissible border search").

Kolsuz cannot contest the clear holdings of this Court and others that (1) the border search doctrine applies to outbound searches, (2) a border search of property

22

detained at the border may be undertaken at a separate location, and (3) a border search is not terminated by an arrest. Rather, he contends that because the search in this case was an exit search *and* he was arrested, he should win the suppression that eluded the defendants in *Oriakhi* and *Ickes*. His argument misunderstands the border search doctrine.

The border search doctrine is triggered "[w]hen someone approaches a border," and it is justified by the government's heightened interest in controlling the transborder flow of people and articles and protecting national security, weighed against the "substantially lessened" expectation of privacy that attends to persons at the border. *Ickes*, 393 F.3d at 506; *accord United States v. Abbouchi*, 502 F.3d 850, 855 (9th Cir. 2007) (border search authority applies where traveler has "manifested a definite commitment to leave the United States") (quoting *United States v. Duncan*, 693 F.2d 971 (9th Cir. 1982)) (alteration omitted). Thus, in *Duncan*, the Ninth Circuit upheld a border search that continued after agents found undeclared currency on the defendant's person, detained the defendant, told him that he could not get on his flight, and retrieved his luggage from the flight. 693 F.2d at 973-74, 977-78. And, in *United States v. Humphries*, the Sixth Circuit held that a lawful border search occurred even though the defendant, who had arrived at the U.S.-Canadian border from the American side, disclaimed any intent to cross the border. 308 F. App'x 892, 895-96 (6th Cir. 2009); *accord Erickson v. Doe*, 2015 WL 4041316, at *3 (E.D. Mich. July 1,

23

2015) (where plaintiff inadvertently arrived at an international border crossing, a border search was lawful even though plaintiff "had not crossed and was not attempting to cross the border").

Kolsuz subjected himself and the property he took with him to a border search when he arrived at the border. *See Montoya de Hernandez*, 473 U.S. at 539 (when defendant "presented herself at the border," she "subjected herself to the criminal enforcement powers of the Federal Government," including border search authority). That the government found numerous weapons parts in his checked luggage, providing probable cause to arrest him, neither increased his expectation of privacy nor reduced the government's "greater interest." *Ickes*, 393 F.3d at 506. To the contrary, the evidence of an ongoing conspiracy to illegally export weapons parts rendered the government's interest even more acute.[7]

In addition to being doctrinally unsound, Kolsuz's argument makes no sense as a practical matter. As the district court correctly observed, requiring "agents to refrain

---

[7] *See, e.g., United States v. Ramos*, 190 F. Supp. 3d 992, 999 (S.D. Cal. 2016) (the search of defendant's cell phone after his arrest for narcotics possession "might have uncovered information about the larger organization involved in the smuggling of methamphetamine, including information about more contraband entering into the country at that time"); *United States v. Mendez*, 2017 WL 928460, at *3 (D. Ariz. Mar. 9, 2017) ("[B]y searching Defendant's cell phone text messages and photos, Agent Woods could have uncovered text communications or photographs indicating that additional contraband was entering the country in conjunction with the contraband Defendant was transporting, or that Defendant was smuggling contraband in locations that the government had not yet searched.").

24

from making a lawful arrest until after completing a border search in its entirety . . . could place border agents and society in danger." JA200; *accord United States v. Ramos*, 190 F. Supp. 3d 992, 1000 (S.D. Cal. 2016). Kolsuz's brief makes this particularly clear, as he candidly admits that had he not been arrested at that time, he would have taken the next available opportunity to leave the United States. Appellant's Br. 20 (explaining that by leaving for Turkey, Kolsuz "could have escaped responsibility for attempting to unlawfully export the firearm parts that had already been found in his luggage").

Kolsuz's argument in this regard would cause substantial harm to the government's interests in protecting national security and preventing transborder crime, while providing little protection to legitimate privacy interests. Kolsuz's theory would apply only where there was both an exit search and an arrest during that search. This is a comparatively rare circumstance – the considerable majority of border searches are of inbound travelers, and the considerable majority of travelers are not arrested. But it is a circumstance of particular importance to law enforcement and national security interests. It should be expected that government agents would focus attention on a person for whom there exists probable cause sufficient to support an arrest, and exit border searches frequently involve national security export crimes such as the one in this case. In short, Kolsuz's proposed legal rule is one that seems tailored to benefit participants in arms export conspiracies, like himself, as well as

25

those engaged in espionage or other crimes where the export of dangerous or sensitive materials poses a harm to the country.

Kolsuz's argument is thus inconsistent with precedent and logic. A lawful border search is not terminated by the arrest of the defendant.

### D. A Border Search Does Not Require a Warrant or Probable Cause

Searches at the border are "not subject to the warrant provisions of the Fourth Amendment." *Ramsey*, 431 U.S. at 617. Generally, such searches are "reasonable simply by virtue of the fact that they occur at the border." *Id.* at 616. The few types of border searches that require individualized suspicion, namely (1) strip searches, x-rays of the person, and body cavity searches, described as searches that implicate particularly sensitive aspects of "human dignity," *Montoya de Hernandez*, 473 U.S. at 540 n.3, and (2) "destructive" searches of property, *Flores-Montano*, 541 U.S. at 156, such as drilling into a vehicle or container, *e.g., United States v. Robles*, 45 F.3d 1, 5 (1st Cir. 1995), are "nevertheless justified merely by reasonable suspicion, a lesser standard than required for analogous non-border searches." *Oriakhi*, 57 F.3d at 1297.

In *Ickes*, for example, this Court upheld a warrantless search of the contents of a laptop computer and other electronic media conducted by customs officers who had located the items in the defendant's van after he presented himself at the border. 393 F.3d 501. This Court held that because the items were transported within the defendant's vehicle, the search of their contents was within the border search

26

authority of government agents and was constitutional in light of the "well-recognized exception to the safeguards of the Fourth Amendment" for border searches that derives from "an equally well-established rationale." *Id.* at 506. This Court refused to create "a sanctuary at the border for all expressive material – even for terrorist plans," that would "undermine the compelling reasons that lie at the very heart of the border search doctrine." *Id.*

The holding in *Ickes* makes clear that border searches of electronic devices, like all border searches, do not require a warrant. Indeed, in *Ickes*, consistent with longstanding border search precedent, the Court did not require any individualized suspicion at all. *Accord United States v. Linarez-Delgado*, 259 F. App'x 506, 508 (3d Cir. 2007) (citing *Ickes* and holding that viewing of camcorder footage was a lawful border search that did not require a warrant or reasonable suspicion); *United States v. Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008) (reasonable suspicion not required for manual search of laptop computer at the border); *see also Cotterman*, 709 F.3d at 960-67 (holding that forensic search of computer that involved restoration and review, from unallocated space, of user-deleted files and was of a "comprehensive and intrusive nature" was a lawful border search that did not require a warrant or probable cause but did require reasonable suspicion; observing that manual border searches of electronic devices require no individualized suspicion as held in *Arnold*).

27

*Riley v. California*, 134 S. Ct. 2473 (2014), does nothing to alter the fact that the "longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself," *Ramsey*, 431 U.S. at 619. The border search doctrine is markedly different from the search-incident-to-arrest exception to the Fourth Amendment warrant requirement at issue in *Riley*. The search-incident-to-arrest exception allows for a search of the person and the immediate vicinity of the arrestee. That is fully consistent with the limited purposes of the exception, which are to locate any weapons that might endanger the arresting officer and to prevent the destruction of evidence. *See Riley*, 134 S. Ct. at 2483 (quoting *Chimel v. California*, 395 U.S. 752, 762-63 (1969)). As the Supreme Court noted in *Riley*, "there are no comparable risks" of harm to the arresting officer or destruction of evidence "when the search is of digital data." *Id.* at 2485.

The border search doctrine, by contrast, serves different and broader purposes, namely protecting the nation's core sovereignty in controlling the entry and exit of persons and property in order to protect national security and threats to the citizenry. *E.g.*, *Almeida-Sanchez*, 413 U.S. at 291; *Oriakhi*, 57 F.3d at 1296-1302; *Ickes*, 393 F.3d at 505. Unlike with searches incident to arrest, the purposes underlying the border search doctrine apply in full force to searches of electronic media, which can contain contraband or material (such as classified information or malware) that, if illicitly

28

transferred beyond our borders, could pose a direct threat to our national security.

And the greater storage capacity of electronic devices enables greater harm through

the smuggling of, for example, large amounts of classified data.  Of course,

"technological advances [should] not give individuals a Fourth Amendment right to

conceal information that otherwise would not have been private."  *United States v.*

*Graham*, 824 F.3d 421, 436 (4th Cir. 2016) (en banc); *see also id.* at 440 ("Modern

communication devices . . . assist criminal syndicates and terrorist cells in inflicting

large-scale damage upon civilian populations.") (Wilkinson, J., concurring).  In short,

"*Riley* did not diminish the Government's interests in protecting the border or the

scope of the border search exception."  *United States v. Saboonchi*, 48 F. Supp. 3d 815,

819 (D. Md. 2014).

In *Riley* itself, the Supreme Court observed that its holding was limited to the

search-incident-to-arrest context, stating that while "the search incident to arrest

exception does not apply to cell phones, other case-specific exceptions may still justify

a warrantless search of a particular phone."  134 S. Ct. at 2492.  *See United States v.*

*Gonzales*, 658 F. App'x 867, 870 (9th Cir. 2016) ("*Riley* did not address border

searches, and expressly acknowledged" that phone searches may be justified under

warrant exceptions other than the search-incident-to-arrest exception); *Saboonchi*, 48 F.

Supp. 3d at 817.

29

For these reasons, the district court correctly concluded that *Riley* does not abrogate the border-search doctrine for searches of electronic devices, JA200, a conclusion shared by other courts that have addressed this issue. *See Ramos*, 190 F. Supp. 3d at 1002 (holding that "it is important to recognize that [*Riley*] did not modify or undercut the paradigmatic border search exception"); *United States v. Molina-Isidoro*, __ F. Supp. 3d __, 2016 WL 8138926, at *4 (W.D. Tex. Oct. 7, 2016) (holding that "*Riley* did not disturb the well-recognized border search exception"); *United States v. Caballero*, 178 F. Supp. 3d 1008, 1018-19 (S.D. Cal. 2016); *Saboonchi*, 48 F. Supp. 3d at 819; *United States v. Mendez*, 2017 WL 928460, at *2 (D. Ariz. Mar. 9, 2017); *United States v. Lopez*, 2016 WL 7370030, at *5 (S.D. Cal. Dec. 20, 2016); *United States v. Cano*, 2016 WL 6920449, at *2 (S.D. Cal. Nov. 23, 2016); *Abidor v. Johnson*, 2016 WL 3102017, at *6 (E.D.N.Y. June 2, 2016); *United States v. Feiten*, 2016 WL 894452, at *4 (E.D. Mich. Mar. 9, 2016); *United States v. Hernandez*, 2016 WL 471943, at *3 n.2 (S.D. Cal. Feb. 8, 2016); *Blue*, 2015 WL 1519159, at *2.

Kolsuz's argument that a warrant is required for a technology-assisted review of a phone during a border search is further foreclosed by the fact that "across the history of the border search doctrine," there does not appear to be "a single case holding that anything more than reasonable suspicion was required to perform a search of even the most invasive kind at the international border." *Saboonchi*, 48 F. Supp. 3d at 818-19; *accord Ramos*, 190 F. Supp. 3d at 997 (observing that "neither the

Supreme Court nor any lower courts have ever required anything more than 'reasonable suspicion' to justify searches at the border").

Border searches that have been found to require no individualized suspicion whatsoever include pat-downs of the person, *Bradley v. United States*, 299 F.3d 197, 203 (3d Cir. 2002), a dog sniff involving contact to the groin, *United States v. Kelly*, 302 F.3d 291, 294-95 (5th Cir. 2002), lifting up a traveler's shirt to investigate a bump, *United States v. Charleus*, 871 F.2d 265, 266-67 (2d Cir. 1989), lifting an ankle-length skirt above the knee, *United States v. Brown*, 499 F.2d 829, 833 (7th Cir. 1974), and disassembling, searching, and then reassembling the fuel tank of a vehicle, *Flores-Montano*, 541 U.S. at 155. Strip searches of the person are permissible as part of a border search where there is reasonable suspicion. *United States v. McMurray*, 747 F.2d 1417, 1420 (11th Cir. 1984); *United States v. Rodriguez*, 592 F.2d 553, 556 (9th Cir. 1979); *United States v. Asbury*, 586 F.2d 973, 975-76 (2d Cir. 1978); *United States v. Himmelwright*, 551 F.2d 991, 994-95 (5th Cir. 1977). So too an x-ray of the person, *United States v. Vega-Barvo*, 729 F.2d 1341, 1349 (11th Cir. 1984), or a "search [of] the alimentary canal of a traveler," *United States v. Seljan*, 547 F.3d 993, 1000 (9th Cir. 2008) (citing *Montoya de Hernandez*, 473 U.S. at 541). Reasonable suspicion is also sufficient to justify drilling into a vehicle or container, even though that causes permanent damage. *United States v. Rivas*, 157 F.3d 364, 366-67 (5th Cir. 1998); *Robles*, 45 F.3d at 5; *United States v. Carreon*, 872 F.2d 1436, 1440-41 (10th Cir. 1989); *cf. United*

31

*States v. Chaudhry*, 424 F.3d 1051, 1053 (9th Cir. 2005) (drilling of single hole in pickup truck bed during border search was lawful even in the absence of individualized suspicion). And the border-search doctrine permits warrantless searches of a personal cabin on a ship returning from abroad. *Compare United States v. Whitted*, 541 F.3d 480, 489 (3d Cir. 2008) (search of cabin was justified by reasonable suspicion notwithstanding "high expectation of privacy and level of intrusiveness") *with United States v. Alfaro-Moncada*, 607 F.3d 720, 726-32 (11th Cir. 2010) (search of crew-member's living quarters was lawful border search even in the absence of any individualized suspicion). In sum, even the most intrusive searches require no more than reasonable suspicion when conducted at the border.

The border search doctrine is by its very nature an exception to the warrant requirement, border searches generally require no individualized suspicion, and no border search requires more than reasonable suspicion.

### E. Even if Reasonable Suspicion Was Required, It Was Clearly Present in this Case

The law is clear that a manual search of an electronic device at the border requires no individualized suspicion. *Ickes*, 393 F.3d at 507; *see also Stewart*, 729 F.3d at 524-26; *Cotterman*, 709 F.3d at 960-61; *United States v. Pickett*, 598 F.3d 231, 234 (5th Cir. 2010); *Linarez-Delgado*, 259 F. App'x at 508; *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 277 (E.D.N.Y. 2013); *United States v. Bunty*, 617 F. Supp. 2d 359, 365 (E.D. Pa.

2008). Indeed, Kolsuz wisely does not challenge the portion of the border search that

involved a manual review of his phone. Appellant's Br. 5 n.2.

It would make little sense to have a different rule for the technology-assisted

examination that produced the iChat and Kik communications introduced at trial

because that review simply facilitated the same type of information gathering.

*Cf. Arnold*, 533 F.3d at 1005-08 (holding that hours-long manual review of computer

required no individualized suspicion). And the question whether there is a meaningful

distinction where the government conducts a forensic search that restores and permits

review of data in unallocated space that cannot be reviewed in a manual search, *see*

*Cotterman*, 709 F.3d at 965, is not before this Court, as the review in this case was only

of allocated space. *See United States v. Lopez*, 2016 WL 7370030, at *4 (S.D. Cal. Dec.

20, 2016) (applying *Cotterman* and holding that where Cellebrite device "used software

to extract data from the electronic devices, downloaded the data from the electronic

devices, and printed out a report," but did not access "information encrypted, deleted

or password protected," no individualized suspicion was required because the "scan

of the electronic devices accessed information available to any manual user examining

the electronic devices").[8]

───────────────

[8] Two of Kolsuz's *amici* make repeated reference to the sensitivity of data
stored on the cloud (*i.e.*, not on the phone but on a remote server). The cloud, of
course, is not something that crosses the border along with a traveler, and, in any
event, it is not something that was searched in this case. To the contrary, the

This Court, of course, should not "'anticipate a question of constitutional law in advance of the necessity of deciding it,' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *United States v. Chappell*, 691 F.3d 388, 392 (4th Cir. 2012) (quoting *Ashwander v. TVA*, 297 U.S. 288 (1936) (Brandeis, J., concurring)). In the context of evolving technology, it would be particularly inappropriate to reach out to decide a constitutional question not presented given the *en banc* Court's recent conclusion that "[t]he legislative branch is far better positioned to respond to changes in technology than are the courts." *Graham*, 824 F.3d at 436; *accord id.* at 438 (Wilkinson, J., concurring) (cautioning that courts should not "run the risk of boxing the democratic branches out of the constitutional dialogue").

Moreover, this Court need not determine whether reasonable suspicion was required for the review that was conducted in this case, as the agents clearly had reasonable suspicion, and thus the search was lawful under either border search standard. *See United States v. Molina-Gomez*, 781 F.3d 13, 19-20 (1st Cir. 2015) (declining to determine whether border search of defendant's computer, gaming system, and cell phones required reasonable suspicion where it was present, and

---

government agent consciously carried out the review in this case in a manner that would not access any information from the cloud or any other information not present on the phone. JA93. This Court should address only the legality of the search that was conducted in this case, not of some other search that the agent deliberately elected not to conduct.

noting the Supreme Court's caution against "complex balancing tests"); *Molina-Isidoro*,

2016 WL 8138926, at *8 (finding it unnecessary to determine whether reasonable

suspicion was required for border search of defendant's cell phone given that

reasonable suspicion was present); *United States v. Hassanshahi*, 75 F. Supp. 3d 101, 119

n.11 (D.D.C. 2014) (following the doctrine of constitutional avoidance and declining

to reach the question whether reasonable suspicion was required for a forensic

computer search because reasonable suspicion was present).[9]

---

[9] Technology-assisted examinations of electronic devices are important tools for identifying national security threats. There may be cases where a customs agent suspects illegal activity based on information that falls short of reasonable suspicion, or where the government has a reasonable suspicion of illegal activity but cannot disclose the basis of it because, for example, it is classified. Imbuing a traveler with a heightened privacy interest in documents and data maintained in electronic form may allow those who would do harm to this country to protect not only information that would further terrorist-related activity, but also items such as malware, malicious code, or other tools of cyberespionage. A holding that reasonable suspicion is required for searches of electronic devices at the border could have adverse consequences for national security. As this Court has held, "[t]he essence of border search doctrine is a reliance upon the trained observations and judgments of customs officials, rather than upon constitutional requirements applied to the inapposite context of this sort of search." *Ickes*, 393 F.3d at 507. "As a practical matter, computer searches are most likely to occur where . . . the traveler's conduct or the presence of other items in his possession suggest the need to search further." *Id.* Like the computer search in *Ickes*, which was conducted only after agents "had already discovered" evidence of illegality, the review of Kolsuz's phone occurred after agents had discovered substantial evidence of an ongoing conspiracy to unlawfully export weapons parts, including information about Kolsuz's and his coconspirators' previous attempts to illegally export weapons parts and the two suitcases full of weapons parts in Kolsuz's possession on the day of the search.

35

Reasonable suspicion means a "minimal level of objective justification." *INS v. Delgado*, 466 U.S. 210, 217 (1984). It "is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less demanding than that for probable cause.'" *United States v. Jones*, 584 F.3d 1083, 1086 (D.C. Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). As the district court correctly found, that standard was easily met here.

By the time agents reviewed information on Kolsuz's phone, they were aware, among other things, that (1) Kolsuz had been stopped on two previous occasions attempting to export weapons parts without a license in his luggage, (2) on one of those occasions he was accompanied by two apparent coconspirators, (3) he was taking a circuitous route from Florida to Turkey that included an apparently unnecessary stopover in Cleveland, (4) his checked luggage on this occasion contained numerous weapons parts that could not lawfully be exported without a license, and (5) the government's database showed no record of any export license issued to Kolsuz. Based on this, the district court correctly concluded that the agents "reasonably suspected that they would discover . . . information related to other ongoing attempts to export illegally various firearms parts" on Kolsuz's cell phone as well as "the identity of co-conspirators, some of whom may have been attempting to smuggle firearms parts out of the country in the imminent future." JA213-14; *cf. Caballero*, 178 F. Supp. 3d at 1016 ("Officers certainly had reasonable suspicion to

36

search the cell phones carried by Caballero after finding 15 kilograms of methamphetamine and one kilogram of heroin hidden in the gas tank of Caballero's automobile as he crossed the border.").

Kolsuz does not seriously dispute that government agents had reasonable suspicion that there was information relating to border security, namely evidence of the ongoing conspiracy to unlawfully export weapons parts, on his phone. Rather, he makes the novel claim that reasonable suspicion must relate to the presence of contraband itself on the phone, as opposed to evidence relating to contraband. Appellant's Br. 28-31. This is wrong.

The reasonable suspicion standard is satisfied where agents "reasonably suspect that the traveler is engaged in criminal activity." *United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015). In the border search context, the distinction between contraband and evidence of unlawful activity "is without legal basis." *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006); *see also Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968) (reasonable suspicion standard is satisfied by "specific and articulable facts" and rational inferences indicating that criminal activity "may be afoot"); *United States v. Abbouchi*, 502 F.3d 850, 855 (9th Cir. 2007) (holding that an extended border search may be justified by "reasonable suspicion that the search may uncover contraband or evidence of criminal activity"); *United States v. Leininger*, 2016 WL 6476310, at *6-7

37

(S.D. Cal. Nov. 2, 2016) (holding, in the context of a cell phone search, that a border search may lawfully be an "investigatory" search for evidence of a crime).

This conclusion is confirmed by this Court's opinion in *Ickes*. While the search in *Ickes* led to child pornography, which is contraband, the Court supported its findings that border searches of electronically stored information are both lawful and necessary by observing that "national security interests may require uncovering terrorist communications," and that limitations on electronic searches "would create a sanctuary at the border for all expressive material—even for terrorist plans." 393 F.3d at 506. Terrorist plans and communications are not contraband. They are evidence of an ongoing conspiracy to commit a national security crime, directly analogous to the coconspirator communications uncovered on Kolsuz's phone, and to other types of documents, such as invoices and bills of lading, that might be found in electronic form in an export case such as this one.

Given that there was clearly reasonable suspicion supporting the examination of Kolsuz's phone, and that the review, while not limited to a manual search, was less intrusive than the search analyzed by the Ninth Circuit in *Cotterman,* this Court can uphold the district court's conclusion that the search complied with the Fourth Amendment without reaching the constitutional issue of whether reasonable suspicion was required.

### F.    The Cases Cited by Kolsuz Do Not Support His Argument

Against this wealth of caselaw, Kolsuz cites two district court cases that he claims support his appeal. Appellant's Br. 20-23. They do not.

In *United States v. Kim*, 103 F. Supp. 3d 32 (D.D.C. 2015), the district court held that if "a reasonably prudent officer would have been justified in his belief that Kim was engaged in ongoing criminal activity at the time he was stopped [at the airport], then the search would have been lawful," and the court would not have needed to address the question whether reasonable suspicion is required for a computer search. *Id.* at 44. The court, however, found a "lack of particularized grounds to believe that this defendant was engaged in criminal activity at the time he was exiting the United States" and that the government was actually "gathering evidence of a completed crime." *Id.* at 44-45. This distinction between an ongoing crime and a completed crime is erroneous.[10] But even under *Kim*'s erroneous reasoning, the search of Kolsuz's phone would clearly be legal because, as described above, it was supported by reasonable suspicion that Kolsuz "was engaged in ongoing criminal activity at the time he was stopped," namely the unlawful export of firearms parts. *Id.* at 44.

---

[10] *See United States v. Hensley*, 469 U.S. 221, 227-29 (1985) (*Terry* stop was lawful where there was reasonable suspicion that the person stopped "was involved in . . . a completed felony"); *United States v. Cortez*, 449 U.S. 411, 417 n.2 (1981) ("Of course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct."); *Gurr*, 471 F.3d at 149 (in the border search context, the distinction "between contraband and documentary evidence of a [past] crime is without legal basis").

*United States v. Djibo*, 151 F. Supp. 3d 297 (E.D.N.Y. 2015), is also inapposite. There the district court held that the results of a phone search should be suppressed because the warrant for the search was based on the results of an earlier phone search that itself was based on a *Miranda* violation. *Id.* at 305-11. The court observed that a lawful border search of the defendant had been "undertaken to find contraband or currency and neither were found," and then concluded that the un-*Mirandized* request for the defendant's phone passcode "had nothing to do with national security at the airport on that day." *Id.* at 310. As with *Kim*, the reasoning in *Djibo* is erroneous; the fact that the initial stages of a border search do not uncover contraband does not prevent agents from continuing the border search and examining additional items. But also like *Kim*, *Djibo* is unavailing to Kolsuz here, as the search of Kolsuz's luggage uncovered numerous weapons parts and the then-ongoing conspiracy to export weapons parts in this case implicated "the government's exceptionally strong interest in national defense and national security." *Defense Distributed*, 838 F.3d at 458.

Finally, to the extent Kolsuz argues that *Kim* and *Djibo* suggest outbound border searches are judged by different standards than inbound ones, that is inconsistent with the law in this and other circuits. *See, e.g.*, *Oriakhi*, 57 F.3d at 1296-97; *Boumelhem*, 339 F.3d at 423; *Cardona*, 769 F.2d at 629. Indeed, the arms export conspiracy in this case is a clear reminder of the national security implications that relate to departing travelers and property.

40

## II. Suppression Would Be Unwarranted in Any Event Because Law Enforcement Agents Acted in Good Faith

Even where, unlike here, there has been an unlawful search, a defendant has no automatic right to suppression. *Herring v. United States*, 555 U.S. 135, 141 (2009). Because suppression imposes a "costly toll upon truth-seeking and law enforcement objectives" and "offends basic concepts of the criminal justice system" by "letting guilty . . . defendants go free," a court must also find that "the benefits of deterrence . . . outweigh the costs," which are heavy. *Id.* (quotation marks omitted); *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364-65 (1998) (exclusionary rule's cost "presents a high obstacle for those urging [its] application"). It is well established that "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis v. United States*, 564 U.S. 229, 238 (2011) (internal citations and quotation marks omitted). Thus, as the Supreme Court has held, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at 241.

It is undeniable that the agents in this case acted in objectively reasonable good faith on the Supreme Court's long-established border search precedents as well as this Court's precedents, including *Ickes* and *Oriakhi*. Indeed, even Kolsuz concedes that a "'mechanical application'" of precedent "would permit" the search in this case. Appellant's Br. 17. Thus, suppression would not be available even if Kolsuz's Fourth

41

Amendment argument had merit. *Cf. United States v. Craig*, 861 F.2d 818, 820 (5th Cir. 1988) ("Principles of judicial restraint and precedent dictate that, in most cases, we should not reach the probable cause issue if a decision on the admissibility of the evidence under the good-faith exception . . . will resolve the matter.").

**III.    The Convictions on Counts 2 and 3 Should Be Affirmed for the Additional Reason That, as the District Court's Findings Make Clear, the Challenged Evidence Was Not Necessary To Demonstrate Kolsuz's Guilt Beyond a Reasonable Doubt**

Finally, Kolsuz's conviction as to Counts 2 and 3 should be affirmed for the additional reason that the evidence he claims should have been suppressed was unnecessary to the verdict on those counts. This Court will not reverse a conviction where "'admission of the [challenged evidence] was harmless beyond a reasonable doubt.'" *United States v. Johnson*, 400 F.3d 187, 197 (4th Cir. 2005) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). With regard to the bench trial in this case, the district court's findings of fact and conclusions of law make it clear beyond doubt that the challenged evidence was not necessary to Kolsuz's convictions on Counts 2 and 3. *See United States v. Poole*, 640 F.3d 114, 120 (4th Cir. 2011) (reviewing district court's opinion to determine what that court relied on for its findings).

Kolsuz was convicted of (1) conspiracy in violation of 18 U.S.C. § 371, (2) attempting to export firearms parts without a license in violation of 22 U.S.C. § 2778, and (3) smuggling goods from the United States in violation of 18 U.S.C. § 554 (which applies to both completed and attempted exporting of goods in violation

of law).  JA215, 244.  For Counts 2 and 3, the government proved that Kolsuz

knowingly attempted to export the weapons parts without a license in violation of law

and that he did so willfully.  JA232-39.  Evidence apart from the communications

obtained from Kolsuz's phone – namely the two suitcases full of weapons parts that

Kolsuz was attempting to take to Turkey, that he had made similar attempts on two

prior occasions, and his lack of an export license on any of these occasions – was

sufficient to prove that Kolsuz attempted to export weapons parts without a license.

*See* JA234-35, 239.

This leaves only the willfulness element.  Willfulness exists where (1) the

defendant has a "general knowledge of illegality," *United States v. Bishop*, 740 F.3d 927,

935 (4th Cir. 2014), or (2) where the defendant has engaged in "deliberate ignorance"

as to the lawfulness of his conduct, *United States v. Zayyad*, 741 F.3d 452, 463 (4th Cir.

2014) (quotation marks omitted).  Either of these is sufficient, and in this case, the

district court, as factfinder, found both.  JA235-39.  While the communications

obtained from Kolsuz's phone were important to the first finding, *see* JA236-37, they

were entirely unnecessary as to the second, JA243 & n.34.  Rather, the finding of

deliberate ignorance was supported by the fact that Kolsuz had previously attempted

to export similar weapons parts and had been informed by an HSI special agent that

these and most other firearms parts required a license for export to be lawful as well

as the fact that Kolsuz had twice had firearms parts seized from him at the airport

(and never returned) because he lacked an export license. JA243. Thereafter, at best, Kolsuz "deliberately closed his eyes to facts that confirm it was generally unlawful to export the firearms parts in issue here without the requisite [government] license." *Id.* For this finding, the district court expressly found it "unnecessary to rely on" the communications that were obtained from Kolsuz's phone. *Id.* n.34.

Because the finding of deliberate ignorance/willful blindness was sufficient to meet the willfulness element for both Counts 2 and 3, and the evidence obtained from Kolsuz's phone was unnecessary for proof of this or any other element of those counts, the admission of the challenged evidence was harmless as to those counts even if it had been erroneous (which it was not).

## CONCLUSION

For the reasons stated above, the district court's judgment should be affirmed.

DATED this 24th day of April 2017.

Respectfully submitted,

DANA BOENTE
United States Attorney
Eastern District
  of Virginia

MARY B. MCCORD
Acting Assistant Attorney General
 for National Security

   */s/ Jeffrey M. Smith*

JEFFREY M. SMITH
HEATHER ALPINO
National Security Division
U.S. Department Of Justice

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

While the United States respectfully suggests that oral argument is not necessary in this case, it does not dispute that oral argument may aid the Court in reaching its decision.

## CERTIFICATE OF COMPLIANCE
### Circuit Rule 32(a)(7)(C)

This brief has been prepared using Microsoft Word, Garamond, 14 Point.

Exclusive of the table of contents; table of citations; statement with respect to oral argument; this certificate; and the certificate of service, the brief contains fewer than 13,000 words, specifically 11,214 words.  I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line printout.

                                      *s/Jeffrey M. Smith*
                                      JEFFREY M. SMITH

46

## CERTIFICATE OF SERVICE

I hereby certify that on April 24th, 2017, I electronically filed the foregoing Answering Brief of Appellee with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit using the ECF system.

I certify that all participants are registered ECF users and that service will be accomplished by the appellate ECF system.

*/s/ Jeffrey M. Smith*
JEFFREY M. SMITH