No. 16-4687

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff/Appellee*,


v.


HAMZA KOLSUZ,
                    *Defendant/Appellant*.


On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. T. S. Ellis, III)


REPLY BRIEF OF THE APPELLANT


GEREMY C. KAMENS
Federal Public Defender

Todd M. Richman
Assistant Federal Public Defender
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Todd_Richman@fd.org

# **TABLE OF CONTENTS**

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.    The Search in This Case Cannot Be Defended as a Border Search Because the Sovereign Interest In Preventing Contraband From Crossing a Border Was Resolved by the Phone's Domestic Seizure Before the Search Began. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.    A Forensic Search of a Cell Phone Is Unreasonable Absent a Warrant, Even in the Context of a Border Search. . . . . . . . . . . . . . 12

     C.    Even if the Search Required Only Reasonable Suspicion, That Suspicion Must Relate to the Presence of Contraband. . . . . . . . . . 14

     D.    The Good Faith of Law Enforcement Is Irrelevant Where, as Here, Agents Were Expanding Upon, Rather Than Acting Upon, What Had Been Specifically Authorized by Binding Precedent. . . . 16

     E.    The Government Cannot Show That Any Error Was Harmless Beyond a Reasonable Doubt With Respect to Any of the Counts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Certificate of Compliance

Certificate of Service

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Almaida-Sanchez v. United States*, 413 U.S. 266 (1973). . . . . . . . . . . . . . . . . . . . . 4

*Arizona v. Gant*, 556 U.S. 332 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 6, 7, 10

*Boyd v. United States*, 116 U.S. 616 (1886). . . . . . . . . . . . . . . . . . . . . . . . 5, 12, 14

*California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974). . . . . . . . . . . . . . . . . . . . 4

*Carroll v. United States*, 267 U.S. 132 (1925). . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Davis v. United States*, 564 U.S. 229 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Katz v. United States*, 389 U.S. 347 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Riley v.  California*, 134 S. Ct. 2473 (2014). . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Terry v. Ohio*, 392 U.S. 1 (1968).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Abbouchi,* 502 F.3d 850 (9th Cir. 2007).. . . . . . . . . . . . . . . . . . 16

*United States v. Baker*, 719 F.3d 313 (4th Cir. 2013).. . . . . . . . . . . . . . . . . . . . . 17

*United States v. Caicedo-Guarnizo*, 723 F.2d 1420 (9th Cir. 1984). . . . . . . . . . . 16

*United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . 15, 16

*United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . 9, 17

*United States v. Leininger*, 2016 WL 6476310 (S.D. Cal., Nov. 2, 2016). . . . . . . 16

*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985). . . . . . . . . . . . . . . 8

*United States v. Oriakhi*, 57 F.3d 1290 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . 17

*United States v. Ramsey*, 431 U.S. 606 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## Constitutional Provision

U.S. Const. amend IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

No. 16-4687

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

HAMZA KOLSUZ,
*Defendant/Appellant*.

_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. T. S. Ellis, III)

_____

REPLY BRIEF OF THE APPELLANT

_____

## **ARGUMENT**

The government's argument with respect to the classification of the search in this case as a border search fails to address the central issue regarding the scope of warrant exceptions presented by *Arizona v. Gant* and *Riley v. California*. Those cases demand that courts construe exceptions to the warrant requirement only as broadly as the exigencies supporting each exception, and only where those exigencies exist "at the time of the search" in question. *Arizona v. Gant*, 556 U.S. 332, 343 (2009);

1

*Riley v. California*, 134 S. Ct. 2473, 2484-85 (2014). By focusing on the place and time of the search in this case (at the border, after Mr. Kolsuz had attempted to leave the United States), the government ignores that the search happened after the cell phone had been seized in relation to a domestic prosecution. The government does not argue that the phone was searched in order to "control[] the entry and exit of persons and property" at the border, which is how the government defines the interest permitting warrantless border searches. Gov't Br. at 28. Because the government does not and cannot explain how the search in this case was factually tethered to that interest, its argument that the search of Mr. Kolsuz's cell phone should be upheld as a border search should fail.

A.    The Search in This Case Cannot Be Defended as a Border Search Because the Sovereign Interest In Preventing Contraband From Crossing a Border Was Resolved by the Phone's Domestic Seizure Before the Search Began

The government mischaracterizes Mr. Kolsuz's principal argument as a claim that *Riley* somehow "abrogate[s] the border-search doctrine for searches of electronic devices." Gov't Br. at 30. That mischaracterization obscures the issue presented. The issue is not whether *Riley* limits the border-search exception. It does not. In fact, *Riley* has little bearing on the principal question presented by this case – whether the search of Mr. Kolsuz's phone was a border search – other than, of course, dictating

2

the result in the event that it was *not* a border search.[1]  But on the central question presented in the opening brief – what type of search occurred – there is no claim that *Riley* controls.  On that question, Mr. Kolsuz's argument relies on *Riley* only as an analogy – as an example of how warrant exceptions are construed.  *See* Appellant's Br. at 12 (noting that in *Riley*, like in *Gant* before it, the Court required that a warrantless search be factually and temporally supported by the interests justifying the asserted warrant exception).

Mr. Kolsuz's argument is that, as the Court recognized in *Gant* and *Riley*, each warrant exception must be construed only as broadly as the reason for exempting each category of search from the warrant requirement.  Thus, where mechanical application of a warrant exception to different fact patterns over time loses sight of the exception's original justification, *Gant* and *Riley* command that courts construe the exception only as broadly as its constitutional basis.  *Gant*, 556 U.S. at 343 (warrant exception must not be construed in a manner that "untether[s] the rule from [its] justifications"); *Riley*, 134 S. Ct. at 2484.  To construe a warrant exception otherwise would allow it to be defined by the case-by-case creep of precedent, thus permitting the exceptions to swallow the constitutional rule.

---

[1]  If the search of Mr. Kolsuz's phone cannot properly be characterized as a border search, the government does not contest that it would be a post-arrest search of a cell phone requiring a warrant under *Riley*.

3

The government fails to respond to Mr. Kolsuz's main argument because its brief is largely organized around the above misconception of it. The government emphasizes its substantial interest in controlling "who and what crosses national borders," and in the longstanding "aspect of national sovereignty" permitting customs officials to examine "'those entering and leaving the country . . . [and] their belongings and effects.'" Gov't Br. at 16 (citing and quoting *Almaida-Sanchez v. United States*, 413 U.S. 266, 291 (1973), and *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 63 (1974)). But never does the government explain why those interests were at play at the time agents searched Mr. Kolsuz's phone, which occurred only after they seized it domestically and determined that it would not cross the border.

Indeed, not only does the government fail to tether this search to the justifications it asserts for warrantless border searches, but a close review of the justifications accepted by the Supreme Court for warrantless border searches illustrates why it cannot do so. The earliest case identified by either party in which the Court set forth the rationale for the border-search exception, *Carroll v. United States*, 267 U.S. 132 (1925), identifies the historical basis for the exception as two-fold: "Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify [*first*] himself as entitled to come in and [*second*] his belongings as effects which may be lawfully brought in." 267 U.S. at 154. Thus, the twin government interests

4

supporting border searches identified in *Carroll* relate to the entry and exit of persons (the government's interest in regulating immigration) and things (the government's interest in regulating customs and excluding contraband).

Further, *Carroll* relied on *Boyd v. United States*, 116 U.S. 616 (1886), a customs case that clarified what the Fourth Amendment has historically permitted in the customs context and what it has not:

> The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him.

116 U.S. at 623.

It was in this historical context that the Supreme Court said in *United States v. Ramsey*, 431 U.S. 606, 616 (1977), that border searches "are reasonable simply by virtue of the fact that they occur at the border." Indeed, the *Ramsey* Court went on to cite and quote both *Carroll* and *Boyd* to demonstrate the purposes and scope of the border-search exception. *Id.* at 617. Accordingly, it is fallacy to understand the broad language the government plucks from *Ramsey* and other cases as an indicator of the allegedly unlimited breadth of the warrant exception whenever a search occurs at or near a border and is temporally proximate to the presentation of oneself and/or one's effects at a border. Rather, the constitutional justifications for exempting

5

searches at the border from the warrant requirement have always been limited to enforcing laws regulating immigration, customs and contraband. And, as noted in Mr. Kolsuz's opening brief, the interests supporting outgoing border searches have historically been limited to the government's interest in detecting and intercepting contraband as it crosses the border. *See* Appellant's Br. at 15-16 (and cases cited).

Accordingly, applying the analysis mandated by *Gant* and *Riley* to the search at issue here – that is, judging it by whether the interests underlying the asserted exception support exempting the search from the warrant requirement – demonstrates that it does not fit within the border-search exception. That is because, as in *Gant*, the exigency supporting the asserted exception was no longer at play when the search commenced. Once Mr. Kolsuz had been arrested and his phone had been removed from the pipeline of goods destined for a border crossing, all of the recognized interests permitting warrantless searches at the border evaporated. At that point, there was no exigency requiring that the search be conducted without a warrant. Instead of seeking a warrant, though, the government treated the border-search exception as if it were "a police entitlement, [which] is anathema to the Fourth Amendment." *Gant*, 556 U.S. at 347.

Indeed, the government's brief repeatedly defines the scope of its authority to conduct a border search only by when that authority commences (that is, upon presenting oneself and/or one's effects at the border). *See* Gov't Br. at 14, 23, 24.

6

It uses this formulation to imply, without citation, that once such authority exists, it continues to exist indefinitely until a search is conducted. That assertion of authority, however, ignores the Fourth Amendment's limiting principle – that warrantless searches are an exception to the constitutional command that searches be conducted pursuant to judicial authorization and a warrant, except in "'a few specifically established and well-delineated exceptions.'" *Gant*, 556 U.S. at 338 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). And, further, that whether a warrant exception justifies a search turns on whether the circumstances justifying a warrantless search continue to exist "at the time of the search." *Gant*, 556 U.S. at 343. *Gant's* choice of language on that point is not careless, but necessary to *Gant's* holding and necessary to effectuate the Fourth Amendment, i.e., to prevent warrantless searches from becoming the rule rather than the exception. The government ignores this well-established limiting principle because it must in order to support the conclusion it asks this Court to reach.

In place of the above analysis, the government instead focuses on the diminished expectation of privacy at the border in support of its claim that once "a person approaches an international border," the government's authority to conduct a border search continues to exist until a search occurs. Gov't Br. at 18. But a diminished expectation of privacy does not in itself establish the government's authority to conduct a warrantless search. Whenever a right to privacy exists – and

7

it can hardly be disputed, in light of *Riley*, that one's privacy interest in the contents of one's cell phone is extraordinary – the analysis turns on a balancing of privacy interests against the government's interests. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985) (scope of authority to conduct border search defined by balancing sovereign's interests at the border against Fourth Amendment right of traveler); *see also Riley*, 134 S. Ct. at 2484 (courts "determine whether to exempt a given type of search from the warrant requirement by assessing . . . the degree to which it intrudes upon an individual's privacy and . . . the degree to which it is needed for the promotion of legitimate governmental interests") (internal quotations and citation omitted).

In the border-search context, the government's interest in proceeding without a warrant in the case of a routine border-search flows not only from historical norms about what a sovereign may do at the border, but also from the obvious impracticability of obtaining a warrant in the course of each and every ordinary border crossing. The government's claim that the authority to conduct a warrantless border search, outside of the ordinary course, continues from the moment an individual approaches a border until whenever a search is concluded, however, attempts to avoid the entire balancing test governing warrant exceptions. It does so because the interests exempting ordinary border searches from the warrant

8

requirement were entirely absent by the time agents began to search Mr. Kolsuz's phone.

Because the government never grapples with whether the search here was actually supported by circumstances that exempt border searches from the warrant requirement, the arguments it does make fall flat. For example, the government argues that the arrest in this case "did not terminate the border search authority," *see* Gov't Br. at 22 (citing *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005)), without addressing the critical distinction (argued in the opening brief) between this case and *Ickes* – that Mr. Ickes's computer was clearing customs when it was searched. *See* Appellant's Br. at 19. *Ickes* involved an incoming search in which the defendant was arrested on a warrant, and the laptop he possessed was then searched. 393 F.3d at 502-03. That search was plainly justified by the border-search exception because, as with all effects entering the country, the laptop could be searched for contraband before being either seized (if it contained contraband) or placed with Mr. Ickes's other personal property to be released to him upon his release from custody (if it did not).

The government's policy-based arguments, *see* Gov't Br. at 24-26, are similarly misplaced. First, the government argues that treating the search that occurred here in the same manner as any other post-arrest search of a cell phone – that is, requiring a warrant – "'could place border agents and society in danger.'" Gov't Br. at 24-25

9

(citing and quoting district court opinion). But the only possible situation in which border agents would have any incentive to delay an arrest merely to conduct a phone search would be where they have probable cause for arrest, but no basis to seek a warrant for the arrestee's phone. In those circumstances, as in the case of any other arrestee's phone, the phone would not be searched. To describe that result as an unacceptable threat to national security or law enforcement is to state the same of the Fourth Amendment itself because, in the case of any other arrestee, the Fourth Amendment precludes a search of his phone unless the government obtains a warrant based on probable cause. Moreover, the government would be no more incentivized to delay arrests by requiring a warrant on these facts than officers are incentivized by *Gant* to delay arrests following traffic stops. But the Court found that concern insufficient to stretch the search-incident-to-arrest exception to apply where the facts do not, "at the time of the search," establish the exigencies (officer safety and evidence destruction) allowing it. *Gant*, 556 U.S. at 343.

The government's next policy-based argument – that requiring a warrant on these facts would "cause substantial harm to the government's interests . . . while providing little protection to legitimate privacy interests," Gov't Br. at 25 – also fails. The government makes much of the supposed narrowness of a rule requiring a warrant only in the case of post-arrest searches of exiting travelers' effects – specifically, by arguing that "the considerable majority of searches are of inbound

10

travelers, and the considerable majority of travelers are not arrested," Gov't Br. at 25 – but that is a red herring that could apply to virtually any type of search. For example, it could equally be said that the considerable majority of vehicles on a highway are not stopped by law enforcement, and that the considerable majority of those stopped are not searched. But that does not exempt automobile travelers from the Fourth Amendment. And the argument that enforcing the Fourth Amendment's warrant requirement in this case is "tailored to benefit participants in arms export conspiracies," Gov't Br. at 25, is no more true than arguing that the Fourth Amendment warrant requirement generally, as applied to those arrested of a crime, is "tailored to benefit" those who have committed a crime. Such arguments simply cannot withstand scrutiny.

In sum, the Fourth Amendment requires a warrant unless an exception applies. The scope of each exception is defined by the circumstances for exempting a given type of search from the constitutional preference for warrants. And each exception permits a warrantless search only as long as those circumstances exist. Accordingly, the government may not defend a warrantless search, as it does here, on the basis of vague assertions of exigency and national interests untethered to circumstances that existed at the time of the search.

11

B.    A Forensic Search of a Cell Phone Is Unreasonable Absent a
Warrant, Even in the Context of a Border Search

Applying the border-search exception to cell phones, viewed in light of the

detailed historical context of customs searches set forth in *Boyd*, 116 U.S. at 624-30,

calls to mind the *Riley* Court's admonition that equating physical items to

smartphones "is like saying a ride on horseback is materially indistinguishable from

a flight to the moon [because] [b]oth are ways of getting from point A to point B."

134 S. Ct. at 2488.  But that is exactly what the government does in listing the various

forms of physical searches that have been permitted within the border-search

exception and asking this Court to apply those rules to the search that was conducted

here.  *See* Gov't Br. at 31-32.  As *Riley* makes pellucidly clear, modern smartphones

are categorically different than items historically carried on the person.  That is, no

matter how intrusive a physical search, its fruits cannot reveal every aspect of a

person's life in the way a cell phone can.  Between text messages, voice messages,

emails, calendar entries, GPS location history, photographs and videos, internet

search history, and all the other contents of a modern phone, a cell phone gives not

just a snapshot into its owner's life, but a virtual "this is your life" documentary

covering nearly every aspect, no matter how intimate, of a person's recent history.

Given these privacy interests, which did not exist in the course of border

crossings as recently as fifteen years ago, it is alarming that the number of warrantless

forensic searches of cell phones at the border has increased dramatically in recent years. As recent media reports explain, the number of cell phone border searches increased fivefold between 2015 and 2016, and is apparently on track to more than double again in 2017. *See* Brief of *Amici Curiae* Cause of Action, *et al.*, at 24-25 (fewer than 5,000 cell phones were searched in 2015, almost 25,000 were searched in 2016, and approximately 5,000 were searched in February 2017). More troubling is that these searches – and their apparently skyrocketing frequency – are unlimited by anything other than the grace of the Executive Branch and/or the limits of DHS's budget for buying Cellebrite machines. Moreover, these searches implicate the privacy interests not only of those arrested of crime, but also of tens of thousands of ordinary citizens, including lawyers, journalists, priests, and others whose digital media are likely to contain not just their own personal information, but that of others whose privacy they must protect.

This trend should not be allowed to continue without judicial review. It does not follow, just because one has diminished privacy expectations at the border, that the government should be permitted to copy, review and retain – perhaps forever – an extraordinary trove of personal information about travelers without judicial authorization. Accordingly, this Court should find that the exceptional privacy implications recognized in *Riley* distinguish cell phones from other items travelers

carry, and require a warrant in order to search a cell phone search in the course of a border search.[2]

C.     Even if the Search Required Only Reasonable Suspicion, That Suspicion Must Relate to the Presence of Contraband

In the event that the Court agrees with the district court that a cell phone may be subjected to a non-routine border search on the basis of reasonable suspicion, the government effectively acknowledges that the suspicion that existed here went only to its owner's commission of a crime, not to the existence of contraband on the phone. *See* Gov't Br. at 37-38 (arguing that reasonable suspicion existed that the phone contained "evidence of the ongoing conspiracy to unlawfully export weapons parts"). But as *Boyd* made clear more than a century ago, searches at the border are justified by the government's interest in enforcing customs laws, not investigating violations of them. *See Boyd*, 116 U.S. at 623 (the historical right of the sovereign to identify "goods liable to duties and concealed to avoid the payment thereof" during a customs search is "totally different [] from a search of a man's private books and papers for the purpose . . . of using them as evidence against him.").

_____

    [2]  Because nothing of evidentiary value was discovered during the manual search of the phone in this case, Mr. Kolsuz has not challenged that search and limits his argument to the technology-assisted search that produced an 896-page report. *Riley*, however, would support applying the warrant requirement to all searches of a cell phone, technology-assisted or manual, because – as the government acknowledges – a manual search can ultimately reach everything covered in the 896-page report at issue here.  *See* Gov't Br. at 33.

14

Moreover, when reasonable suspicion is used to inform the scope of an exception to the warrant requirement, it may only meaningfully do so if governed by the same analysis that determines the scope of warrant exceptions generally – that is, by the existence of circumstances justifying a warrantless search. Here, the relevant exception is premised on the government's interest in interdicting contraband when it is destined for an imminent border crossing. Its interest in searching for evidence of a crime in support of a prosecution, on the other hand, is governed by traditional Fourth Amendment jurisprudence. Accordingly, if reasonable suspicion is sufficient to support a warrantless border search, that reasonable suspicion must relate to the presence of contraband in the item to be searched.[3]

It is no answer to cite, as the government does, *United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006), for the proposition that the distinction between contraband and evidence of unlawful activity "is without legal basis." *See* Gov't Br. at 37. *Gurr* made that statement in the context of recognizing that the "customs officers" before it were "authorized to search for material subject to duty or otherwise introduced

_____

[3] This is consistent with how reasonable-suspicion analysis is used elsewhere in the law. Under *Terry v. Ohio*, 392 U.S. 1 (1968), for example, reasonable suspicion that crime is afoot is sufficient for a brief investigative detention of a person, but in order for a *Terry* stop to justify a pat-down for weapons, there must be reasonable suspicion that the detainee is "armed and dangerous." 392 U.S. at 27. To require a logical connection between reasonable suspicion and the violation of privacy it supposedly authorizes is not, therefore, a "novel claim." Gov't Br. at 37.

15

illegally into the United States," and in the course of such an authorized search happened upon "evidence of crimes."  471 F.3d at 149.  It is entirely unremarkable to observe that evidence of crime discovered during a lawful search could be seized and used by the government, but that is entirely different than holding – and *Gurr* does not hold – that a border search may be predicated on a search for evidence rather than to identify contraband.[4]

> D.   The Good Faith of Law Enforcement Is Irrelevant Where, as Here, Agents Were Expanding Upon, Rather Than Acting Upon, What Had Been Specifically Authorized by Binding Precedent

The government's good-faith-of-law-enforcement argument, *see* Gov't Br. at 41-42, paints with a broad brush because it cannot withstand close scrutiny.  It is true that good faith reliance by law enforcement on binding precedent, in the case of a

---

[4]  The government also cites *United States v. Abbouchi,* 502 F.3d 850, 855 (9th Cir. 2007), for the proposition that reasonable suspicion of evidence is sufficient to support a non-routine border search.  Gov't Br at 37.  *Abbouchi*, however, made that assertion in dicta; the case had nothing to do with a reasonable-suspicion-based search because it involved a "random" search of a UPS package.  502 F.3d at 853. Moreover, the case cited by *Abbouchi* for this proposition (*United States v. Caicedo-Guarnizo*, 723 F.2d 1420 (9th Cir. 1984)) says nothing about reasonable suspicion of evidence, and in fact is about reasonable suspicion of contraband.   723 F.2d at 1422.  The remaining case cited for this point by the government, *United States v. Leininger*, 2016 WL 6476310, at *6-7 (S.D. Cal., Nov. 2, 2016), also fails to support its argument.  *Leininger* did not decide what sort of reasonable suspicion was necessary in the context of a non-routine border search ("investigatory" versus suspicion of contraband) because the forensic search of the phone in *Leininger* was conducted pursuant to a warrant, after an initial, non-forensic review had been conducted during a warrantless border search, apparently without the need for any level of suspicion.  2016 WL 6476310 at *7.

search later held to be unconstitutional, informs the cost-benefit analysis of the exclusionary rule and can allow the admission even of evidence held to have been obtained in violation of the Fourth Amendment. But the cases require not only good faith reliance on binding appellate precedent, but also that the officers did "exactly what the law at the time said" they could do. *United States v. Baker*, 719 F.3d 313, 321 (4th Cir. 2013); *see also Davis v. United States*, 564 U.S. 229, 241 (2011) (deterrent effect of exclusionary rule does not apply "when binding appellate precedent specifically *authorizes* a particular police practice" later deemed unconstitutional) (emphasis in original).

Here, the law is not so clear. The United States does not identify any cases authorizing law enforcement to do "exactly" what they did here, or "specifically authorizing [the] particular police practice" at issue. It is true that this Court had applied the border-search exception to outgoing searches (in *United States v. Oriakhi*, 57 F.3d 1290 (4th Cir. 1995)), and to post-arrest searches and searches of electronics (in *Ickes*, 393 F.3d 501), but not to an item that had been removed from the pipeline of items destined for a border crossing prior to the commencement of its search. And while this might seem like a fine distinction, in practice it is not. There is no question that the law enforcement agents here knew exactly what they were doing – they were not reviewing the phone to determine whether it could legally cross the border. Rather, they were stretching the contours of the border exception – treating it as "a

17

police entitlement" – to search for a purpose totally unrelated to interdicting contraband. The government has failed to identify any case of this Court or the Supreme Court upholding a border search in similar circumstances.

Simply put, there is no precedent specifically authorizing law enforcement to "border search" an item that has been definitively removed from the pipeline of items crossing a border prior to its search. Accordingly, if this Court deems the search that occurred in this case improper, the exclusionary rule applies.

E.    The Government Cannot Show That Any Error Was Harmless
      Beyond a Reasonable Doubt With Respect to Any of the Counts

Finally, the government's argument that the convictions on Counts Two and Three should be affirmed, even if suppression of the contents of the cell phone is warranted, takes too myopic a view of the trial evidence.[5] That is because, had the fruits of the cell phone search been excluded – particularly the exchange of text messages between Mr. Kolsuz and an alleged co-conspirator between about October 2015 and early 2016 – the trial defenses that would have been reasonably available to Mr. Kolsuz would have been far different. Indeed, absent the evidence in the chats

---

[5]  As an initial matter, the government's reference to the conviction on Count Three is incorrect because no conviction was entered on that count. J.A. 262. Count Three was dismissed at the time of sentencing on the government's motion. J.A. 11. Specifically, the government did not contest Mr. Kolsuz's argument that, on the facts presented at trial, the Double Jeopardy Clause prohibited entry of a conviction on both Counts Two and Three.

18

recovered from the iPhone – some of which explicitly discussed his contemporaneous knowledge and/or concerns about United States customs law, *see, e.g.*, J.A. 223, 224 n.11, 225, 225 n.14 – Mr. Kolsuz's trial defense might have been entirely different. In that event, the government's evidence of willfulness would have been limited to Mr. Kolsuz's knowledge of United States export laws gained during a 2012 briefing, which knowledge would have been dated by several years. That temporal gap would have increased the possibility that Mr. Kolsuz, a foreigner who speaks little or no English and is unfamiliar with American law, did not – in 2016 – clearly remember the content of the 2012 warnings. Or a factfinder could have found, absent the contemporaneous evidence found on the phone, that Mr. Kolsuz simply did not believe those warnings (a foreigner might reasonably believe that United States customs officials were attempting to extort a bribe, like officials in some foreign countries are known to do, by making up laws that do not exist). Any such defenses were largely foreclosed, however, by the contemporaneous indications found on the iPhone that Mr. Kolsuz was familiar with the United States prohibition on the unlicensed exportation of firearm parts.

Moreover, absent the evidence gained from the phone search, the government almost certainly would not have been able to pursue at trial the conspiracy charged in Count One. Without the evidence found on the phone, the evidence of conspiratorial conduct would have arisen mainly from conduct that occurred in 2012

19

and early 2013, almost entirely pre-dating the time that the conspirators had been advised of the law regarding the need for an export license with respect to items on the United States Munitions List (and thereby precluding a finding of willfulness with respect to almost all of that conduct). *See* J.A. 217-19.  And the suppression would not only have affected the ability of the government to prosecute a conspiracy charge, but also the admissibility of other evidence that was admitted only due to that charge. For example, statements made by a co-conspirator during a 2012 trip to a firearms store were admitted for their truth and used by the court below to find that Mr. Kolsuz "knew that it was generally unlawful to export firearm parts from the United States without a license." J.A. 220.[6]  Moreover, the suppression of the fruits of the iPhone search would have related not only to the content of the conversations, but also to the investigative leads the government took based on the conversations, such as its identification of invoices for parts purchased by a conspirator in anticipation of Mr. Kolsuz's trip to the United States, some of which referred specifically to firearms export laws. *See* J.A. 224 (referencing Government Trial Exhibit 39, an invoice from Lone Wolf Distributors relating to a purchase discussed in the cell phone chats).

---

[6]  Because this conversation occurred in English, which Mr. Kolsuz does not speak or understand, there can be no claim that it was admitted for its effect on the listener (the only listener whose knowledge was relevant at trial being Mr. Kolsuz). Rather, the statements were admitted as co-conspirator statements for their truth, and used against Mr. Kolsuz at trial to establish the conspirators' knowledge of the law, including Mr. Kolsuz's knowledge.

20

Considering all of the effects on the trial that would have followed suppression of the fruits of the iPhone search, the government cannot carry its burden of showing, had suppression been granted, that any error with respect to the conviction on Count Two was harmless beyond a reasonable doubt.  In any event, the government concedes that even if this Court finds any error to be harmless beyond a reasonable doubt with respect to Count Two, that holding would have no bearing on the Count One conspiracy conviction.  That is because no reasonable fact-finder could have found the conspiracy charged in the Indictment (which continued through and included Mr. Kolsuz's 2016 travel to the United States, *see* J.A. 20-21) to have existed without the evidence obtained from the iPhone.

## CONCLUSION

For the reasons stated above and those in his opening brief, this Court should reverse the judgment of the district court denying Mr. Kolsuz's motion to suppress, vacate his convictions, and remand for further proceedings.

21

Respectfully submitted,

GEREMY C. KAMENS
Federal Public Defender
for the Eastern District of Virginia


_____s/  Todd M. Richman_____
Todd M. Richman
Assistant Federal Public Defender
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Todd_Richman@fd.org

Dated May 8, 2017

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This Reply Brief of the Appellant has been prepared using WordPerfect X6 software, Times New Roman font, 14-point proportional type size.

2.      EXCLUSIVE of the corporate disclosure statement, table of contents, table of authorities, statement with respect to oral argument, any addendum containing statutes, rules, or regulations, and the certificate of service, this brief contains no more than 6,500 words, specifically 5,193 words.


I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.


<table>
<tr><td>May 8, 2017</td><td>s/  Todd M. Richman</td></tr>
<tr><td>Date</td><td>Todd M. Richman<br>Assistant Federal Public Defender</td></tr>
</table>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 8, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Heather N. Alpino, Esq.
Jeffrey M. Smith, Esq.
U.S. Department of Justice
Heather.Alpino@usdoj.gov
Jeffrey.Smith5@usdoj.gov

    s/  Todd M. Richman       
Todd M. Richman
Assistant Federal Public Defender
